

H.R. REP. 96-154, H.R. Rep. No. 154, 96TH Cong., 1ST Sess. 1979, 1979 U.S.C.C.A.N. 2317, 1979 WL 10229 (Leg.Hist.)

**\*1** P.L. 96-153, HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1979
SEE PAGE 93 STAT. 1101
HOUSE REPORT (BANKING, FINANCE AND URBAN AFFAIRS COMMITTEE)
NO. 96-154, MAY 15, 1979 (TO ACCOMPANY H.R. 3875)
SENATE REPORT (BANKING, HOUSING, AND URBAN AFFAIRS
COMMITTEE) NO. 96-145, MAY 15, 1979 (TO ACCOMPANY
S. 903)
SENATE REPORT (BANKING, HOUSING, AND URBAN AFFAIRS
COMMITTEE) NO. 96-157, MAY 15, 1979 (TO ACCOMPANY
S. 1064)
SENATE REPORT (BANKING, HOUSING, AND URBAN AFFAIRS
COMMITTEE) NO. 96-164, MAY 15, 979 (TO ACCOMPANY
S. 1149)
HOUSE CONFERENCE REPORT NO. 96-706, DEC. 13, 1979 (TO
ACCOMPANY H.R. 3875)
SENATE CONFERENCE REPORT NO. 96-496, DEC. 13, 1979 (TO
ACCOMPANY H.R. 3875)
CONG. RECORD VOL. 125 (1979)
DATES OF CONSIDERATION AND PASSAGE
HOUSE JUNE 7, DECEMBER 19, 1979
SENATE JULY 13, DECEMBER 18, 1979
THE HOUSE BILL WAS PASSED IN LIEU OF THE SENATE BILLS.
THE HOUSE REPORT (THIS PAGE) AND THE HOUSE CONFERENCE
REPORT (PAGE 2402) ARE SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR
INFORMATION ABOUT OMITTED MATERIAL.  EACH    COMMITTEE REPORT IS A SEPARATE
DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 96-154
MAY 15, 1979
**\*1 \*2317** THE COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS, TO WHOM WAS REFERRED THE BILL (H.R. 3875) TO AMEND AND EXTEND CERTAIN FEDERAL LAWS RELATING TO HOUSING, COMMUNITY AND NEIGHBORHOOD DEVELOPMENT AND PRESERVATION, AND RELATED PROGRAMS, AND FOR OTHER PURPOSES, HAVING CONSIDERED THE SAME, REPORT FAVORABLY THEREON WITH AMENDMENTS AND RECOMMEND THAT THE BILL AS AMENDED DO PASS.

\*    \*    \*    \*

**\*2** INTRODUCTION

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



THE COMMITTEE BILL, H.R. 3875, AS AMENDED, THE PROPOSED 'HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1979' CONTAINS FIVE TITLES AS FOLLOWS:

TITLE I AUTHORIZES $150 MILLION FOR SECTION 312 LOANS WHICH ALONG WITH REPAYMENTS WILL PERMIT A $245 MILLION PROGRAM LEVEL FOR FISCAL YEAR 1980; AUTHORIZES $45 MILLION FOR SECTION 701 COMPREHENSIVE PLANNING **\*2318** GRANTS FOR FISCAL YEAR 1980; AUTHORIZES AN ADDITIONAL $275 MILLION FOR FISCAL YEAR 1980 FOR THE URBAN DEVELOPMENT ACTION GRANT PROGRAM; INCREASES THE SET ASIDE IN THE COMMUNITY DEVELOPMENT BLOCK GRANT PROGRAM FOR NONENTITLEMENT METROPOLITAN CITIES FROM $250 MILLION TO $290 MILLION IN FISCAL YEAR 1980; AND MAKES OTHER IMPROVEMENTS TO THE COMMUNITY DEVELOPMENT BLOCK GRANT PROGRAM.

TITLE II WOULD AUTHORIZE FOR FISCAL YEAR 1980 $1,286,155,000 FOR LOW INCOME PUBLIC HOUSING AND SECTION 8 HOUSING ASSISTANCE. OF THIS AMOUNT, $223,142,000 IS DESIGNATED FOR THE PUBLIC HOUSING PROGRAMS OF WHICH AT LEAST $55 MILLION IS TO BE USED FOR MODERNIZING LOW INCOME PUBLIC HOUSING PROJECTS. IT ALSO CLARIFIES THAT THESE FUNDS MUST BE ALLOCATED IN ACCORDANCE WITH LOCAL HOUSING ASSISTANCE PLANS. $741,500,000 IS AUTHORIZED IN FISCAL YEAR 1980 FOR PUBLIC HOUSING OPERATING SUBSIDIES. THERE ARE ALSO PROVISIONS INCREASING TENANT CONTRIBUTIONS IN LOW INCOME PUBLIC HOUSING OF UP TO 30 PERCENT OF ANNUAL INCOME FOR PERSONS WHOSE INCOMES ARE ABOVE 50 PERCENT OF MEDIAN INCOME AND ESTABLISHES PRIORITIES IN FEDERALLY ASSISTED HOUSING FOR PERSONS LIVING IN SUBSTANDARD HOUSING AND WHO ARE INVOLUNTARILY DISPLACED. IT ALSO EXTENDS OPERATING ASSISTANCE TO FEDERAL LOW RENT PROJECTS WHOSE ORIGINAL CONTRACTS HAVE EXPIRED AND INCLUDES PROVISIONS FOR ASSURING THAT THE LOW AND MODERATE INCOME CHARACTER OF FEDERALLY ASSISTED HOUSING IS MAINTAINED.

**\*2** TITLE II WOULD EXTEND THE FHA AUTHORITY TO INSURE MORTGAGES UNDER THE NATIONAL HOUSING ACT AND INCREASES THE MAXIMUM INSURED **\*3** MORTGAGE AMOUNTS FOR SINGLE AND MOBILE HOMES BY 8 PERCENT AND FOR MOBILE HOME SITES BY 25 PERCENT. FOR MULTIFAMILY HOUSING IN HIGH COST AREAS THE AMOUNT BY WHICH MORTGAGES CAN EXCEED THE STATUTORY LIMIT HAS BEEN INCREASED FROM 50 PERCENT TO 75 PERCENT. IT ALSO EXTENDS THE GNMA AUTHORITY TO PURCHASE INSURED MULTIFAMILY MORTGAGES ASSISTED UNDER SECTION 8.

IT ALSO PROVIDES A THREE-YEAR SECTION 202 ELDERLY AND HANDICAPPED HOUSING PROGRAM AUTHORIZATION WHICH PROVIDES AN INCREASED FUNDING LEVEL OF $875 MILLION FOR FISCAL YEAR 1980, AND AN AUTHORIZATION FOR FISCAL YEAR 1980 OF $9.5 MILLION FOR THE NEIGHBORHOOD REINVESTMENT CORPORATION. IN ADDITION, THE TITLE AUTHORIZES THE SECRETARY TO INSURE CERTAIN MORTGAGES ON NEWLY-CONSTRUCTED HOMES WITH CONSUMER PROTECTION OR WARRANTY PLANS WITHOUT THE NECESSITY OF PRECONSTRUCTION APPROVAL BY THE SECRETARY AND EXEMPTS HUD-FHA INSURED MORTGAGE AND LOANS FROM STATE USURY LAWS.

TITLE IV WOULD AMEND THE INTERSTATE LAND SALES FULL DISCLOSURE ACT BY ADDING SEVERAL EXEMPTIONS FROM THE REGISTRATION AND DISCLOSURE REQUIREMENTS (INCLUDING SUBDIVISIONS OF LESS THAN **100 LOTS**) AND DELETING TWO OTHER EXEMPTIONS. THE FRAUD PROVISIONS WOULD BE EXTENDED TO ALL SUBDIVISIONS REGARDLESS OF SIZE AND WOULD COVER OMISSIONS OF MATERIAL FACT. THIS TITLE WOULD ALSO ELIMINATE DUPLICATIVE STATE AND FEDERAL REGISTRATION AND DISCLOSURE REQUIREMENTS BY CERTIFYING STATES WHOSE LAWS PROVIDE SIMILAR PROTECTION. IN ADDITION, THE TITLE WOULD: EXTEND THE STATUTE OF LIMITATIONS, PARTICULARLY FOR FRAUDULENT ACTS; GIVE HUD A MODIFIED CEASE AND DESIST POWER TO DEAL WITH FRAUDULENT SALES PRACTICES; AND INCREASE THE PENALTIES FOR CRIMINAL VIOLATIONS.

TITLE V WOULD EXTEND FUNDING AUTHORIZATIONS FOR THE FMHA RURAL HOUSING

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



ASSISTANCE PROGRAMS, ESTABLISH MAXIMUM INTEREST RATES FOR FMHA INSURED MORTGAGES AT THE SAME LEVEL AS FHA RATES, LIMIT REPAYMENT,**2319** REFINANCING AND PROPERTY DISPOSITION TERMS IN FMHA PROGRAMS, AND IMPROVE FMHA TECHNICAL AND SUPERVISORY ASSISTANCE AND THE SITE DEVELOPMENT LOAN PROGRAMS.

HEARINGS ON THE BILL WERE HELD BY THE SUBCOMMITTEE ON HOUSING AND COMMUNITY DEVELOPMENT ON MARCH 26, 27, 28, 29, 30 AND APRIL 10, 1979. THE SUBCOMMITTEE HELD MARKUP SESSIONS ON THE BILL ON APRIL 30, MAY 1 AND 2 AND APPROVED FOR FULL COMMITTEE CONSIDERATION A CLEAN BILL, H.R. 3875. THE FULL COMMITTEE CONSIDERED AND AMENDED THIS BILL DURING MARKUP SESSIONS ON MAY 8, 9 AND 10 AND ORDERED THE BILL REPORTED, AS AMENDED, ON MAY 10, 1979.


WHAT THE BILL WOULD DO


INTRODUCTION


OVERVIEW

THE COMMITTEE HAS CONTINUED THE EXAMINATION OF THE FEDERAL HOUSING AND COMMUNITY DEVELOPMENT WHICH IT BEGAN LAST YEAR. THIS EXAMINATION, UNDERTAKEN BY THE SUBCOMMITTEE ON HOUSING AND COMMUNITY DEVELOPMENT, INVOLVED EXTENSIVE ANALYTICAL WORK, FIELD INVESTIGATIONS AND HEARINGS. THROUGHOUT THIS WORK, THE COMMITTEE, PERHAPS MORE THAN EVER BEFORE, HAD TO TAKE ACCOUNT OF THE SPECTER OF INFLATION AND THE NEED FOR FISCAL RESTRAINT. THUS, IN FOCUSING ON THE ELEMENTS OF THIS BILL, THE COMMITTEE WAS MINDFUL OF THE NEED TO BALANCE PROGRAMMATIC **4** CONSIDERATIONS WITH A NATIONAL IMPERATIVE FOR AUSTERITY AND FISCAL RESTRAINT.

**3** IT IS IMPORTANT TO NOTE THAT MOST OF THE AUTHORIZATION LEVELS CONTAINED IN THIS BILL DO NOT EXCEED THE LEVELS AUTHORIZED IN PRIOR YEARS AND IN MANY INSTANCES ARE LESS. THE COMMITTEE, HOWEVER, WAS RELUCTANT TO REDUCE FUNDING AUTHORIZATIONS FOR PROGRAMS CRUCIAL TO THE HOUSING AND COMMUNITY DEVELOPMENT NEEDS OF BOTH RURAL AND URBAN AREAS. THUS, THE AUTHORIZATION LEVELS PROPOSED IN THIS BILL HAVE BEEN CAREFULLY DETERMINED IN ORDER TO MINIMIZE DETRIMENTAL IMPACTS ON THE PEOPLE AND COMMUNITIES THE PROGRAMS SERVE.

THE HOUSING AND COMMUNITY DEVELOPMENT AUTHORIZATIONS CONTAINED IN THE BILL REFLECT THE NEED FOR BUDGET RESTRAINT. AUTHORIZATIONS FOR FEDERALLY ASSISTED HOUSING PROGRAMS OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT FOR FISCAL YEAR 1980 MOST DRAMATICALLY EXEMPLIFY THE SITUATION. THE LEVELS PROPOSED IN THE BILL ARE SUFFICIENT TO FUND ONLY 300,000 UNITS OF LOW INCOME ASSISTED HOUSING, DOWN FROM THE 400,000 UNIT LEVEL PROVIDED IN PREVIOUS YEARS. THIS LEVEL, THOUGH, IS HIGHER BY 40,000 UNITS THAN THE 260,000 THAT ARE ESTIMATED TO BE ABLE TO BE REALIZED FROM THE ADMINISTRATION'S PROPOSAL. ON THE OTHER HAND, THE COMMITTEE IS INCREASING THE AUTHORIZATION FOR THE URBAN DEVELOPMENT ACTION GRANT (UDAG) PROGRAM BY $275 MILLION IN FISCAL YEAR 1980. THIS LEVEL, WHICH WAS REQUESTED BY THE PRESIDENT, SHOULD ACT TO INCREASE PRODUCTIVITY IN THE ECONOMY WHICH SHOULD MORE THAN OFFSET ITS COST.

THE COMMITTEE APPLIED ITS OVERSIGHT RESPONSIBILITIES MOST SERIOUSLY AND SCRUTINIZED IN DETAIL THE SEVERAL RURAL AND URBAN PROGRAMS COVERED IN THIS BILL. THE COMMITTEE BELIEVES THAT THIS MADE IT POSSIBLE TO INCLUDE IMPORTANT PROVISIONS IN THE BILL THAT ARE AIMED AT MAKING FULL USE OF AVAILABLE RESOURCES. THUS, THE BILL CONTAINS PROVISIONS THAT WILL PREVENT THE LOSS OF LOW AND MODERATE INCOME

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



HOUSING UNITS FROM THE *2320 LIMITED AVAILABLE INVENTORY. IN THIS RESPECT FINANCIAL ASSISTANCE IS PROVIDED FOR TROUBLED MULTIFAMILY HOUSING PROJECTS AND FOR THE CONTINUED OPERATION OF LOW INCOME HOUSING PROJECTS TO ASSURE THEIR CONTINUED AVAILABILITY AS LOW AND MODERATE INCOME HOUSING RESOURCES. BOTH IN THE RURAL AND URBAN PROGRAMS, PROVISION IS MADE FOR ASSURING THE CONTINUED USE OF ASSISTED HOUSING WHEN ACTIONS ARE TAKEN AFFECTING THEIR DISPOSITION THROUGH SALE, PREPAYMENT OF LOANS AND REFINANCING OF ORIGINAL DEBT.

IN FURTHERANCE OF ITS EFFORTS TO MAKE FULL USE OF AVAILABLE RESOURCES, THE BILL CONTAINS PROVISIONS FOR EFFECTIVELY TARGETING ASSISTANCE TO THOSE MOST IN NEED. THUS, PROVISIONS ARE INCLUDED IN BOTH THE RURAL AND URBAN PORTIONS OF THE BILL THAT RELATE THE AMOUNT OF ASSISTANCE MORE PRECISELY TO THE ABILITY OF LOW AND MODERATE INCOME FAMILIES TO MEET THEIR SHARE OF THE COSTS; TENANT SELECTION CRITERIA ARE ADJUSTED TO GIVE PRIORITY TO FAMILIES WHO ARE LIVING IN SUBSTANDARD HOUSING OR ARE BEING DISPLACED; AND IN THE RURAL PROGRAMS, AREA-BASED INCOME ELIGIBILITY LEVELS ARE ESTABLISHED FOR THE FIRST TIME TO PREVENT INEQUITIES AND THE INEFFICIENT USE OF THE ASSISTANCE PROVIDED.

*4 IN ACTIONS AFFECTING THE AVAILABILITY OF MORTGAGE CREDIT THE COMMITTEE CAREFULLY BALANCED THE NEED TO CONTINUE THE AVAILABILITY OF PROGRAMS FOR THEIR TRADITIONAL CLIENTELE WITH THE NEED TO MITIGATE HOUSING INFLATION.

A MAJOR THRUST OF THE BILL IS TO IMPROVE THE EXTENT TO WHICH CONSUMER INTERESTS ARE PROTECTED. MOST SIGNIFICANT ARE THE PROVISIONS OF *5 THE INTERSTATE LAND SALES FULL DISCLOSURE ACT IN TITLE IV WHICH EXTEND THE FRAUD PROVISIONS, STRENGTHEN THE STATE ROLE IN THIS ACTIVITY AND MAKE OTHER IMPROVEMENTS TO THIS PROGRAM, INCLUDING THE REDUCTION OF THE REGULATORY BURDEN ON SMALL DEVELOPERS.

THE COMMITTEE BELIEVES THAT THE HOUSING AND COMMUNITY DEVELOPMENT POLICIES AND PROGRAMS WILL BE SUBSTANTIALLY IMPROVED AS A RESULT OF THE PROVISIONS IN THE BILL. HOWEVER, IN VIEW OF THE FISCAL CONSTRAINT THAT GOVERNMENTS AT ALL LEVELS MUST FACT, THE COMMITTEE BELIEVES THAT EFFORTS MUST BE REDOUBLED TO MAKE THESE PROGRAMS MORE EFFICIENT AND MORE SENSITIVE TO THE NEEDS OF THOSE FAMILIES WHO LIVE IN LESS THAN ADEQUATE CIRCUMSTANCES BOTH WITH RESPECT TO THEIR HOUSING AND THEIR COMMUNITIES.

LEGISLATIVE REVIEW PROCESS

WITH THIS BILL, THE COMMITTEE HAS ACTED FOR THE FIRST TIME TO TRIGGER THE DEFERRAL PROCEDURES OF THE NEW LEGISLATIVE REVIEW PROCESS (SECTION 7(O) OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ACT OF 1965, AS AMENDED). UNDER THAT PROCESS NO RULE OR REGULATION ISSUED BY THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT CAN TAKE EFFECT UNTIL 20 DAYS AFTER ITS PUBLICATION FOR EFFECT. IF DURING THAT TIME THE COMMITTEE REPORTS OUT A RESOLUTION OF DISAPPROVAL OF ANY PART OF A RULE, THAT PART OF THE RULE CANNOT GO INTO EFFECT FOR 90 DAYS. UNDER THE COMMITTEE PROCEDURES, THE PASSAGE OF THE MOTION TO REPORT OUT H.R. 3875 ON MAY 10, 1979, HAD THE EFFECT OF REPORTING OUT A RESOLUTION OF DISAPPROVAL SINCE THAT RESOLUTION IS A PART OF THE BILL. WITH THAT ACTION THE PART OF THE RULE DISAPPROVED IS DELAYED FROM IMPLEMENTATION UNTIL AUGUST 8 (90 DAYS FROM MAY 10) UNLESS THE HOUSE *2321 REJECTS THAT SECTION OF THE BILL PRIOR TO THAT DATE. IN THAT EVENT THE DISAPPROVED PART OF THE RULE CAN GO INTO IMMEDIATE EFFECT.

THE COMMITTEE'S MOST EXTENSIVE EXPERIENCE WITH THE NEW PROCEDURE, HOWEVER, HAS BEEN WITH THE REVIEW OF RULES AND REGULATIONS PRIOR TO THEIR PUBLICATION FOR

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



COMMENT. THE REVIEW PROCESS GIVES THE COMMITTEE THE OPPORTUNITY TO REVIEW ANY RULE OR REGULATION, WHICH IT HAS IDENTIFIED FROM A REQUIRED SEMIANNUAL AGENDA OF RULE MAKING, FOR FIFTEEN DAYS BEFORE THE RULE OR REGULATION IS PUBLISHED FOR COMMENT. THIS PROCEDURE HAS BEEN HELPFUL IN DEVELOPING A CLOSER AND MORE COOPERATIVE RELATIONSHIP BETWEEN THE COMMITTEE AND THE DEPARTMENT. THE COMMITTEE WISHES TO EXPRESS ITS GRATITUDE TO THE SECRETARY AND HER STAFF FOR THE GRACIOUSNESS AND EASE WITH WHICH THEY HAVE WORKED WITH THE COMMITTEE.

  HOWEVER, THE PROCESS HAS HIGHLIGHTED A NUMBER OF CONCERNS ABOUT THE DEPARTMENT'S RULE MAKING PROCEDURES. INITIALLY, THE COMMITTEE BECAME CONCERNED BY THE WIDE VARIETY OF TYPES OF RULE MAKING ACTIVITIES. THERE ARE 'FINAL RULES ', 'INTERIM RULES', 'NOTICES', 'PROCEDURES', 'GUIDELINES', 'HANDBOOKS ', 'NOTICES OF POLICY CLARIFICATION', AND 'INVITATIONS TO COMMENT AND ADOPTION OF STANDARDS' TO NAME A FEW. THERE ARE ALSO A NUMBER OF LESS FORMAL DOCUMENTS GOVERNING THE SUBSTANTIVE EXECUTION OF THE LAWS. IT IS UNCLEAR TO THE COMMITTEE ON WHAT BASIS THE DEPARTMENT DETERMINES WHICH OF THESE ISSUANCE FORMS TO FOLLOW. IT APPEARS THAT EACH OFFICE OF THE DEPARTMENT HAS DIFFERENT CRITERIA FOR MAKING THOSE DETERMINATIONS. THE COMMITTEE'S CONCERN IS NOT AN IDLE ONE. THE DETERMINATION OF UNDER WHAT GUISE A RULE IS ISSUED AFFECTS BOTH THE APPLICABILITY OF THE NEW PROCEDURE, AND MORE IMPORTANTLY, WHETHER THE PUBLIC HAS THE ABILITY TO COMMENT UPON THE SUBSTANTIVE POLICY DETERMINATIONS *6 OF THE DEPARTMENT. IT IS CLEAR TO THE COMMITTEE THAT SOME MATERIALS THAT SHOULD, AS A MATTER OF LAW OR POLICY, BE PUBLISHED IN THE FEDERAL REGISTER HAVE NOT BEEN PUBLISHED OR MADE AVAILABLE FOR PUBLIC COMMENT. IN SOME CASES PUBLISHED REGULATIONS HAVE DONE NOTHING BUT RESTATE LEGISLATIVE LANGUAGE; CRUCIAL DEPARTMENTAL PROCEDURES FOR IMPLEMENTING THOSE LAWS HAVE BEEN RELEGATED TO HANDBOOKS OR GUIDELINES WHICH ARE NOT SUBJECTED TO THE HEALTHY AND NECESSARY PUBLIC COMMENT PROCESS. THE PUBLIC'S RIGHT TO KNOW AND TO BE INVOLVED IN THE RULE MAKING PROCESS MUST BE PRESERVED IF THE DEPARTMENT'S POLICIES ARE TO BE ACCEPTED BY THAT PUBLIC. THE CONFUSION WHICH APPEARS TO MARK THE RULE MAKING PROCESS MUST BE PRESERVED IF THE DEPARTMENT'S POLICIES ARE TO BE ACCEPTED BY THAT PUBLIC. THE CONFUSION WHICH APPEARS TO MARK THE RULE MAKING PROCESS IS TROUBLING TO THE COMMITTEE. THE COMMITTEE IS CERTAIN THAT THE SECRETARY SHARES THIS CONCERN. IT TRUSTS THAT SHE WILL TAKE IMMEDIATE STEPS TO BRING GREATER RATIONALITY TO THE PROCESS AND TO ASSURE THAT THE PUBLIC'S RIGHTS ARE PRESERVED. IT APPEARS TO THE COMMITTEE THAT IF THERE IS TO BE ANY BIAS IN THIS PROCESS IT MUST BE ON THE SIDE OF THE PUBLIC'S RIGHT TO KNOW AND PARTICIPATE IN THE RULE MAKING PROCESS.

TITLE I

SECTION 312 REHABILITATION LOANS

  *5 THE COMMITTEE HAS AUTHORIZED AN ADDITIONAL $150 MILLION FOR THE SECTION 312 REHABILITATION LOAN PROGRAM FOR FISCAL YEAR 1980, $20 MILLION ABOVE THE ADMINISTRATION'S REQUEST. TOGETHER WITH RECAPTURED AUTHORITY AND CARRYOVER FUNDS, THE CO
MMITTEE ESTIMATES THAT $245 MILLION WILL BE AVAILABLE FOR THE PROGRAM IN FISCAL YEAR 1980. THE COMMITTEE*2322 HAS ALSO DIRECTED THAT NO MORE THAN $50 MILLION BE USED FOR MULTIFAMILY REHABILITATION LOANS. THIS AMOUNT WILL MAINTAIN THE SAME

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



PROPORTION OF SECTION 312 MULTIFAMILY LOAN ASSISTANCE AS WAS PROVIDED BY THE CONGRESS LAST YEAR. THE COMMITTEE WISHES, AGAIN, TO EMPHASIZE THAT IT VIEWS THIS IMPORTANT REHABILITATION PROGRAM ESSENTIALLY AS A SINGLE FAMILY PROGRAM. IT DOES NOT INTEND TO SHIFT THE PROGRAM AWAY FROM THAT FOCUS ALTHOUGH IT HAS PROVIDED AUTHORITY FOR THE SECRETARY TO USE SOME OF THE FUNDS AUTHORIZED FOR MULTIFAMILY STRUCTURES UNDER VERY SPECIAL CIRCUMSTANCES.

COMPREHENSIVE PLANNING

   THE COMMITTEE WISHES TO REAFFIRM ITS VIEW THAT COMPREHENSIVE PLANNING IS NECESSARY TO ASSIST IN THE DEVELOPMENT OF SUCCESSFUL COMMUNITY DEVELOPMENT AND HOUSING STRATEGIES. IT IS FOR THIS REASON THAT THE COMMITTEE HAS PROVIDED A FUNDING LEVEL THAT IS $5 MILLION OVER THE ADMINISTRATION'S REQUEST FOR FISCAL YEAR 1980. THE COMMITTEE IS CONCERNED, HOWEVER, THAT THE SECRETARY IS DIRECTING THE PROGRAM IN A WAY WHICH DOES NOT FULLY CONSIDER STATE AND LOCAL PLANNING ASSISTANCE NEEDS AND WHICH MAY BE INCONSISTENT WITH CONGRESSIONAL INTENT. WHILE THE COMMITTEE SUPPORTS EFFORTS TO ACHIEVE NATIONAL URBAN POLICY OBJECTIVES, IT IS CONCERNED THAT ONE EFFECT OF THE CURRENT THRUST OF THE PROGRAM MAY WELL BE TO REMOVE ONE OF THE FEW COMPREHENSIVE PLANNING RESOURCES AVAILABLE TO STATES AND LOCAL GOVERNMENTS AS WELL AS REGIONAL PLANNING AGENCIES. AS IT STANDS, FUNDING AUTHORIZATIONS FOR THIS IMPORTANT PLANNING FUNCTION HAVE BEEN REDUCED FROM $150 MILLION IN 1976 TO LESS THAN ON-THIRD OF THAT AMOUNT FOR 1980. MANY IMPORTANT **\*7** ACTIVITIES THAT WERE ONCE FUNDED UNDER THIS PROGRAM SIMPLY ARE NOT BEING UNDERTAKEN BY STATE, REGIONAL AND LOCAL AGENCIES. AT A TIME WHEN MANAGEMENT CAPACITY AT ALL LEVELS OF GOVERNMENT NEED STRENGTHENING TO ASSURE THE EFFICIENT USE OF LIMITED HOUSING AND COMMUNITY DEVELOPMENT FUNDS, THIS FUNCTION, TOO, SEEMS TO BE DE-EMPHASIZED BY THE DEPARTMENT. THE COMMITTEE URGES THE SECRETARY TO CAREFULLY ASSESS STATE AND LOCAL PLANNING NEEDS AND, BASED UPON SUCH AN ASSESSMENT, MAKE REGULATORY CHANGES AND RECOMMEND TO THE CONGRESS, PRIOR TO THE NEXT LEGISLATIVE SESSION, SUCH MEASURES AS MAY BE REQUIRED TO STRENGTHEN THE 701 COMPREHENSIVE PLANNING ASSISTANCE PROGRAM.

COMMUNITY DEVELOPMENT

COMMUNITY DEVELOPMENT BLOCK GRANTS

   THE COMMITTEE HAS INCREASED THE STATUTORY SET-ASIDE FOR NONENTITLEMENT METROPOLITAN CITIES IN FISCAL YEAR 1980 FROM $250 MILLION TO $290 MILLION. IN 1977 WHEN THE $250 MILLION SET-ASIDE WAS ESTABLISHED, IT WAS THE COMMITTEE'S EXPECTATION THAT AN ADDITIONAL $60 MILLION WOULD BE AVAILABLE FOR THESE COMMUNITIES. THESE ADDITIONAL FUNDS WERE EXPECTED TO BE LEFT OVER OUT OF THE METROPOLITAN AREA ALLOCATION AFTER FUNDING THE ENTITLEMENT COMMUNITIES. HOWEVER, DUE TO THE INCREASED NUMBER OF ENTITLEMENT COMMUNITIES, IT NOW APPEARS THAT NONE OF THESE ADDITIONAL FUNDS WILL BE AVAILABLE IN FISCAL YEAR 1980. THEREFORE, IN ORDER TO FORESTALL AN ACTUAL DECREASE BETWEEN FISCAL YEAR 1979 AND FISCAL YEAR 1980 IN FUNDS AVAILABLE TO SMALL METROPOLITAN COMMUNITIES, THE COMMITTEE INCREASED THE SET-ASIDE BY $40 MILLION.
   **\*6 \*2323** IN ORDER TO IMPLEMENT THIS INCREASED SET-ASIDE AND TO MAKE OTHER

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



NECESSARY ADJUSTMENTS, THE COMMITTEE HAS EXTENDED THROUGH FISCAL YEAR 1980 THE SECRETARY'S AUTHORITY TO MAKE REALLOCATIONS THROUGH PRORATA REDUCTIONS IN ALL GRANTS. HOWEVER, THE COMMITTEE BELIEVES THAT IT WOULD BE INAPPROPRIATE TO SHIFT TO THE NONMETRO AND ENTITLEMENT CITIES THE FULL BURDEN OF MAKING UP THE $40 MILLION DEFICIENCY IN FUNDS FOR SMALL METRO CITIES. ONE OF THE STATUTORY PURPOSES OF THE SECRETARY'S 3 PERCENT DISCRETIONARY FUND IS TO CORRECT FOR INADEQUACIES RESULTING FROM THE BASIC DISTRIBUTION AND ALLOCATION SYSTEM-- PRECISELY THE SITUATION AFFECTING THE SMALL METRO CITIES. THE COMMITTEE THUS INSTRUCTS THE SECRETARY TO UTILIZE AT LEAST $15 MILLION AND PREFERABLY UP TO $20 MILLION OF FUNDS IN THE 3 PERCENT DISCRETIONARY FUND FOR THIS PURPOSE.

THE COMMITTEE HAS ALSO REMOVED SOME OF THE RESTRICTIONS ON THE SECRETARY'S ABILITY TO WAIVE ALL OR PART OF THE PROGRAM SUMMARY, FORMULATION, AND DESCRIPTION REQUIREMENTS FOR CITIES APPLYING FOR SINGLE PURPOSE GRANTS. PREVIOUSLY, ONLY NONURBANIZED CITIES OF LESS THAN 25,000 WOULD BE ABLE TO HAVE THESE APPLICATION REQUIREMENTS WAIVED. BY REMOVING THIS LIMITATION, THE COMMITTEE ANTICIPATES THAT CONSIDERABLE UNNECESSARY PAPER WORK CAN BE ELIMINATED THROUGH THE JUDICIOUS USE OF THE WAIVER AUTHORITY.

THE BILL ALSO PROVIDES LANGUAGE TO CLARIFY THE AUTHORITY OF THE SECRETARY TO DELEGATE TO LOCAL GOVERNMENTS HER RESPONSIBILITY OVER THE CONDUCT OF ENVIRONMENTAL REVIEWS. THERE HAS BEEN SOME CONFUSION OVER WHETHER THE SECRETARY HAS THE AUTHORITY TO DELEGATE SUCH AUTHORITY WITH REGARD TO ACTS OTHER THAN THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969 (NEPA). SPECIFICALLY, THE COMMITTEE WISHES TO MAKE CLEAR THAT DELEGATIONS CAN ALSO BE MADE WITH REGARD TO THE NATIONAL HISTORIC **\*8** PRESERVATION ACT OF 1966, COASTAL ZONE MANAGEMENT ACT OF 1972, WILD AND SCENIC RIVERS ACT, FLOOD DISASTER PROTECTION ACT AND CLEAN AIR ACT, AS WELL AS OTHER ACTS WHICH FURTHER THE PURPOSES OF THE NEPA.

URBAN DEVELOPMENT ACTION GRANT

THE COMMITTEE HAS INCREASED THE AUTHORIZATION LEVEL FOR THE HIGHLY PROMISING URBAN DEVELOPMENT ACTION GRANT PROGRAM BY $275 MILLION IN FISCAL YEAR 1980. THIS INCREASE WAS REQUESTED BY THE PRESIDENT AND IS A KEY ELEMENT OF HIS URBAN POLICY INITIATIVES. THE COMMITTEE REALIZES THAT THIS IS A SIZEABLE INCREASE FOR A PROGRAM SO NEW, HOWEVER, IT IS THE COMMITTEE'S FIRM BELIEF THAT THIS INCREASE IS NOT ONLY DESIRABLE BUT NECESSARY. THE UDAG PROGRAM PRESENTS A UNIQUE OPPORTUNITY FOR THE FEDERAL GOVERNMENT. IT ACTS AS A CATALYST FOR SIGNIFICANT CAPITAL INVESTMENT IN SOME OF THE MOST DISTRESSED COMMUNITIES IN THE NATION. ACCORDING TO HUD'S FIGURES, THE PROGRAM HAS INDUCED AN AVERAGE OF 6 TIMES AS MUCH PRIVATE INVESTMENT AS IT PROVIDES IN GRANTS. TO DATE, ON AN INVESTMENT OF $738 MILLION IN PUBLIC FUNDS, PRIVATE COMMITMENTS OF OVER $4.5 BILLION HAVE BEEN GENERATED. HUD ESTIMATES THAT THE PROJECTS FUNDED SO FAR WILL PRODUCE ALMOST 172,000 PERMANENT FULL TIME JOBS AT THE ASTOUNDINGLY LOW COST OF $4.243 PER JOB IN FEDERAL FUNDS AND WILL PRESERVE ABOUT 78,000 ADDITIONAL JOBS. (UNDER THE CETA PROGRAMS THE COST PER JOB IS APPROXIMATELY $10,000.) THERE WILL ALSO BE APPROXIMATELY 116,000 CONSTRUCTION JOBS GENERATED BY THESE GRANTS. THESE FIGURES ARE EVEN MORE IMPRESSIVE WHEN ONE REALIZES THAT THE INVESTMENT AND JOB CREATION AND PRESERVATION IS TAKING PLACE IN THE NATION'S MOST **\*2324** DISTRESSED COMMUNITIES. IN THE TWO YEARS OF ITS EXISTENCE THE PROGRAM HAS BEEN SUCCESSFUL IN GENERATING A PROCESS OF PUBLIC AND PRIVATE PARTNERSHIP AIMED AT THE REJUVENATION OF THE NATION'S MOST DISTRESSED CITIES. THE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



PROGRAM'S POPULARITY AND EFFECT CAN BE SEEN BY THE FACT THAT AT THE CURRENT TIME THERE ARE ALMOST $500 MILLION WORTH OF ELIGIBLE GRANT APPLICATIONS COMPETING FOR THE ROUGHLY $25 MILLION IN GRANT FUNDS TO BE DISTRIBUTED IN THE NEXT ROUND OF GRANT AWARDS.

TITLE II-- HOUSING ASSISTANCE PROGRAMS

ASSISTED HOUSING

*7 THE MOST DIFFICULT DELIBERATIONS MADE BY THE COMMITTEE THIS YEAR FOCUSED ON THE ASSISTED HOUSING PROGRAMS. THIRTY YEARS AGO, THE CONGRESS MADE A COMMITMENT TO A DECENT HOME AND A SUITABLE LIVING ENVIRONMENT FOR EVERY AMERICAN, AND IN EACH YEAR SINCE THE PASSAGE OF THE HOUSING ACT OF 1949, THE CONGRESS HAS RECOMMITTED ITSELF TO THAT GOAL. THESE PAST THIRTY YEARS HAVE BEEN A PERIOD OF REMARKABLE GROWTH AND SUCCESS IN HOUSING. THE STOCK OF HOUSING HAS NEARLY DOUBLED WHILE AT THE SAME TIME THE NATION HAS SEEN THE NUMBER OF SUBSTANDARD HOUSING UNITS FALL FROM 35.5 PERCENT OF THE HOUSING STOCK TO LESS THAN 5 PERCENT. THOUGH WE HAVE MADE GREAT STRIDES, WE WILL HAVE MUCH TO DO. IT IS ESTIMATED THAT THERE ARE CURRENTLY 14.2 MILLION AMERICAN HOUSEHOLDS LIVING IN SUBSTANDARD CONDITIONS OR SEVERELY OVER BURDENED BY HOUSING COSTS. ALMOST 10 MILLION OF THESE HOUSEHOLDS LIVE IN RENTAL HOUSING AND HAVE LITTLE OR NO CONTROL OVER THEIR HOUSING CONDITIONS. WITH THE ENACTING OF THE LANDMARK HOUSING AND COMMUNITY DEVELOPMENT ACT IN 1974, THE CONGRESS REDEDICATED ITSELF TO MEETING THE NEEDS *9 OF THESE FAMILIES. IN THE FIRST FOUR YEARS AFTER THE PASSAGE OF THAT ACT, WE AUTHORIZED SUFFICIENT FUNDING TO PROVIDE ASSISTANCE FOR 1,600,000 FAMILIES AT AN ANNUAL RATE OF 400,000 ADDITIONAL FAMILIES ASSISTED. BUT EVEN AT THAT RATE, IT WOULD TAKE ALMOST 25 YEARS BEFORE OUR COMMITMENT COULD BE FULFILLED. THE DILEMMA FACING THE COMMITTEE, HOWEVER, IS THAT THE COST OF PROVIDING THIS ASSISTANCE IS VERY HIGH. BECAUSE THE HOUSING PROGRAMS ARE FOCUSED UPON MAKING HOUSING AVAILABLE TO FAMILIES IN NEED OVER AN EXTENDED PERIOD, THE FEDERAL GOVERNMENT COMMITS ITSELF TO A SERIES OF EXPENDITURES OVER PERIODS AS LONG AS FORTY YEARS. THESE OBLIGATIONS ARE EXPECTED TO TOTAL, BY THE END OF FISCAL YEAR 1980, OVER $230 BILLION, OR MORE THAN HALF OF ALL FEDERAL OBLIGATIONS. THE ANNUAL COST IS NOT INCONSIDERABLE EITHER. TO ASSURE THE CONSTRUCTION OF A NEW SECTION 8 HOUSING UNIT, IT IS NECESSARY FOR THE FEDERAL GOVERNMENT TO COMMIT AN ANNUAL SUBSIDY AVERAGING APPROXIMATELY $4,900 OVER THE CONTRACT PERIOD. IN THE FIRST YEAR OF OCCUPANCY, EVEN AFTER SUBTRACTING THE CONTRIBUTION OF THE TENANT, THE SUBSIDY WOULD BE, IN GENERAL, NO LESS THAN $2,900 FOR SUCH A UNIT.

IT IS IN THIS CONTEXT THAT THE COMMITTEE HAS ACTED. THE NEED FOR ASSISTED HOUSING IS AS CLEAR AS THE PRICE THAT ONE MUST PAY TO FILL IT. IT WAS THE COMMITTEE'S JUDGMENT THAT IN THIS YEAR OF FISCAL RESTRAINT A TEMPORARY REDUCTION IN THE NUMBER OF FAMILIES TO BE ASSISTED WAS NECESSARY. HOWEVER, THE COMMITTEE BELIEVES FIRMLY THAT WE MUST MAINTAIN OUR COMMITMENT TO THE AMERICAN PEOPLE MADE THIRTY YEARS AGO. AND WE MUST NEVER LOSE SIGHT OF THE FACT THAT WE HAVE MUCH LEFT TO DO.

*2325 AUTHORIZATION FOR LOW-INCOME HOUSING

FUNDING LEVELS

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



THE COMMITTEE HAS PROVIDED, SUBJECT TO APPROPRIATION, $1,286,155,000 IN ANNUAL CONTRACT AUTHORITY FOR THE ASSISTED HOUSING PROGRAMS IN FISCAL YEAR 1980. OF THIS AMOUNT, NOT MORE THAN $223,142,000 OF ANNUAL CONTRACT AUTHORITY WILL BE AVAILABLE FOR THE TRADITIONAL PUBLIC HOUSING PROGRAM, INCLUDING NOT LESS THAN $55,000,000 FOR MODERNIZATION. THE REMAINING $1,063,013,000 OF ANNUAL CONTRACT AUTHORITY WILL BE AVAILABLE FOR THE SECTION 8 PROGRAM.

**\*8** THIS AUTHORIZATION LEVEL IS APPROXIMATELY $145 MILLION ABOVE THE ADMINISTRATION'S REQUEST. THE ADMINISTRATION, IN JUSTIFYING ITS REQUEST STATED THAT IT WOULD BE SUFFICIENT TO FUND APPROXIMATELY 300,000 ADDITIONAL UNITS OF HOUSING IN FISCAL YEAR 1980. HOWEVER, DUE TO UNANTICIPATED INFLATION, OVERLY OPTIMISTIC COST-SAVINGS PROJECTIONS AND THE LACK OF ALLOWANCES FOR AMENDMENTS TO PRIOR YEARS CONTRACTS, THE COMMITTEE ESTIMATED THAT ONLY 260,000 UNITS WOULD BE FUNDABLE OUT OF THE REQUEST. THIS LEVEL WOULD BE 100,000 UNITS BELOW THE LEVEL ESTIMATED FOR THE CURRENT FISCAL YEAR OR A REAL CUT OF 28 PERCENT IN ACTIVITY. WITH THE ADDITION OF THE $145 MILLION BY THE COMMITTEE, IT IS ESTIMATED THAT AN ACTIVITY LEVEL OF 300,000 UNITS WILL BE POSSIBLE. EVEN THIS LEVEL, HOWEVER, IS WELL BELOW THE ESTIMATED 360,000 UNITS TO BE ASSISTED DURING THE CURRENT FISCAL YEAR AND THE 400,000 UNITS PROVIDED FOR IN PREVIOUS YEARS.

INDIAN HOUSING

THE EFFECTS OF THIS CUT CAN BE SEEN GRAPHICALLY BY LOOKING AT THE DIFFICULTIES BEING FACED IN THE HUD INDIAN HOUSING PROGRAM. IN 1969 **\*10** THE DEPARTMENT COMMITTED ITSELF TO A GOAL OF PROVIDING 6,000 ASSISTED HOUSING UNITS PER YEAR TO HELP MEET THE PRESSING NEEDS FOR HOUSING ON INDIAN RESERVATIONS. HOWEVER, IN THE ALMOST 10 YEARS WHICH HAVE PASSED SINCE THE COMMITMENT WAS MADE, THIS GOAL HAS NEVER BEEN REACHED. IN FACT, OVER THOSE 10 YEARS, THE NUMBER OF FAMILIES WHO LIVE IN SUBSTANDARD HOUSING HAS GROWN RATHER THAN DECLINED. ACCORDING TO A RECENT GAO REPORT, ALMOST 60 PERCENT OF ALL INDIAN FAMILIES LIVE IN SUBSTANDARD CONDITIONS. YET, AS A DIRECT CONSEQUENCE OF THE REDUCED FUNDING LEVEL FOR ALL ASSISTED HOUSING, THE DEPARTMENT PROJECTS THAT IT WILL COMMIT FUNDS FOR ONLY 4,000 UNITS OF HOUSING ON INDIAN RESERVATIONS IN FISCAL YEAR 1980. THE FUNDING LEVEL FOR INDIAN HOUSING, HOWEVER, IS ONLY ONE OF THE PROBLEMS BESETTING THIS PROGRAM. CLEARLY, THERE ARE ADMINISTRATIVE DIFFICULTIES. HUD HAS YET TO FULLY RECOGNIZE THE SPECIAL NEEDS AND CIRCUMSTANCES OF INDIAN TRIBES AND FAMILIES. AND MANY OF THE INDIAN HOUSING AUTHORITIES HAVE YET TO FULLY DEVELOP THE EXPERTISE NECESSARY TO SUCCESSFULLY CONSTRUCT AND OPERATE THE HOUSING FINANCED THROUGH THE HUD PROGRAMS. THERE ARE ALSO PROBLEMS WITH COORDINATION BETWEEN HUD, THE BUREAU OF INDIAN AFFAIRS, THE INDIAN HEALTH SERVICE, THE TRIBAL COUNCILS, AND THE INDIAN HOUSING AUTHORITIES. THE COMMITTEE RECOGNIZES THE DIFFICULT AND COMPLEX NATURE OF DEVELOPING SOLUTIONS TO THESE PROBLEMS. HOWEVER, THE COMMITTEE BELIEVES THAT THE DEPARTMENT CAN AND MUST TAKE ACTION TO IMPROVE COORDINATION WITH THE INDIAN HOUSING AUTHORITIES AND WITH THE OTHER AGENCIES CONCERNED WITH INDIAN HOUSING. THEREFORE, THE COMMITTEE DIRECTS **\*2326** THE SECRETARY TO AT LEAST MAINTAIN THE LEVEL OF PERSONNEL NOW ACTIVE WITH THE INDIAN HOUSING PROGRAMS IN ORDER TO ASSIST IN THAT PROCESS. ADDITIONALLY, THE COMMITTEE BELIEVES THAT THESE PERSONNEL SHOULD DIRECT ATTENTION TOWARD ACHIEVING THE ORIGINAL 6,000 UNIT GOAL BY

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



INCREASING THE LEVEL OF HOUSING CONSTRUCTION STARTS FROM RESERVATIONS NOW IN THE PIPELINE AND THUS INCREASE THE NUMBER OF INDIAN FAMILIES ABLE TO RECEIVE ASSISTANCE. BECAUSE OF ITS OWN CONCERN, THE COMMITTEE IS CURRENTLY UNDERTAKING A CAREFUL REVIEW OF THE PROGRAM TO DETERMINE IF LEGISLATIVE ACTION IS NECESSARY TO ASSIST IN THE DEVELOPMENT OF SOLUTIONS TO THE VERY PRESSING PROBLEMS OF INDIAN HOUSING.

### STATE AGENCIES

 **\*9** AT A TIME OF REDUCED FUNDING, THE COMMITTEE BELIEVES THE DEPARTMENT MUST IMPROVE THE EFFICIENCY OF ITS ASSISTED HOUSING DELIVERY MECHANISMS. IN THIS REGARD, THE COMMITTEE RECOGNIZE THE SIGNIFICANT ROLE PLAYED BY STATE HOUSING FINANCE AGENCIES IN PROVIDING CONSTRUCTION AND PERMANENT FINANCING FOR SECTION 8 PROJECTS SINCE THE PROGRAM'S INCEPTION. ON A CUMULATIVE BASIS, 34 PERCENT OF SECTION 8 STARTS ARE ON PROJECTS FUNDED BY SUCH AGENCIES. IN ALLOCATING FUNDS IN FISCAL YEAR 1980, THE COMMITTEE INSTRUCTS HUD, TO THE EXTENT FEASIBLE IN LIGHT OF THE FISCAL YEAR 1980 ALLOCATION, TO CONTINUE ITS PAST PRACTICE OF SETTING ASIDE SECTION 8 FUNDS FOR UTILIZATION BY STATE HOUSING FINANCE AGENCIES IN RECOGNITION OF THE NEED FOR THESE AGENCIES TO HAVE A CONSISTENT FUNDING LEVEL IN VIEW OF THEIR NECESSITY TO MAINTAIN STAFF AND OPERATIONAL CAPACITY ON A CONTINUING BASIS.

### CONTRACT TERMS

 THE COMMITTEE HAS BECOME CONCERNED BY THE HUGE LEVEL OF FUTURE OBLIGATIONS ASSOCIATED WITH THE SECTION 8 PROGRAM. THE COMMITTEE BELIEVES **\*11** THAT IT IS UNNECESSARY TO ENTER INTO CONTRACTS WHICH EXTEND FOR MUCH AS FORTY YEARS UNDER THIS PROGRAM, PARTICULARLY WHERE THE FINANCING FOR PROJECTS IS PROVIDED THROUGH STATE OR LOCAL GOVERNMENT AGENCIES. THE COMMITTEE, THEREFORE, INSTRUCTS THE SECRETARY TO ENTER INTO CONTRACTS AVERAGING NO MORE THAN 30 YEARS IN THE CASE OF PROJECTS FINANCED BY STATE HOUSING FINANCE AGENCIES. THE COMMITTEE WISHES TO MAKE CLEAR, HOWEVER, THAT CONTRACTS OF LONGER THAN 30 YEARS ARE STILL PERMITTED, AS LONG AS THE AVERAGE TERM ON ALL SUCH PROJECTS IS NO MORE THAN 30 YEARS. ADDITIONALLY, IN THE CASE PROJECTS FINANCED THROUGH THE PROVISIONS OF SECTION 11(B) OF THE U.S. HOUSING ACT OF 1937, THE COMMITTEE DIRECTS THE SECRETARY TO ENTER INTO CONTRACTS OF NO GREATER THAN 20 YEARS IN DURATION.

### HOUSING ASSISTANCE PLAN

 HOUSING ASSISTANCE FUNDS, AS IN PAST YEARS, ARE TO BE DISTRIBUTED IN ACCORDANCE WITH LOCALLY DEVELOPED HOUSING ASSISTANCE PLANS (HAP). THESE PLANS SET OUT THE COMMUNITY'S GOALS ALONG TWO IMPORTANT DIMENSIONS-- H
OUSEHOLD TYPE (FAMILY, LARGE FAMILY AND ELDERLY FAMILY) AND HOUSING TYPE (NEW CONSTRUCTION, SUBSTANTIAL REHABILITATION AND EXISTING). THE HAP'S IN AGGREGATE PROVIDE THE BASIS FOR DETERMINING THE MIX OF HOUSING ASSISTANCE PROGRAMS. FOR THE NEXT FISCAL YEAR, IT IS ESTIMATED THAT THE HAPS WOULD REQUIRE 66 PERCENT OF THE UNITS TO BE ASSISTED TO BE EITHER NEWLY CONSTRUCTED OR SUBSTANTIALLY REHABILITATED WITH ONLY 34 PERCENT BEING IN EXISTING HOUSING. GIVEN THE COMMITTEE'S DESIRE**\*2327** TO HOLD DOWN THE HIGH COST OF THE ASSISTED HOUSING PROGRAM, THIS MIX

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



HAS CAUSED SOME CONCERN. THE COST OF ASSISTING A FAMILY IN EXISTING HOUSING IS ROUGHLY ONE HALF THAT OF ASSISTING THAT FAMILY IN A NEWLY CONSTRUCTED OR SUBSTANTIALLY REHABILITATED UNIT. CLEARLY, BY DEPENDING MORE HEAVILY ON EXISTING HOUSING, MANY MORE FAMILIES COULD BE ASSISTED. HOWEVER, WHILE THE COMMITTEE WOULD LIKE TO SEE GREATER EMPHASIS PLACED BY COMMUNITIES ON EXISTING HOUSING, IT DOES NOT WANT TO LEGISLATE THIS AT THE EXPENSE OF THE LOCAL INITIATIVE INVOLVED IN THE FORMULATION OF THE HOUSING ASSISTANCE PLAN. THESE PLANS PROVIDE THE SINGLE MOST IMPORTANT LINK BETWEEN LOCAL COMMUNITY DEVELOPMENT EFFORTS AND THE NATION'S ASSISTED HOUSING PROGRAMS. THIS LINKAGE IS CRUCIAL TO MEETING OVER THE LONG TERM, BOTH THE HOUSING AND COMMUNITY DEVELOPMENT NEEDS OF THE NATION'S CITIES. THE COMMITTEE ALSO CONTINUES TO BELIEVE THAT LOCAL OFFICIALS ARE GENERALLY BETTER ABLE TO EVALUATE THE HOUSING NEEDS AND GOALS OF THEIR COMMUNITIES THAN IS THE FEDERAL GOVERNMENT. ANY STATUTORY REQUIREMENT FOR THE GREATER USE OF EXISTING HOUSING WOULD MAKE A SHAM OF THE LOCAL DISCRETION THE COMMITTEE HAS WORKED HARD TO INCORPORATE INTO BOTH THE HOUSING AND COMMUNITY DEVELOPMENT PROGRAMS. IT IS FOR THESE REASONS THAT THE COMMITTEE HAS CHOSEN TO REEMPHASIZE THE REQUIREMENT THAT HOUSING ASSISTANCE FUNDS MUST BE DISTRIBUTED IN ACCORDANCE WITH THE HAPS. THE COMMITTEE BELIEVES, HOWEVER, THAT THE FORMULATION OF THE HAPS BY LOCAL COMMUNITIES CAN MORE DIRECTLY REFLECT THE RESOURCES AT HAND. IN THIS REGARD, THE COMMITTEE EXPECTS THE DEPARTMENT TO WORK WITH LOCAL OFFICIALS TO ASSIST THEM IN SETTING REALISTIC GOALS WITHIN THE CONSTRAINTS OF THE AVAILABLE HOUSING ASSISTANCE BUDGET.

PUBLIC HOUSING

NEW CONSTRUCTION

   **\*10** THE COMMITTEE HAS STATUTORILY LIMITED TO $223 MILLION THE FUNDS AVAILABLE FOR PUBLIC HOUSING. IT HAS DONE SO BECAUSE OF ITS GREAT CONCERN **\*12** OVER THE LACK OF PROGRESS THE DEPARTMENT HAS MADE IN REDUCING THE BACKLOG OF FUNDED PROJECTS WHICH HAVE YET TO COMMENCE CONSTRUCTION. THE DEPARTMENT ESTIMATES THAT BY THE END OF FY 1979 OVER 138,000 PUBLIC HOUSING UNITS WILL BE AWAITING CONSTRUCTION, MORE THAN DOUBLE THE 62,000 UNITS UNSTARTED AT THE END OF 1977. THE CURRENT BACKLOG IS EQUAL TO ALMOST 3 YEARS WORTH OF UNIT RESERVATIONS. BEFORE EXPANDING THE PROGRAM BEYOND THE CURRENT LEVEL, THE COMMITTEE BELIEVES THAT THIS BACKLOG MUST BE REDUCED. WHAT MAKES THIS PROBLEM ALL THE MORE DISTRESSING IS THAT PUBLIC HOUSING TENDS TO BE LESS EXPENSIVE THAN SECTION 8 HOUSING, BUT THIS COST ADVANTAGE DISAPPEARS AS THE UNITS ARE DELAYED FOR EXTENDED PERIODS BEFORE THE START OF CONSTRUCTION. THE COMMITTEE BELIEVES THAT THE SECRETARY MUST DIRECT GREATER ATTENTION TO THE PUBLIC HOUSING PROGRAM, SINCE IT MAY OFFER AN OPPORTUNITY TO REDUCE THE COST OF ASSISTED HOUSING.

MODERNIZATION

   OUT OF THE $223 MILLION TO BE AVAILABLE FOR PUBLIC HOUSING, THE COMMITTEE HAS PROVIDED THAT NOT LESS THAN $55 MILLION BE DIRECTED TOWARD THE MODERNIZATION OF EXISTING PUBLIC HOUSING PROJECTS. THE COMMITTEE HAS ALSO PROVIDED THAT THESE FUNDS BE USED ON A PRIORITY BASIS FOR THE MODERNIZATION OF SUBSTANDARD VACANT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



UNITS. IN TOO MANY CITIES, PUBLIC HOUSING PROJECTS SIT EMPTY AND VANDALIZED, UNFIT FOR HABITATION. THE **\*2328** TRAGEDY OF THIS SITUATION IS NOT SO MUCH IN THE BLIGHT THAT IS BROUGHT TO THE COMMUNITY OR EVEN IN THE FACT THAT THE FEDERAL GOVERNMENT IS STILL PAYING FOR THESE EMPTY HULKS, BUT RATHER IN THE FACT THAT NEEDY FAMILIES FOR WHOM THESE PROJECTS WERE BUILT MUST CONTINUE TO LIVE IN SQUALOR. THE COMMITTEE BELIEVES THAT THIS SITUATION MUST CHANGE. IN THE PAST, THE MODERNIZATION PROGRAM HAS SUFFERED FROM A LACK OF ADEQUATE ATTENTION AND FROM CONSTANTLY SHIFTING PRIORITIES. IN EXPANDING THE FUNDING LEVEL SUCH THAT OVER $600 MILLION OF IMPROVEMENTS CAN BE FINANCED, IT IS THE INTENT OF THE COMMITTEE THAT THE DEPARTMENT DIRECT INCREASED ATTENTION TO THE PROGRAM. AND BY PROVIDING A PRIORITY FOR SUBSTANDARD VACANT UNITS, IT IS THE COMMITTEE'S DESIRE TO BRING A FOCUS TO THE PROGRAM. THE COMMITTEE RECOGNIZES THAT IN PART THE DIFFICULTY WITH THE PROGRAM HAS BEEN THE INABILITY OF CERTAIN HOUSING AUTHORITIES TO MAKE USE OF THE FUNDS ALLOCATED TO THEM. IT IS THE COMMITTEE'S BELIEF THAT NO AWARD OF MODERNIZATION CONTRACTS SHOULD BE MADE WITHOUT THE SECRETARY FIRST DETERMINING THAT THE PHA HAS THE CAPACITY TO EFFECTIVELY EMPLOY THE FUNDS. TO FACILITATE THIS, THE COMMITTEE HAS EXEMPTED MODERNIZATION FUNDS FROM THE SECTION 213 ALLOCATION REQUIREMENTS. THIS SHOULD ALLOW THE SECRETARY TO MAKE FUNDS AVAILABLE ON A COMPETITIVE BASIS AND TO THE MOST NEED PHAS.

THE COMMITTEE RECOGNIZES THAT MODERNIZATION NEEDS GO WELL BEYOND SUBSTANDARD VACANT UNITS. IT IS CLEAR THAT A COMPREHENSIVE APPROACH TO UPGRADING THE NATION'S PUBLIC HOUSING STOCK IS CRUCIAL. OUR GOAL MUST BE NOT TO ALLOW ANOTHER PROJECT TO BECOME VACANT OUT OF NEGLECT OR LACK OF RESOURCES. IT IS IN THIS LIGHT THAT THE COMMITTEE IS PLEASED THAT THE DEPARTMENT IS CURRENTLY UNDERTAKING A DETAILED STUDY OF THE MODERNIZATION NEED. IT IS THE COMMITTEE'S HOPE THAT THIS STUDY WILL ALSO PROVIDE AN INSIGHT INTO DEFERRED MAINTENANCE NEEDS. DEFERRED MAINTENANCE IS THE FIRST STEP IN THE PROCESS OF DETERIORATION, AND IT RESULTS EITHER FROM LACK OF ADEQUATE RESOURCES OUT OF CURRENT OPERATING FUNDS OR SIMPLY FROM BAD MANAGEMENT. IT IS AN AREA WHICH CLEARLY NEEDS ATTENTION. THE **\*13** COMMITTEE EXPECTS TO LINK THE INFORMATION DEVELOPED BY THIS STUDY WITH THAT GENERATED BY THE EVALUATION OF THE PERFORMANCE FUNDING SYSTEM, WHICH IS ALSO UNDERWAY, AND OVER THE NEXT YEAR TO DEVELOP COMPREHENSIVE LEGISLATION TO NOT ONLY ASSIST IN UPGRADING THE PUBLIC HOUSING STOCK BUT TO ALSO MINIMIZE THE NEED FOR MODERNIZATION IN THE FUTURE.

OPERATING SUBSIDY

**\*11** THE COMMITTEE HAS PROVIDED AN AUTHORIZATION LEVEL OF $741,500,000 FOR THE OPERATION OF LOW RENT PUBLIC HOUSING. IT IS ESTIMATED BY THE DEPARTMENT THAT THIS LEVEL, TOGETHER WITH $40 MILLION OF FUNDS LEFT OVER OUT OF THE FISCAL YEAR 1978 APPROPRIATION, SHOULD BE ADEQUATE TO MEET THE OPERATING SUBSIDY NEEDS AS DETERMINED BY THE PERFORMANCE FUNDING SYSTEM (PFS) OF THE PHAS. THE PFS IS DESIGNED TO PROVIDE ASSISTANCE TO PUBLIC HOUSING AUTHORITIES ONLY UP TO THE LEVEL WHICH WOULD BE NECESSARY FOR A WELL RUN PHA TO OPERATE ITS PROJECTS. IN THE PAST, THERE HAS BEEN A SENSE THAT THE OPERATING SUBSIDIES SIMPLY REWARDED BAD MANAGEMENT. THE PFS WHICH HAS BEEN IN OPERATION ONLY SINCE FISCAL YEAR 1977, HOWEVER, HAS MET WITH SOME DIFFICULTY. LARGE PUBLIC HOUSING AUTHORITIES BELIEVE THAT IT INADEQUATELY ACCOUNTS FOR THEIR COSTS. OTHERS COMPLAIN THAT SMALL PHAS TEND TO GET OVERCOMPENSATED.**\*2329**   STILL OTHERS BELIEVE THAT THE BASIC FORMULATION OF

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



THE SYSTEM IS FLAWED TO SUCH AN EXTENT THAT IT SHOULD BE ELIMINATED. AND THERE ARE THOSE WHO BELIEVE THAT THE FORMULA IS MANIPULATED TO MEET THE NEEDS OF SOME PHAS. THE COMMITTEE HAS REASON TO AGREE WITH AT LEAST SOME OF THESE VIEWS, PARTICULARLY THE COMPLIANTS OF THE LARGE PHAS. THE COMMITTEE, HOWEVER, IS STILL COMMITTED TO THE CONCEPT OF THE PERFORMANCE FUNDING SYSTEM AND WILL BE CAREFULLY FOLLOWING THE PROGRESS OF THE CURRENT EVALUATION THE DEPARTMENT IS UNDERTAKING OF THE PROGRAM.  IN THE INTERIM, THE COMMITTEE HAS PROVIDED THAT ANY FUNDS WHICH REMAIN AFTER FULLY FUNDING THE PFS MUST BE USED TO MEET NEEDS WHICH ARE BEYOND THE CONTROL OF THE PHA AND WHICH WERE NOT ADEQUATELY ACCOUNTED FOR BY THE PFS. THE PURPOSE OF THIS PROVISION IS NOT TO PERMIT THE SUBSIDIZATION OF INEFFICIENT OR POORLY MANAGED PHAS BUT RATHER TO RECOGNIZE THAT THE CURRENT FORMULATION OF THE PFS DOES NOT FULLY TAKE INTO ACCOUNT CERTAIN UNCONTROLLABLE COSTS. THE COMMITTEE HAS MADE THIS PROVISION MANDATORY (TO THE EXTENT OF AVAILABLE FUNDS) BECAUSE IT BELIEVES THAT NOT FUNDING THESE NEEDS SIMPLY INCREASES THE LIKELIHOOD OF A REDUCTION OF SERVICES TO THE TENANTS BELOW ACCEPTABLE STANDARDS.

SECTION 8

COST CONTROL

   IT IS EVIDENT TO THE COMMITTEE THAT THE COSTS OF SECTION 8 NEW CONSTRUCTION AND SUBSTANTIAL REHABILITATION ARE FAST APPROACHING A LEVEL WHICH MAY BE UNACCEPTABLE TO THE AMERICAN PEOPLE. A RECENT STUDY BY THE CONGRESSIONAL BUDGET OFFICE SHOWS THAT UNDER VIRTUALLY ANY PLAUSIBLE SET OF ASSUMPTIONS EVEN THE MASSIVE AMOUNT OF OBLIGATIONS NOW BEING ENTERED INTO MAY WELL BE INADEQUATE TO FULLY FUND THE UNITS. UNDER SOME OF THESE SCENARIOS, THE NEED FOR CONTRACT AMENDMENTS COULD APPEAR AS EARLY AS NINE YEARS FROM THE DATE OF ENTERING INTO THE CONTRACT AND UNDER ALL BUT THE MOST OPTIMISTIC ASSUMPTIONS THE NEED FOR AMENDMENT WOULD OCCUR WELL BEFORE THE EXPIRATION OF **14** THE CONTRACT. THE CBO STUDY ALSO POINTED OUT THAT THE COST OF SECTION 8 EXCEEDS THE COST OF PUBLIC HOUSING BY BETWEEN 10 PERCENT AND 30 PERCENT DEPENDING UPON ECONOMIC ASSUMPTIONS. THIS CONCLUSION CONFIRMS THAT REACHED EARLIER BY CRS AND GAO. THE COMMITTEE RECOGNIZES THAT HOUSING ASSISTANCE IS AN EXPENSIVE UNDERTAKING, UNDER ANY CIRCUMSTANCES, BUT IT BELIEVES THAT MUCH CAN BE DONE TO REMOVE THE INEFFICIENT AND WASTEFUL ASPECTS OF THE CURRENT PROGRAMS. THE COMMITTEE IS HEARTENED BY THE FACT THAT THE DEPARTMENT IS STARTING TO TAKE SOME STEPS TO FINALLY BRING THE COST OF THE PROGRAM UNDER CONTROL. THE COMMITTEE EXPECTS TO CLOSELY MONITOR THESE EFFORTS.

SECTION 8 INCOME VERIFICATION

   **12** WHILE THE COMMITTEE IS CONCERNED ABOUT THE INCREASING COSTS OF THE SECTION 8 PROGRAM AND IS COMMITTED TO REDUCING COSTS WHENEVER POSSIBLE, THE COMMITTEE IS INSISTENT THAT THE BENEFITS OF THE PROGRAM AND ALL ASSISTED HOUSING PROGRAMS GO TO THOSE WHO MOST REQUIRE THIS ASSISTANCE. THE COMMITTEE BELIEVES STRONGLY THAT THOSE WHO ARE RECEIVING ASSISTANCE UNDER THESE PROGRAMS SHOULD RECEIVE NO MORE NOR NO LESS THAN THAT TO WHICH THEY ARE ENTITLED BY LAW.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



**\*2330** IT IS AGAINST THIS BACKGROUND THAT THE COMMITTEE EXPRESSES ITS STRONG CONCERN OVER RECENT REPORTS AND PRELIMINARY STUDIES WHICH INDICATE THAT IN SOME INSTANCES TENANT INCOMES, WHICH ARE THE PRIMARY FACTOR IN DETERMINING PROGRAM ELIGIBILITY AND SUBSIDY OUTLAY, ARE NOT BEING VERIFIED TO THE FULL DEGREE REQUIRED BY EXISTING LAW.

GAO INVESTIGATIONS INITIATED BY THE MANPOWER AND HOUSING SUBCOMMITTEE INDICATE THAT VERIFICATION METHODS VARY WIDELY AMONG PROJECT MANAGERS AND LOCAL HOUSING AUTHORITIES. HUD'S EXPERIMENTAL HOUSING ALLOWANCE PROGRAM INDICATED CONSIDERABLE INSTANCES OF PAYMENT ERROR WITH ALMOST AS MANY APPLICANTS OVERSTATING THEIR INCOMES, AND THUS BEING DENIED RIGHTFUL SUBSIDIES, AS WERE UNDERSTATING. QUITE CLEARLY, BECAUSE SO MANY GOVERNMENT PROGRAMS ARE INCOME-DEPENDENT, ACCURATE STATEMENTS OF INCOME WITH THE POTENTIAL FOR ACCURATE VERIFICATION ARE ESSENTIAL.

THE SECTION 8 PROGRAM IS ADMINISTERED BY BOTH PUBLIC HOUSING AGENCIES AND PRIVATE OWNERS. WITH RESPECT TO NEW CONSTRUCTION AND SUBSTANTIAL REHABILITATION, THE OWNER IS RESPONSIBLE FOR REQUIRING APPLICANTS TO COMPLETE FORMS, DETERMINING THE ELIGIBILITY OF APPLICANTS AND RETAINING COPIES OF THE COMPLETED HUD PRESCRIBED APPLICATION FORMS. THE EXISTING HOUSING PROGRAM PLACES THIS RESPONSIBILITY IN THE HANDS OF THE PUBLIC HOUSING AGENCIES. IN BOTH INSTANCES, THE ULTIMATE RESPONSIBILITY FOR VERIFYING THE WORK OF THESE AGENTS OF THE DEPARTMENT, OF COURSE, RESTS WITH THE DEPARTMENT, AND THE COMMITTEE EXPECTS THAT THE DEPARTMENT IS FULLY COGNIZANT OF THIS RESPONSIBILITY AND WILL EXERCISE ITS REVIEW DILIGENTLY.

THE COMMITTEE IS PLEASED TO NOTE THAT THE DEPARTMENT HAS RECENTLY INITIATED A SERIES OF ACTIONS TO SOLVE THIS PROBLEM. AN EXTENSIVE STUDY HAS BEGUN INVOLVING A LARGE NUMBER OF HUD OFFICES AND LOCAL HOUSING AUTHORITIES, WHICH SHOULD PROVIDE RELIABLE INFORMATION ABOUT THE EXTENT AND SEVERITY OF ERRORS, SHOULD IDENTIFY THE BEST METHODS AND ARRANGEMENTS FOR VERIFYING INCOMES, AND SHOULD EXAMINE THE COST-EFFECTIVENESS OF ALTERNATIVES DESIGNED TO REDUCE ERRORS.

**\*15** THE STUDY WILL ALSO EXAMINE THE DESIRABILITY OF USING DATA AVAILABLE THROUGH THE INTERNAL REVENUE SERVICE AND THE SOCIAL SECURITY ADMINISTRATION. THE COMMITTEE EXPECTS THE DEPARTMENT TO GIVE PRIORITY TO THIS STUDY AND TO REPORT TO THE COMMITTEE ANY SPECIFIC RECOMMENDATIONS IT HAS, INCLUDING NECESSARY LEGISLATIVE CHANGES, AT THE EARLIEST POSSIBLE DATE.

OPERATING ASSISTANCE FOR TROUBLED MULTIFAMILY HOUSING PROJECTS

LAST YEAR THE CONGRESS ENACTED A PROGRAM OF FINANCIAL ASSISTANCE TO TROUBLED ASSISTED HOUSING PROJECTS AIMED AT RESTORING THE FINANCIAL SOUNDNESS OF, AND IMPROVING THE MANAGEMENT OF THESE PROJECTS, SO AS TO ASSIST IN MAINTAINING THEIR AVAILABILITY AS A HOUSING RESOURCE FOR LOW- TO MODERATE-INCOME FAMILIES. THE COMMITTEE HAS REAUTHORIZED THIS PROGRAM FOR FISCAL YEAR 1980 AT A LEVEL OF $92,000,000 RATHER THAN $82,000,000 AS REQUESTED BY THE ADMINISTRATION IN ORDER TO MEET THE STRONG NEED FOR THIS ASSISTANCE IN BOTH HUD-INSURED AND NON-INSURED PROJECTS. IN TAKING THIS ACTION, THE COMMITTEE DOES NOT INTEND TO EARMARK ANY PORTION OF THIS ASSISTANCE TO ANY CLASS OF PROJECTS, BUT ONLY TO INDICATE THAT BOTH HUD-INSURED AND NON-INSURED ASSISTED PROJECTS **\*2331** ARE ELIGIBLE FOR ASSISTANCE. IN REAUTHORIZING THIS PROGRAM, THE COMMITTEE ALSO WISHES TO RE-EMPHASIZE THE FLEXIBLE AND DISCRETIONARY NATURE OF THE PROGRAM AND THAT THE COMMITTEE DOES

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



NOT VIEW THIS ASSISTANCE AS A SUBSTITUTE FOR OTHER PROGRAMS AIMED AT PROVIDING LONG-TERM RENTAL ASSISTANCE PAYMENTS SUCH AS THE SECTION 8 OR RENT SUPPLEMENT PROGRAMS.

  *13 THE TROUBLED PROJECTS PROGRAM PROVIDES THE SECRETARY AN ADDITIONAL FLEXIBLE TOOL TO BE UTILIZED ON A SHORT-TERM BASIS TO DEAL WITH SPECIFIC PROBLEMS. WHEN DETERMINING THE MOST COST-EFFECTIVE METHOD FOR MAINTAINING THIS HOUSING STOCK, THE COMMITTEE BELIEVES THE DEPARTMENT MUST HAVE AVAILABLE AND FULLY CONSIDER A RANGE OF ALTERNATIVES. IN SOME INSTANCES, THE AUTHORITY TO MODIFY MORTGAGES OR THE AUTHORITY TO MAKE PARTIAL PAYMENT OF A CLAIM PROVIDED BY THE CONGRESS LAST YEAR MIGHT BE APPROPRIATE. IN ADDITION, THE COMMITTEE WISHES TO INDICATE THAT ASSISTANCE UNDER THIS PROGRAM MAY BE MADE AVAILABLE IN THE FORM OF LOANS AS WELL AS GRANTS. FINALLY, THE SECRETARY SHOULD CONSIDER THE TAX IMPLICATIONS TO PROJECT OWNERS AND INVESTORS IN FASHIONING THE MOST APPROPRIATE SOLUTION IN A GIVEN INSTANCE.

  THE COMMITTEE HAS DIRECTED THE SECRETARY TO UTILIZE AMOUNTS CREDITED TO THE SECTION 236 RENTAL HOUSING ASSISTANCE FUND PRIOR TO OCTOBER 1, 1978, BUT REMAINING UNOBLIGATED ON OCTOBER 31, 1978, FOR THE TROUBLED PROJECTS PROGRAM. LAST YEAR, THE CONGRESS DID NOT ADDRESS THE USE OF THESE FUNDS IN ORDER NOT TO PREJUDICE PENDING LITIGATION BETWEEN THE DEPARTMENT AND CERTAIN TENANTS. SUBSEQUENT SETTLEMENT OR RESOLUTION OF THESE DISPUTES NOW ENABLES THE COMMITTEE TO MAKE SUCH FUNDS AVAILABLE FOR THIS PROGRAM.

  LAST YEAR IN ENACTING THE TROUBLED PROJECTS PROGRAM, THE COMMITTEE INDICATED ITS CONCERN FOR THE FUTURE OF UNSUBSIDIZED PROJECTS WHICH WERE NOT ELIGIBLE FOR ASSISTANCE UNDER THE TROUBLED PROJECTS PROGRAM AND DIRECTED THE SECRETARY TO MAKE RECOMMENDATIONS IN TIME FOR LEGISLATIVE CONSIDERATION THIS YEAR ON HOW BEST TO MINIMIZE LOSSES INCURRED THROUGH FAILURE OF THESE PROJECTS. THE COMMITTEE HAS NOT RECEIVED SUCH RECOMMENDATIONS AND DIRECTS THE DEPARTMENT TO GIVE IMMEDIATE *16 ATTENTION TO THIS AREA SO THAT THESE RECOMMENDATIONS WILL BE AVAILABLE FOR COMPLETE AND FULL CONSIDERATION WITH THE REMAINDER OF THE DEPARTMENT'S LEGISLATIVE PROPOSALS NEXT YEAR.


TENANT CONTRIBUTION TO RENT


  THE BILL INCREASES THE MAXIMUM TENANT CONTRIBUTION TO RENT FOR FAMILIES WITH INCOMES ABOVE 50 PERCENT OF MEDIAN FROM 25 PERCENT
OF ADJUSTED INCOME TO 30 PERCENT. THIS CHANGE, WHICH AFFECTS TENANTS IN BOTH SECTION 8 AND PUBLIC HOUSING, WOULD BE ON A SLIDING SCALE RELATIVE TO INCOME, SO THAT FOR EXAMPLE SOMEONE AT 65 PERCENT OF MEDIAN WOULD PAY A MAXIMUM OF 27 PERCENT OF ADJUSTED INCOME. THIS CHANGE WOULD AFFECT RELATIVELY FEW SECTION 8 AND PUBLIC HOUSING TENANTS. IN THE SECTION 8 PROGRAM ONLY 7 PERCENT OF THE TENANTS HAVE INCOMES ABOVE 50 PERCENT OF MEDIUM AND IN PUBLIC HOUSING ONLY 12 PERCENT HAVE INCOMES ABOVE 50 PERCENT OF MEDIAN. IN A PERIOD OF GREAT CONCERN OVER THE COST OF OUR ASSISTED HOUSING PROGRAMS, THE COMMITTEE BELIEVES THAT SOME RECOGNITION SHOULD BE MADE OF THE DIFFERENTIAL ABILITY OF FAMILIES TO PAY FOR THEIR HOUSING. IT IS CLEAR TO THE COMMITTEE THAT A FAMILY WITH AN INCOME *2332 OF 80 PERCENT OF MEDIAN HAS A PROPORTIONATELY GREATER ABILITY TO CONTRIBUTE TO ITS COST OF HOUSING THAN A FAMILY WITH AN INCOME OF 50 PERCENT OF MEDIAN. THE SECRETARY IN IMPLEMENTING THIS PROVISION SHOULD TAKE CARE TO ASSURE THAT NO FAMILY IS OVER-BURDENED BY TOO RAPID AN INCREASE IN RENT, AND WHERE SHE DEEMS IT APPROPRIATE, TO

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



PHASE-IN THE INCREASES FOR EXISTING TENANTS. HOWEVER, SUCH A PHASING-IN SHOULD NOT EXTEND FOR A PERIOD OF LONGER THAN TWO YEARS.

TENANT SELECTION CRITERIA

   **\*14** THE COMMITTEE HAS PROVIDED A PRIORITY IN THE SELECTION OF TENANTS IN PUBLIC HOUSING AND SECTION 8 FOR FAMILIES WHO OCCUPY SUBSTANDARD HOUSING OR HAVE BEEN INVOLUNTARILY DISPLACED AT THE TIME THEY APPLY FOR ASSISTANCE. THE COMMITTEE BELIEVES THAT IN A PERIOD OF REDUCED FUNDING FOR ASSISTED HOUSING, THE PROGRAMS SHOULD BE DIRECTED TOWARD THOSE FAMILIES WHO HAVE HOUSING NEEDS WHICH REQUIRE MORE URGENT ATTENTION. THE PRIORITY IS INTENDED TO GUIDE THE OWNER OR PHA IN DETERMINING WHICH POTENTIAL TENANTS TO SELECT. THE PRIORITY IS NOT INTENDED NOR SHOULD IT BE USED TO ALLOW THE DEPARTMENT TO DIRECT AN OWNER OR PHA TO SELECT CERTAIN TENANTS. IT WOULD BE UNACCEPTABLE AND CLEARLY NOT AUTHORIZED BY THIS PROVISION FOR THE DEPARTMENT TO REQUIRE A PHA OR OWNER TO SELECT TENANTS FROM A LIST DEVELOPED BY THE DEPARTMENT. THIS PROVISION IS NOT INTENDED TO ALTER THE BASIC RESPONSIBILITY OVER TENANT SELECTION WHICH, UNDER CURRENT LAW, RESTS SOLELY WITH THE PHA AND OWNER. IT IS SIMPLY INTENDED TO HAVE OWNERS AND PHAS GIVE PRIORITY TO MEETING THE URGENT HOUSING NEEDS OF THOSE FAMILIES LIVING IN SUBSTANDARD CONDITIONS OR BEING INVOLUNTARILY DISPLACED.

MAINTENANCE OF LOW-INCOME CHARACTER OF CERTAIN ASSISTED HOUSING PROJECTS

PUBLIC HOUSING

   OVER THE LAST YEAR, A NUMBER OF PUBLIC HOUSING PROJECTS HAVE REACHED THE EXPIRATION DATE OF THEIR ANNUAL CONTRIBUTIONS CONTRACTS. THIS HAS POSED A PROBLEM FOR PROJECTS WHICH ARE EXPECTED TO CONTINUE TO SERVE **\*17** LOWER INCOME FAMILIES. UNDER CURRENT LAW, PUBLIC HOUSING OPERATING SUBSIDY FUNDS ARE NOT AVAILABLE TO PROJECTS WITHOUT ACTIVE ACCS. IN ORDER TO ASSURE THAT THESE PROJECTS CONTINUE TO HAVE THE RESOURCES NECESSARY TO PERMIT THEM TO SERVE LOWER INCOME FAMILIES, THE COMMITTEE HAS ACTED TO EXTEND THE OPERATING SUBSIDY PROGRAM TO INCLUDE THEM. THE COMMITTEE IS ALSO CONCERNED ABOUT OTHER PROJECTS REACHING THEIR 40TH YEAR WHICH BEING RELEASED FROM THE REGULATORY REQUIREMENTS OF THE ACC, MAY BE DISPOSED OF BY THEIR PHA WITHOUT MAKING PROVISIONS FOR THEIR LOWER INCOME TENANTS. IN THIS REGARD THE COMMITTEE HAS ACTED TO CONDITION ANY FUTURE ACCEPTANCE OF OPERATING ASSISTANCE FUNDS ON THE AGREEMENT OF THE PHA THAT NO PROJECT DISPOSITION WILL TAKE PLACE WITHOUT THE APPROVAL OF THE SECRETARY. THIS PROVISION EXTENDS THE AUTHORITY WHICH THE SECRETARY NOW HAS WITH REGARD TO PROJECTS WITH ACTIVE ACCS TO PROJECTS WITH EXPIRED ACC'S IF THOSE PROJECTS ACCEPT OPERATING SUBSIDY FUNDS ANY TIME AFTER OCTOBER 1, 1979.

SECTION 8

   EARLIER THIS YEAR THE GAO BROUGHT TO THE COMMITTEE'S ATTENTION A POTENTIAL PROBLEM WITH THE WAY THE SECTION 8 PROGRAM IS BEING ADMINISTERED.**\*2333**   THE GAO POINTED OUT THAT BECAUSE OF THE UNILATERAL ABILITY OF OWNERS OF NEWLY CONSTRUCTED OR SUBSTANTIALLY REHABILITATED PROJECTS TO CANCEL THEIR SECTION 8

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



CONTRACTS AT FIVE-YEAR INTERVALS, AND THE STRONG ECONOMIC INCENTIVES WHICH MAY EXIST FOR MANY OWNERS TO DO SO, A NUMBER OF SECTION 8 PROJECTS WILL LIKELY DROP OUT OF THE PROGRAM LONG BEFORE THE EXPIRATION OF THE FULL CONTRACT TERM. THIS SITUATION COULD RESULT IN THE DISPLACEMENT OF LOW AND MODERATE INCOME TENANTS. IT COULD ALSO HAVE THE EFFECT OF INCREASING THE COST OF THE PROGRAM SINCE REPLACEMENT UNITS WOULD HAVE TO BE BUILT AT THE HIGHER PRICES THAT WOULD BE PREVALENT THE YEAR THE CONTRACT WAS CANCELLED. TO FORESTALL THIS EVENTUALITY, THE COMMITTEE HAS PROVIDED THAT NO SECTION 8 CONTRACT ON NEWLY CONSTRUCTED OR SUBSTANTIALLY REHABILITATED UNITS MAY BE FOR A TERM OF LESS THAN 20 YEARS.

OTHER ASSISTED HOUSING

   *15 ONE OF THE PURPOSES OF THE TROUBLED PROJECTS PROGRAM IS TO ASSURE THAT ASSISTED HOUSING PROJECTS CONTINUE TO BE AVAILABLE FOR LOW AND MODERATE INCOME FAMILIES. THE COMMITTEE IS AMENDING THE PROGRAM TO MAKE CLEAR THAT THE PROJECTS WHICH RECEIVE ASSISTANCE MUST BE AVAILABLE FOR LOW AND MODERATE INCOME FAMILIES FOR AT LEAST A PERIOD EQUAL TO THE REMAINING TERM OF THE PROJECT MORTGAGE.

RENT SUPPLEMENT

   THE TROUBLED PROJECTS PROGRAM ENACTED LAST YEAR WAS DESIGNED THROUGH SHORT-TERM ASSISTANCE TO RESTORE PROJECTS TO SOUND ECONOMIC AND PHYSICAL CONDITION. THE CONCEPT WAS TO PUT THE PROJECTS BACK ON THEIR FEET, NOT TO PROVIDE A LONG-TERM SUBSIDY MECHANISM. IT WAS IN THIS LIGHT THAT THE COMMITTEE BECAME CONCERNED ABOUT THE RENT SUPPLEMENT PROGRAM. THE DEPARTMENT'S BUDGET JUSTIFICATION SUGGESTED THAT 'BEGINNING IN 1980 ADDITIONAL ASSISTANCE FOR RENT SUPPLEMENT UNITS WILL BE PROVIDED EXCLUSIVELY FROM THE TROUBLED PROJECTS PROGRAM.' THE JUSTIFICATION WENT ON TO INDICATE THAT OVER 900 PROJECTS WOULD REQUIRE TROUBLED PROJECTS ASSISTANCE BECAUSE 'OF A CESSATION, STABILIZATION OR REDUCTION IN THE AMOUNT OF RENT SUPPLEMENT ASSISTANCE AVAILABLE TO THEM.' IN FACT, THIS NEED MAY BE AGGRAVATED BY THE DEPARTMENT'S REQUEST *18 FOR A RESCISSION OF $200 MILLION IN RENT SUPPLEMENT FUNDS FOR FISCAL 1978. THE COMMITTEE WAS CONCERNED THAT NOT ONLY DID IT APPEAR THAT THE TROUBLED PROJECTS PROGRAM WAS BEING MISAPPLIED, BUT ALSO THAT RENT SUPPLEMENT PROJECTS WERE BEING FORCED INTO DIFFICULTY IN ORDER THAT THEY MIGHT BE ASSISTED THROUGH THAT PROGRAM. HOWEVER, THE COMMITTEE HAS BEEN UNEQUIVOCALLY ASSURED BY THE DEPARTMENT THAT WITH THE AUTHORITY CONFERRED BY THIS PORTION OF THE BILL THE TROUBLED PROJECTS PROGRAM WILL NOT BE USED IN THIS FASHION.
   THE DIFFICULTY FACING RENT SUPPLEMENT PROJECTS IS THAT THE LEVEL OF ASSISTANCE HAS NOT KEPT PACE WITH THE COST OF OPERATING THE PROJECT. UNDER EXISTING CONDITIONS, RENT SUPPLEMENT PROJECT OWNERS MUST PERIODICALLY APPEAL TO HUD TO GET THEIR CONTRACTS AMENDED TO MEET THEIR OPERATING COST. HUD, IN THE PAST, HAS FOUND THE FUNDS TO MAKE THOSE ADJUSTMENTS BY ENCOURAGING OWNERS TO CANCEL SOME OF THEIR CONTRACTS AND RECAPTURING THE AUTHORITY. LAST YEAR, THE PROBLEM BECAME SO SEVERE THAT THE DEPARTMENT REQUESTED AND RECEIVED A ONE-YEAR SUPPLEMENT TO FUND THESE INCREASES.
   *2334 IN ORDER TO PROVIDE A LONG-TERM SOLUTION TO THIS PROBLEM THE COMMITTEE HAS PROVIDED AUTHORITY FOR THE SECRETARY TO OFFER TO CONFORM RENT SUPPLEMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



CONTRACTS TO THE SAME TERMS AND CONDITIONS AS THOSE FOUND IN THE SECTION 8 PROGRAM AND TO AMEND THE CONTRACTS SO THAT SUFFICIENT FUNDS WILL BE AVAILABLE TO MEET THE NEEDS CAUSED BY ESCALATING OPERATING COSTS. THE COMMITTEE ANTICIPATES THAT THE AMENDMENT AND CONVERSION PROCESS WILL TAKE PLACE OVER A PERIOD OF NO MORE THAN FOUR YEARS AND DIRECTS THE SECRETARY TO COMMENCE IT AS SOON AS PRACTICABLE AFTER ENACTMENT OF THIS SECTION. BY AMENDING THE EXISTING RENT SUPPLEMENT CONTRACTS, NONE OF THE PRESENT OBLIGATED CONTRACT AUTHORITY WILL BE LOST. IT IS ESTIMATED THAT AMENDMENTS OF ONLY $20-$25 MILLION A YEAR OVER THE CONVERSION PERIOD WILL BE NECESSARY, ONLY SLIGHTLY MORE THAN WOULD HAVE OTHERWISE BEEN REQUIRED. IN ADDITION TO ASSURING OWNERS AND TENANTS ALIKE OF THE CONTINUED AVAILABILITY OF ASSISTANCE, THIS CONVERSION PROCESS SHOULD HAVE THE ADDED BENEFIT OF EASING PROGRAM ADMINISTRATION SINCE BOTH RENT SUPPLEMENT AND SECTION 8 WILL OPERATE UNDER IDENTICAL PROCEDURES. HOWEVER, WITH THE EXCEPTION OF TENANT SELECTION REQUIREMENTS, THE TERMS OF THE CONTRACTS AS NOW CONSTITUTED WILL REMAIN IN EFFECT AND ENFORCEABLE UNTIL THE CONTRACT IS AMENDED.

SECTION 235 HOMEOWNERSHIP ASSISTANCE PROGRAM

*16 THE COMMITTEE BILL WOULD AMEND THE SECTION 235 HOMEOWNERSHIP ASSISTANCE PROGRAM TO GIVE PRIORITY FOR ASSISTANCE TO LOW-INCOME FAMILIES WHO WILL BECOME CONDOMINIUM OR COOPERATIVE OWNERS, AND IN PARTICULAR, TO THOSE FAMILIES WHO, WITHOUT SUCH ASSISTANCE, WOULD BE LIKELY TO BE DISPLACED FROM RENTAL UNITS BEING CONVERTED TO CONDOMINIUMS OR COOPERATIVE OWNERSHIP. THIS PROVISION WOULD ALSO DELETE THE CURRENT STATUTORY RESTRICTIONS ON THE AVAILABILITY OF SECTION 235 HOMEOWNERSHIP ASSISTANCE FOR AN EXISTING DWELLING UNIT OR CONDOMINIUM PROJECT TO CERTAIN DISPLACED AND LOW INCOME FAMILIES.

THE SECTION 235 HOMEOWNERSHIP ASSISTANCE PROGRAM WAS ENACTED IN 1968 AND SUSPENDED IN 1973. THE PROGRAM WAS REACTIVATED IN 1975 PURSUANT TO A COURT ORDER. ASSISTANCE UNDER THE ORIGINAL PROGRAM PROVIDED A HOMEOWNERSHIP SUBSIDY TO LOWER INCOME FAMILIES. FAMILIES PAY 20 PERCENT OF THEIR ADJUSTED MONTHLY INCOME TOWARD MONTHLY MORTGAGE PAYMENTS. THE BALANCE IS MADE UP BY FEDERAL ASSISTANCE *19 PAYMENTS WHICH CANNOT EXCEED THE DIFFERENCE BETWEEN THE REQUIRED MORTGAGE PAYMENT AND THE AMOUNT THAT WOULD BE REQUIRED ON A MORTGAGE BEARING AN INTEREST RATE OF ONE PERCENT. THE MORTGAGE IS INSURED BY FHA AND REQUIRES ONLY A MINIMAL DOWNPAYMENT. THE REVISED PROGRAM PROVIDES FOR A HIGHER INCOME ELIGIBILITY (95 PERCENT OF AREA MEDIAN INCOME), AN ASSISTANCE PAYMENT WHICH SUBSIDIZES THE DIFFERENCE BETWEEN A 4 PERCENT INTEREST RATE AND THE FHA INTEREST RATE, AND A DOWNPAYMENT OF 3 PERCENT OF ACQUISITION COST. PRIOR TO REACTIVATION, MORTGAGES ASSISTED TOTALED 458,000 UNITS FOR A TOTAL MORTGAGE VALUE OF $8.2 BILLION. OUTSTANDING UNOBLIGATED AUTHORITY IN 1975 WAS $265 MILLION IN FUNDS AVAILABLE FOR ASSISTANCE PAYMENTS.

SINCE THE REVISED PROGRAM HAS BEEN IN EFFECT, ACTIVITY HAS BEEN MINIMAL. AT THE END OF FISCAL YEAR 1978, $224,000,000 IN UNOBLIGATED AUTHORITY REMAINED AND ONLY 7100 UNITS WERE INSURED DURING THAT FISCAL YEAR. THE FISCAL YEAR 1979 BUDGET PROJECTED AN ACTIVITY LEVEL OF 50,000 UNITS. THIS PROJECTION IS PROVING TO BE UNREALISTIC, AND IT IS PRESENTLY*2335 ESTIMATED THAT AT THE CLOSE OF FISCAL YEAR 1979 LESS THAN 18,000 UNITS WILL BE RESERVED.

THE COMMITTEE BELIEVES THAT THIS HOMEOWNERSHIP ASSISTANCE PROGRAM SHOULD BE MADE AVAILABLE, PARTICULARLY AT THIS TIME, TO THOSE ELIGIBLE FAMILIES WHO ARE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



BEING DISPLACED BECAUSE OF CONVERSION OF EXISTING MULTIFAMILY RENTAL PROJECTS TO CONDOMINIUM AND COOPERATIVE OWNERSHIP. ACCORDING TO ESTIMATES MADE AVAILABLE TO THE COMMITTEE, OVER 100,000 RENTAL UNITS WERE CONVERTED TO CONDOMINIUM AND COOPERATIVE OWNERSHIP IN 1978. IN 1977 THERE WERE ONLY 50,000 SUCH CONVERSIONS. PROJECTIONS FOR 1979 ARE ESTIMATED FOR AT LEAST 130,000 UNIT CONVERSIONS. IN MANY HOUSING MARKET AREAS, THIS CONDOMINIUM CONVERSION DEVELOPMENT IS DEPLETING THE STOCK OF RENTAL HOUSING, PARTICULARLY FOR LOW AND MODERATE INCOME PERSONS. CONDOMINIUM CONVERSIONS IN WASHINGTON, D.C. HAS CAUSED THE LOSS OF 5 PERCENT OF ITS TOTAL RENTAL HOUSING STOCK TO CONDOMINIUM OWNERSHIP. SUBURBAN WASHINGTON (PARTICULARLY THE NORTHERN VIRGINIA AREA) HAS LOST ALMOST 10 PERCENT OF ITS RENTAL HOUSING STOCK. MANY OF THE RENTAL PROJECTS CONVERTING HAVE A HIGH PERCENTAGE OF ELDERLY TENANTS WHO, IN MOST CASES, CANNOT AFFORD TO PURCHASE THEIR UNITS. THE PRIORITY SET FORTH IN THIS PROVISION OF THE BILL IS AN ATTEMPT TO MAKE AN EXISTING, BUT LITTLE USED, HOMEOWNERSHIP SUBSIDY PROGRAM AVAILABLE TO THOSE LOWER INCOME PEOPLE, PARTICULARLY THE ELDERLY, LIVING IN RENTAL HOUSING ABOUT TO BE CONVERTED TO CONDOMINIUM AND COOPERATIVE OWNERSHIP.

   **\*17** THE COMMITTEE IS AWARE OF THE PAST HISTORY OF ABUSE INVOLVING EXISTING HOUSING IN THIS PROGRAM AND EXPECTS THE DEPARTMENT TO MONITOR THIS SITUATION CAREFULLY.


DISPLACEMENT


   LAST YEAR CONGRESS ADOPTED PROVISIONS TO ASSURE THAT TENANTS DISPLACED FROM PREVIOUSLY ASSISTED HUD-HELD PROPERTIES WOULD BE PROVIDED HOUSING ASSISTANCE. THE SECRETARY WAS REQUIRED TO SEEK TO ASSURE THE MAXIMUM OPPORTUNITY FOR SUCH TENANTS TO RETURN TO A REPAIRED UNIT, TO OCCUPY A UNIT IN ANOTHER HUD-OWNED MULTIFAMILY PROJECT, TO OBTAIN OTHER HUD HOUSING ASSISTANCE OR TO RECEIVE ANY OTHER AVAILABLE RELOCATION ASSISTANCE. THE COMMITTEE ACTION THIS YEAR IS TO MAKE CLEAR THAT THE SECRETARY IS REQUIRED TO PROVIDE ASSISTANCE TO THESE TENANTS. THE SECRETARY CONTINUES TO HAVE THE DISCRETION TO DECIDE WHICH OF THE ABOVE ALTERNATIVES ARE APPROPRIATE TO ASSIST THESE TENANTS.


   **\*20** TITLE III-- PROGRAM AMENDMENTS AND EXTENSIONS


EXTENSION OF FHA MORTGAGE INSURANCE PROGRAM


   THE COMMITTEE IS EXTENDING FOR ONE YEAR THE AUTHORITY OF THE SECRETARY TO INSURE MORTGAGES OR LOANS UNDER CERTAIN HUD-FHA MORTGAGE OR LOAN INSURANCE PROGRAMS CONTAINED IN THE NATIONAL HOUSING ACT.

   UNDER EXISTING LAW, THE AUTHORITY OF THE SECRETARY TO INSURE MORTGAGES AND LOANS UNDER THESE PROGRAMS WILL EXPIRE ON SEPTEMBER 30, 1979. AFTER THAT DATE, THE SECRETARY MAY NOT INSURE MORTGAGES OR LOANS UNDER ANY OF THE MAJOR HUD-FHA INSURING AUTHORITIES CONTAINED IN THAT ACT EXCEPT PURSUANT TO A COMMITMENT TO INSURE ISSUED BEFORE THAT DATE.

   **\*2336** INSURING AUTHORITIES WHICH WILL EXPIRE ON SEPTEMBER 30, 1979, INCLUDE THOSE FOR THE FOLLOWING HUD-FHA MORTGAGE OR LOAN INSURANCE PROGRAM: TITLE I-- PROPERTY IMPROVEMENT AND MOBILE HOME LOAN INSURANCE; SECTION 203-- BASIC HOME MORTGAGE INSURANCE; SECTION 207-- RENTAL HOUSING INSURANCE; SECTION 213-- COOPERATIVE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



HOUSING INSURANCE; SECTION 220-- REHABILITATION AND NEIGHBORHOOD CONSERVATION HOUSING INSURANCE; SECTION 221-- HOUSING FOR MODERATE INCOME AND DISPLACED FAMILIES; SECTION 222-- MORTGAGE INSURANCE FOR SERVICEMEN; SECTION 223-- MISCELLANEOUS HOUSING INSURANCE, INCLUDING INSURANCE IN OLDER, DECLINING URBAN AREAS AND FOR EXISTING MULTIFAMILY HOUSING PROJECTS; SECTION 231-- HOUSING FOR THE ELDERLY; SECTION 232-- NURSING HOMES; SECTION 233-- EXPERIMENTAL HOUSING; SECTION 234-- CONDOMINIUMS; SECTION 235-- HOMEOWNERSHIP FOR LOWER INCOME FAMILIES; SECTION 236-- RENTAL AND COOPERATIVE HOUSING FOR LOWER INCOME FAMILIES; SECTION 237-- SPECIAL MORTGAGORS; SECTION 240-- HOMEOWNER PURCHASE OF FEE SIMPLE TITLE; SECTION 241-- SUPPLEMENTAL LOANS FOR MULTIFAMILY HOUSING PROJECTS; SECTION 242-- HOSPITALS; SECTION 243-- HOMEOWNERSHIP FOR MIDDLE-INCOME FAMILIES; SECTION 244-- MORTGAGE INSURANCE ON A CO-INSURANCE BASIS; SECTION 245-- MORTGAGE INSURANCE ON AN EXPERIMENTAL BASIS; TITLE VII-- ARMED FORCES RELATED HOUSING; TITLE X-- LAND DEVELOPMENT; AND TITLE XI-- GROUP PRACTICE FACILITIES.

## EXTENSION OF FLEXIBLE INTEREST RATE AUTHORITY

THE COMMITTEE APPROVED AN EXTENSION, THROUGH SEPTEMBER 30, 1980, OF THE SECRETARY'S AUTHORITY ADMINISTRATIVELY TO SET INTEREST RATES FOR FHA-INSURED MORTGAGE LOANS TO MEET THE MARKET AT RATES ABOVE THE STATUTORY MAXIMUM. UNDER EXISTING LAW, THIS AUTHORITY TO SET RATES ABOVE THE STATUTORY 6 PERCENT MAXIMUM WILL EXPIRE ON SEPTEMBER 30, 1979.

## EXTENSION OF EMERGENCY HOME PURCHASE ASSISTANCE ACT OF 1974

**\*18** THE COMMITTEE ALSO EXTENDED FROM OCTOBER 1, 1979, TO OCTOBER 1, 1980, THE AUTHORITY OF THE GOVERNMENT NATIONAL MORTGAGE ASSOCIATION TO ENTER INTO NEW COMMITMENTS TO PURCHASE MORTGAGES UNDER THE INTERIM MORTGAGE PURCHASE AUTHORITY CONTAINED IN SECTION 313 OF THE NATIONAL HOUSING ACT, AS ADDED BY THE EMERGENCY HOME PURCHASE ASSISTANCE ACT OF 1974.

**\*21** THE EMERGENCY HOME PURCHASE ASSISTANCE ACT OF 1974 ADDED SECTION 313 TO THE NATIONAL HOUSING ACT AUTHORIZING INTERIM OR STANDBY AUTHORITY TO PUR CHASE MORTGAGES. THIS AUTHORITY IS SUBJECT TO A FINDING BY THE SECRETARY THAT INFLATIONARY CONDITIONS AND RELATED GOVERNMENTAL ACTIONS OR OTHER ECONOMIC CONDITIONS ARE HAVING A SEVERELY DISPROPORTIONATE EFFECT ON THE HOUSING INDUSTRY AND THAT A RESULTING REDUCTION IN THE VOLUME OF HOME CONSTRUCTION OR ACQUISITION SERIOUSLY THREATENS TO AFFECT THE ECONOMY AND TO DELAY THE ORDERLY ACHIEVEMENT OF NATIONAL GOALS. THE PURCHASE AUTHORITY ALSO MUST BE RELEASED IN APPROPRIATION ACTS. THIS EXTENSION WOULD MAINTAIN THIS STANDBY AUTHORITY FOR AN ADDITIONAL YEAR.

## **\*2337** RESEARCH AUTHORIZATIONS

THE BILL WOULD AUTHORIZE $51,000,000 FOR THE FISCAL YEAR 1980 FOR HUD RESEARCH, STUDY AND DEMONSTRATION. BECAUSE THE COMMITTEE HAS SEPARATELY AUTHORIZED FUNDING FOR THE NEIGHBORHOOD REINVESTMENT CORPORATION, THIS REPRESENTS A SMALL INCREASE IN THE AMOUNT OF FUNDS AVAILABLE TO THE DEPARTMENT FOR ITS PLANNED RESEARCH, STUDY AND DEMONSTRATION ACTIVITIES. THE COMMITTEE IS PLEASED WITH THE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



MORE SPECIFIC FOCUS BEING PLACED ON THE DEPARTMENT'S RESEARCH ACTIVITIES, PARTICULARLY WITH REGARD TO SUCH STUDIES AS THE AUTHORIZATION NEEDS IN PUBLIC HOUSING AND DETERMINING WHO BENEFITS FROM THE COMMUNITY DEVELOPMENT BLOCK GRANT PROGRAM AND WHAT THE SPECIFIC BENEFITS ARE. THE DEPARTMENT IS ENCOURAGED TO CONTINUE EMPHASIS ON USEFUL RESEARCH IN CRITICAL POLICY AREAS, SUCH AS THE COST OF THE SECTION 8 HOUSING PROGRAM. THE COMMITTEE STRONGLY URGES THE DEPARTMENT TO AVOID DUPLICATING RESEARCH EFFORTS OF OTHER DEPARTMENTS AND TO IMPROVE COMMUNICATION BETWEEN THOSE INVOLVED IN RESEARCH AND THOSE RESPONSIBLE FOR THE IMPLEMENTATION OF THE RESULTS OF THAT RESEARCH. THIS TYPE OF COMMUNICATION APPEARED TO BE LACKING IN THE DEPARTMENT'S DEVELOPMENT OF THERMAL STANDARDS WITH RESPECT TO MASONRY CONSTRUCTION AND THE COMMITTEE BELIEVES THAT IF THE DEPARTMENT IS TO CONTRIBUTE MEANINGFULLY TO THE NATION'S ENERGY CONSERVATION EFFORT, ITS RESEARCH AND POLICY IMPLEMENTATION MUST BE THOROUGH AND CONSISTENT, BOTH INTERNALLY AND WITH THOSE OF OTHER DEPARTMENTS.

FHA-- GENERAL INSURANCE FUND

THE COMMITTEE HAS PROVIDED AN AUTHORIZATION FOR APPROPRIATIONS OF UP TO $93,000,000 FOR THE GENERAL INSURANCE FUND RATHER THAN THE OPEN-ENDED AUTHORIZATION REQUESTED BY THE DEPARTMENT. THIS AUTHORIZATION IS NECESSARY TO PERMIT RESTORATION TO THE FUND OF LOSSES WHICH ARE UNABLE TO BE MET OUT OF FUND INCOME AND TO AVOID INSOLVENCY OF THE FUND.

HOUSING FOR THE ELDERLY OR HANDICAPPED

THE COMMITTEE REAUTHORIZED THIS PROGRAM FOR 3 YEARS AT THE FOLLOWING LEVELS: $875 MILLION FOR FISCAL YEAR 1980, $925 MILLION FOR FISCAL YEAR 1981, AND $950 MILLION FOR FISCAL YEAR 1982.

**\*19** THE COMMITTEE MADE TWO CHANGES IN THE AUTHORIZING LEGISLATION AIMED AT STRENGTHENING THE OVERALL IMPACT OF THE PROGRAM. FIRST, THE SECRETARY WOULD BE GIVEN THE AUTHORITY IN REVIEWING APPLICATIONS TO CONSIDER THE EXTENT TO WHICH PROJECTS WILL ASSIST IN (1) STABILIZING, **\*22** CONSERVING, AND REVITALIZING NEIGHBORHOODS AND COMMUNITIES, (2) PROVIDING HOUSING IN AREAS WHICH ARE EXPERIENCING SIGNIFICANT DISPLACEMENT OF ELDERLY AND HANDICAPPED FAMILIES BECAUSE OF PRIVATE OR PUBLIC INVESTMENT, AND (3) IN THE ECONOMICAL REHABILITATION OF STRUCTURES HAVING ARCHITECTURAL, HISTORICAL, OR CULTURAL SIGNIFICANCE. SECOND, THE SECRETARY WOULD MAKE AVAILABLE TECHNICAL AND TRAINING ASSISTANCE SO AS TO ASSURE THAT APPLICANTS HAVING LIMITED RESOURCES WOULD BE ABLE TO PARTICIPATE MORE FULLY IN THE SPONSORSHIP OF SECTION 202 PROJECTS. IN MAKING THIS ASSISTANCE AVAILABLE, THE SECRETARY IS PRECLUDED FROM UTILIZING FUNDS WHICH MAY BE APPROPRIATED FOR THE SECTION 202 PROGRAM.**\*2338** RATHER, IF SHE ELECTS TO MAKE SUCH ASSISTANCE AVAILABLE, THE COMMITTEE DIRECTS THAT IT BE SECURED FROM OTHER RESOURCES AVAILABLE TO THE DEPARTMENT. FINALLY, THE COMMITTEE ENACTED A PROVISION AIMED AT CLARIFYING EXISTING PRACTICE WITH RESPECT TO THE SPECIFIC LEVEL OF SECTION 8 ASSISTANCE AVAILABLE TO A PROJECT. VERY SIMPLY, WHEN THERE IS A CHANGE IN THE INTEREST RATE TO BE CHARGED FOR THE SECTION 202 LOAN BETWEEN THE TIME OF RESERVATION OF SECTION 8 ASSISTANCE AND THE TIME AT WHICH THE LOAN IS ACTUALLY MADE, THIS CHANGE SHOULD BE REFLECTED BY ADJUSTING THE LEVEL OF SECTION 8

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



ASSISTANCE PROVIDED FOR THE PROJECT.

MORTGAGE INSURANCE FOR EXISTING DWELLINGS WITH WARRANTY PLANS

  THE COMMITTEE ADOPTED A CHANGE IN THE BASIC FHA SECTION 203(B) HOME MORTGAGE INSURANCE PROGRAM WHICH WOULD PERMIT NEWLY CONSTRUCTED HOMES THAT ARE COVERED BY CONSUMER PROTECTION OR WARRANTY PLANS AND ARE LESS THAN ONE YEAR OLD TO QUALIFY FOR THE MAXIMUM LOAN-TO-VALUE RATIOS ALLOWED UNDER THE PROGRAM.
  UNDER EXISTING LAW, THE SECRETARY OF HUD IS AUTHORIZED TO INSURE 97 PERCENT OF THE FIRST $25,000 OF APPRAISED VALUE AND 95 PERCENT OF THE VALUE IN EXCESS OF $25,000 UP TO $60,000. THESE MAXIMUMS APPLY TO BOTH PROPOSED NEW CONSTRUCTION AND TO EXISTING PROPERTIES WHICH ARE MORE THAN ONE YEAR OLD. IN THE CASE OF DWELLINGS WHICH ARE LESS THAN ONE YEAR OLD AND NOT APPROVED BY HUD FOR MORTGAGE INSURANCE PRIOR TO THE BEGINNING OF CONSTRUCTION, THE SECRETARY IS NOW LIMITED TO INSURING NOT MORE THAN 90 PERCENT OF THE PROPERTY'S ENTIRE APPRAISED VALUE. THIS DISTINCTION IS INTENDED TO GIVE HUD THE OPPORTUNITY TO REVIEW PLANS PRIOR TO CONSTRUCTION AND TO INSPECT THE PROPERTY DURING CONSTRUCTION SO AS TO ASSURE COMPLIANCE WITH MINIMUM PROPERTY STANDARDS BEFORE INSURING THE MAXIMUM RATIO MORTGAGE. UNDER THE CHANGE APPROVED BY THE COMMITTEE, THE SECRETARY WOULD HAVE THE DISCRETIONARY AUTHORITY TO INSURE THIS THIRD CATEGORY OF HOMES UP TO THE MAXIMUM LOAN-TO-VALUE RATIO IF THE HOME (1) IS PROTECTED BY AN APPROVED WARRANTY PLAN AND (2) SATISFIES ALL REQUIREMENTS WHICH WOULD HAVE BEEN APPLICABLE IF THE HOME HAD BEEN APPROVED FOR MORTGAGE INSURANCE PRIOR TO THE BEGINNING OF CONSTRUCTION.
  *20 THE AMENDMENT IS INTENDED ONLY TO PERMIT THE WAIVER OF PRECONSTRUCTION PLAN REVIEW AND OF THOSE INSPECTIONS WHICH THE DEPARTMENT BELIEVES ADVISABLE. ALL OTHER REQUIREMENTS, INCLUDING COMPLIANCE WITH MINIMUM PROPERTY STANDARDS FOR NEW CONSTRUCTION AND WITH ENVIRONMENTAL ASSESSMENTS, WOULD REMAIN INTACT. WHERE ANY BUILDERS COVERED BY A CONSUMER PROTECTION OR WARRANTY PLAN FAIL TO MAINTAIN STANDARDS WHICH ASSURE CONSUMERS OF PROTECTION OR WHERE THE FINANCIAL RESERVES *23 OF SUCH PLANS ARE INADEQUATE TO COVER CLAIMS UNDER SUCH PLANS, THE COMMITTEE EXPECTS THE SECRETARY TO PROMPTLY DISCONTINUE ANY WAIVERS APPLICABLE TO SUCH BUILDERS.
  THE COMMITTEE NOTES THAT THE FEDERAL TRADE COMMISSION IS IN THE PROCESS OF CONDUCTING A COMPLETE ANALYSIS OF THE EXPERIENCE WITH WARRANTY PLANS AND THE NEED FOR ADDITIONAL PROTECTIONS IN THIS AREA. THE COMMITTEE WOULD EXPECT THE DEPARTMENT TO REVIEW THIS STUDY, TO MONITOR ITS OWN EXPERIENCE WITH ANY APPROVED WARRANTY PLANS AND WITH WARRANTIES MADE PURSUANT TO SECTION 801 OF THE HOUSING ACT OF *2339 1954 AND TO MAKE ANY RECOMMENDATIONS FOR FURTHER LEGISLATIVE CHANGES WHICH IT BELIEVES ADVISABLE.

THE NEIGHBORHOOD REINVESTMENT CORPORATION

  THE COMMITTEE BILL WOULD AUTHORIZE AN APPROPRIATION OF $9.5 MILLION FOR FISCAL YEAR 1980 FOR THE NEIGHBORHOOD REINVESTMENT CORPORATION. THE NEIGHBORHOOD REINVESTMENT CORPORATION WAS CREATED LAST YEAR TO CARRY FORWARD THE WORK OF THE URBAN REINVESTMENT TASK FORCE IN THE DEVELOPMENT AND SUPPORT OF

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



NEIGHBORHOOD HOUSING SERVICES PROGRAMS, AS WELL AS THE MONITORING, EVALUATION, AND REPLICATION OF OTHER PROMISING NEIGHBORHOOD PRESERVATION STRATEGIES. THE EFFORT TO DATE HAS RESULTED IN THE DEVELOPMENT AND SUPPORT OF 89 NEIGHBORHOOD HOUSING SERVICES PROGRAMS IN 76 CITIES. NEIGHBORHOOD HOUSING SERVICES PROGRAMS ARE PARTNERSHIPS OF RESIDENTS AND REPRESENTATIVES OF LOCAL FINANCIAL INSTITUTIONS AND GOVERNMENT, PROVIDING TECHNICAL AND FINANCIAL ASSISTANCE TO HOMEOWNERS ORGANIZED TO REVERSE NEIGHBORHOOD DETERIORATION AND STRENGTHEN THE INVESTMENT CLIMATE. THE NEIGHBORHOOD REINVESTMENT CORPORATION PROVIDES SMALL GRANTS TO NHS PROGRAMS, BUT ITS MAIN ACTIVITY IS AN EDUCATIONAL ONE, A CAREFUL DEVELOPMENTAL PROCESS WHICH WELDS THE DISPARATE MEMBERS OF THE PARTNERSHIP INTO AN EFFECTIVE WORKING RELATIONSHIP.

THE COMMITTEE BELIEVES THAT THE WORK OF THE CORPORATION AND ITS PREDECESSOR ENTITY, THE URBAN REINVESTMENT TASK FORCE, HAS BEEN SUCCESSFUL AND HAS STIMULATED LOCAL COMMUNITIES' REVITALIZATION EFFORTS. WHILE THE AUTHORIZATION PROVIDED FOR IN THIS PROVISION OF THE COMMITTEE BILL IS HIGHER THAN THE PREVIOUS FISCAL YEAR LEVEL, THE FUNDS PROVIDED HERE ARE NOT AS HIGH AS SOME HAVE REQUESTED. THE COMMITTEE BELIEVES THAT THE SUCCESS OF THE NEIGHBORHOOD REINVESTMENT CORPORATION'S UNDERTAKINGS RESTS ON WELL CONCEIVED AND CAREFULLY FOLLOWED UP PROGRAMS. EFFORTS TO GREATLY EXPAND THE CORPORATION'S PROGRAMS ACTIVITIES COULD CONCEIVABLY HURT THE ON-GOING EFFORTS AND CONTINUED SUCCESSFUL EFFORTS AT NEIGHBORHOOD REVITALIZATION.

STUDY OF MORTGAGE INSURANCE PREMIUMS

**\*21** THE COMMITTEE HAS DIRECTED THE SECRETARY TO CONDUCT A STUDY OF THE RELATIVE RISKS OF LOSS WHICH EXIST WITHIN THE MAJOR CLASSES OF MORTGAGES WHICH MAY BE INSURED UNDER THE ONE-TO-FOUR FAMILY HOME AND THE COOPERATIVE MORTGAGE INSURANCE PROGRAMS. CURRENTLY HUD-FHA MORTGAGORS IN ALMOST ALL PROGRAMS PAY EQUAL ANNUAL INSURANCE PREMIUMS BASED UPON THE AVERAGE OUTSTANDING BALANCE OVER THE LIFE OF THE LOAN. THE STUDY IS SPECIFICALLY AIMED AT OBTAINING RECOMMENDATIONS AS TO WHETHER IT IS ADVISABLE TO REDUCE SOME OR ALL OF THE MORTGAGE INSURANCE **\*24** PREMIUMS. THE STUDY MIGHT INCLUDE AN ANALYSIS OF THE ADVANTAGES AND DISADVANTAGES OF OTHER VARIATIONS IN PREMIUM STRUCTURE INCLUDING THE POSSIBILITY OF PROVIDING FOR INSURANCE PREMIUMS TO BE PAID IN THE FIRST FEW YEARS OF A MORTGAGE LOAN. RECOMMENDATIONS SHOULD ALSO ASSURE THAT THE RESULTANT PREMIUM SYSTEM IS BOTH ADMINISTRATIVELY SIMPLE AND FAIR TO HOMEOWNERS.

**\*2340** EXEMPTION FROM STATE USURY LAWS

THE COMMITTEE HAS ACTED TO PREEMPT ANY STATE CONSTITUTIONAL PROVISION AND LAW THAT LIMITS THE RATE OR AMOUNT OF INTEREST OR OTHER CHARGES LEVIED ON ALL FHA-INSURED LOANS, MORTGAGES AND ADVANCES. THIS PREEMPTION APPLIES TO ALL SUCH STATE USURY LIMITS THAT ARE CURRENTLY IN EFFECT. THE COMMITTEE FURTHER PROVIDES, HOWEVER, THAT SUBSEQUENT TO THE DATE OF ENACTMENT OF THIS ACT, THE STATES MAY ACT TO SUBJECT THESE FHA INSTRUMENTS TO STATE USURY CEILINGS.

NEIGHBORHOOD SELF HELP DEVELOPMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



THE COMMITTEE BILL WOULD AMEND THE NEIGHBORHOOD SELF HELP DEVELOPMENT ACT OF 1978 TO PROVIDE THAT NOT MORE THAN 10 PERCENT OF THE ASSISTANCE MAY BE MADE AVAILABLE WITHOUT A CERTIFICATION BY THE LOCAL GOVERNMENT THAT SUCH ASSISTANCE IS CONSISTENT WITH A SUPPORTIVE OF THE SPECIFIC OBJECTIVES OF THE LOCAL GOVERNMENT, IF THE ASSISTANCE IS BEING MADE AVAILABLE FOR DEMONSTRATION OF INNOVATIVE MEANS OF ASSISTING IN NEIGHBORHOOD CONSERVATION AND REVITALIZATION.

IT HAS BEEN BROUGHT TO THE ATTENTION OF THE COMMITTEE THAT CERTAIN COMMUNITIES INTEND TO ARBITRARILY REFUSE TO CERTIFY THAT PROJECTS PROPOSED BY ESTABLISHED LOCAL NEIGHBORHOOD GROUPS ARE SUPPORTIVE AND INTEGRAL TO THE COMMUNITY'S CD OBJECTIVES, THEREBY DENYING THESE GROUPS FEDERAL ASSISTANCE. THE CONGRESSIONAL INTENT IN ENACTING THIS FEDERAL ASSISTANCE PROGRAM WAS TO RECOGNIZE THE GREAT POTENTIAL OF THESE GRASS ROOTS NEIGHBORHOOD ORGANIZATIONS, TO TAP IT, AND CHANNEL IT INTO WORKING RELATIONSHIPS WITH A COMMUNITY'S ELECTED OFFICIALS. ARBITRARY REFUSAL BY ELECTED OFFICIALS TO RECOGNIZE NEIGHBORHOOD GROUPS AS INTEGRAL ELEMENTS OF THEIR LOCAL CDBG EFFORTS IS NOT A SITUATION THE COMMITTEE DESIRES TO LET HAPPEN. IT WOULD SERIOUSLY HAMPER EFFECTIVE NEIGHBORHOOD GROUPS PARTICIPATION IN THE CDBG PROGRAM. SO THE COMMITTEE BILL WOULD PERMIT UP TO 10 PERCENT OF THE FUNDS MADE AVAILABLE UNDER THE NEIGHBORHOOD SELF HELP DEVELOPMENT ACT TO BE MADE WHERE THERE IS NO GOVERNMENTAL CERTIFICATION, BUT ONLY WHERE SUCH ACTIVITY IS IN THE DETERMINATION OF THE SECRETARY BOTH SUPPORTIVE OF AND CONSISTENT WITH THE SPECIFIC OBJECTIVES OF THE LOCAL GOVERNMENT AND IMPORTANT AS A DEMONSTRATION OF INNOVATIVE NEIGHBORHOOD DEVELOPMENT EFFORTS. THE COMMITTEE EXPECTS THE SECRETARY TO REVIEW LOCAL CIRCUMSTANCES CAREFULLY WHERE PROBLEMS ARISE REGARDING CERTIFICATION AND TO CONTINUE TO WORK CLOSELY WITH NEIGHBORHOOD GROUPS AND THE LOCALLY ELECTED GOVERNMENT OFFICIALS TO ASSIST IN RESOLVING THOSE DIFFERENCES.

FHA MORTGAGE LIMITS

**\*22** THE COMMITTEE HAS INCREASED MORTGAGE LIMITS UNDER A VARIETY OF FHA MORTGAGE INSURANCE PROGRAMS. IN THE BASIC SECTION 203(B) PROGRAM, **\*25** THE LIMITS HAVE BEEN RAISED FROM $60,000 FOR A SINGLE FAMILY HOME TO $65,000 AND FOR TWO FAMILY HOUSES FROM $65,000 TO $73,500 WITH SIMILAR INCREASES FOR THREE AND FOUR FAMILY HOUSES. THE ADJUSTMENT FACTOR FOR MORTGAGE LIMITS IN HIGH COST AREAS ON MULTIFAMILY STRUCTURES INSURED UNDER A NUMBER OF FHA PROGRAMS WAS INCREASED FROM 50 PERCENT TO 75 PERCENT. LIMITS ON MOBILE HOME LOANS WERE ALSO INCREASED.

**\*2341** THE COMMITTEE WAS RELUCTANT TO MAKE THESE ADJUSTMENTS AND DID SO ONLY AFTER CAREFULLY WEIGHING THE NEED TO MAINTAIN THE FHA PROGRAM'S COMPETITIVE POSITION AGAINST THE RISK OF INCREASING HOUSING INFLATION. IT WAS CLEAR TO THE COMMITTEE THAT THE TRADITIONAL RELATIONSHIP BETWEEN FHA MORTGAGE LIMITS AND MEDIAN HOME PRICES HAS BEEN SEVERELY STRAINED. PROPERTIES WHICH WOULD HAVE BEEN INSURED TWO YEARS AGO OR EVEN LAST YEAR ARE NO LONGER ABLE TO BE INSURED. IN ORDER TO SERVE THE SAME GROUP AS THE PROGRAMS HAVE IN PREVIOUS YEARS THE MORTGAGE LIMITS WOULD THEREFORE HAVE TO BE RAISED. HOWEVER, IT WAS EQUALLY CLEAR THAT THERE IS STILL A GREAT DEAL OF ROOM BETWEEN THE EXISTING LIMITS AND THE AVERAGE INSURED LOAN. FOR EXAMPLE, DURING 1978 THE AVERAGE SINGLE FAMILY SECTION 203(B) LOAN WAS $38,076 FOR A NEW HOME AND $31,994 FOR AN EXISTING HOME, WELL BELOW

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



THE $60,000 LIMIT FOR THE PROGRAM. SIMILARLY, FOR THE MOBILE HOME PROGRAMS, THE AVERAGE LOAN WAS ONLY $13,756, AND THAT AVERAGE INCLUDED BOTH SINGLE WIDE ($16,000 LIMIT) AND DOUBLE WIDE ($24,000 LIMIT) MOBILE HOMES. THE KEY CONCERN OF THE COMMITTEE, HOWEVER, WAS THAT RAISING THE MORTGAGE LIMITS MIGHT CONTRIBUTE TO INFLATION. IF BY RAISING THE LIMITS MORE FAMILIES WOULD BUY HIGHER PRICED HOUSING, THE LIMITS WOULD TEND TO BE INFLATIONARY. THIS INFLATIONARY TENDENCY IS AGGRAVATED BY A TIGHT HOUSING MARKET, SUCH AS WE ARE NOW EXPERIENCING. IN A MARKET WHERE SUPPLY IS OUT OF BALANCE WITH DEMAND, REMOVING A CONTAINING INFLUENCE ON THE ABILITY OF PEOPLE TO PAY HIGHER PRICES MAY CAUSE PRICES TO INCREASE WITHOUT A COMMENSURATE INCREASE IN EITHER THE QUALITY OR QUANTITY OF HOUSING PURCHASED AND THUS CAUSE INFLATION. HOWEVER, THE COMMITTEE ON BALANCE BELIEVED THAT BY RAISING THE LIMITS AN AVERAGE OF 8 PERCENT, THE RISK OF INFLATION WOULD BE MITIGATED WHILE THE PROGRAMS WOULD BE ABLE TO CONTINUE TO SERVE THEIR PRIMARY MARKET.

MOBILE HOME REPORT

DURING MARKUP OF THIS BILL, THE COMMITTEE CONSIDERED CHANGING THE TERM 'MOBILE HOME' TO 'MANUFACTURED HOUSING' EVERYWHERE THAT IT APPEARS IN THE NATIONAL HOUSING ACT. FURTHER CONSIDERATION OF THIS PROPOSAL WAS POSTPONED BECAUSE THE COMMITTEE WAS CONCERNED THAT IT MAYBE MORE THAN A TECHNICAL NOMENCLATURE CHANGE. THE COMMITTEE DIRECTS THE HUD SECRETARY TO REVIEW THIS PROPOSAL, PARTICULARLY WITH REGARD TO ITS LEGAL AND REGULATORY IMPLICATIONS, AND TO REPORT BACK TO THE COMMITTEE AS SOON AS POSSIBLE. IT HAS BEEN THE COMMITTEE'S EXPERIENCE THAT SO-CALLED 'TECHNICAL CHANGES' IN THE NATIONAL HOUSING ACT, ESPECIALLY THOSE ALTERING DEFINITIONS OR TERMS, OFTEN REFLECT MAJOR NEW POLICY DIRECTIONS.

**\*23** WHILE IT IS TRUE THAT IN MANY AREAS OF THE COUNTRY MOBILE HOMES ARE NOT MOBILE HOMES BUT MANUFACTURED HOUSING UNITS WHICH ARE PLACED AND ANCHORED ON A SITE AND BECOME PERMANENT AND FIXED RESIDENCES, **\*26** MANY MOBILE HOMES, THEMSELVES, ARE STILL BEING FINANCED UNDER THE TITLE I FHA INSURANCE PROGRAM. BEFORE THE COMMITTEE COULD PROCEED WITH FURTHER CONSIDERATION, A CAREFUL DEFINITION OF WHAT A MOBILE HOME AND A MANUFACTURED HOUSING UNIT IS, WOULD HAVE TO BE DELINEATED, AND THE LEGAL AND REGULATORY EFFECTS THAT SUCH A CHANGE MIGHT MAKE WOULD HAVE TO BE SET FORTH.

**\*2342** THIS REPORT SHOULD ALSO EXAMINE THE BASIS UPON WHICH A MOBILE HOME MAY QUALIFY FOR THE HIGHER LOAN LIMITS. SECTION 2(B) OF THE NATIONAL HOUSING ACT QUALIFIED MOBILE HOMES COMPOSED OF TWO OR MORE MODULES FOR THE HIGHER LOAN LIMITS. PRESENTLY SINGLE MODULE MOBILE HOMES GENERALLY RANGE FROM 775 TO 1050 SQUARE FEET, WHILE TWO MODULE OR 'DOUBLE WIDE' HOMES RANGE FROM 900 TO 1450 SQUARE FEET IN SIZE. HOWEVER, SOME SINGLE MODULE HOMES OR HOMES COMPOSED OF ONE AND ONE-HALF MODULES ARE PRESENTLY BEING BUILT WHICH PROVIDE OVER 1100 SQUARE FEET OF LIVING SPACE. UNDER EXISTING LAW THESE HOMES ONLY QUALIFY FOR THE LOWER LOAN LIMITS. IT MAY BE THAT AS AN ALTERNATIVE TO MULTIPLE MODULE CONSTRUCTION, OTHER FACTORS SUCH AS TOTAL SQUARE FOOTAGE OR ATTACHMENT TO A PERMANENT FOUNDATION SHOULD BE USED TO DEFINE ELIGIBILITY FOR HIGHER LOAN LIMITS.

FINALLY, UNDER EXISTING REGULATIONS DEFINING THE MOBILE HOME LOT OR COMBINATION MOBILE HOME AND LOT LOAN PROGRAMS, THE PROPORTIONATE VALUE OF COMMON AREAS AND IMPROVEMENTS MAY BE CONSIDERED WHEN ESTABLISHING THE VALUE OF A PARTICULAR LOT LOCATED IN A PLANNED UNIT DEVELOPMENT. HUD SHOULD CONSIDER

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



TREATING THE VALUE OF COMMON AREAS AND IMPROVEMENTS SIMILARLY WHEN THE LOT OR THE MOBILE HOME AND LOT ARE IN A CONDOMINIUM DEVELOPMENT.

FEDERAL HOME LOAN MORTGAGE CORPORATION ACT AMENDMENT

THE COMMITTEE AMENDMENT TO THE FEDERAL HOME LOAN MORTGAGE CORPORATION ACT IS INTENDED TO ASSURE A BROADER MARKET FOR THE CORPORATION'S SECURITIES. SINCE FHLMC IS A TAX-EXEMPT FEDERAL ENTITY, THE COMMITTEE AGREED TO PROVIDE ITS SECURITIES WITH SPECIAL STATUS AS IT RELATES TO THE DEFINITION OF LEGAL INVESTMENTS BY ANY PERSON, TRUST OR ORGANIZATION CREATED TO OR EXISTING UNDER ANY STATE LAW, AND TO ALLOW SUCH SECURITIES TO BE PLEDGED AS SECURITY FOR PUBLIC DEPOSITS. IN ENACTING THIS AMENDMENT, THE COMMITTEE NOTES THAT IN NONE OF THE INSTANCES WHERE STATUTES ARE BEING OVERRIDDEN, DOES IT APPEAR THAT THE STATUTE WAS INTENDED TO EXCLUDE SECURITIES ISSUED BY THE CORPORATION.

GNMA LIMITS

THE COMMITTEE HAS ACTED TO PERMIT GNMA TO PURCHASE MORTGAGES THAT HAVE PER DWELLING UNIT COSTS IN EXCESS OF APPLICABLE STATUTORY MAXIMUM MORTGAGE LIMITS IF SUCH MORTGAGES ARE INSURED UNDER SECTION 221(D)(3) OR 221(D)(4) AND ARE IN PROJECTS THAT ARE ASSISTED THROUGH SECTION 8 CONTRACTS. THIS ACTION IS IN FURTHERANCE OF THE COMMITTEE'S INTENT TO ASSURE THAT LOW AND MODERATE INCOME PERSONS ARE THE PRIMARY BENEFICIARIES OF GNMA'S MORTGAGE PURCHASE ACTIVITIES.

**27 FHA MINIMUM PROPERTY STANDARD THERMAL REQUIREMENTS**

**24** HUD HAS RECENTLY ISSUED AN INTERIM RULE, TO BECOME EFFECTIVE ON MAY 16, 1979, WHICH REVISED THE THERMAL REQUIREMENTS OF THE FHA MINIMUM PROPERTY STANDARDS FOR SINGLE FAMILY CONSTRUCTION. THE COMMITTEE WAS PLEASED TO SEE THE DEPARTMENT RESPOND IN A TIMELY FASHION TO THE MANDATE OF THE NATIONAL ENERGY POLICY CONSERVATION ACT, PUBLIC LAW 95-619, TO REVISE THE MINIMUM PROPERTY STANDARDS TO ACHIEVE **2343** A SIGNIFICANT INCREASE IN THE ENERGY EFFICIENCY OF NEW BUILDINGS. HOWEVER, THE COMMITTEE IS CONCERNED THAT A COST-BENEFIT ANALYSIS WAS CONDUCTED ONLY FOR FRAME CONSTRUCTION AND THAT THE DEPARTMENT IGNORED THE ECONOMIC IMPACT OF REQUIRING SIMILAR STANDARDS FOR MASONRY CONSTRUCTION. ALTHOUGH HUD HAS ACKNOWLEDGED THIS OVERSIGHT AND HAS DIRECTED THE NATIONAL BUREAU OF STANDARDS TO CONDUCT A COST-BENEFIT ANALYSIS IN ORDER TO ESTABLISH EQUITABLE ENERGY EFFICIENCY STANDARDS FOR MASONRY CONSTRUCTION, THAT ANALYSIS WILL NOT BE COMPLETE UNTIL APPROXIMATELY 2 MONTHS AFTER THE STANDARDS GO INTO EFFECT. GIVEN THE SCOPE OF THESE STANDARDS AND THEIR POTENTIAL IMPACT ON NATIONAL BUILDING PRACTICES, THE DEPARTMENT SHOULD HAVE COMPLETED SUCH A CRITICAL ANALYSIS PRIOR TO ISSUING THE STANDARDS AS FINAL. ACCORDINGLY, THE COMMITTEE IS FOR THE FIRST TIME EXERCISING THE POWER CREATED BY SECTION 7(O) OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ACT OF 1965 AS AMENDED BY THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1978. THE IMMEDIATE IMPACT OF REPORTING THE RESOLUTION OF DISAPPROVAL OF THE THERMAL REQUIREMENTS AS THEY APPLY TO MASONRY CONSTRUCTION IS TO DELAY THE EFFECTIVE DATE OF THOSE REGULATIONS FOR THREE MONTHS FROM MAY 10, 1979, THE DATE THE RESOLUTION WAS REPORTED OUT OF THIS

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



COMMITTEE. THREE MONTHS SHOULD GIVE THE DEPARTMENT ADEQUATE TIME TO REVIEW AND, IF JUSTIFIED BASED ON DATA PRESENTED DURING THE COMMENT PERIOD FOR THE INTERIM RULE AND DEVELOPED PURSUANT TO THE NATIONAL BUREAU OF STANDARDS ANALYSIS, TO MODIFY THE STANDARD AS IT APPLIES TO VARIOUS TYPES OF MASONRY CONSTRUCTION.

THE COMMITTEE IS AWARE THAT IN ADDITION TO THE ANALYSIS PRESENTLY BEING DONE FOR HUD, BOTH THE DEPARTMENT OF ENERGY AND THE FARMERS HOME ADMINISTRATION HAVE AUTHORIZED COST-BENEFIT ANALYSES OF THE IMPACT ON MASONRY CONSTRUCTION OF INCREASED THERMAL EFFICIENCY CONSTRUCTION STANDARDS. IT IS OF GREAT CONCERN TO THE COMMITTEE THAT BECAUSE EACH STUDY IS BASED ON SLIGHTLY DIFFERENT ASSUMPTIONS ABOUT CONSTRUCTION PRACTICES, COMPONENT COSTS, LIVING HABITS, FUEL COSTS AND ENVIRONMENTAL FACTOR, COSTLY AND UNNECESSARY DUPLICATION IS OCCURRING. A SIMILAR PROBLEM EXISTS IN ESTABLISHING COST-EFFECTIVE ENERGY STANDARDS FOR REHABILITATION PROGRAMS. THE SECRETARY OF ENERGY, IN COORDINATION WITH THE SECRETARY OF HUD AND OTHER AGENCY ADMINISTRATORS, HAS RESPONSIBILITY FOR DEVELOPING STANDARDS FOR THE APPLICATION OF COST-EFFECTIVE ENERGY MEASURES IN THE LOW-INCOME WEATHERIZATION GRANT PROGRAM AUTHORIZED BY SECTION 413(B) OF THE ENERGY CONSERVATION IN EXISTING BUILDINGS ACT. SEVERAL PROVISIONS IN THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1978 DIRECTED THE SECRETARY OF HUD TO DEVELOP COST-EFFECTIVE ENERGY CONSERVATION STANDARDS FOR REHABILITATION ACTIVITY CONDUCTED PURSUANT TO THE SECTION 312 REHABILITATION *28 LOAN PROGRAM AND THE SECTION 203(K) REHABILITATION LOAN INSURANCE PROGRAM. AS OF THIS DATE, THE SECRETARY OF ENERGY IS PROCEEDING IN ONE DIRECTION AND THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT IS PROCEEDING IN ANOTHER.

*25 GIVEN THE VITAL SIGNIFICANCE TO THIS NATION OF THE FEDERAL GOVERNMENT DEVELOPING A RATIONAL AND CONSISTENT APPROACH TO ENERGY CONSERVATION, IT IS ABSOLUTELY NECESSARY THAT THE THREE AGENCIES INVOLVED IN DEVELOPING CONSERVATION STANDARDS FOR NEW AND REHABILITATED HOUSING CONSTRUCTION SHOULD WORK CLOSELY TOGETHER TO REACH A CONSENSUS ABOUT THE ASSUMPTIONS AND DATA USED IN DEVELOPING THESE STANDARDS. ACCORDINGLY,*2344 THE COMMITTEE DIRECTS THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT, THE SECRETARY OF ENERGY AND THE ADMINISTRATOR OF THE FARMERS HOME ADMINISTRATION TO COORDINATE THEIR EFFORTS SO THIS NATION WILL NOT BE WHIPSAWED BY CONFLICTING ENERGY STANDARDS APPLYING TO RESIDENTIAL CONSTRUCTION OR REHABILITATION.

SECTION 203(I) RURAL HOUSING INSURANCE

THE COMMITTEE HAS CHANGED TWO REQUIREMENTS IN THE FHA RURAL HOUSING INSURANCE PROGRAM. THE COMMITTEE HAS REDUCED THE MINIMUM SIZE OF A PROPERTY INSURED UNDER SECTION 203(I) FROM 5 ACRES TO 2 AND ONE-HALF ACRES AND REQUIRED THAT THE PROPERTY BE ADJACENT TO A 'ALL WEATHER' ROAD RATHER THAN A 'PUBLIC HIGHWAY ' UNDER EXISTING LAW. THESE CHANGES ARE MADE BY THE COMMITTEE SO AS TO MAKE INSURANCE PROVISION OPERABLE IN RURAL AREAS. ORIGINALLY, THIS PROGRAM WAS ENACTED TO LIBERALIZE FHA'S INSURING PROGRAM IN CONSIDERATION OF THE SPECIAL NEEDS FOR FARM HOUSING. AT THAT TIME FHA MINIMUM PROPERTY STANDARDS WERE CONSIDERED AS TOO STRICT FOR RURAL AREAS. THUS FHA WAS PERMITTED TO ESTABLISH LOWER PROPERTY STANDARDS FOR INSURING LOANS IN RURAL AREAS PROVIDED THAT THE PROPERTY WAS ADJACENT TO A PUBLIC HIGHWAY AND WAS LOCATED ON A LOT OF NO LESS THAN 5 ACRES IN SIZE. FOR THE PAST SIX YEARS, HOWEVER, FHA HAS APPLIED THE SAME MINIMUM PROPERTY

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



STANDARDS AS IN THE REGULAR 203(B) INSURING PROGRAM-- EXCEPT FOR THE ROAD AND LOT SIZE REQUIREMENT. THUS, THE 203(I) PROGRAM IS ACTUALLY STRICTER THAN THE REGULAR 203(B) PROGRAM. THE COMMITTEE WISHES TO ENCOURAGE THE USE OF FHA INSURANCE PROGRAMS IN ORDER TO ASSIST IN THE DEVELOPMENT OF RURAL AREAS WHERE MORTGAGE CREDIT TENDS TO BE IN SHORT SUPPLY. IT IS CONCERNED, HOWEVER, THAT THE UNDERWRITING STANDARDS USED IN SECTION 203(B) CONTINUE TO APPLY TO PROPERTIES ASSISTED UNDER SECTION 203(I) AND THAT THE SECRETARY NOT PROVIDE INSURANCE UNDER THIS PROVISION UNLESS, OTHER THAN WITH RESPECT TO THE SIZE OF THE LOT AND ITS LOCATION TO ROADS, IT IS REQUIRED TO MEET FHA SECTION 203(B) MINIMUM PROPERTY STANDARDS.

CONDOMINIUMS

THE COMMITTEE CONDUCTED HEARINGS ON H.R. 2792, THE CONDOMINIUM ACT OF 1979 IN RESPONSE TO THE REQUEST OF MANY MEMBERS OF THE CONGRESS AND REPORTS OF A SIGNIFICANT NUMBER OF CONSUMER PROBLEMS AND DEVELOPER ABUSES WITH RESPECT TO CONDOMINIUM DEVELOPMENT AND CONVERSIONS.

THE COMMITTEE IS CONSCIOUS OF THE RAPIDLY EXPANDING CONDOMINIUM MARKET. THIS GROWTH STEMS FROM THE ADVANTAGES PERCEIVED BY BOTH PURCHASERS AND DEVELOPERS. TO PURCHASERS, CONDOMINIUMS OFFER RELATIVE **\*29** EASE OF MAINTENANCE COMBINED WITH EQUITY APPRECIATION AND TAX ADVANTAGES MORE TRADITIONALLY ASSOCIATED WITH SINGLE FAMILY HOUSING. IN ADDITION, THE RISING COST OF DETACHED HOUSING HAS CREATED A DEMAND FOR THIS OFTEN LESS EXPENSIVE FORM OF ACQUIRING HOME OWNERSHIP. FOR DEVELOPERS, RISING COSTS CREATE PRESSURE FOR HIGHER DENSITIES AND THE IMPACT OF RENT CONTROL MEASURES ON PROFITABILITY SOMETIMES LEAD POTENTIAL BUILDERS OF NEW MULTIFAMILY HOUSING, AS WELL AS OWNERS OF EXISTING RENTAL PROJECTS, TO CONVERT THEIR PROJECTS TO CONDOMINIUMS.

**\*26** H.R. 2792 ADDRESSES A SERIES OF PROBLEMS WHICH MANY WITNESSES INDICATED NEED TO BE ADDRESSED IF THE CONGRESS IS TO ASSURE THAT MINIMUM **\*2345** STANDARDS AND PROTECTIONS ARE TO BE OFFERED TO THE GROWING NUMBER OF AMERICANS WHO RESIDE IN CONDOMINIUMS. IN ADDITION TO SETTING FORTH NATIONAL STANDARDS FOR CONSUMER PROTECTION AND DISCLOSURE REQUIREMENTS, H.R. 2792 ATTEMPTS TO RESOLVE THE PARTICULAR PROBLEM OF THE LONG-TERM RECREATION LEASE CONTAINING AN AUTOMATIC ESCALATOR CLAUSE. MORE PARTICULARLY, PROPONENTS OF THE LEGISLATION EXPRESSED STRONG CONCERN OVER WHAT THEY BELIEVE TO BE SPECIAL PROBLEMS WHICH EXIST IN SOUTH FLORIDA WHERE THE COMBINATION OF THE RELATIVELY LOW COST OF PURCHASING CONDOMINIUM UNITS AND THE DESIRABLE CLIMATE HAS ATTRACTED LARGE NUMBERS OF RETIREES WHO LIVE ON FIXED INCOMES.

WITNESSES FROM THIS AREA STRONGLY CRITICIZED LONG-TERM RECREATIONAL LEASES AND MANAGEMENT CONTRACTS AND AGREEMENTS AS UNCONSCIONABLE, RESULTING FROM ALLEGEDLY CONSCIOUS ATTEMPTS BY DEVELOPERS TO CHEAT, DECEIVE AND MISLEAD PURCHASERS. THE COMMITTEE RECEIVED TESTIMONY THAT THE DOCUMENTS EXECUTED BY CONDOMINIUM PURCHASERS ARE GENERALLY BEYOND THE COMPREHENSION OF THE AVERAGE CONSUMER; THE LEGAL RELATIONSHIPS INVOLVED IN THE CREATION OF A CONDOMINIUM ARE COMPLEX AND THE DOCUMENTATION REQUIRED FOR THE CREATION OF A CONDOMINIUM FREQUENTLY EXCEEDS 100 PAGES. PURCHASERS DO NOT UNDERSTAND THEIR RIGHTS AND RESPONSIBILITIES UNTIL PROBLEMS ARISE AND LONG-TERM OR PREVIOUSLY UNRECOGNIZED FINANCIAL OBLIGATIONS BECOME PAINFULLY APPARENT.

THE COMMITTEE BELIEVES THAT STATES AND LOCAL GOVERNMENTS NOW PERCEIVE THE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:09-cv-04651-DLC     Document 17-5     Filed 12/18/2009     Page 29 of 83

H.R. REP. 96-154                                                                    Page 29



NEED TO ENACT APPROPRIATE SAFEGUARDS AND ARE TAKING STEPS TO SOLVE THESE PROBLEMS. ACCORDINGLY, IT DOES NOT, AT THIS TIME, SEE AN OVERWHELMING NEED FOR ESTABLISHING NATIONAL MINIMUM STANDARDS OF DISCLOSURE AND PROTECTION.

THE COMMITTEE IS LESS SANGUINE, HOWEVER, ABOUT THE PROBLEMS CREATED BY LONG-TERM RECREATIONAL LEASES AND SO-CALLED 'SWEETHEART' MANAGEMENT CONTRACTS. MANY CONDOMINIUMS, AS WELL AS COOPERATIVES, WERE SOLD WITH LONG-TERM RECREATION LEASES AS A CONDITION OF PURCHASE. THESE LEASES CONTAIN AUTOMATIC ESCALATOR CLAUSES, USUALLY TIED TO THE CONSUMER PRICE INDEX, WHICH BEAR NO RELATIONSHIP TO THE COST OF REPAIRS AND MAINTENANCE OF THE FACILITIES BEING LEASED. IF A UNIT OWNER FAILS TO PAY THESE CHARGES, HE OR SHE FACES FORECLOSURE ON THE UNIT. THIS PROBLEM IS PARTICULARLY ACUTE IN FLORIDA. THE COMMITTEE RECEIVED CONFLICTING TESTIMONY AS TO WHY THE FLORIDA COURTS AND LEGISLATURE HAVE BEEN UNABLE OR UNWILLING TO RESOLVE PROBLEMS ASSOCIATED WITH THESE AGREEMENTS. IN LIGHT OF THIS CONFLICTING TESTIMONY AND BECAUSE THE RESOLUTION OF THESE MATTERS IS NOT BEING ACTIVELY DEBATED WITHIN THE STATE OF FLORIDA, THE COMMITTEE IS UNPREPARED TO ENACT THE FAR-REACHING LEGISLATION PROPOSED IN H.R. 2792. IN ADDITION, THE COMMITTEE NOTES THAT A NUMBER OF CONDOMINIUM ASSOCIATIONS ARE BUYING THEIR LEASES FROM DEVELOPERS AND BELIEVES THAT SUCH BUY-OUTS ARE A TREND WHICH SHOULD *30 BE ENCOURAGED. THE COMMITTEE URGES BOTH DEVELOPERS AND UNIT-OWNERS TO ACT IN GOOD FAITH IN NEGOTIATING SUCH BUY-OUTS SO THAT THE AGREED-UPON PURCHASE PRICES WILL BE RELATED TO ACTUAL VALUE AND NOT PROVE TO BE AS BURDENSOME AND CONTROVERSIAL AS THE LEASES THEMSELVES.

*27 THE COMMITTEE EXPECTS TO MONITOR CLOSELY DEVELOPMENTS IN FLORIDA AND THROUGHOUT THE NATION IN ORDER TO DETERMINE WHAT FURTHER ACTION SHOULD BE TAKEN IN THIS AREA. IF THE RECREATIONAL LEASE AND OTHER ALLEGED ABUSES ARE NOT ALLEVIATED, OR IF ADDITIONAL PROBLEMS WHICH ARE BEYOND THE REACH OF STATE AND LOCAL GOVERNMENTS BECOME EVIDENT, THE COMMITTEE WOULD EXPECT TO TAKE ACTION IN THE FUTURE.

*2346 TITLE IV-- INTERSTATE LAND SALES

BACKGROUND

ELEVEN YEARS AGO CONGRESS PASSED THE INTERSTATE LAND SALES FULL DISCLOSURE ACT IN RESPONSE TO EVIDENCE OF EXTENSIVE FRAUD IN THE LAND SALES INDUSTRY. PURCHASERS LIVING IN THE SAME STATE WHERE THE LAND WAS LOCATED OR LIVING OUT OF STATE WERE PERSUADED TO BUY LAND THEY HAD NEVER SEEN BY SOPHISTICATED SALES FORCES PROMISING THAT LAND (WHICH MIGHT BE UNDER WATER OR SUITABLE ONLY FOR GRAZING PURPOSES) WAS A GOOD INVESTMENT, SUITABLE FOR HOMESITES AND EASILY RESALEABLE. WHERE LAND IS EXEMPT FROM THE PROVISIONS OF THE INTERSTATE LAND SALES FULL DISCLOSURE ACT, THESE PROBLEMS STILL EXIST. A RECENT SERIES OF NEWSPAPER ARTICLES IN THE ARMY TIMES, DESCRIBING PROBLEMS FACED BY ARMY PERSONNEL WHO BOUGHT EXEMPT LAND, IS REMINISCENT OF THOSE STORIES HEARD BY THE CONGRESS MORE THAN ELEVEN YEARS AGO.

IN MANY RESPECTS THE REGISTRATION AND DISCLOSURE PROCEDURES REQUIRED BY THE ACT AND THE ENFORCEMENT ACTIVITIES UNDERTAKEN BY THE OFFICE OF INTERSTATE LAND SALES REGISTRATION AT HUD (OILSR) HAVE SUCCEEDED IN CHANGING INDUSTRY PRACTICES. CONSUMERS HAVE ALSO BEEN ABLE TO MAKE MORE INFORMED JUDGMENTS ABOUT THEIR

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



PURCHASES AFTER READING THE FEDERALLY REQUIRED PROPERTY REPORT. HOWEVER, EVEN WITH REGISTERED SUBDIVISIONS, PROBLEMS CONTINUE AS A RESULT OF THE FAILURE OF DEVELOPERS TO COMPLETE PROMISED AMENITIES, THE USE OF THE INSTALLMENT SALES CONTRACT AND THE BRIEF STATUTE OF LIMITATIONS WHICH PREMATURELY CUTS OFF DEFRAUDED PURCHASERS' ABILITY TO ACHIEVE A REMEDY. IN ADDITION, SMALL BUSINESSMEN AND PERSONS WHO SELL OCCASIONAL LOTS FROM A LARGER INVENTORY OF LAND HAVE BEEN SUBJECTED TO EXTENSIVE REGULATORY REQUIREMENTS.

LAST YEAR THE SENATE VERSION OF THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1978 CONTAINED TWO PROVISIONS WHICH WOULD EXEMPT FROM THE REGISTRATION, DISCLOSURE AND FRAUD PROVISIONS OF THE ACT ALL LAND SALES THAT WERE PRIMARILY INTRASTATE IN NATURE. THE CONFERENCE COMMITTEE REJECTED THIS BROAD BRUSH APPROACH AND DIRECTED THE OFFICE OF INTERSTATE LAND SALES REGISTRATION TO CONDUCT A STUDY WHICH WOULD FOCUS ON THE PROBLEMS OF IN-STATE PURCHASERS AND SMALL DEVELOPERS.

BOTH THE STUDY AND THE EXTENSIVE HEARINGS HELD BY THE SUBCOMMITTEE ON GENERAL OVERSIGHT AND RENEGOTIATION AND THE HOUSING AND COMMUNITY DEVELOPMENT SUBCOMMITTEE OF THIS COMMITTEE CLEARLY INDICATE THE NECESSITY FOR COMPREHENSIVE AMENDMENTS TO THE ACT WHICH WILL BALANCE THE CONSUMER'S NEED FOR ADEQUATE PROTECTIONS AND REMEDIES WITH THE SMALL BUSINESSMAN'S CONCERN WITH OVER-REGULATION. THE BILL **\*31**
 ADDS SEVERAL EXEMPTIONS AND A STATE CERTIFICATION PROCEDURE WHICH WILL RESULT IN FEWER SUBDIVISIONS HAVING TO BE REGISTERED WITH OILSR BUT IT ALSO PROVIDES IMPROVED REMEDIES TO ASSIST DEFRAUDED CONSUMERS.

**\*28** THE COMMITTEE EXPECTS THE AGENCY TO DEVOTE GREATER ATTENTION TO THE INVESTIGATION AND AGGRESSIVE PURSUIT OF THOSE DEVELOPERS ENGAGED IN FRAUDULENT SALES PRACTICES. THE COMMITTEE BELIEVES THIS BILL HAS PROVIDED IMPROVED REGULATORY AUTHORITY WHICH WILL BE USEFUL IN ADDRESSING THESE PROBLEMS, BUT CLEARLY, ENFORCED PERSONNEL REDUCTIONS, SUCH AS OCCURRED LAST YEAR, CAN ONLY IMPAIR OILSR'S ABILITY TO PROTECT CONSUMERS**\*2347** WHO BUY LAND. IT IS NOT REASONABLE TO EXPECT THE AGENCY RESPONSIBLE FOR REGULATING LAND SALE THROUGHOUT THE NATION TO FUNCTION EFFECTIVELY AND AGGRESSIVELY WITH A STAFF SMALLER THAN THE NUMBER OF PEOPLE USED BY THE STATE OF CALIFORNIA TO REGULATE LAND SALES WITHIN THAT SINGLE STATE.

OILSR HAS RECENTLY PUBLISHED COMPREHENSIVE REVISIONS OF THE REGULATIONS GOVERNING THE INTERSTATE LAND SALES PROGRAM. IN MANY RESPECTS THE COMMITTEE BELIEVES THESE REGULATIONS REPRESENT AN IMPROVEMENT IN TERMS OF PROTECTING THE CONSUMER AND REDUCING THE PAPERWORK BURDEN ON DEVELOPERS. HOWEVER, THE COMMITTEE IS CONCERNED BY THE REQUIREMENT THAT EACH AND EVERY DEVELOPER COMPLETELY REVISE AND REPRINT THE PROPERTY REPORTS DELIVERED TO CONSUMERS. THIS MAY BE APPROPRIATE IN INSTANCES WHERE THE NATURE OF THE SUBDIVISION OFFERING HAS CHANGED RADICALLY AND SUBSTANTIAL AMENDMENTS TO THE REGISTRATION STATEMENT ARE NECESSARY. HOWEVER, IT SEEMS UNNECESSARY, COSTLY AND BURDENSOME TO REQUIRE NEW PROPERTY REPORTS THAT ONLY REORGANIZE INFORMATION ALREADY AVAILABLE IN EXISTING PROPERTY REPORTS. A REASONABLE ALTERNATIVE WOULD BE TO REQUIRE A DEVELOPER TO ADD A CLARIFYING ADDENDUM TO AN EXISTING PROPERTY REPORT.


EXEMPTIONS FROM REGISTRATION AND DISCLOSURE REQUIREMENTS OF THE ACT


THE BILL, AS APPROVED BY THE COMMITTEE, INSTEAD OF EXEMPTING ALL LARGE AND

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



SMALL DEVELOPERS WHO SELL PRIMARILY TO IN-STATE RESIDENTS, WOULD FOCUS PRECISELY ON THE PROBLEMS OF SMALL BUSINESSMEN AND WOULD RELIEVE MANY FROM AN EXPENSIVE REGULATORY BURDEN. NO FEDERAL REGISTRATION STATEMENT OR PROPERTY REPORT WOULD HAVE TO BE PREPARED FOR THE SALE OF **LOTS** WHEN: (1) THE **LOTS** ARE IN A SUBDIVISION CONTAINING LESS THAN **100 LOTS**; (2) FEWER THAN 12 **LOTS** ARE SOLD PER YEAR FROM A SUBDIVISION CONTAINING **100** OR MORE **LOTS**; AND (3) MORE THAN **100 LOTS** ARE OFFERED FOR SALE BUT THE **LOTS** ARE SCATTERED IN SEPARATE SITES, EACH SITE CONTAINS FEWER THAN 10 **LOTS** AND EACH PURCHASER MAKES AN ON-SITE INSPECTION PRIOR TO SALE.

THE COMMITTEE BILL WOULD RAISE THE EXEMPTION FROM THE REGISTRATION AND DISCLOSURE PROVISIONS TO SUBDIVISIONS OF LESS THAN **100 LOTS**, AND WOULD CLARIFY THAT ONLY NON-EXEMPT **LOTS** WOULD BE COUNTED TO REACH THE **100-LOT** THRESHOLD. OILSR INTERPRETED PRIOR LAW TO REQUIRE A DEVELOPER WHO HAD A SUBDIVISION CONTAINING 80 LOTS, 10 OF WHICH WERE NON-EXEMPT RAW LAND, 50 OF WHICH WERE EXEMPT BECAUSE THEY HAD HOMES ON THEM, AND 20 OF WHICH WERE EXEMPT BECAUSE THEY WERE PLANNED FOR COMMERCIAL DEVELOPMENT, TO REGISTER THE 10 NON-EXEMPT UNDEVELOPED LOTS BECAUSE THE TOTAL NUMBER OF LOTS IN THE SUBDIVISION EXCEEDED THE STATUTORY **\*32** THRESHOLD OF 50 LOTS. THAT TYPE OF AGGREGATION OF OTHERWISE EXEMPT LOTS COULD NO LONGER OCCUR.

**\*29** EXEMPTIONS ARE PROVIDED FOR SUBDIVISIONS WITH FEWER THAN 12 SALES PER YEAR AND FOR SCATTERED SITE SUBDIVISIONS HAVING LESS THAN 10 LOTS IN EACH SITE. THE COMMITTEE BELIEVES THAT THESE EXEMPTIONS ARE APPROPRIATE BECAUSE IT IS LESS LIKELY THAT AN EXTENSIVE SALES CAMPAIGN OR PROMISES OF ELABORATE FUTURE AMENITIES WILL OCCUR IN THESE SITUATIONS. OILSR'S NEW REGULATIONS INCLUDE A SCATTERED SITE EXEMPTION FOR WHEN EACH SITE CONTAINS FEWER THAN 49 LOTS EACH. THE COMMITTEE IS CONCERNED THAT A **\*2348** LARGE DEVELOPER COULD TOO EASILY CIRCUMVENT THE INTENT OF THE ACT BY OFFERING LAND IN NUMEROUS 49 LOT PARCELS SO IT HAS LIMITED THE SCATTERED SITE EXEMPTION TO SITES CONTAINING 10 OR FEWER LOTS.

THE COMMITTEE ALSO REFINED THE EXEMPTION ENACTED INTO LAW LAST YEAR WHICH APPLIED TO THE SALE OF FULLY DEVELOPED, SINGLE-FAMILY LOTS IN REGULATED JURISDICTIONS. THE AMENDMENTS REMOVE UNNECESSARILY STRICT REQUIREMENTS BUT RETAIN PROTECTIONS NEEDED BY PURCHASERS. THE EXEMPTION WOULD APPLY TO THE SALE OF SINGLE-FAMILY LOTS, EVEN WHEN THE LOTS ARE LOCATED IN A MIXED-USE DEVELOPMENT. THE REVISED PROVISION WOULD ALLOW THE USE OF A DEED OR GRANT OTHER THAN A WARRANTY DEED IN JURISDICTIONS WHERE A WARRANTY DEED IS NOT COMMONLY USED AND WHERE THE ALTERNATIVE DEED INCLUDES AT LEAST TWO IMPORTANT PROTECTIONS: A WARRANTY THAT THE GRANTOR HAS NOT CONVEYED THE LOT TO ANOTHER PERSON AND THAT THE LOT IS FREE FROM ENCUMBRANCES MADE BY THE GRANTOR. IN RECOGNITION OF DIFFERENT STATE PRACTICES, THE EXEMPTION WOULD BE LONGER REQUIRE A POLICY OF TITLE INSURANCE, BUT AT THE TIME OF CLOSING A TITLE INSURANCE BINDER OR TITLE OPINION WOULD HAVE TO BE ISSUED. THE SUBDIVISION'S STREETS COULD BE MAINTAINED EITHER BY THE LOCAL GOVERNMENT OR BY A HOMEOWNERS ASSOCIATION; WHERE A HOMEOWNERS ASSOCIATION IS OBLIGATED TO MAINTAIN THE ROADS, THE SELLER WOULD HAVE TO PROVIDE TO THE PURCHASER OR LESSEE PRIOR TO SIGNING THE CONTRACT OF SALE OR LEASE, A GOOD FAITH WRITTEN ESTIMATE OF THE COST OF CARRYING OUT SUCH AN OBLIGATION OVER THE FIRST TEN YEARS. THIS PROVISION WAS AMENDED TO RECOGNIZE THAT MANY HIGH QUALITY SUBDIVISIONS CONTAIN PROVIDE ROADS BUILT TO STANDARDS APPLICABLE TO LOCAL PUBLIC STREETS AND HIGHWAYS.

THE REQUIREMENT THAT FUTURE COSTS BE DISCLOSED IN INTENDED TO ASSURE THAT PURCHASERS BE ADVISED OF THE EXTENT OF THE OBLIGATION THE HOMEOWNERS

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



ASSOCIATION WOULD HAVE FOR MAINTENANCE AND FOR ANY COSTS, INCLUDING BALLOON PAYMENTS RELATED TO THE CONSTRUCTION OF THE ROAD. WHILE IT WOULD BE IMPOSSIBLE FOR A DEVELOPER TO PROJECT THE EXACT COST OF MAINTAINING THE ROADS OVER 10 YEARS, A GOOD FAITH WRITTEN ESTIMATE SHOULD TAKE INTO ACCOUNT FACTS AND INFORMATION AS THEY EXIST AT THE TIME THE ESTIMATE IS MADE INCLUDING THE LIKELIHOOD OF NEEDED REPAIR GIVEN THE QUALITY OF THE ROAD CONSTRUCTED, LOCAL WEATHER AND TRAFFIC CONDITIONS AND REASONABLE PROJECTIONS REGARDING THE IMPACT OF INFLATION. FINALLY, THE AMENDMENT WOULD RESTRICT THE DEVELOPER'S USE OF THE TELEPHONE OR MAIL FOR PURPOSES OF OFFERING PROMOTIONAL GIFTS, TRIPS OR DINNERS, BUT NOT FOR OTHER BUSINESS PURPOSES.

*30 A NEW EXEMPTION HAS BEEN ADDED WHICH WOULD APPLY TO THE SALE OR LEASE OF LOTS WHERE ONE SELLER PROVIDES THE LOT AND A SECOND SELLER PROVIDES A MOBILE HOME WHICH WILL BE DELIVERED AND ERECTED UPON THE LOT WITHIN TWO YEARS OF SIGNING THE CONTRACT OF SALE OR LEASE. TO QUALIFY FOR THIS EXEMPTION, THE SELLERS MUST DEPOSIT ALL MONEY RECEIVED FROM THE PURCHASER IN INDEPENDENTLY-CONTROLLED ESCROW ACCOUNTS UNTIL THE TRANSACTIONS *33 ARE COMPLETED AND THE MOBILE HOME IS ERECTED UPON THE LOT. THOSE FUNDS WOULD BE RELEASED TO THE PURCHASER IF THE TRANSACTION IS NOT COMPLETED WITHIN TWO YEARS. IN ADDITION, THE LOT MUST CONFORM TO LOCAL CODES FOR MOBILE HOME SUBDIVISIONS AND POTABLE WATER, SANITARY SEWAGE DISPOSAL AND ELECTRICITY MUST BE PROVIDED TO THE MOBILE HOME. THE PURCHASER MUST RECEIVE MARKETABLE TITLE AND WHERE COMMON FACILITIES, SUCH AS CLUBHOUSES, SWIMMING POOLS OR TENNIS COURTS ARE TO BE PROVIDED, THEY MUST BE COMPLETED OR FULLY FUNDED BY THE TIME THE HOME IS TO BE DELIVERED.

*2349 WHILE THE BILL LESSENS THE REGULATORY BURDEN BY EXEMPTING SEVERAL TYPES OF LAND SALES, THE BILL WOULD DELETE TWO EXEMPTIONS FOUND IN EXISTING LAW AND WOULD MODIFY A THIRD. ONE OF THE MAJOR LAND SALES PROBLEMS IS THE FREQUENCY OF BANKRUPTCY BY DEVELOPERS AND THEIR SUBSEQUENT FAILURE TO COMPLETE PROMISED AMENITIES. SINCE A COURT'S PRIMARY RESPONSIBILITY, WHETHER IN BANKRUPTCY OR PROBATE, LIES IN CONSERVING THE ESTATE AND SATISFYING CREDITORS, NOT WITH PROTECTING OR INFORMING PROSPECTIVE PURCHASERS, THE EXEMPTION FOR SALES PURSUANT TO COURT ORDER HAS BEEN DELETED.

IN ADDITION, LAST YEAR HUD RECOMMENDED DELETING THE EXEMPTION FOR SALES THAT OCCURRED AFTER AN ON-SITE INSPECTION BECAUSE THE INSPECTION DID NOT ASSURE THAT PURCHASERS WOULD BE ADEQUATELY INFORMED OF THE POTENTIAL PROBLEMS INVOLVED IN BUYING THAT LAND-- SUCH AS THE AVAILABILITY OF POTABLE WATER, THE EXISTENCE OF POTENTIAL EARTHQUAKE HAZARDS OR THE COST OF BRINGING ELECTRICITY OR TELEPHONE SERVICE TO EACH LOT. THE REPORT OILSR RECENTLY SUBMITTED TO CONGRESS CONFIRMS THAT AT LEAST ONE-THIRD OF ALL PERSONS COMPLAINING TO OILSR REGARDING LAND SALES PROBLEMS HAD MADE AN ON-SITE INSPECTION PRIOR TO PURCHASE OR LEASE.

OILSR HAS ALSO FOUND THAT MANY DEVELOPERS, PARTICULARLY IN THE WEST, ARE SUBDIVIDING LAND INTO LOTS WHICH ARE MORE THAN FIVE ACRES IN SIZE AND SELLING THEM FOR APPROXIMATELY THE SAME AMOUNT AS SMALLER LOTS SELL FOR IN OTHER PARTS OF THE COUNTRY. THE PRICE IS LOW ENOUGH TO BE APPEALING TO THE UNSOPHISTICATED BUYER, SALES ABUSES EXIST AND PROTECTION IS NEEDED. FOR THESE REASONS, THE EXEMPTION FOR THE SALE OF LOTS OF GREATER THAN 5 ACRES IS AMENDED TO EXEMPT SALES OF LOTS WHERE AT LEAST 90 PERCENT ARE 40 ACRES OR MORE AND ANY REMAINING LOTS ARE NO LESS THAN 30 ACRES.

STATE CERTIFICATION PROCEDURES

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



**\*30** THE BILL ALSO RECOGNIZES THE BURDEN DUPLICATIVE STATE AND FEDERAL REGISTRATION AND DISCLOSURE REQUIREMENTS HAVE IMPOSED ON MANY DEVELOPERS AND PROVIDES THAT WHERE THE SECRETARY FINDS ADEQUATE STATE LAWS, COMPLIANCE WITH STATE PROCEDURES WILL BE ACCEPTABLE FOR PURPOSES OF FEDERAL REGISTRATION AND DISCLOSURE REQUIREMENTS. WHILE 23 STATES PRESENTLY ACCEPT THE HUD PROPERTY REPORT FOR STATE DISCLOSURE PURPOSES, SEVERAL STATES IMPOSE THEIR OWN REGISTRATION AND DISCLOSURE REQUIREMENTS. OTHERS HAVE STRICT DEVELOPMENT STANDARDS THAT PROVIDE CONSUMERS WITH GREATER PROTECTION THAN DISCLOSURE WOULD. IN THOSE STATES, A DEVELOPER MUST PRESENTLY COMPLY WITH TWO SETS OF PROCEDURES-- ONE FOR THE STATE AND A SEPARATE ONE FOR OILSR. EVEN IN THE STATE OF CALIFORNIA, WHICH IS OFTEN CITED AS HAVING ONE OF THE MOST AGGRESSIVE AND SUCCESSFUL STATE PROGRAMS DESIGNED TO REGULATE AND IMPROVE THE LAND SALES INDUSTRY, OILSR HAS INTERPRETED THE PRESENT LAW TO REQUIRE **\*34** DEVELOPERS TO SUBMIT EXTENSIVE INFORMATION TO OILSR BEYOND THAT REQUIRED BY THE STATE OF CALIFORNIA. IN ADDITION, OILSR REQUIRES THE DEVELOPER TO REVEAL TO PURCHASERS INFORMATION THAT IS REDUNDANT GIVEN THE THOROUGHNESS OF THE SUBSTANTIVE DEVELOPMENT STANDARDS IMPOSED BY THE STATE.

**\*31** THE BILL PROPOSES A PROCEDURE WHEREBY HUD WILL CERTIFY STATES WHOSE DISCLOSURE REQUIREMENTS, TAKEN AS A WHOLE, MEET OR EXCEED THE FEDERAL REQUIREMENTS. WHERE A STATE DOES NOT REQUIRE AS MUCH DISCLOSURE**\*2350** AS THE FEDERAL LAW BUT HAS DEVELOPMENT STANDARDS THAT PRECLUDE THE NECESSITY FOR DISCLOSING THAT INFORMATION TO CONSUMERS, A STATE MAY ALSO BE CERTIFIED. IN REVIEWING WHETHER A STATE HAS THE ADMINISTRATIVE CAPACITY TO REVIEW THE ACCURACY OF INFORMATION REQUIRED TO BE DISCLOSED UNDER STATE LAW, THE COMMITTEE IS CONCERNED THAT STATES NOT BE HELD TO A HIGHER STANDARD THAN THAT APPLIED TO OILSR'S OWN STAFF. ONCE CERTIFICATION OCCURS, A DEVELOPER SELLING OR LEASING LOTS IN THAT STATE WOULD ONLY HAVE TO COMPLY WITH THE STATE DISCLOSURE AND REGISTRATION REQUIREMENTS AND WOULD FORWARD COPIES OF THE DISCLOSURE STATEMENT AND SUPPORTING DOCUMENTATION TO OILSR. IF A STATE IS NOT CERTIFIED UNDER THIS PROGRAM, THE COMMITTEE EXPECTS THE SECRETARY TO INFORM THE STATE IN WRITING OF THE REASONS FOR THE REJECTION AND TO EXPLAIN WHAT CHANGES IN STATE LAW OR IN THE ADMINISTRATION OF THE PROGRAM WOULD BE NECESSARY FOR CERTIFICATION TO BE GRANTED. THIS PROCEDURE IS DESIGNED TO RECOGNIZE THE AGGRESSIVE ROLE PLAYED BY SEVERAL STATES AND TO ENCOURAGE OTHER STATES TO ASSUME GREATER RESPONSIBILITY FOR REGULATING THE SALE OF LAND. THE COMMITTEE BELIEVES THAT WHERE STATES HAVE NOT DEVELOPED STRONG LAWS WHICH ASSURE FULL DISCLOSURE ABOUT THE LAND IN QUESTION, CONSUMERS SHOULD NOT BE ABANDONED BY REMOVING THE PROTECTIONS AND REMEDIES PROVIDED BY THE EXISTING FEDERAL STATUTE.

FRAUD AND MISREPRESENTATION

SEVERAL AMENDMENTS EXTEND THE PROHIBITIONS AGAINST FRAUDULENT ACTIVITY AND INCREASE THE REMEDIES AVAILABLE TO CONSUMERS WHO ARE DEFRAUDED. WITH THE EXCEPTION OF SEVEN TYPES OF SALES THAT REMAIN TOTALLY EXEMPT FROM THE ACT AS UNDER EXISTING LAW (LAND ON WHICH THERE IS, OR WITHIN TWO YEARS WILL BE, A BUILDING; INDEBTEDNESS SECURED BY A MORTGAGE; REIT SECURITIES; LAND SOLD BY A GOVERNMENT AGENCY; LAND SOLD TO PERSONS IN THE CONSTRUCTION BUSINESS; CEMETERY

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



LOTS; AND LAND ZONED FOR INDUSTRIAL OR COMMERCIAL DEVELOPMENT), IT WILL BE UNLAWFUL TO USE FRAUDULENT MEANS TO SELL ALL OTHER TYPES OF LAND, EVEN LAND EXEMPT FROM THE REGISTRATION AND DISCLOSURE REQUIREMENTS OF THE ACT. BY EXTENDING THIS PROVISION TO SALES FROM SUBDIVISIONS OF LESS THAN 50 LOTS, THE COMMITTEE IS RECOGNIZING A RESPONSIBILITY TO PROVIDE CONSUMERS WITH A FEDERAL REMEDY FOR FRAUD WHETHER THE FRAUD OCCURS IN THE SALE OF A LOT OWNED BY A LARGE CORPORATE DEVELOPER OR A SMALL LOCAL DEVELOPER.

THE DEFINITION OF A PROHIBITED FRAUDULENT ACTIVITY IS AMENDED TO CONFORM MORE CLOSELY TO THE LANGUAGE FOUND IN THE SECURITIES LAWS. INSTEAD OF THE PROHIBITION AGAINST OBTAINING MONEY BY MEANS OF A MATERIAL MISREPRESENTATION WITH RESPECT TO ANY INFORMATION INCLUDED IN THE PROPERTY REPORT OR STATEMENT OF RECORD, IT WOULD BE UNLAWFUL TO SELL OR LEASE ANY LOT WHERE ANY PART OF THE STATEMENT OF RECORD OR PROPERTY REPORT CONTAINS AN UNTRUE STATEMENT OF MATERIAL FACT OR **35** OMITS TO STATE A MATERIAL FACT REQUIRED BY THE ACT OR BY REGULATIONS TO BE STATED THEREIN. INSTEAD OF THE PROHIBITION AGAINST OBTAINING MONEY BY MEANS OF A MATERIAL REPRESENTATION WITH RESPECT TO ANY OTHER INFORMATION PERTINENT TO THE LOT OR SUBDIVISION AND UPON WHICH THE PURCHASER RELIES, IT WOULD BE UNLAWFUL IN SELLING OR LEASING, OR OFFERING TO SELL OR LEASE, ANY LOT TO OBTAIN MONEY OR PROPERTY BY MEANS OF ANY UNTRUE STATEMENT OF A MATERIAL FACT OR ANY OMISSION TO STATE A MATERIAL FACT NECESSARY IN ORDER TO MAKE THE STATEMENTS MADE (IN **2351** LIGHT OF THE CIRCUMSTANCES IN WHICH THEY WERE MADE AND WITHIN THE CONTEXT OF THE OVERALL OFFER AND SALE OR LEASE) NOT MISLEADING WITH RESPECT TO ANY INFORMATION PERTINENT TO THE LOT OR SUBDIVISION. WHILE THE PURCHASER'S ACTUAL RELIANCE WOULD NO LONGER HAVE TO BE AN ELEMENT OF PROOF, IT IS CLEAR THAT IN PROVING THAT AN UNTRUE OR OMITTED FACT WAS MATERIAL, IT MUST BE ESTABLISHED THAT THE FACT WAS IMPORTANT ENOUGH THAT A REASONABLE PERSON WOULD HAVE RELIED UPON IT IN MAKING A DECISION TO PURCHASE OR LEASE THAT PARTICULAR PIECE OF LAND.

**32** THE LANGUAGE 'WITHIN THE CONTEXT OF THE OVERALL OFFER AND SALE OR LEASE' WAS INCLUDED TO MAKE CLEAR THAT A DEVELOPER IS NOT REQUIRED TO SAY EVERYTHING ABOUT THE SUBDIVISION IN EACH DISCRETE CONTACT WITH THE PURCHASER, BUT RATHER THAT WHAT THE DEVELOPER DOES CHOOSE TO SAY MUST NOT OMIT IMPORTANT FACTS THAT WOULD BE NEEDED SO THAT THE PURCHASER WOULD NOT BE MISLED. WHERE THE LACK OF A DISCLOSURE MAY CREATE A PREDISPOSITION TO PURCHASE, AND DUE TO THE NATURE OF ANY SUBSEQUENT INFORMATION, OR THE LACK THEREOF, THIS PREDISPOSITION COULD NOT BE REASONABLY EXPECTED TO BE COUNTERVAILED, THEN THE OMISSION SHOULD BE CONSIDERED MISLEADING. CLEARLY, WHEN A SELLER DRAWS ATTENTION TO INFORMATION WHICH IS FAVORABLE TO THE SALE OF THE LOT AND DELAYS PROVIDING CONTRADICTORY INFORMATION, A PREDISPOSITION IS CREATED. ANY SUBSEQUENT INFORMATION OF A COUNTERVAILING NATURE MUST BE HIGHLIGHTED; IT IS NOT SUFFICIENT SIMPLY TO DELIVER THE INFORMATION TO THE PURCHASER. THE SELLER BY OMISSION HAS TAKEN ON AN AFFIRMATIVE OBLIGATION TO MAKE THE STATEMENTS CLEAR AND UNAMBIGUOUS TO THE PURCHASER. THIS IS PARTICULARLY IMPORTANT WHERE THE PRIMARY CONTACT BETWEEN THE PURCHASER AND THE SELLER IS THROUGH ADVERTISING OR THE MAILS. IN THIS CIRCUMSTANCE AN ADVERTISEMENT FOR 'LAKESIDE PROPERTY ' WHICH OMITS TO STATE THAT THE LAKE WAS DRY FOR SIX MONTHS OF THE YEAR OR AN ADVERTISEMENT FOR 'HOMESITES' WHICH FAILS TO MENTION THAT THE LAND WAS INAPPROPRIATE FOR SEPTIC TANKS AND A MUNICIPAL SEWAGE SYSTEM WAS UNAVAILABLE WOULD BE MISLEADING.

THE BILL WOULD ALSO PROHIBIT THE USE OF ADVERTISING AND PROMOTIONAL MATERIAL WHICH IS INCONSISTENT WITH INFORMATION REQUIRED TO BE DISCLOSED IN THE PROPERTY

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



REPORT. FOR EXAMPLE, IT WOULD BE CONTRADICTORY TO ADVERTISE WOODED LOTS OR TO PICTURE WOODED HILLSIDES WHEN INFORMATION IN THE PROPERTY REPORT REVEALS THAT TIMBER RIGHTS TO THE LAND ARE UNDER OPTION OR HAVE BEEN SOLD, AND THAT THE EXERCISE OF SUCH RIGHTS WOULD DENUDE THE PROPERTY. THIS PROVISION CLEARLY DOES NOT MEAN THAT EVERYTHING INCLUDED IN THE PROPERTY REPORT MUST BE REVEALED IN THE ADVERTISING; HOWEVER, NOTHING IN THE ADVERTISING COULD CONTRADICT INFORMATION REVEALED IN THE PROPERTY REPORT.

THIS PROVISION DOES NOT GIVE OILSR THE AUTHORITY TO REQUIRE THE SUBMISSION FOR APPROVAL OF ADVERTISING MATERIAL PRIOR TO ITS USE. HOWEVER, THIS MATERIAL COULD BE REQUIRED TO BE SUBMITTED AS PART OF AN INVESTIGATION OF ALLEGED VIOLATIONS OF THE ACT. THE AGENCY *36 MAY ALSO ISSUE GUIDELINES REGARDING ADVERTISING THAT WOULD BE CONSIDERED CONTRADICTORY OR INCONSISTENT WITH THE PROPERTY REPORT OR WOULD BE CONSIDERED MISLEADING AND FRAUDULENT.

THE BILL WOULD ALSO REQUIRE THAT WHENEVER A DEVELOPER REPRESENTS ORALLY OR IN WRITING THAT ROADS, SEWERS (INCLUDING SEPTIC SYSTEMS), WATER OR ELECTRIC SERVICE, OR RECREATIONAL AMENITIES WILL BE PROVIDED OR COMPLETED BY THE DEVELOPER, THE CONTRACT OF SALE OR LEASE MUST *2352 STIPULATE THAT SUCH SERVICES OR AMENITIES WILL BE PROVIDED OR COMPLETED. THIS PROVISION WAS INTENDED TO ASSURE THAT WHEN DEVELOPERS OR THEIR SALES AGENTS MAKE SEDUCTIVE PROMISES THROUGH ORAL OR WRITTEN REPRESENTATIONS OR ADVERTISEMENTS TO INDUCE INDIVIDUALS TO BUY LAND, THE INDIVIDUALS HAVE A CONTRACTUAL BASIS FOR ASSURING THE SERVICES OR AMENITIES ARE COMPLETED WITHIN A REASONABLE TIME. IT PROVIDES A STATUTORY BASIS FOR SUIT IF THE CONTRACT FAILS TO REFLECT THE REPRESENTATIONS THAT WERE MADE.

ADDITIONAL CONSUMER REMEDIES AND STATUTE OR LIMITATIONS

*33 SINCE THE COMMITTEE BELIEVES A FULLY INFORMED CONSUMER IS ESSENTIAL FOR MINIMIZING FRAUDULENT SALES OR RECKLESS INVESTMENTS, SEVERAL PROVISIONS REGARDING THE AMOUNT OF TIME WHICH A CONSUMER HAS TO REVIEW THE PROPERTY REPORT AND TO CONSIDER OR RECONSIDER THE TRANSACTION HAVE BEEN AMENDED. EXISTING LAW GIVES THE PURCHASER OR LESSEE TWO YEARS TO VOID A CONTRACT OF SALE OR LEASE WHERE A PROPERTY REPORT HAS NOT BEEN GIVEN IN ADVANCE OR AT THE TIME OF SIGNING THE LEASE OR CONTRACT OF SALE. THIS BILL WOULD REQUIRE THAT THE PROPERTY REPORT ALWAYS BE GIVEN TO THE PURCHASER IN ADVANCE OF (NOT AT THE TIME OF) SIGNING THE CONTRACT OR AGREEMENT AND WHILE RETAINING THE TWO-YEAR REVOCATION PERIOD FOR FAILURE TO PROVIDE THE PROPERTY REPORT, THAT RIGHT MUST BE CLEARLY INDICATED IN THE CONTRACT OR AGREEMENT AND A PURCHASER OR LESSEE HAS A THIRD YEAR IN WHICH TO SUE TO ENFORCE THE RIGHT. BY REQUIRING THAT THE PROPERTY REPORT BE FURNISHED IN ADVANCE OF SIGNING, THE COMMITTEE HOPES TO ASSURE THAT THE PROSPECTIVE PURCHASER HAVE A REASONABLE OPPORTUNITY TO REVIEW AND BENEFIT FROM THE INFORMATION CONTAINED THEREIN. IF THE PROSPECTIVE PURCHASER DOES NOT HAVE THIS OPPORTUNITY, CLEARLY THE REPORT IS OF LESS VALUE IN EVALUATING THE ADVANTAGE AND DISADVANTAGE OF THE SALE OF LEASE. IF THE REPORT IS PROVIDED AT THE OUTSET OF, OR VERY EARLY IN THE SALE, LEASE, OR OFFERING PROCESS, THIS WOULD BE REASONABLE. IF THE REPORT WERE PROVIDED, A FEW SECOND BEFORE OR VIRTUALLY SIMULTANEOUSLY WITH THE CONTRACT DOCUMENTS TO BE EXECUTED, THIS WOULD NOT MEET THE REQUIREMENTS OF THE ACT. DEVELOPERS AND THEIR AGENTS SHOULD BE CLEARLY AWARE OF THE ROLE THE COMMITTEE INTENDS THE REPORT TO PLAY AND THE IMPORTANCE AND VALUE WHICH THE COMMITTEE PLACES ON THE PROPERTY REPORT IN DESIGNING THEIR SALES PRACTICES AND

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



PROCEDURES.

EXISTING LAW ALSO PROVIDES A THREE-DAY REVOCATION PERIOD WHERE A PROPERTY REPORT HAS NOT BEEN PROVIDED AT LEASE FORTY-EIGHT HOURS PRIOR TO SIGNING THE CONTRACT OR AGREEMENT. THIS BILL EXTENDS THAT REVOCATION RIGHT TO AN ABSOLUTE TEN-DAY REVOCATION RIGHT, UNRELATED TO THE TIME A PROPERTY REPORT IS DELIVERED. IN ORDER TO ASSURE THAT ALL STATE LAWS PROVIDE AT LEAST A TEN-DAY MINIMUM REVOCATION PERIOD, NO LESSER FEDERAL OR STATE REVOCATION PERIOD SHALL BE IMPOSED EXCEPT A STATE MAY PERMIT A LONGER PERIOD. MANY LAND SALES OCCUR WHEN PURCHASERS ARE **37** VACATIONING OR AFTER AGGRESSIVE SALES CAMPAIGNS DIRECTED AT HAVING THE PURCHASER SIGN THE SALES OR LEASE AGREEMENT ON THE SAME DAY THE OFFER IS MADE. THREE DAYS IS TOO SHORT A PERIOD FOR MANY CONSUMERS TO THOROUGHLY REVIEW THE PROPERTY REPORT OR TO RECEIVE INDEPENDENT PROFESSIONAL ADVICE ON THE WISDOM OF THE TRANSACTION. TEN DAYS IS A **2353** MORE REASONABLE PERIOD WHICH WOULD NOT PLACE AN UNFAIR BURDEN ON DEVELOPERS.

THE COMMITTEE IS CONCERNED THAT ONE OF THE MOST COMMON METHODS USED FOR FINANCING THESE PURCHASES, THE INSTALLMENT SALES CONTRACT, MAY PROVIDE CONSUMERS TOO LITTLE PROTECTION FOR THEIR INVESTMENT.

**34** UNDER THE TRADITIONAL INSTALLMENT CONTRACT, THE PURCHASER AGREES TO PAY FOR A LOT OVER A PERIOD OF YEARS, USUALLY SEVEN TO TEN, THROUGH MONTHLY INSTALLMENTS. THERE IS NO TRANSFER OF TITLE TO THE PURCHASER UNTIL PAYMENTS ARE COMPLETED AND, IN MANY CASES, PURCHASERS WHO FINISH PAYING DISCOVER THAT THE DEVELOPER IS UNABLE TO DELIVER CLEAR TITLE. MOST INSTALLMENT CONTRACTS CONTAIN A 'LIQUIDATED DAMAGES' CLAUSE WHICH PROVIDES THAT IN THE CASE OF DEFAULT BY THE PURCHASER, ALL MONEY PAID BY THE PURCHASER IS RETAINED BY THE DEVELOPER. THUS, THE BUYER BUILDS NO EQUITY PROPORTIONAL TO PAYMENT AS WOULD OCCUR UNDER A TRADITIONAL MORTGAGE METHOD OF FINANCING. IN SOME CASES, PEOPLE HAVE PAID OVER 90 PERCENT OF WHAT THEY OWE AND THEY HAVE BEEN LEFT WITH NOTHING WHEN THEY CANNOT CONTINUE TO PAY. ANOTHER PROBLEM WHICH RESULTS FROM THE INSTALLMENT CONTRACT METHOD OF FINANCING IS THAT DEVELOPERS OFTEN SELL THE INSTALLMENT CONTRACTS TO THIRD PARTIES. THE PURCHASER THEN OWES HIS PAYMENT TO THE THIRD PARTY, BUT, BECAUSE OF HOLDER IN DUE COURSE LAWS, THE PURCHASERS CANNOT FORCE THE THIRD PARTY TO FULFILL THE OBLIGATIONS OF THE DEVELOPER. IN ADDITION TO THESE PROBLEMS, BECAUSE THE PURCHASER DOES NOT GET TITLE UNTIL HE HAS COMPLETED PAYMENTS, HE MAY NOT HAVE USE OF THE PROPERTY FOR SEVEN TO TEN YEARS AFTER HE SIGNS THE CONTRACT OF SALE.

THE COMMITTEE BILL ALLOWS DEVELOPERS TO CONTINUE TO USE A FORM OF INSTALLMENT CONTRACT, BUT PROVIDES A TWO-YEAR RIGHT OF REVOCATION AT THE OPTION OF THE PURCHASER OR LESSEE IF THE CONTRACT DOES NOT PROVIDE CERTAIN PROTECTIONS FOR THE BUYER. IT IS ANTICIPATED THAT THIS WILL SEVERELY RESTRICT THE USE OF LIQUIDATED DAMAGES CLAUSES AND THUS ALLOW PURCHASERS TO MORE ASSUREDLY BUILD EQUITY. IT SHOULD ALLOW THE BUYER TIME TO CURE BREACHES CAUSED BY LATE PAYMENTS AND ASSURE THAT CONTRACTS OR AGREEMENTS CONTAIN LEGALLY SUFFICIENT AND RECORDABLE DESCRIPTION OF THE BOUNDARIES OF THE LOT SO THAT PURCHASERS MAY PUBLICLY RECORD AND THUS PROTECT THEIR INTERESTS IN THEIR LOTS.

AN ADDITIONAL PROBLEM WITH THE EXISTING LAW RESULTED FROM THE COMBINATION OF THE USE OF INSTALLMENT CONTRACTS AND A SHORT THREE-YEAR STATUTE OF LIMITATIONS ON CIVIL SUITS. MANY LOT BUYERS PURCHASE THROUGH SEVEN- TO TEN-YEAR INSTALLMENT CONTRACTS. SINCE THE DEVELOPER IS NOT REQUIRED TO DELIVER TITLE UNTIL THE END OF THAT PERIOD, MANY DEFECTS IN THE PROPERTY OR THE TITLE ARE NOT DISCOVERED UNTIL

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



LONG AFTER THE THREE-YEAR STATUTE OF LIMITATIONS IN THE PRESENT LAW HAS EXPIRED. THIS BILL EXTENDS THE STATUTE OF LIMITATIONS FOR MANY CAUSES OF ACTION TO THREE YEARS AFTER THE LAST PAYMENT HAS BEEN MADE UPON THE SALES CONTRACT.

THE FOREGOING AMENDMENTS WOULD NOT APPLY TO SALES TRANSACTIONS WHERE A PURCHASER, WITHIN SIX MONTHS OF SIGNING THE SALES CONTRACT, RECEIVES A WARRANTY DEED, OR WHERE A WARRANTY DEED IS NOT COMMONLY *38 USED, A DEED OR GRANT THAT WARRANTS THE GRANTOR HAS NOT CONVEYED THE LOT TO ANOTHER PERSON AND THE LOT IS FREE FROM ENCUMBRANCES MADE BY OR THROUGH THE GRANTOR.

*35 STATUTE OF LIMITATIONS PROBLEMS HAVE NOT BEEN LIMITED TO PURCHASERS PAYING INSTALLMENT CONTRACTS. MANY PURCHASERS BUY LAND SIGHT UNSEEN, *2354 HOLD IT FOR MANY YEARS AS AN INVESTMENT AND NEVER VISIT THE PROPERTY UNTIL THEY PLAN TO RETIRE. ONLY WHEN THEY VISIT THE PROPERTY DO THEY DISCOVER THE PROMISED ROADS HAVE NOT BEEN PROVIDED OR MAINTAINED OR THE CLUBHOUSE HAS NOT BEEN BUILT OR THE LAND IS UNINHABITABLE BECAUSE WATER IS UNAVAILABLE OR THE LAND IS NOT SUITABLE FOR SEPTIC TANKS. MANY SUCH CONSUMERS HAVE NO REMEDY BECAUSE THE CURRENT STATUTE OF LIMITATIONS IN SECTION 1412 IS UNDULY SHORT. IN FACT, OVER 63 PERCENT OF THE PERSONS WHO COMPLAINED TO OILSR ABOUT LAND SALES PROBLEMS DURING A NINE-MONTH PERIOD IN 1978 HAD NO REMEDY BECAUSE THE STATUTE OF LIMITATIONS HAD EXPIRED.

AT PRESENT, ACTIONS FOR LIABILITIES CREATED BY SECTION 1410(A) OR (B)(2) (WHICH BASICALLY INVOLVE UNTRUE STATEMENTS OR OMISSIONS OF MATERIAL FACT IN THE STATEMENT OF RECORD OR PROPERTY REPORT) MUST BE BROUGHT WITHIN ONE YEAR FROM DISCOVERY OR FROM WHEN DISCOVERY SHOULD HAVE BEEN MADE. ACTIONS FOR LIABILITIES CREATED BY SECTION 1410(B)(1) (WHICH BASICALLY INVOLVES THE SALE OF UNREGISTERED PROPERTY OR SALE BY FRAUD OR MISREPRESENTATION) MUST BE BROUGHT WITHIN TWO YEARS AFTER THE VIOLATION HAS OCCURRED. FINALLY, THE MAXIMUM LENGTH OF TIME AFTER THE SALE OR LEASE OF PROPERTY WITHIN WHICH TO COMMENCE AN ACTION IS THREE YEARS. THIS BILL WOULD EXTEND THE STATUTE OF LIMITATIONS AFFECTING FRAUDULENT SALES AND THE FAILURE TO STIPULATE IN THE CONTRACT OF SALE OR LEASE ANY REPRESENTATIONS MADE CONCERNING THE PROVISION OR COMPLETION OF SERVICES OR AMENITIES, TO THREE YEARS AFTER THE DISCOVERY OF THE VIOLATION OR AFTER DISCOVERY SHOULD HAVE BEEN MADE BY EXERCISE OF REASONABLE DILIGENCE.

UNDER EXISTING LAW, THE STATUTE OF LIMITATIONS REGARDING VARIOUS VIOLATIONS RELATED TO THE PROPERTY REPORT OR STATEMENT OR RECORD RANGE FROM ONE YEAR AFTER DISCOVERY, TO TWO YEARS AFTER THE VIOLATION OCCURRED TO A MAXIMUM OF THREE YEARS AFTER THE SALE OR LEASE. THIS BILL AMENDS THE STATUTE OF LIMITATIONS AFFECTING ALL VIOLATIONS RELATED TO THE PROPERTY REPORT OR STATEMENT OF RECORD TO THREE YEARS AFTER THE LAST PAYMENT HAS BEEN MADE PURSUANT TO THE CONTRACT OF SALE OR LEASE, OR THREE YEARS AFTER CONVEYANCE OF A WARRANTY DEED, WHICHEVER IS SHORTER. NO PURCHASER MAY SUE TO ENFORCE THE VARIOUS RIGHTS OR REVOCATION LATER THAN THREE YEARS AFTER SIGNING THE CONTRACT OF SALE OR LEASE, NOTWITHSTANDING DELIVERY OF A DEED TO THE PURCHASER.

THE PRESENT ACT RESTRICTS THE MAXIMUM CIVIL DAMAGES OBTAINABLE BY PRIVATE PARTIES TO THE PURCHASE PRICE, THE REASONABLE COST OF IMPROVEMENTS AND COURT COSTS. EXPERIENCE SUGGESTS THAT THESE RESTRICTIONS HAVE INHIBITED THE INITIATION OF PRIVATE LITIGATION BECAUSE CONSUMERS ARE FORCED TO BEAR EXPENSES PROXIMATELY RELATED TO THE SELLER'S PROVEN BREACH. ACCORDINGLY, THIS BILL WOULD PERMIT A COURT TO AWARD WHATEVER RELIEF IT DEEMS 'FAIR, JUST AND EQUITABLE' INCLUDING ALL DAMAGES REASONABLY ATTRIBUTABLE TO THE SELLER'S BREACH, SUCH AS REASONABLE ATTORNEY'S FEES, INTEREST, REASONABLE TRAVEL COSTS TO AND FROM THE PROPERTY AND

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



APPRAISAL FEES. IN ADDITION, PURCHASERS WOULD HAVE THE RIGHT TO OBTAIN SPECIFIC PERFORMANCE WHENEVER THE COURT DEEMED **\*39** THIS FORM OF RELIEF TO BE APPROPRIATE, FOR INSTANCE, IN CASES WHERE THE DEVELOPER FAILED TO FURNISH PROMISED IMPROVEMENTS.

**\*36** THE BILL ALSO AMENDS THE CRIMINAL PENALTY PROVISIONS BY INCREASING THE MAXIMUM FINE FROM $5,000 TO $10,000 FOR EACH CRIMINAL COUNT AND THE MAXIMUM TERM OF IMPRISONMENT FROM FIVE TO SEVEN YEARS. THE PRIOR LIMITS HAVE EXISTED SINCE 1968.

**\*2355** ORDERS TO CEASE AND DESIST

THE BILL PROVIDES OILSR WITH A NEW TOOL TO DEAL WITH FRAUDULENT OR DECEPTIVE SALES PRACTICES. ALTHOUGH THE AGENCY HAD REQUESTED A BROAD POWER TO ISSUE CEASE AND DESIST ORDERS FOR ANY VIOLATION OF THE ACT OR ITS REGULATIONS, THE COMMITTEE HAS CAREFULLY NARROWED THE SCOPE OF THIS POWER TO ASSURE THAT IT IS USED ONLY WHERE THE SECRETARY HAS REASONABLE CAUSE TO BELIEVE HARMFUL AND FRAUDULENT ACTIVITY IS OCCURRING. WHERE IT IS DETERMINED, AFTER A HEARING ON THE RECORD BEFORE AN OBJECTIVE ADMINISTRATIVE LAW JUDGE, THAT THE SECRETARY OF HUD HAS REASONABLE CAUSE TO BELIEVE THAT ANY DEVELOPER OR HIS AGENT IS ENGAGED IN ANY ACT OR PRACTICES THAT WOULD VIOLATE THE ANTI-FRAUD PROVISIONS OF THE ACT AND WHERE THE SECRETARY DETERMINES SUCH ACT OR PRACTICE IS LIKELY TO CAUSE HARM TO PURCHASERS OR LESSEES, A PERMANENT CEASE AND DESIST ORDER MAY BE ISSUED AGAINST SUCH DEVELOPER OR HIS AGENT. THIS ORDER MAY BE APPEALED PURSUANT TO SECTION 1411 OF THE ACT WITHIN 60 DAYS TO AN APPROPRIATE UNITED STATES COURT OF APPEALS. A TEMPORARY ORDER TO CEASE AND DESIST MAY BE ISSUED BY THE SECRETARY PRIOR TO A HEARING WHERE THERE IS REASONABLE CAUSE TO BELIEVE THE VIOLATION IS LIKELY TO CAUSE IMMEDIATE AND SUBSTANTIAL HARM TO PURCHASERS OR LESSEES. A HEARING ON THE RECORD BEFORE AN ADMINISTRATIVE LAW JUDGE MUST THEN BE HELD SOMETIME BETWEEN 20 AND 45 DAYS AFTER THE ISSUANCE OF THE TEMPORARY CEASE AND DESIST ORDER, AND PRIOR TO THE ISSUANCE OF A PERMANENT CEASE AND DESIST ORDER. A DEVELOPER OR AGENT MAY, HOWEVER, WITHIN 10 DAYS FROM RECEIVING THE TEMPORARY CEASE AND DESIST ORDER, APPLY TO ANY APPROPRIATE UNITED STATES DISTRICT COURT IN ORDER TO SUSPEND THE ORDER PRIOR TO A HEARING ON THE RECORD BASED ON A DETERMINATION THAT THE ORDER WAS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION OR NOT IN ACCORDANCE WITH AGENCY PROCEDURES ESTABLISHED BY LAW.

THIS NEW ENFORCEMENT POWER SHOULD PROVIDE A VITAL TOOL WHICH WOULD ALLOW OILSR TO ACT RAPIDLY AND PRECISELY TO PREVENT THE CONTINUED USE OF FRAUDULENT AND DECEPTIVE SALES PRACTICES. UNDER EXISTING LAW, SUBDIVISION SALES MAY BE STOPPED BY AN ADMINISTRATIVE ORDER SUSPENDING A STATEMENT OF RECORD ONLY WHEN THAT STATEMENT OF RECORD CONTAINS AN UNTRUE STATEMENT OF MATERIAL FACT OR OMITS TO STATE A REQUIRED MATERIAL FACT. CURRENTLY NO ADMINISTRATIVE ENFORCEMENT POWERS EXIST WHICH CAN BE USED IN COMBATTING FRAUDULENT ADVERTISING OR DECEPTIVE SALES TECHNIQUES. IF OILSR CANNOT OBTAIN VOLUNTARY COMPLIANCE, IT MUST SEEK AN INJUNCTION OR PERSUADE THE DEPARTMENT OF JUSTICE TO BRING CRIMINAL CHARGES IN AN ALREADY OVERBURDENED FEDERAL COURT. THE AGENCY HAS CITED SEVERAL EXAMPLES WHERE DELAY HAS BEEN MEASURED NOT IN MONTHS BUT IN YEARS AND MEANWHILE, DURING THE LONG PERIOD OF LITIGATION, THE SERIOUS PRACTICES WHICH CAUSED THE AGENCY TO INITIATE THE ACTION HAVE CONTINUED.

**\*37** CONGRESS HAS VESTED MANY ADMINISTRATIVE AGENCIES WITH THE POWER TO ISSUE CEASE AND DESIST ORDERS-- INCLUDING SUCH BODIES AS THE FEDERAL HOME LOAN BANK

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



BOARD, THE COMPTROLLER OF THE CURRENCY, OTHER FEDERAL **40** FINANCIAL REGULATORY AGENCIES, THE FEDERAL TRADE COMMISSION AND COURTS HAVE CONSISTENTLY FOUND THAT DUE PROCESS AFFORDED CASES HELD BEFORE AN ADMINISTRATIVE LAW JUDGE ACTING IN ACCORDANCE WITH THE PROCEDURAL SAFEGUARDS ESTABLISHED UNDER THE ADMINISTRATIVE PROCEDURES ACT IS FULLY ON A PAR WITH CASES THAT COMMENCE IN TRIAL COURTS. FOR EXAMPLE, JUDICIAL AND PROSECUTORIAL FUNCTIONS ARE SEPARATE AND THE **2356** RULE FORBIDDING EXPARTE COMMUNICATIONS IMPOSES ON ADMINISTRATIVE PROCEEDINGS THE SAME PROHIBITIONS AS EXIST IN COURT PROCEEDINGS. ADMINISTRATIVE LAW JUDGES ARE NOT AGENCY PUPPETS AND, FURTHERMORE, THE U.S. COURTS OF APPEAL, APPLYING THE SUBSTANTIAL EVIDENCE TEST, HAVE BEEN EFFECTIVE IN ASSURING THAT INDIVIDUAL RIGHTS ARE PROTECTED.

BY PROVIDING THE SECRETARY OF HUD WITH THE POWER TO ISSUE CEASE AND DESIST ORDER, THE COMMITTEE DOES NOT INTEND TO DIMINISH THE SIGNIFICANCE OF THE POWER THE SECRETARY PRESENTLY HAS TO BRING AN ACTION IN ANY FEDERAL DISTRICT COURT TO ENFORCE SUBPOENAS AND TO ENJOIN ACTS AND PRACTICES WHICH CONSTITUTE OR WILL CONSTITUTE VIOLATIONS OF THE ACT. HOWEVER, THE USEFULNESS OF THIS ENFORCEMENT TOOL CAN BE UNDERCUT WHEN IT CANNOT BE USED DIRECTLY AND MUST BE COORDINATED THROUGH SEVERAL GOVERNMENT AGENCIES. GREAT EFFICIENCY IS LOST WHEN A TEAM OF ATTORNEYS FROM ONE AGENCY DIRECTS THE INVESTIGATION, PREPARES THE CASE AND THEN MUST BRIEF A SECOND TEAM FROM A SEPARATE AGENCY WHICH CONDUCTS THE COURT CASE. THE LANGUAGE OF SUBSECTION 1415(A) AND (D) OF THIS ACT IS SUBSTANTIALLY THE SAME AS THAT CONTAINED IN THE SECURITIES ACT OF 1933, 15 U.S.C. 77TB) AND 15 U.S.C. 77VB) AND THE SECURITIES EXCHANGE ACT OF 1934, 15 U.S.C. 78UE) AND 15 U.S.C. 78UC) RESPECTIVELY, AND BY USING THIS LANGUAGE CONGRESS INTENDED TO CONFER THE SAME RIGHTS UPON THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT AS THOSE HELD BY THE SECURITIES AND EXCHANGE COMMISSION. THOSE RIGHTS INCLUDE THE PERSONAL APPEARANCE OF ATTORNEYS OF RECORD ON BEHALF OF THE SECRETARY IN APPROPRIATE FEDERAL COURTS.

BIENNIAL REPORT

THE BILL DIRECTS OILSR TO PREPARE A BIENNIAL REPORT ANALYZING THE IMPACT OF THIS LAW ON CONSUMERS WHO PURCHASE UNDEVELOPED OR PARTIALLY DEVELOPED LAND AND ON THE LAND DEVELOPMENT INDUSTRY. AS THE TOPICS SPECIFIED IN THE BILL INDICATE, THE COMMITTEE IS PARTICULARLY INTERESTED IN PROBLEMS ENCOUNTERED BOTH THE CONSUMERS AND BY INDUSTRY AND ON THE BENEFICIAL AND DETRIMENTAL IMPACT OF EXISTING AND NEW EXEMPTIONS FROM THE ACT. THE COMPLAINT MONITORING SYSTEM THAT WAS ESTABLISHED LAST YEAR BY OILSR SHOULD BE VERY USEFUL FOR REPORTING PURPOSES AND FOR ASSISTING THE AGENCY IN EVALUATION ON A CONTINUING BASIS, THE EFFECTIVENESS OF POLICIES AND PROCEDURES DEVELOPED PURSUANT TO THIS ACT. THE REPORT SHOULD ALSO KEEP THE COMMITTEE INFORMED ON EFFORTS MADE BY STATES TO IMPROVE THE LAWS AND PROCEDURES GOVERNING THE SALE OF UNDEVELOPED OR PARTIALLY DEVELOPED LAND. OILSR SHOULD ALSO CONTINUE TO EXAMINE METHODS TO LESSEN THE REGULATORY BURDEN ON DEVELOPERS WHICH WILL PROVIDE ADEQUATE DISCLOSURE AND PROTECTION FOR CONSUMERS.

**38** AS THE STATUTORY REPORTING REQUIREMENT MAKES CLEAR, THE REPORT SHOULD NOT BE LIMITED TO THE TOPICS SPECIFIED IN THE AMENDMENT. OFTEN IMPROVED INDUSTRY PRACTICES, UNANTICIPATED TRENDS IN CONSUMER PROBLEMS AND NEW REMEDIES DEVISED BY OTHER AGENCIES WHO ALSO REVIEW THE **41** LAND SALES INDUSTRY WILL SUGGEST NEEDED AMENDMENTS TO THE EXISTING LAW. THE SCOPE OF THE REPORT SHOULD REMAIN

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



FLEXIBLE ENOUGH TO COVER OTHER SIGNIFICANT ISSUES. FOR EXAMPLE, SINCE THIS BILL WOULD, FOR THE FIRST TIME, EMPOWER THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT TO ISSUE CEASE AND DESIST ORDERS, THE COMMITTEE INTENDS TO REVIEW CAREFULLY THE EXERCISE OF THIS POWER. TO THIS END, THE COMMITTEE DIRECTS THE **2357** SECRETARY TO INCLUDE IN THE BIENNIAL REPORT AN ANALYSIS OF THE USE OF THE CEASE AND DESIST ORDER INCLUDING THE NUMBER OF ORDERS ISSUED, THE TYPES OF DEVELOPER, SUBDIVISION AND FRAUDULENT ACTIVITY, ADDRESSED, AND THE RESULTS OF ANY APPEALS.

TITLE V-- RURAL HOUSING

AUTHORIZATIONS

THE COMMITTEE HAS FOR THE FIRST TIME PLACED AUTHORIZATION LIMITS ON THE USE OF THE RURAL HOUSING INSURANCE FUND (RHIF) AND SUBJECTED ALL ACTIVITIES CARRIED OUT THROUGH THE FUND TO THE ANNUAL APPROPRIATION PROCESS. THE RHIF OPERATES UNDER PERMANENT BORROWING AUTHORITY WHICH WAS NOT PREVIOUSLY FORMALLY SUBJECT TO ANNUAL APPROPRIATIONS LIMITATION. APPROPRIATION ACTIONS ARE NOW ONLY REQUIRED TO RESTORE LOSSES REALIZED BY THE FUND AND MANY OF THESE ACTIONS ARE MANDATORY. THE COMMITTEE HAS BEEN CONCERNED SINCE THE PASSAGE OF THE BUDGET ACT IN 1974 WITH THE UNCONTROLLED NATURE OF THIS BACKDOOR SPENDING MECHANISM. SPENDING IS BEST CONTROLLED BEFORE IT HAPPENS, BUT PRIOR TO THIS ACTION CONTROL ON EXPENDITURES (ON A STATUTORY BASIS) WAS ABLE TO OCCUR ONLY BY ALLOWING THE CAPITAL IN THE FUND TO BE DISSIPATED.

IN TAKING THESE ACTIONS THE COMMITTEE BELIEVES THAT SEVERAL IMPORTANT OBJECTIVES WILL BE ATTAINED. FIRST, THE COMMITTEE WILL NOW BE REQUIRED TO SCRUTINIZE ANNUALLY THE RURAL HOUSING PROGRAMS AS IT DOES OTHER HOUSING AND RELATED PROGRAMS WITHIN ITS JURISDICTION. IN A PERIOD OF SEVERE FISCAL AUSTERITY SUCH ANNUAL OVERSIGHT IS IMPERATIVE TO ASSURE THE MOST EFFECTIVE AND EFFICIENT USE OF FEDERAL PROGRAMS. SECONDLY, THE COMMITTEE PROVIDES A STATUTORY BASIS FOR APPROPRIATION ACTION TO LIMIT RURAL HOUSING PROGRAM ACTIVITY, BRINGING THIS ACTIVITY UNDER THE FORMAL PURVIEW OF THE APPROPRIATIONS PROCESS IN CONFORMANCE WITH THE BUDGET ACT. BOTH OBJECTIVES ARE ESSENTIAL FOR IMPROVING THE CONGRESSIONAL AUTHORIZATION AND APPROPRIATION PROCESS FOR RURAL HOUSING PROGRAMS.

THE COMMITTEE HAS SET A LIMIT ON THE AGGREGATE PRINCIPAL AMOUNT OF INSURED AND GUARANTEED LOANS FOR FISCAL YEAR 1980. OF THIS AMOUNT NO LESS THAN $2.857 MILLION IS MADE AVAILABLE FOR LOANS UNDER PROGRAMS DESIGNED TO ASSIST LOW AND MODERATE INCOME PERSONS IN RURAL AREAS AND $38 MILLION IS MADE AVAILABLE FOR SECTION 514 DOMESTIC FARM LABOR HOUSING LOANS. THE COMMITTEE AUTHORIZES FOR APPROPRIATION FOR FISCAL YEAR 1980 $48 MILLION FOR SECTION 504 REHABILITATION LOANS AND GRANTS; $25 MILLION FOR SECTION 516 FARM LABOR HOUSING GRANTS; $1 MILLION FOR TECHNICAL ASSISTANCE AND RESEARCH; $5 MILLION EACH FOR ADVANCES FOR PREPAYMENTS OF INSURANCE, TAXES AND OTHER RELATED EXPENSES PURSUANT TO SECTION 501(E) AND FOR EXPENSES AND CLAIMS IN CONNECTION WITH CORRECTING CONSTRUCTION DEFECTS PURSUANT TO SECTION 509(C); AND $1.2 MILLION, $3.8 MILLION AND $1 MILLION RESPECTIVELY FOR TECHNICAL ASSISTANCE, HOMEOWNER AND DELINQUENCY COUNSELLING AND FOR PRECONSTRUCTION LOANS. ALSO, THE COMMITTEE LIMITED TO $500 MILLION THE AGGREGATE AMOUNT OF **42** CONTRACT AUTHORITY THAT MAY BE USED FOR THE NEW DEEP HOMEOWNER

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



SUBSIDY PROGRAM FOR FISCAL YEAR 1980. THE COMMITTEE INTENDS THAT THIS NEW HOMEOWNER SUBSIDY PROGRAM BE SUBJECT TO ANNUAL AUTHORIZATION SO THAT IT MAY OVERSEE THE OPERATION OF THE PROGRAM PRIOR TO REAUTHORIZING IT FOR ANY PERIOD AFTER FISCAL YEAR 1980. THIS PRACTICE IS CONSISTENT **\*2358** WITH THE MANNER IN WHICH THE COMMITTEE ACTS WITH REGARD TO MOST OTHER HOUSING SUBSIDY PROGRAMS. IN ADDITION, THE COMMITTEE AUTHORIZES FOR APPROPRIATION $1 MILLION FOR SECTION 523 MUTUAL AND SELF-HELP HOUSING LOANS AND GRANTS.

INTEREST RATE PROVISIONS AND DEFINITION OF LOW-INCOME PERSONS

**\*39** THE COMMITTEE HAS ACTED TO STRUCTURE RURAL HOUSING ASSISTANCE SO THAT AVAILABLE ASSISTANCE IS PROVIDED IN DIRECT RELATION TO NEED. THUS FOR VERY LOW INCOME FAMILIES OPERATING SUBSIDIES ARE PROVIDED IN THE NEW HOME OWNER ASSISTANCE PROGRAM AND IN SEVERAL RENTAL ASSISTANCE PROGRAMS. FOR THOSE RURAL FAMILIES WITH LESS NEED, SHALLOWER INTEREST SUBSIDIES ARE PROVIDED AND INSURANCE AND GUARANTEES ARE PROVIDED FOR PERSONS WHO CAN AFFORD MARKET RATE LOANS. THE COMMITTEE BELIEVES A RANGE OF ASSISTANCE SHOULD BE AVAILABLE ACCORDING TO FAMILIES' INCOMES AND HOUSING NEEDS, EXTENDING FROM FULL INTEREST SUBSIDIES COMBINED WITH HOMEOWNERSHIP OR RENTAL ASSISTANCE PAYMENTS TO LOAN GUARANTEES. IN ORDER THAT SUCH A CONTINUUM OPERATE WITHOUT WASTE OR SUBSTITUTION 2 THINGS MUST OCCUR. INTEREST RATES MUST BE SET SO THAT THE AMOUNT OF INTEREST SUBSIDY BEAR A DIRECT RELATIONSHIP TO THE INCOMES OF THE PERSONS WHO ARE ASSISTED AND THE AMOUNT OF ASSISTANCE PAYMENTS IN ADDITION TO INTEREST SUBSIDIES MUST ALSO BEAR A DIRECT RELATIONSHIP TO NEED.

WITH RESPECT TO INTEREST RATES FOR RURAL HOUSING PROGRAMS THE COMMITTEE REQUIRES THAT NONSUBSIDIZED RURAL HOUSING LOANS WILL BEAR THE SAME RATE AS THE FHA SECTION 203(B) RATE, CURRENTLY 10 PERCENT. UNSUBSIDIZED RURAL HOUSING LOANS CURRENTLY BEAR A 9 PERCENT RATE BASED ON THE FEDERAL COST OF BORROWING. THE CURRENT PRACTICE TENDS TO PERMIT BORROWERS WHO HAVE THE ABILITY TO PAY MARKET RATES TO RECEIVE AN UNNECESSARY SUBSIDY. THE UNSUBSIDIZED LOAN VOLUME IS ESTIMATED AT $674 MILLION FOR 1980. THE DIFFERENCE IN RATES ON THIS VOLUME IS ESTIMATED AT $674 MILLION FOR 1980. THE DIFFERENCE IN RATES ON THIS VOLUME OF LOANS WOULD YIELD ALMOST $6 MILLION EACH YEAR OVER THE LIFE OF THE LOAN TO OFFSET LOSSES TO THE FUND AND WOULD BE SUFFICIENT TO UNDERWRITE THE LOSSES ON APPROXIMATELY $120 MILLION WORTH OF INTEREST SUBSIDY LOANS.

THE COMMITTEE HAS BEEN CONCERNED FOR SEVERAL YEARS ABOUT THE ARBITRARY INCOME ELIGIBILITY STANDARDS USED BY THE FMHA FOR RURAL HOUSING PROGRAMS. ALTHOUGH IT HAD BEEN DIRECTED TO STUDY ITS INCOME LIMITS, FMHA HAS YET TO PROVIDE THE COMMITTEE WITH RECOMMENDATIONS BASED ON SUCH STUDY AND REVIEW. EXISTING LAW REQUIRES THAT 60 PERCENT OF ALL SECTION 502 AND 515 LOANS BE USED TO ASSIST PERSONS OF LOW INCOME.

TARGETING ASSISTANCE TO THOSE MOST IN NEED IS A MAJOR ADMINISTRATION INITIATIVE. THE COMMITTEE SUPPORTS THIS TARGETING CONCEPT BUT IS CONCERNED THAT THERE MIGHT NOT BE APPRECIABLE TARGETING PROGRESS UNLESS FMHA IS MORE PRECISE IN DETERMINING HOW TO ALLOCATE ITS HOUSING ASSISTANCE PROGRAM FUNDS. IT IS INCONCEIVABLE TO THE COMMITTEE THAT SUCH TARGETING CAN BE ACHIEVED WITHOUT USING INCOME CRITERIA BASED ON LOCAL AREA CHARACTERISTICS. THEREFORE, THE COMMITTEE PROVIDED A DEFINITION OF LOW INCOME SIMILAR TO THAT USED FOR THE HUD SECTION 8 PROGRAM. THIS DEFINES LOW INCOME PERSONS AS THOSE WHOSE INCOMES DO **\*43** NOT EXCEED 80 PERCENT OF

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



THE AREA INCOME BUT PERMITS ADJUSTMENTS TO ACCOMMODATE FAMILY SIZE, CONSTRUCTION COSTS, UNUSUALLY HIGH OR LOW INCOME AND OTHER FACTORS. FMHA HAS EXPERIENCE IN APPLYING SUCH AN AREA BASED LIMITS IN THE RURAL RENTAL ASSISTANCE PROGRAM THAT COMBINES FMHA SECTION 515 AND HUD SECTION 8 ASSISTANCE. THE COMMITTEE **2359 DIRECTS THE DEPARTMENT TO EXPEDITIOUSLY ADMINISTER ITS PROGRAMS IN ACCORDANCE WITH THE NEW LOW INCOME DEFINITIONS. IN LINE WITH THIS, THE COMMITTEE IS ALSO CONCERNED ABOUT HOW FMHA ESTABLISHES CRITERIA TO ALLOCATE ITS HOUSING ASSISTANCE FUNDS BOTH TO THE STATES AND, IN TURN, TO THE COUNTIES. THE COMMITTEE IS AWARE THAT IN THE PAST THE UNIQUE FIELD OFFICE STRUCTURE FLOWING FROM STATE OFFICES DOWN TO COUNTY OFFICES WORKED VERY WELL. IT DOES NOT BELIEVE, HOWEVER, THAT THE FIELD STRUCTURE ITSELF SHOULD BE THE SOLE BASIS FOR ALLOCATING RURAL HOUSING ASSISTANCE. ESPECIALLY IN PERIODS OF SEVERE FISCAL RESTRAINT, THE DEPARTMENT SHOULD TAKE PRECISE MEASURES TO INSURE THAT THE LIMITED ASSISTANCE IT PROVIDES GOES TO THOSE MOST IN NEED. THE COMMITTEE URGES THE DEPARTMENT TO CAREFULLY ANALYZE THE NATURE OF ITS PROGRAMS, THOSE ELIGIBLE FOR EACH, THE CHARACTERISTICS OF ELIGIBLE FAMILIES WHICH TEND TO MAKE THEM MORE NEEDY AND OTHER SIMILAR FACTORS IN ESTABLISHING ITS ASSISTANCE ALLOCATION PROCEDURES.

PREPAYMENT AND REFINANCING OF SECTION 514 AND SECTION 515 LOANS

*40 RECENTLY MANY SECTION 515 RURAL RENTAL PROJECTS HAVE STARTED TO PREPAY THEIR MORTGAGES AND BE DIVERTED FROM HOUSING THE LOW- AND MODERATE-INCOME FAMILIES WHO ARE THE INTENDED BENEFICIARIES OF THE PROGRAM. THERE ARE POTENTIALLY 30,000 SECTION 515 UNITS THAT COULD BE LOST IN THIS WAY FROM THE RURAL LOW AND MODERATE INCOME HOUSING INVENTORY. THE COMMITTEE BELIEVES IT IS NECESSARY TO STEM THIS POTENTIAL LOSS OF MUCH NEEDED HOUSING. FMHA TAKES A NARROW VIEW OF THE GRADUATION PROVISIONS IN THE LAW. IT BELIEVES IT MUST HONOR REQUESTS TO PREPAY OR REFINANCE THESE LOANS EVEN THOUGH THE RESULT COULD BE THAT MUCH NEEDED HOUSING WOULD BE LOST TO THE RURAL LOW AND MODERATE INCOME HOUSING INVENTORY. THE COMMITTEE THEREFORE HAS LIMITED THE SECRETARY FROM ACCEPTING OFFERS BY BORROWERS TO PREPAY OR REQUESTS FOR REFINANCING UNLESS THE BORROWER IS OBLIGATED TO CONTINUE USING THE PROPERTY FOR ITS ORIGINAL PURPOSES FOR THE REMAINING PERIOD UNDER THE ORIGINAL REPAYMENT SCHEDULE OR UNTIL THE SECRETARY DETERMINES THERE IS NO LONGER A NEED FOR THE PROJECT OR THAT ASSISTANCE TO THE RESIDENTS WILL NOT LONGER BE AVAILABLE. THE COMMITTEE CAREFULLY WEIGHED ITS ACTIONS IN THIS MATTER SINCE THESE ACTIONS NOT ONLY APPLY TO NEW LOAN AGREEMENTS BUT ALSO TO EXISTING LOAN AGREEMENTS. THE COMMITTEE TOOK THESE ACTIONS BECAUSE IT BELIEVES THAT THE CURRENT PROCEDURES BEING FOLLOWED BY THE DEPARTMENT ARE IN DIRECT CONFLICT WITH THE INTENT OF THE STATUTES CREATING THE SECTION 514 AND 515 PROGRAMS. IT WAS THE CLEAR INTENT OF CONGRESS THAT THESE PROJECTS BE AVAILABLE TO LOW AND MODERATE INCOME FAMILIES FOR THE ENTIRE ORIGINAL TERM OF THE LOAN. BORROWERS WHO PARTICIPATE IN THE PROGRAM RECOGNIZE THIS AS EVIDENCED BY THEIR WILLINGNESS TO ENTER INTO AGREEMENTS WHICH LIMIT OCCUPANCY FOR THE FULL MORTGAGE TERM. IN PERMITTING PREPAYMENT AND REFINANCING THE CONGRESS NEVER INTENDED THAT THE BASIC PURPOSE OF THE PROGRAM BE FRUSTRATED. THE COMMITTEE HAS TAKEN CARE TO MAINTAIN THE ABILITY OF A BORROWER TO PREPAY *44 OR REFINANCE THE LOAN; IT HAS ONLY ACTED TO ASSURE THAT THE HOUSING CONTINUES TO BE AVAILABLE FOR THE IMPORTANT PUBLIC PURPOSE FOR WHICH IT WAS FINANCED. THEREFORE, THE COMMITTEE BELIEVES ITS ACTIONS ARE BOTH RESPONSIBLE AND COMPELLED BY AN OVERWHELMING

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



PUBLIC INTEREST.

## *2360 RENTAL ASSISTANCE

THE COMMITTEE HAS RAISED FROM 20 PERCENT TO 40 PERCENT THE STATUTORY LIMIT ON THE PROPORTION OF LOW AND MODERATE INCOME UNITS IN A MULTIFAMILY PROJECT. ALTHOUGH THE SECRETARY WAS ALREADY AUTHORIZED TO EXCEED THE STATUTORY PERCENTAGE LIMIT (AND MAY ALSO EXCEED THE NEW LIMIT), THE COMMITTEE ACTION IS INTENDED TO FACILITATE THE ADMINISTRATION OF THE MULTIFAMILY RENTAL ASSISTANCE PROGRAM. THE COMMITTEE, HOWEVER, WISHES TO REAFFIRM ITS COMMITMENT TO SOCIALLY AND ECONOMICALLY INTEGRATED PROJECTS.

## TECHNICAL ASSISTANCE

THE COMMITTEE HAS RESTRUCTURED THE FMHA SECTION 525 TECHNICAL ASSISTANCE AND COUNSELING PROGRAM IN ORDER TO IMPROVE THE EFFECTIVENESS OF BOTH IMPORTANT FUNCTIONS. THE COMMITTEE IS SERIOUSLY CONCERNED THAT FMHA HAS BEEN RELUCTANT TO RECOGNIZE THE DISTINCTION BETWEEN OUTREACH ACTIVITIES AND COUNSELING ACTIVITIES. THE COMMITTEE DOES NOT BELIEVE THAT ORGANIZATIONS FUNDED BY FMHA TO PROVIDE OUTREACH AND TECHNICAL ASSISTANCE NECESSARILY HAVE COUNSELING COMPETENCE OR NECESSARILY OPERATE IN AREAS WHERE THE COUNSELING DEMAND IS SIGNIFICANT. IN FACT, IT WOULD APPEAR THAT THE OPPOSITE WOULD BE TRUE. OUTREACH AREAS WOULD TEND TO HAVE LITTLE DEVELOPED HOUSING, THEREFORE, LITTLE DEMAND FOR COUNSELING. THE COMMITTEE INTENDS THAT A COMPREHENSIVE COUNSELING APPROACH BE DEVELOPED COMMENSURATE WITH FMHA'S TARGETING INITIATIVES AND THAT COUNSELING FUNDS BE ALLOCATED ACCORDING TO WHERE THERE ARE POTENTIAL AND ACTUAL DELINQUENCIES OR WHERE THERE ARE OTHER COUNSELING NEEDS SUCH AS FOR BORROWERS IN THE NEW DEEP SUBSIDY HOMEOWNER ASSISTANCE PROGRAM.

## REFINANCING

*41 THE COMMITTEE HAS MADE SEVERAL IMPORTANT CHANGES IN FMHA'S REFINANCING AUTHORITY. THESE CHANGES HAVE BEEN MADE WITH CONSIDERABLE TREPIDATION. WITH LIMITED FUNDS TO MEET THE HOUSING NEEDS OF RURAL FAMILIES, THE COMMITTEE DOES NOT DESIRE THAT REFINANCING BE INDISCRIMINATELY PERMITTED. NOR DOES THE COMMITTEE INTEND THAT REFINANCING SHOULD RESULT IN ENCOURAGING OR 'BAILING OUT ' INDIVIDUALS OR FIRMS THAT OVERBURDEN RURAL FAMILIES WITH DEBT OBLIGATIONS. HOWEVER, WHEN THROUGH NO FAULT OF THEIR OWN, RURAL HOMEOWNERS STAND TO LOSE THEIR HOMES, AND IN TURN, WOULD BE FORCED TO OCCUPY SUBSTANDARD HOUSING, THE COMMITTEE BELIEVES THAT FMHA SHOULD PERMIT SUCH OWNERS TO REFINANCE THEIR HOMES. THE COMMITTEE RECOGNIZES THAT THIS PLACES A DIFFICULT BURDEN ON FMHA AND URGES THAT IT IMPLEMENT THE NEW REFINANCING PROVISIONS CAUTIOUSLY.

EXISTING LAW PREVENTED REFINANCING OF EXISTING INDEBTEDNESS UNLESS THE HOME WAS OWNED FOR AT LEAST FIVE YEARS. THE COMMITTEE HAS REMOVED THE FIVE-YEAR RESTRICTION TO PERMIT REFINANCING WITHOUT REGARD TO LENGTH OF TIME THE HOME IS OWNED. IT DOES, HOWEVER, REQUIRE THAT FMHA FIND *45 THAT THE NEED FOR REFINANCING WAS DUE TO FACTORS BEYOND THE CONTROL OF THE OWNER AND THAT WITHOUT THE REFINANCING THE OWNER WOULD LIKELY LOSE HIS OR HER HOME. THE COMMITTEE ALSO

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



TREATS REFINANCING INVOLVING REHABILITATION, IN ADDITION TO MORTGAGE INDEBTEDNESS, SEPARATELY. IN *2361 THIS SITUATION, THE COMMITTEE REQUIRES THAT IN ORDER TO PROVIDE REFINANCING, THE FMHA MUST FIND THAT WITHOUT REFINANCING OF BOTH THE MORTGAGE LOAN AND THE LOAN FOR REPAIRS THE RURAL HOMEOWNER WOULD BE DEPRIVED OF A STANDARD DWELLING.

### PROPERTY DISPOSITION

THE COMMITTEE HAS STRENGTHENED THE PROVISIONS IN EXISTING LAW GOVERNING THE DISPOSITION OF FMHA-HELD PROPERTIES. IN ALL PROPERTY DISPOSITION ACTIVITIES, THE COMMITTEE BELIEVES THAT IT SHOULD BE THE POLICY OF THE GOVERNMENT TO ASSURE THAT PROPERTIES BE IN STANDARD CONDITION UPON, OR SOON AFTER, DISPOSAL. THE COMMITTEE HAS ADDED TO EXISTING AUTHORITY A PROVISION PERMITTING FMHA TO REPAIR AND REHABILITATE FMHA-HELD PROPERTIES PRIOR TO DISPOSITION. IT ALSO ADDS A PROVISION TO EXISTING LAW TO REQUIRE THAT WHEN THE SUBJECT PROPERTY IS TO BE USED FOR RESIDENTIAL PURPOSES, FMHA SHALL ASSURE THAT IT WILL BE IN STANDARD CONDITION BEFORE OR WITHIN A REASONABLE TIME AFTER SALE OR DISPOSITION.

### CONSTRUCTION DEFECTS

THE COMMITTEE WAS CONCERNED THAT DUE TO THE PERIOD OF TIME THAT LAPSED AFTER ENACTING THE CONSTRUCTION DEFECTS PROVISIONS IN 1977, BUT BEFORE REGULATIONS COULD BE PREPARED AND IMPLEMENTED BY FMHA MANY OF THE INTENDED BENEFICIARIES WERE INADVERTENTLY PREVENTED FROM PARTICIPATING IN THE PROGRAM. EXISTING LAW PERMITTED FMHA TO ACCEPT REQUESTS FOR CONSTRUCTION DEFECTS ASSISTANCE 18 MONTHS AFTER THE DATE OF ENACTMENT OF THE 1977 LAW. THE REGULATIONS, HOWEVER, WERE NOT MADE AVAILABLE UNTIL NOVEMBER, 1978, MORE THAN A YEAR LATER. THAT MEANT THAT LESS THAN HALF A YEAR REMAINED DURING WHICH FMHA COULD ACCEPT REQUEST FOR ASSISTANCE. THEREFORE, THE COMMITTEE EXTENDED THE REQUEST PERIOD BY 18 MONTHS. THIS ACTION WAS MERELY TO MAKE THE 1977 PROVISIONS OPERATIVE AND WAS NOT INTENDED TO ADD NEW LAW. THEREFORE, THE COMMITTEE DID NOT EXTEND THE 36-MONTH PERIOD IN EXISTING LAW DURING WHICH CONSTRUCTION DEFECTS WERE DISCOVERED. THE COMMITTEE EXPECTS FMHA TO BE MINDFUL OF THIS FACTOR AND TO TAKE CAREFUL STEPS IN IMPLEMENTING THESE PROVISIONS TO ASSURE THAT THE ASSISTANCE REQUESTED IS FOR DEFECTS THAT OCCURRED DURING THE ORIGINAL 36-MONTH PERIOD THAT CONGRESS APPROVED IN THE 1977 ACT.

### SECTION 524 SITE DEVELOPMENT LOANS

*42 UNDER EXISTING LAW, SECTION 524 SITE DEVELOPMENT LOANS WERE ONLY AVAILABLE FOR THE ACQUISITION AND DEVELOPMENT OF BUILDING SITES ON WHICH HOUSING WAS TO BE CONSTRUCTED FOR LOW- AND MODERATE-INCOME FAMILIES AND WAS ASSISTED THROUGH FEDERAL, STATE OR LOCAL HOUSING ASSISTANCE PROGRAMS. ALSO, SUCH LOANS WERE REQUIRED TO BEAR AN INTEREST RATE BASED ON THE U.S. TREASURY'S COST OF BORROWING FOR NOTES OF COMPARABLE MATURITIES. THE COMMITTEE HAS APPROVED REMOVING THESE REQUIREMENTS TO PERMIT THE CONSTRUCTION OF ANY TYPE OF HOUSING ON SITES ACQUIRED *46 AND DEVELOPED WITH SECTION 524 LOANS AND HAS ESTABLISHED A MARKET RATE OF INTEREST FOR SUCH LOANS. THE LOANS, HOWEVER, WOULD CONTINUE TO BE MADE ONLY TO

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



PUBLIC OR PRIVATE NONPROFIT ORGANIZATIONS. IN IMPLEMENTING THESE NEW PROVISIONS THE COMMITTEE INTENDS THAT FMHA **\*2362** APPROVE SUCH LOANS ONLY WHEN A CLEAR NEED IS DEMONSTRATED AND WHERE FINANCING IS NOT NOW AVAILABLE, NOR MAY BE EXPECTED TO BE AVAILABLE IN A REASONABLE PERIOD OF TIME, FROM PRIVATE SOURCES. THE COMMITTEE ALSO DIRECTS FMHA TO GIVE PRIORITY TO APPLICANTS WHO PROPOSE TO CONSTRUCT PROJECTS THAT INCLUDE HOUSING UNITS FOR LOW- AND MODERATE-INCOME FAMILIES.

### STATEMENTS REQUIRED IN ACCORDANCE WITH HOUSE RULES

IN ACCORDANCE WITH CLAUSE 2(L)(2)(B), 2(L)(3), AND 2(L)(4) OF RULE XI AND CLAUSE 7(A) OF RULE XIII OF THE RULES OF THE HOUSE OF REPRESENTATIVES, THE FOLLOWING STATEMENTS ARE MADE.

### COMMITTEE VOTE (RULE XI, CLAUSE 2(L)(2)(B))

A TOTAL OF 34 VOTES CASE FOR REPORTING FAVORABLY H.R. 3875, AS AMENDED, AND 3 VOTES WERE CASE AGAINST REPORTING THE BILL.

THE FOLLOWING COMMITTEE MEMBERS CAST VOTES FOR REPORTING THE BILL: REPRESENTATIVES REUSS, ASHLEY, MOORHEAD, ST. GERMAIN, GONZALEZ, MINISH, ANNUNZIO, HANLEY, MITCHELL (BY PROXY), FAUNTROY, NEAL (BY PROXY), BLANCHARD, HUBBARD, SPELLMAN (BY PROXY), AUCOIN, D'AMOURS (BY PROXY), LUNDINE, CAVANAUGH, OAKAR (BY PROXY), VENTO, WATKINS, GARCIA, LOWRY (BY PROXY), STANTON, WYLIE, MCKINNEY, HYDE, LEACH (IOWA), EVANS (DELAWARE) (BY PROXY), GREEN, BETHUNE, CAMPBELL, RITTER (BY PROXY), AND HINSON (BY PROXY).

THE FOLLOWING COMMITTEE MEMBERS CAST VOTES AGAINST REPORTING THE BILL: REPRESENTATIVES MATTOX, KELLY, AND PAUL.

THE FOLLOWING COMMITTEE MEMBERS WERE ABSENT: REPRESENTATIVES PATTERSON, LAFALCE, EVANS (INDIANA), BARNARD, HANSEN, AND SHUMWAY.

### OVERSIGHT FINDINGS (RULE XI, CLAUSE 2(L)(3)(A), AND RULE X, CLAUSE 2(B)(1))

THE COMMITTEE STATES THAT NO FINDINGS OR RECOMMENDATIONS ON OVERSIGHT ACTIVITY CONDUCTED IN ACCORDANCE WITH CLAUSE 4(C)(2), RULE X OF THE RULES OF THE HOUSE OF REPRESENTATIVES HAVE BEEN SUBMITTED BY THE COMMITTEE ON GOVERNMENT OPERATIONS FOR INCLUSION IN THIS REPORT. WHILE NO REPORTS FROM THE COMMITTEE ON GOVERNMENT OPERATIONS HAVE BEEN SUBMITTED, THE COMMITTEE HAS BEEN WORKING WITH THE GOVERNMENT OPERATIONS COMMITTEE ON THEIR OVERSIGHT WORK CONCERNING THE OPERATION OF VARIOUS HOUSING AND COMMUNITY DEVELOPMENT PROGRAMS.

### ESTIMATE OF COST TO BE INCURRED (RULE XIII, CLAUSE 7(A)(A), (2))

**\*43** IN ADDITION TO THE INFORMATION PROVIDED PURSUANT TO CLAUSE 2(L)(3)(C) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES, THE COMMITTEE PROVIDES THE FOLLOWING INFORMATION WITH RESPECT TO THE COST TO THE UNITED STATES IN CARRYING OUT H.R. 3875 IN FISCAL YEAR 1979 AND IN EACH OF THE FIVE SUCCEEDING YEARS: TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



   **\*2363 \*47** THE COMMITTEE HAS NOT RECEIVED A SIMILAR ESTIMATE OF SUCH COSTS FROM A GOVERNMENT AGENCY.

COST ESTIMATE OF THE CONGRESSIONAL BUDGET OFFICE PURSUANT TO SECTION 403 OF THE CONGRESSIONAL BUDGET ACT OF 1974 (RULE XI, CLAUSE 2(L)(3)(C))

   CONGRESSIONAL BUDGET OFFICE,
   U.S. CONGRESS,
   WASHINGTON, D.C., MAY 14, 1979.
   HON. HENRY S. REUSS,
   CHAIRMAN, COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS, U.S. HOUSE OF REPRESENTATIVES, WASHINGTON D.C.
   DEAR MR. CHAIRMAN: PURSUANT TO SECTION 403 OF THE CONGRESSIONAL BUDGET ACT OF 1974, THE CONGRESSIONAL BUDGET OFFICE HAS PREPARED THE ATTACHED COST ESTIMATE FOR H.R. 3875, THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1979.
   SHOULD THE COMMITTEE SO DESIRE, WE WOULD BE PLEASED TO PROVIDE FURTHER DETAILS ON THIS ESTIMATE.
   SINCERELY,
   JAMES BLUM,
   (FOR ALICE M. RIVLIN, DIRECTOR).

CONGRESSIONAL BUDGET OFFICE-- COST ESTIMATE

   MAY 14, 1979.
   1. BILL NUMBER: H.R. 3875.
   2. BILL TITLE: HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1979.
   3. BILL STATUS: AS ORDERED REPORTED BY THE HOUSE COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS, MAY 10, 1979.
   4. BILL PURPOSE: THE BILL, IF ENACTED, WOULD AMEND SEVERAL LAWS RELATING TO THE FEDERAL GOVERNMENT'S HOUSING AND COMMUNITY DEVELOPMENT PROGRAMS. ADDITIONAL FUNDING WOULD BE PROVIDED FOR THE ASSISTED HOUSING AND COMMUNITY DEVELOPMENT ACTIVITIES OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD) AND THE FARMERS HOME ADMINISTRATION (FMHA). IN ADDITION, VARIOUS MORTGAGE LOAN GUARANTEE AND INSURANCE AUTHORITIES WOULD BE EXTENDED. THE BILL ALSO CONTAINS MAJOR REVISIONS TO THE INTERSTATE LAND SALES FULL DISCLOSURE ACT.
   5. COST ESTIMATE: THE ESTIMATED BUDGET IMPACT OF THIS BILL, BY TITLE IS SUMMARIZED IN THE FOLLOWING TABLE.

**\*48 \*2364** BUDGET IMPACT BY BILL TITLE

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
   THE ESTIMATED BUDGET IMPACT OF THIS BILL, BY FUNCTION IS SUMMARIZED BELOW:
   6. BASIS OF ESTIMATE: TITLE I-- COMMUNITY AND NEIGHBORHOOD DEVELOPMENT AND CONSERVATION.
   REHABILITATION LOAN FUND.-- THE BILL WOULD AUTHORIZE THE APPROPRIATION OF AN AMOUNT NOT TO EXCEED $150 MILLION FOR FISCAL YEAR 1980 FOR SECTION 312 REHABILITATION LOANS AND LIMIT TO $50 MILLION THE AMOUNT OF THE APPROPRIATED FUNDS THAT CAN BE USED FOR REHABILITATION LOANS FOR MULTIFAMILY PROPERTIES AFTER

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



OCTOBER 1, 1979. IT WOULD ALSO EXTEND, THROUGH FISCAL YEAR 1980, HUD'S AUTHORITY TO MAKE REHABILITATION LOANS. THE $150 MILLION IS $80 MILLION LESS THAN THE 1979 APPROPRIATION FOR THE 312 PROGRAM. IT IS ASSUMED THAT THE FULL AUTHORIZED LEVEL WOULD BE APPROPRIATED AND THAT ALL $150 MILLION WOULD BE OBLIGATED DURING FISCAL YEAR 1980. THE ESTIMATED OUTLAYS OF THIS PROVISION REPRESENT ANNUAL LOAN DISBURSEMENTS MINUS RECEIPTS.

*44 COMPREHENSIVE PLANNING.-- THE BILL WOULD AUTHORIZE AN APPROPRIATION NOT TO EXCEED $45 MILLION FOR FISCAL YEAR 1980 FOR THE SECTION 701 COMPREHENSIVE PLANNING ASSISTANCE PROGRAM, A PROGRAM THAT WAS APPROPRIATED $53 MILLION FOR FISCAL YEAR 1979. ALL $45 MILLION IS ASSUMED TO BE APPROPRIATED; OUTLAYS ARE ESTIMATED ON THE BASIS OF HISTORICAL SPENDING PATTERNS.

COMMUNITY DEVELOPMENT BLOCK GRANT PROGRAM.-- THE BILL WOULD INCREASE THE AMOUNT OF COMMUNITY DEVELOPMENT BLOCK GRANT FUNDS RESERVED IN FISCAL YEAR 1980 FOR NONENTITLEMENT METROPOLITAN COMMUNITIES*2365 *49 FROM $250 MILLION TO $290 MILLION, APPROXIMATELY THE AMOUNT THAT IS EXPECTED TO BE USED FOR THIS PURPOSE IN FISCAL YEAR 1979. THIS PROVISION WOULD AUTHORIZE NO NEW APPROPRIATIONS AND WOULD NOT APPRECIABLY ALTER THE PROGRAM'S DISBURSEMENT LEVELS.

AN APPROPRIATION OF UP TO $675 MILLION FOR FISCAL YEAR 1980 WOULD BE AUTHORIZED FOR THE URBAN DEVELOPMENT ACTION GRANT PROGRAM, AN INCREASE OF $275 MILLION OVER THE EXISTING $400 MILLION AUTHORIZATION FOR 1980. OUTLAYS ARE ESTIMATED BY ASSUMING APPROPRIATION IN 1980 OF THE FULL ADDITIONAL $275 MILLION, AND BY APPLYING A DISBURSEMENT RATE DERIVED FROM EXPERIENCE IN SIMILAR GRANT PROGRAMS.

THE BUDGET IMPACT OF TITLE I IS SUMMARIZED IN THE FOLLOWING TABLE:
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

TITLE II-- HOUSING ASSISTANCE PROGRAMS

LOW-INCOME HOUSING.-- TITLE II OF THE BILL WOULD AUTHORIZE AN INCREASE IN THE ANNUAL CONTRACT AUTHORITY AVAILABLE FOR USE IN HUD'S LOW-INCOME HOUSING PROGRAMS BY $1,286 MILLION. THE BILL ALSO SPECIFIES THAT OF THIS AMOUNT, AT LEAST $1,063 MILLION MUST BE USED FOR HOUSING UNITS ASSISTED UNDER SECTION 8 OF THE UNITED STATES HOUSING ACT OF 1937. OF THE REMAINING $223 MILLION, NOT LESS THAN $55 MILLION MUST BE USED FOR MODERNIZATION OF PUBLIC HOUSING PROJECTS. IT IS ESTIMATED THAT THE NEWLY AUTHORIZED CONTRACT AUTHORITY WOULD BE SUFFICIENT TO ASSIST AN ADDITIONAL 286,000 UNITS OF LOW-INCOME HOUSING. ORDINARILY, FUNDS SET ASIDE FOR MODERNIZATION WOULD NOT INCREASE THE NUMBER OF UNITS AVAILABLE FOR OCCUPANCY. THE BILL STATES, HOWEVER, THAT WHEN OBLIGATING THE PUBLIC HOUSING MODERNIZATION FUNDS, PREFERENCE MUST BE GIVEN TO IMPROVING SUBSTANDARD VACANT UNITS. THUS THE BILL COULD HAVE THE EFFECT OF MAKING AVAILABLE FOR OCCUPANCY MORE THAN 286,000 UNITS. AFTER ALLOWING FOR THESE SET-ASIDES, IT WAS ASSUMED IN THIS COST ESTIMATE THAT THE NEWLY AVAILABLE CONTRACT AUTHORITY WOULD BE ALLOCATED AMONG THE VARIOUS SUBPROGRAMS WITHIN THE SECTION 8 AND PUBLIC HOUSING PROGRAMS IN THE SAME PROPORTIONS AS IN HUD'S FISCAL YEAR 1980 BUDGET REQUEST.

THE NEW ANNUAL CONTRACT AUTHORITY RELEASED IN A GIVEN YEAR FOR HUD'S LOW-INCOME HOUSING PROGRAMS IS THE LIMIT ON THE ADDITIONAL FEDERAL EXPENDITURES PER YEAR THAT CAN DERIVE FROM THE USE OF THAT AUTHORITY. BUDGET AUTHORITY, ON THE OTHER HAND, IS THE LIMIT ON THE TOTAL FEDERAL EXPENDITURES THAT CAN RESULT FROM THE USE OF THE NEW AUTHORITY. THUS, BUDGET AUTHORITY IS A FUNCTION OF THE AMOUNT OBLIGATED IN A GIVEN YEAR AND THE MAXIMUM NUMBER OF YEARS (THE CONTRACT TERM)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



THOSE OBLIGATIONS CAN BE IN EFFECT. THE CONTRACT TERM IS NOT THE SAME FOR ALL OF **\*50 \*2366** THE VARIOUS SUBPROGRAMS. THE HOUSE COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS, IN THE REPORT ACCOMPANYING THIS BILL, HAS MADE SPECIFIC ASSUMPTIONS AS TO THE CONTRACT TERMS FOR SEVERAL SUBPROGRAMS. WITH THE EXCEPTION OF THESE, THE TERMS USED IN THIS ESTIMATE ARE THOSE PROJECTED BY HUD IN ITS 1980 BUDGET SUBMISSION.

**\*45** TO ESTIMATE THE ANNUAL OUTLAYS STEMMING FROM THAT PART OF THE 1980 AUTHORIZATION ALLOCATED TO SECTION 8, ASSUMPTIONS MUST BE MADE IN THREE PRINCIPAL AREAS: THE RATES AT WHICH THE NEW AUTHORITY CAN BE OBLIGATED AND THE HOUSING UNITS THUS ASSISTED CAN ACTUALLY COME UNDER PAYMENT; CURRENT AND FUTURE RENT LEVELS; AND CURRENT AND FUTURE TENANT INCOME LEVELS.

FOR THIS ESTIMATE IT WAS ASSUMED THAT ALL OF THE NEW AUTHORITY WHICH WOULD BE RELEASED IN THE BILL WOULD BE APPROVED IN APPROPRIATIONS ACTS FOR FISCAL YEAR 1980 AND THAT IT WOULD ALSO BE FULLY OBLIGATED IN FISCAL YEAR 1980. THE RATE AT WHICH UNITS ASSISTED WITH 1980 AUTHORITY ACTUALLY COME UNDER PAYMENT IS ESTIMATED FROM PROGRAM EXPERIENCE. THESE ESTIMATES RANGE FROM 1 TO 2 YEARS FOR EXISTING HOUSING PROGRAMS TO 3 AND 4 YEARS FOR PROGRAMS INVOLVING NEW CONSTRUCTION.

ONCE A SECTION 8 ASSISTED HOUSING UNIT IS OCCUPIED, FEDERAL OUTLAYS BEGIN. THESE OUTLAYS ARE THE DIFFERENCE BETWEEN THE RENT LEVEL ESTABLISHED UNDER PROGRAM PROCEDURES FOR THAT UNIT AND A PORTION OF THE TENANT FAMILY'S INCOME. RENT LEVELS USED IN THIS ESTIMATE FOR THE SECTION 8 PROGRAMS IN THE INITIAL PAYMENT YEAR ARE FISCAL YEAR 1978 AMOUNTS ADJUSTED FOR PRICE INCREASES. THIS ADJUSTMENT WAS ACCOMPLISHED FOR THE NEW CONSTRUCTION PROGRAMS USING THE CBO PROJECTION FOR INCREASES IN THE COSTS OF RESIDENTIAL CONSTRUCTION. FOR EXISTING HOUSING PROGRAMS, THE CBO PROJECTION FOR INCREASES IN THE RENTAL COMPONENT OF THE CONSUMER PRICE INDEX WAS USED. IN THE YEARS FOLLOWING INITIAL OCCUPANCY, RENTS FOR BOTH THE NEW CONSTRUCTION AND EXISTING PROGRAMS WERE ADJUSTED USING THE CBO PROJECTIONS FOR THE RENTAL CPI.

TENANT INCOME LEVELS FOR THE DIFFERENT PROGRAMS USED IN THIS REPORT WERE ESTIMATED FROM INFORMATION PROVIDED BY HUD FOR FISCAL YEAR 1977. THESE 1977 INCOMES WERE INCREASED FOR SUBSEQUENT YEARS BY CBO'S ESTIMATE OF THE RATE OF GROWTH OF INCOME FOR THAT PORTION OF THE POPULATION ELIGIBLE FOR ASSISTANCE. THE BILL CONTAINS PROVISIONS THAT WOULD INCREASE THE PORTION OF INCOME CERTAIN ASSISTED HOUSEHOLDS MUST CONTRIBUTE TOWARD THEIR RENT. IT IS ESTIMATED THAT, WITH THESE CHANGES, TENANTS OF NEWLY CONSTRUCTED UNITS WOULD CONTRIBUTE ABOUT 24 PERCENT OF INCOME AND TENANTS OF EXISTING UNITS ABOUT 22 PERCENT. IF ENACTED, THE BILL'S PROVISIONS CHANGING TENANT CONTRIBUTIONS WOULD HAVE THE EFFECT OF LOWERING FEDERAL COSTS FOR UNITS ASSISTED WITH 1980 AUTHORITY AND ALSO FOR UNITS ALREADY UNDER PAYMENT OR RESERVED FROM PRIOR YEARS' AUTHORITY.

ESTIMATED COSTS FOR THE PUBLIC HOUSING PORTION OF THE FISCAL YEAR 1979 AUTHORIZATIONS DEPEND UPON CONSTRUCTION SCHEDULE ASSUMPTIONS. THE SCHEDULES USED IN THIS ESTIMATE WERE BASED ON PROGRAM EXPERIENCE. ONCE CONSTRUCTION IS COMPLETE, THE FULL AMOUNT OF ALLOCATED ANNUAL CONTRACT AUTHORITY IS ASSUMED TO BE SPENT EACH YEAR.

OPERATING ASSISTANCE.-- TITLE II AUTHORIZES THE APPROPRIATION OF $741.5 MILLION FOR PUBLIC HOUSING OPERATING ASSISTANCE AND $92.0 MILLION FOR OPERATING ASSISTANCE FOR TROUBLED MULTIFAMILY PROJECTS. IT WAS ASSUMED THAT THE FULL AMOUNTS WOULD BE APPROPRIATED AND THAT OUTLAYS WOULD FOLLOW HISTORICAL PATTERNS.

**\*46 \*51 \*2367** THE BUDGET IMPACT OF TITLE II IS SUMMARIZED IN THE FOLLOWING TABLE:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

TITLE III-- PROGRAM AMENDMENTS AND EXTENSIONS

   TITLE III OF THE BILL EXTENDS FOR ONE YEAR HUD'S BASIC MORTGAGE INSURANCE PROGRAMS. THESE PROGRAMS RESULT IN CONTINGENT LIABILITIES TO THE FEDERAL GOVERNMENT AND COULD HAVE SIGNIFICANT BUDGET IMPACT IN ANY GIVEN YEAR, ALTHOUGH INTENDED TO BE ACTUARIALLY SOUND IN THE LONG-RUN. NO BUDGET IMPACT FOR THESE PROGRAMS IS INCLUDED IN THIS ESTIMATE.
   AMENDMENTS ARE ALSO MADE TO CERTAIN SECTIONS OF THE NATIONAL HOUSING ACT AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION ACT; THESE AMENDMENTS ARE EXPECTED TO HAVE NO APPRECIABLE BUDGET IMPACT. TITLE III ALSO AUTHORIZES THE APPROPRIATION OF $93 MILLION TO COVER LOSSES IN THE GENERAL INSURANCE FUND OF THE FEDERAL HOUSING ADMINISTRATION (FHA). THIS MONEY WOULD BE USED TO PAY INSURANCE CLAIMS AND OTHER LIABILITIES OF THE FUND. WITHOUT SUCH AN APPROPRIATION, THESE CLAIMS AND LIABILITIES WOULD BE PAID WITH FUNDS BORROWED FROM THE U.S. TREASURY. THUS, THIS PROVISION IS EXPECTED TO HAVE NO ADDITIONAL BUDGET IMPACT.
   RESEARCH AUTHORIZATIONS.-- AN APPROPRIATION NOT TO EXCEED $51 MILLION WOULD BE AUTHORIZED FOR HUD RESEARCH ACTIVITIES FOR FISCAL YEAR 1980. THIS COMPARES WITH A FISCAL YEAR 1979 APPROPRIATION OF $57.5 MILLION. ALL $51 MILLION IS ASSUMED TO BE APPROPRIATED; OUTLAYS ARE ESTIMATED ON THE BASIS OF HISTORICAL SPENDING PATTERNS.
   HOUSING FOR THE ELDERLY OR HANDICAPPED.-- TITLE III WOULD AUTHORIZE THE RELEASE IN APPROPRIATIONS ACTS OF ADDITIONAL BORROWING AUTHORITY OF $535 MILLION, $950 MILLION AND $975 MILLION FOR FISCAL YEARS 1980, 1981 AND 1982, RESPECTIVELY, FOR HUD'S SECTION 202 HOUSING PROGRAM FOR THE ELDERLY AND HANDICAPPED. FUNDS OBTAINED FROM THE USE OF THIS AUTHORITY WOULD BE LOANED TO QUALIFIED SPONSORS OF HOUSING DESIGNED TO MEET THE NEEDS OF ELDERLY AND HANDICAPPED PERSONS. THIS ESTIMATE ASSUMES THAT THE FULL AMOUNTS WILL BE RELEASED IN APPROPRIATIONS ACTS AND THAT THE LOAN LIMITATIONS SET ANNUALLY BY THE APPROPRIATIONS PROCESS WILL BE SUFFICIENT TO ALLOW COMPLETE OBLIGATION OF THE FUNDS. IT WAS ALSO ASSUMED THAT FUNDS WOULD BE OBLIGATED DURING THE YEAR APPROPRIATED, THAT CONSTRUCTION WOULD BEGIN 12 MONTHS AFTER RESERVATION AND THAT THE UNITS WOULD BE COMPLETED 24 MONTHS AFTER CONSTRUCTION BEGINS. INTEREST RATES CHARGED TO BORROWERS WERE PROJECTED AT 8 1/8 PERCENT DURING THE TWO-YEAR CONSTRUCTION PERIOD AND AT 7 5/8 PERCENT FOR THE *52 *2368 REMAINING 38 YEARS OF THE LOAN. THIS IS IN LINE WITH CURRENT PROGRAM REGULATIONS. THE OUTLAYS SHOWN IN THIS ESTIMATE ARE LOAN DISBURSEMENTS LESS INTEREST AND PRINCIPAL PAYMENTS.
   NEIGHBORHOOD REINVESTMENT CORPORATION.-- THE BILL WOULD AUTHORIZE APPROPRIATIONS NOT TO EXCEED $9.5 MILLION FOR THE NEIGHBORHOOD REINVESTMENT CORPORATION FOR FISCAL YEAR 1980. THE FULL $9.5 MILLION IS ASSUMED TO BE APPROPRIATED. FUNDS ARE ASSUMED TO BE USED FOR TECHNICAL ASSISTANCE AND ADMINISTRATIVE ACTIVITIES BY CORPORATION STAFF AND FOR GRANTS TO LOCAL NEIGHBORHOOD HOUSING SERVICE PROGRAMS. ADMINISTRATIVE AND TECHNICAL ASSISTANCE FUNDS WOULD BE FULLY EXPENDED IN FISCAL YEAR 1980, WHILE GRANT MONIES WOULD BE DISBURSED OVER A TWO-YEAR PERIOD.
   *47 THE BUDGET IMPACT OF TITLE III IS SUMMARIZED IN THE FOLLOWING TABLE:
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



### TITLE IV-- INTERSTATE LAND SALES

TITLE IV WOULD AMEND SECTIONS OF THE INTERSTATE LAND SALES FULL DISCLOSURE ACT THAT CONCERN EXEMPTIONS FROM LAND SALE REGISTRATION AND DISCLOSURE REQUIREMENTS, THE EXTENT OF COVERAGE OF FRAUD PROVISIONS, STATE AND FEDERAL REGISTRATION AND DISCLOSURE REQUIREMENTS, THE STATUTE OF LIMITATIONS, CEASE AND DESIST POWERS, PENALTIES FOR CRIMINAL VIOLATIONS, AND OTHER MATTERS. IT WOULD ALSO REQUIRE HUD TO SUBMIT TO THE CONGRESS BIENNIAL REPORTS ON ADMINISTRATION OF THE ACT, WITH THE FIRST REPORT DUE ON MARCH 1, 1981. FUNDS FOR SUPPORT OF THE ACTIVITIES UNDER THIS BILL, AND FOR ADMINISTRATION OF THE LAND SALES ACT IN GENERAL, ARE DRAWN FROM HUD MANAGEMENT AND ADMINISTRATION APPROPRIATIONS. TITLE IV WOULD AUTHORIZE NO NEW APPROPRIATIONS, AND WOULD RESULT IN NO SIGNIFICANT ADDITIONAL COSTS.

### TITLE V-- RURAL HOUSING

RURAL HOUSING GRANTS.-- THE BILL WOULD AUTHORIZE APPROPRIATIONS OF $61 MILLION FOR THE FARMERS HOME ADMINISTRATION'S (FMHA) RURAL HOUSING GRANTS AND RESEARCH PROGRAMS. IT WAS ASSUMED THAT THESE AUTHORIZATIONS WOULD BE FULLY APPROPRIATED AND THAT OUTLAYS FROM APPROPRIATIONS WOULD FOLLOW HISTORICAL PATTERNS.

RURAL HOUSING LOANS.-- SUBJECT TO THE PASSAGE OF EXTENSIONS AND REAUTHORIZATIONS INCLUDED IN THE BILL AND THE NECESSARY APPROPRIATIONS ACTION, FMHA PLANS FISCAL YEAR 1980 LOAN OBLIGATIONS OF $3,429 MILLION. ONCE THE OBLIGATED FUNDS HAVE BEEN DISBURSED TO THE BORROWER, FMHA GENERALLY SELLS THE LOANS, IN THE FORM OF PARTICIPATION CERTIFICATES, TO *53 *2369 THE FEDERAL FINANCING BANK. THESE CERTIFICATES BEAR HIGHER INTEREST RATES THAN THE ACTUAL LOANS BACKING THEM AND FMHA PAYS THE DIFFERENCE FROM FUNDS AVAILABLE FROM THE RURAL HOUSING INSURANCE FUND (RHIF). THE ESTIMATED OUTLAYS OF FMHA'S RURAL HOUSING LOAN PROGRAMS SHOWN IN THIS COST ESTIMATE REFLECT ONLY THE COSTS OF THE INTEREST SUBSIDIES AND LOAN DELINQUENCIES. ACTUAL LOAN AMOUNTS AND PRINCIPAL REPAYMENTS WERE NOT INCLUDED SINCE IT WAS ASSUMED THAT LOANS WOULD BE SOLD IMMEDIATELY UPON DISBURSEMENT.

OF THE TOTAL LOAN AMOUNT OF $3,429 MILLION, FMHA HAS SCHEDULED $548 MILLION FOR OBLIGATION TO MODERATE-INCOME BORROWERS. UNDER A PROVISION OF THE BILL, THESE LOANS WOULD BE MADE AT THE SAME RATE OF INTEREST SET BY THE SECRETARY OF HUD FOR LOANS INSURED UNDER SECTION 203(B)(5) OF THE NATIONAL HOUSING ACT. THIS ESTIMATE ASSUMES THAT FISCAL YEAR 1980 MODERATE-INCOME LOANS WILL BE MADE AT AN INTEREST RATE OF 8.5 PERCENT PER YEAR.

THE REMAINING $2,881 MILLION OF LOANS IS EXPECTED TO BE OBLIGATED TO LOW-INCOME BORROWERS. DEPENDING ON INCOME, THESE BORROWERS ARE ELIGIBLE FOR INTEREST CREDITS THAT MAY RESULT IN EFFECTIVE INTEREST RATES OF AS LOW AS ONE PERCENT PER YEAR. THERE ARE PROVISIONS, HOWEVER, FOR INTEREST CREDITS TO BE REDUCED AS BORROWER INCOMES INCREASE. FMHA EXPERIENCE INDICATES THAT, ON AVERAGE, INTEREST CREDIT RECIPIENTS ARE PAYING THE MODERATE-INCOME RATE AFTER ABOUT EIGHT YEARS. IN LINE WITH CURRENT RHIF ACTIVITY, THIS ESTIMATE ASSUMES THAT LOW-INCOME LOANS WILL BE MADE AT AN AVERAGE EFFECTIVE INTEREST RATE OF TWO PERCENT PER YEAR BUT THAT INTEREST CREDITS WILL BE GRADUALLY REDUCED, RESULTING IN AVERAGE EFFECTIVE RATES OF ABOUT 5 PERCENT PER YEAR FIVE YEARS AFTER DISBURSEMENT. DELINQUENCY COSTS

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



WERE CALCULATED BASED ON THE ASSUMPTION THAT, AT ANY GIVEN TIME, 15 PERCENT OF THE NUMBER OF LOANS ARE THREE MONTHS IN ARREARS. THE AUTHORIZATION LEVELS SHOWN IN THIS ESTIMATE ARE THOSE NECESSARY TO COVER EACH YEAR'S ESTIMATED OUTLAYS.

   **\*48** HOMEOWNERSHIP ASSISTANCE PROGRAM.-- THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1978 (PUBLIC LAW 95-557) ESTABLISHED THE HOMEOWNERSHIP ASSISTANCE PROGRAM (HOAP) WHEREBY VERY LOW-INCOME BORROWERS COULD RECEIVE ASSISTANCE IN ADDITION TO THAT AVAILABLE FROM RHIF'S INTEREST CREDIT PROGRAM. THE BILL WOULD PLACE A LIMIT OF $500 MILLION ON THE AGGREGATE AMOUNT OF LONG-TERM OBLIGATIONS ENTERED INTO IN FISCAL YEAR 1980 FOR HOAP ASSISTANCE. IT IS ESTIMATED THAT OUTLAYS FROM 1980 COMMITMENTS OF $500 MILLION WOULD BE $15 MILLION PER YEAR OVER THE 33-YEAR MAXIMUM LIFE OF THE LOANS.

   THE BUDGET IMPACT OF TITLE V IS SHOWN IN THE FOLLOWING TABLE:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

   **\*54 \*2370** 7. ESTIMATE COMPARISON: NONE.

   8. PREVIOUS CBO ESTIMATE: CBO HAS PREVIOUSLY PREPARED A COST ESTIMATE FOR S. 1064, THE RURAL HOUSING AMENDMENTS OF 1979, ORDERED REPORTED BY THE SENATE COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS, MAY 10, 1979. THAT BILL COVERS THE SAME ACTIVITIES AS TITLE V OF H.R. 3875. S. 1064 WOULD PROVIDE SLIGHTLY HIGHER GRANT AUTHORITIES, ESSENTIALLY THE SAME LOAN AUTHORITIES, AND ALMOST TWICE THE LEVEL OF HOAP ASSISTANCE. THE PROVISION OF H.R. 3875 THAT WOULD TIE THE INTEREST RATE FOR THE RHIF'S NON-INTEREST CREDIT PROGRAM TO THE RATE FOR HUD'S 203(B) PROGRAM IS NOT INCLUDED IN S. 1064.

   9. ESTIMATE PREPARED BY: BRENT G. SHIPP (225-7760), ALLEN KRAUS (225-7760).

   10. ESTIMATE APPROVED BY:

C. G. NUCKOLS, JR.,

DEPUTY ASSISTANT DIRECTOR FOR BUDGET ESTIMATES.


INFLATION IMPACT STATEMENT


(PREPARED IN COMPLIANCE WITH CLAUSE 2(1)(B)(4) OF RULE XI OF THE HOUSE OF REPRESENTATIVES)


   THIS LEGISLATION WILL MODIFY AND CONTINUE CERTAIN FEDERAL LAWS RELATING TO HOUSING AND COMMUNITY DEVELOPMENT. AS SUCH, IT HAS POTENTIAL IMPACT UPON THE LEVEL OF PRICES AS WELL AS PRODUCTIVE ACTIVITY. IN GENERAL, THESE AMENDMENTS ARE NOT EXPECTED TO AFFECT SIGNIFICANTLY THE LEVEL OF PRICES IN THE ECONOMY AS A WHOLE OR IN THE CONSTRUCTION INDUSTRY. THE PROPOSED CHANGES ARE ESSENTIALLY TECHNICAL IN NATURE AND ANTICIPATED IN THE INDUSTRY. THUS, IT WOULD BE UNLIKELY THAT NEW INFLATIONARY EXPECTATIONS WOULD BE GENERATED BY ENACTMENT OF THESE AMENDMENTS.


STATE OF THE ECONOMY


   THE ECONOMY IS IN ITS FIFTH YEAR OF RECOVERY FROM THE RECESSION OF 1974-1975. THE UNEMPLOYMENT RATE IN APRIL, 1979 WAS 5.8 PERCENT, WITH 5.94 MILLION PERSONS OUT OF WORK. OF THESE, 543,000 MILLION PERSONS HAD BEEN IDLE 6 MONTHS OR LONGER, THUS COMPRISING A HARD CORE OF UNEMPLOYED. THE PROPORTION OF MANUFACTURING CAPACITY OF AMERICAN INDUSTRY BEING UTILIZED WAS ESTIMATED AT 86.1 PERCENT FOR THE FIRST

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



QUARTER OF 1979 COMPARED WITH 82.1 PERCENT IN THE FIRST QUARTER OF 1978.

IN THE CONSTRUCTION INDUSTRY, THE UNEMPLOYMENT RATE IN APRIL, 1979 WAS 10.3 PERCENT, WITH 531,000 PERSONS OUT OF WORK. THIS IS A RELATIVELY LOW RATE FOR THIS INDUSTRY, BUT HIGHER THAN THE 9.5 PERCENT OF A YEAR EARLIER. HOUSING STARTS IN MARCH, 1979 WERE AT AN ANNUAL RATE OF 1.79 MILLION UNITS, DOWN FROM 2.047 LEVEL OF A YEAR EARLIER.

## INFLATIONARY PRESSURES

**\*49** THE UNDERLYING INFLATION RATE FOR THE ECONOMY AS A WHOLE IS BETWEEN 8 AND 10 PERCENT. THE CONSUMER PRICE INDEX IN MARCH, 1979 SHOWED A RISE OF 10.2 PERCENT OVER THE PREVIOUS YEAR. THIS WAS LESS THAN THE 11 PERCENT INCREASE IN 1974 OVER 1973 BUT ABOVE A RATE THAT BUSINESSMEN AND ECONOMISTS CONSIDER ACCEPTABLE. FUEL AND UTILITY PRICES IN HOUSING WERE UP 6.3 PERCENT IN MARCH, 1979 OVER THE PREVIOUS YEAR. THE BOECKH INDEX OF CONSTRUCTION COSTS FOR APARTMENTS, HOTELS, AND OFFICE BUILDINGS SHOWED A RISE OF 7.4 PERCENT IN JANUARY, 1979 OVER **\*55 \*2371** THE PRECEDING YEAR. FOR RESIDENCES (MOSTLY ONE-FAMILY HOUSES), THE INCREASE WAS 11.5 PERCENT.

IN THE FIRST QUARTER OF 1979 PRICES IN THE ECONOMY WERE RISING AT A RATE OF 9 TO 10 PERCENT. REFLECTING THESE PRICE INCREASES AND A COMPARATIVELY STRONG DEMAND FOR LOANABLE FUNDS BY CONSUMERS, PRIVATE CORPORATIONS AND GOVERNMENTS, INTEREST RATES WERE ON THE RISE IN THE FIRST QUARTER OF 1979. THE FEDERAL FUNDS RATE ROSE FROM ABOUT 9.6 PERCENT IN THE LAST QUARTER OF 1978 TO 10.25 PERCENT IN EARLY MAY OF 1979. RATES ON SEASONED HIGH-GRADE INDUSTRIAL BONDS (MOODY'S AAA) AVERAGED 9.38 PERCENT IN APRIL, 1979, UP FROM A 1978 AVERAGE OF 8.43 PERCENT. THE AVERAGE YIELD ON FOUR-MONTH COMMITMENTS BY THE FEDERAL NATIONAL MORTGAGE ASSOCIATION TO BUY FHA/VA MORTGAGES WAS 10.82 PERCENT AT THE END OF APRIL, 1979 COMPARED WITH 9.52 PERCENT IN MAY, 1978.

## THE HOUSING OUTLOOK

A DECLINE IN NET NEW SAVINGS AT THRIFT INSTITUTIONS AND CONTINUED HIGH INTEREST RATES ARE EXPECTED TO HAVE A DAMPENING EFFECT ON HOME SALES AND STARTS. IF THE FLOW OF FUNDS INTO SAVINGS AND LOAN ASSOCIATIONS SLOWS DOWN IN THE SECOND AND THIRD QUARTERS OF 1979, AS NOW SEEMS PROBABLY, THIS WILL TRANSLATE INTO LOWER HOUSING ACTIVITY IN THE SECOND HALF OF 1979. HOUSING STARTS, WHICH TOTALED OVER 2 MILLION UNITS IN 1978, COULD DECLINE TO 1.65 TO 1.75 MILLION UNITS IN 1979.

## IMPACT OF THE PROPOSED LEGISLATION

TITLE I OF H.R. 2875 EXTENDS THE AUTHORIZATION FOR SECTION 312 REHABILITATION LOANS AND PERMITS APPROPRIATIONS FOR UP TO $150 MILLION FOR FISCAL YEAR 1980. SUCH LOANS TEND TO EXTEND THE USEFUL LIFE OF OLDER STRUCTURES AND THUS REDUCE THE VOLUME OF NEW CONSTRUCTION NEEDED TO HOUSE ADEQUATELY LOW- AND MODERATE-INCOME FAMILIES.

THE SAME TITLE AUTHORIZES AN APPROPRIATION OF UP TO $675 MILLION FOR FISCAL YEAR 1980 FOR URBAN DEVELOPMENT ACTION GRANTS. THIS IS AN INCREASE FROM $400 MILLION PRESENTLY AUTHORIZED. ADMINISTRATION OFFICIALS HAVE ESTIMATED THAT FOR EACH DOLLAR OF FEDERAL GRANTS UNDER THIS PROGRAM FIVE TO SIX DOLLARS OF NEW PRIVATE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



INVESTMENT IS GENERATED. THUS AN INCREASE IN THE AUTHORIZATION LEVEL IS NOT INSIGNIFICANT WITH RESPECT TO POTENTIAL PRICE INCREASES, BUT THE BENEFITS TO THE DISTRESSED PLACES WHERE NEW INVESTMENTS WILL OCCUR ARE DEEMED TO JUSTIFY THE COSTS.

OTHER PROVISIONS IN TITLE I ARE NOT LIKELY TO HAVE INFLATIONARY CONSEQUENCES.

TITLE II AUTHORIZES THE APPROPRIATION OF FUNDS FOR ASSISTED HOUSING PROGRAMS AT PRODUCTION LEVELS THAT ARE ABOUT THE SAME OR PERHAPS SLIGHTLY LOWER THAN IN FISCAL YEAR 1979. THE ADDITIONAL HOUSING UNITS CONTAINED WITHIN THESE TOTALS HAVE ALREADY BEEN ENTERED INTO THE PROJECTIONS OF HOUSING STARTS MADE BY MARKET ECONOMISTS. THUS, NO NEW INFLATIONARY EXPECTATIONS WOULD BE GENERATED BY THIS AUTHORIZATION. A SET ASIDE FOR MODERNIZATION OF LOW INCOME PUBLIC HOUSING PROJECTS WILL TEND TO SALVAGE OLDER PROPERTIES AND THUS WILL BE ANTI-INFLATIONARY.

**\*50** ANOTHER PROVISION WOULD PERMIT INCREASES IN RENT-TO-INCOME RATIOS FROM 25 TO 30 PERCENT FOR CERTAIN PUBLIC HOUSING TENANTS. WHILE THIS WILL INCREASE THE HOUSING BURDEN FOR SUCH TENANTS, THE PROVISION WILL **\*56 \*2372** TEND TO HOLD DOWN INCREASES IN FEDERAL OPERATING SUBSIDIES FOR PUBLIC HOUSING. THE AMOUNT AUTHORIZED FOR OPERATING SUBSIDIES ($741.5 MILLION) IS ESSENTIAL TO KEEP LOCAL PUBLIC AGENCIES FROM INCURRING FURTHER OPERATING DEFICITS OR FURTHER CUTS IN NECESSARY SERVICES AND MAINTENANCE OF LOW INCOME PUBLIC HOUSING DEVELOPMENTS.

TITLE III EXTENDS A LARGE NUMBER OF HUD AND HUD-FHA MORTGAGES OR LOAN INSURANCE PROGRAMS THAT WOULD OTHERWISE EXPIRE ON SEPTEMBER 30, 1979. NONE OF THESE IS DEEMED TO HAVE INFLATIONARY IMPACT ON THE GENERAL ECONOMY.

ANOTHER PROVISION IN THE TITLE INCREASES THE MAXIMUM FOR MORTGAGES INSURED UNDER FHA PROGRAMS (FOR EXAMPLE, TO $65,000 FOR MORTGAGES FOR ONE-FAMILY RESIDENCES). THESE INCREASES ESSENTIALLY RECOGNIZE MARKET REALITIES.

THE AUTHORIZATIONS INCLUDED FOR RESEARCH ($49 MILLION), THE INCREASE IN FUNDS AUTHORIZED TO BE APPROPRIATED TO COVER LOSSES OF THE FHA GENERAL INSURANCE FUND ($93 MILLION), AND THE AUTHORIZATION TO APPROPRIATE UP TO $9.5 MILLION DURING FISCAL 1980 FOR THE NEIGHBORHOOD REINVESTMENT CORPORATION DO NOT APPEAR LIKELY TO HAVE AN INFLATIONARY IMPACT.

TITLE IV, BEARING AN INTERSTATE LAND SALES, DOES NOT APPEAR TO HAVE ANY SIGNIFICANT IMPACT ON INFLATION.

TITLE IV, RELATING TO RURAL HOUSING ASSISTANCE PROGRAMS, IS NOT DEEMED TO HAVE SIGNIFICANT IMPACT ON INFLATION IN THE NATIONAL ECONOMY.


SECTION-BY-SECTION SUMMARY OF H.R. 3875


TITLE I-- COMMUNITY AND NEIGHBORHOOD DEVELOPMENT AND CONSERVATION


REHABILITATION LOANS


SECTION 101(A) OF THE BILL WOULD AMEND SECTION 312(D) OF THE HOUSING ACT OF 1964 TO AUTHORIZE THE APPROPRIATION OF AN AMOUNT NOT TO EXCEED $150 MILLION FOR FISCAL YEAR 1980 FOR THE REHABILITATION LOAN PROGRAM AND WOULD LIMIT TO $50 MILLION THE AMOUNT THAT COULD BE USED FOR REHABILITATION LOANS FOR MULTIFAMILY PROPERTIES AFTER OCTOBER 1, 1979.

SECTION 101(B) WOULD AMEND SECTION 312(H) OF THE ACT TO EXTEND THE SECRETARY'S

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



AUTHORITY TO MAKE SECTION 312 LOANS THROUGH FISCAL YEAR 1980.

SECTION 101(C) IS A TECHNICAL AMENDMENT WHICH WOULD REDESIGNATE SUBSECTIONS (I) AND (J) OF SECTION 312 OF THE HOUSING ACT OF 1964, AS ADDED BY SECTION 101(B) OF THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1978, AS SUBSECTIONS (J) AND (K), RESPECTIVELY.

## COMPREHENSIVE PLANNING

SECTION 102 WOULD AMEND SECTION 701(E) OF THE HOUSING ACT OF 1954 BY AUTHORIZING THE APPROPRIATION OF NOT TO EXCEED $45 MILLION FOR FISCAL YEAR 1980 FOR THE SECTION 701 COMPREHENSIVE PLANNING ASSISTANCE PROGRAM.

## COMMUNITY DEVELOPMENT BLOCK GRANT PROGRAM

SECTION 103(A)(1) WOULD AMEND SECTION 103(A)(2) OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1974 TO INCREASE THE AMOUNT OF **\*57 \*2373** FUNDS IN THE COMMUNITY DEVELOPMENT BLOCK GRANT PROGRAM SPECIFICALLY ALLOCATED FOR NONENTITLEMENT METROPOLITAN COMMUNITIES FROM $250 MILLION TO $290 MILLION IN FISCAL YEAR 1980.

**\*51** SECTION 103(A)(2) WOULD AMEND SECTION 106(M) OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1974 BY EXTENDING THROUGH FISCAL YEAR 1980 THE PROVISION THAT, IF THE TOTAL AMOUNT AVAILABLE FOR DISTRIBUTION UNDER SECTION 106 IS INSUFFICIENT TO MEET ALL ENTITLEMENT FUNDING REQUIREMENTS, AND FUNDS ARE NOT OTHERWISE APPROPRIATED TO MEET THE SHORTFALL, THE DEFICIENCY IS TO BE MADE UP THROUGH A PRO-RATA REDUCTION IN ALL GRANTS.

SECTION 103(B) WOULD AMEND SECTION 103(C) OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1974 TO AUTHORIZE AN APPROPRIATION OF UP TO $675 MILLION FOR FISCAL YEAR 1980 FOR THE URBAN DEVELOPMENT ACTION GRANT PROGRAM CONTAINED IN SECTION 119 OF THAT ACT. EXISTING LAW AUTHORIZES THE APPROPRIATION OF UP TO $400 MILLION FOR THE PROGRAM FOR FISCAL YEAR 1980.

SECTION 103(C) WOULD AMEND SECTION 104(B)(3) OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1974 BY AUTHORIZING THE SECRETARY TO WAIVE ALL OR PART OF THE PROGRAM SUMMARY FORMULATION AND DESCRIPTION REQUIREMENTS CONTAINED IN SECTION 104(A)(1), (2), AND (3), RESPECTIVELY, WHERE AN APPLICATION DOES NOT INVOLVE A COMPREHENSIVE COMMUNITY DEVELOPMENT PROGRAM, AS DETERMINED BY THE SECRETARY, AND THE SECRETARY DETERMINES THAT, WITH REGARD TO THE NATURE OF THE ACTIVITY TO BE CARRIED OUT, SUCH WAIVER IS NOT INCONSISTENT WITH THE PURPOSES OF THE BLOCK GRANT PROGRAM.

SECTION 103(D) WOULD AMEND SECTION 104(H) OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1974 TO CLARIFY THE AUTHORITY OF THE SECRETARY OF HUD TO PROVIDE FOR PERFORMANCE BY LOCAL GOVERNMENTS OF ENVIRONMENTAL REVIEWS UNDER STATUES WHICH FURTHER PURPOSES SIMILAR TO THE PURPOSES OF THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969.

## TITLE II-- HOUSING ASSISTANCE PROGRAMS

## AUTHORIZATION FOR LOW-INCOME HOUSING

SECTION 201(A)(1) WOULD AMEND SECTION 5(C) OF THE UNITED STATES HOUSING ACT OF 1937

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



TO PROVIDE, SUBJECT TO APPROVAL IN APPROPRIATIONS ACTS, ANNUAL CONTRIBUTIONS CONTRACT AUTHORITY FOR THE PUBLIC HOUSING AND SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAMS IN THE AMOUNT OF $1,286,155,000 FOR FISCAL YEAR 1980. OF THE AMOUNT AUTHORIZED, NO MORE THAN $223,142,000 WOULD BE AUTHORIZED FOR PUBLIC HOUSING UNITS AND NO LESS THAN $55 MILLION OF THE AMOUNT AUTHORIZED FOR PUBLIC HOUSING UNITS COULD BE USED FOR THE MODERNIZATION OF PUBLIC HOUSING UNITS WITH A PREFERENCE GIVEN TO THE MODERNIZATION OF SUBSTANDARD VACANT PUBLIC HOUSING UNITS AND THE SECRETARY WOULD NOT BE PERMITTED TO ENTER INTO AGREEMENTS IN EXCESS OF THE $223,142,000 FOR THESE PURPOSES. NOT MORE THAN $1,063,013,000 IS AUTHORIZED TO BE APPROPRIATED FOR SECTION 8 UNITS. THE AMENDMENT CLARIFIES THE EXISTING REQUIREMENT THAT PUBLIC HOUSING AND SECTION 8 FUNDS ARE TO BE ALLOCATED IN ACCORDANCE WITH GOALS AND NEEDS DEFINED IN LOCAL HOUSING ASSISTANCE PLANS.

SECTION 201(A)(2) WOULD AMEND SECTION 213(D) OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1974 TO ASSURE THAT THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT SHALL ALLOCATE FUNDS FOR THE MODERNIZATION OF PUBLIC HOUSING PROJECTS AUTHORIZED IN FISCAL YEAR 1980 WITHOUT**2374 *58 REGARD TO NEEDS OR GOALS AS REFLECTED IN LOCAL OR STATE HOUSING ASSISTANCE PLANS.

*52 SECTION 201(B) WOULD AMEND SECTION 9(C) OF THE UNITED STATES HOUSING ACT OF 1937 TO PROVIDE AN AUTHORIZATION OF NOT TO EXCEED $741,500,000 FOR FISCAL YEAR 1980 FOR PUBLIC HOUSING OPERATING SUBSIDIES.

OPERATING ASSISTANCE FOR TROUBLED MULTIFAMILY HOUSING PROJECTS

SECTION 202(A) WOULD AMEND SECTION 201(H) OF THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1978 TO PROVIDE A FUNDING AUTHORIZATION OF NOT TO EXCEED $92 MILLION FOR FISCAL YEAR 1980 FOR THE TROUBLED PROJECTS PROGRAM.

SECTION 202(B) WOULD AMEND SECTION 236(F)(3)(B) OF THE NATIONAL HOUSING ACT TO DIRECT THE SECRETARY TO UTILIZE AMOUNTS CREDITED TO THE SECTION 236 RENTAL HOUSING ASSISTANCE FUND PRIOR TO OCTOBER 1, 1978, BUT REMAINING UNOBLIGATED ON OCTOBER 31, 9178, FOR THE SOLE PURPOSE OF CARRYING OUT THE SECTION 201 TROUBLED PROJECTS PROGRAM. IN ADDITION, THE AMENDMENT WOULD PROVIDE THAT NO AMOUNTS MAY BE APPROVED IN AN APPROPRIATION ACT FOR PAYMENTS FROM THE SECTION 236 RENTAL HOUSING ASSISTANCE FUND FOR THE SECTION 201 TROUBLED PROJECTS PROGRAM AFTER SEPTEMBER 30, 1980.

AMOUNT OF TENANT CONTRIBUTION FOR RENTAL PAYMENTS

SECTION 203(A) OF THE BILL WOULD AMEND SECTION 3(1) OF THE UNITED STATES HOUSING ACT OF 1937 TO PERMIT THE SECRETARY TO BASE THE AMOUNT A FAMILY MUST PAY IN RENT FOR A PUBLIC HOUSING UNIT ON THE FAMILY'S RELATIVE LEVEL OF INCOME. THE MAXIMUM AMOUNT THE SECRETARY COULD REQUIRE A FAMILY WHOSE INCOME IS BELOW 50 PERCENT OF AREA MEDIAN TO PAY WOULD REMAIN THE SAME AS EXISTING LAW-- NO MORE THAN 25 PERCENT OF FAMILY INCOME. THE MAXIMUM AMOUNT THE SECRETARY COULD REQUIRE A FAMILY WHOSE INCOME IS ABOVE 50 PERCENT OF AREA MEDIAN TO PAY WOULD CHANGE FROM NOT MORE THAN 25 TO NOT MORE THAN 30 PERCENT OF FAMILY INCOME.

SECTION 203(B) OF THE BILL WOULD AMEND SECTION 8(C)(3) OF THE UNITED STATES HOUSING ACT OF 1937 TO REVISE THE AMOUNT OF MONTHLY ASSISTANCE PAYMENT THAT COULD BE PAID ON BEHALF OF CERTAIN FAMILIES QUALIFYING FOR SECTION 8 ASSISTANCE. THE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



ASSISTANCE PAYMENTS FOR A VERY LOW-INCOME FAMILY AND FOR A LARGE VERY LOW-INCOME FAMILY OR A LOWER-INCOME FAMILY WITH EXCEPTIONAL MEDICAL OR OTHER EXPENSES WOULD REMAIN THE SAME AS UNDER EXISTING LAW (THE DIFFERENCE BETWEEN THE RENT AND NOT LESS THAN 15 PERCENT BUT NOT MORE THAN 25 PERCENT OF FAMILY INCOME FOR A VERY LOW-INCOME FAMILY AND THE DIFFERENCE BETWEEN THE RENT AND 15 PERCENT OF FAMILY INCOME FOR THE LARGE VERY LOW-INCOME FAMILY OR THE FAMILY WITH EXCEPTIONAL EXPENSES). THE ASSISTANCE PAYMENTS FOR A VERY LARGE LOWER INCOME FAMILY WOULD BE CHANGED FROM THE DIFFERENCE BETWEEN THE RENT AND 15 PERCENT OF THE FAMILY INCOME TO THE DIFFERENCE BETWEEN THE RENT AND 20 PERCENT OF FAMILY INCOME. THE ASSISTANCE PAYMENTS FOR OTHER FAMILIES WOULD BE CHANGED FROM THE DIFFERENCE BETWEEN THE RENT AND NOT LESS THAN 15 PERCENT BUT NOT MORE THAN 25 PERCENT OF THE FAMILY INCOME TO THE DIFFERENCE BETWEEN THE RENT AND NOT LESS THAN 20 PERCENT BUT NOT MORE THAN 30 PERCENT OF FAMILY INCOME, TAKING INTO CONSIDERATION THE RELATIVE LEVEL OF FAMILY INCOME AND OTHER FACTORS SUCH AS THE NUMBER OF MINOR CHILDREN IN THE FAMILY AND THE EXTENT OF MEDICAL AND OTHER UNUSUAL EXPENSES INCURRED BY THE FAMILY.

*59 *2375 TENANT SELECTION CRITERIA

  *53 SECTION 204 OF THE BILL WOULD AMEND SECTION 6(C)(4A, 8(D)(1)(A) AND 8(E)(2) OF THE UNITED STATES HOUSING ACT OF 1937 TO PROVIDE THAT THE TENANT SELECTION CRITERIA ESTABLISHED FOR THE PUBLIC HOUSING AND SECTION 8 PROGRAMS WOULD INCLUDE PRIORITIES FOR FAMILIES WHO, AT THE TIME THEY SEEK HOUSING ASSISTANCE, ARE LIVING IN SUBSTANDARD HOUSING OR ARE INVOLUNTARILY DISPLACED.

MAINTENANCE OF LOW-INCOME CHARACTER OF CERTAIN ASSISTED HOUSING PROJECTS

  SECTION 205(A) OF THE BILL WOULD AMEND SECTION 9(A) OF THE UNITED STATES HOUSING ACT OF 1937 TO PROVIDE THAT NO LOW-INCOME HOUSING PROJECT THAT HAS RECEIVED OPERATING SUBSIDIES UNDER CONTRACT WITH HUD SHALL (EITHER DURING OR AFTER THE TERM OF THE CONTRACT) BE DISPOSED OF UNLESS APPROVED BY THE SECRETARY. IN ADDITION, THE SUBSECTION WOULD ESTABLISH THAT OPERATING SUBSIDIES COULD ONLY BE PROVIDED TO LOW-INCOME HOUSING PROJECTS, OTHER THAN SECTION 8 PROJECTS, WHICH ARE ASSISTED BY AN ANNUAL CONTRIBUTIONS CONTRACT AUTHORIZED BY SECTION 5(C) OF THE UNITED STATES HOUSING ACT EXCEPT THAT THE SECRETARY MAY PROVIDE OPERATING SUBSIDIES TO LOW-INCOME HOUSING PROJECTS WHOSE ANNUAL CONTRIBUTIONS CONTRACTS HAVE ENDED AS LONG AS THE LOW-INCOME CHARACTER OF THOSE PROJECTS IS MAINTAINED.
  SECTION 205(B) OF THE BILL WOULD AMEND SECTION 8(E)(1) OF THE UNITED STATES HOUSING ACT OF 1937 TO CHANGE FROM ONE MONTH TO TWENTY YEARS THE MINIMUM TERM REQUIRED UNDER A CONTRACT FOR SECTION 8 ASSISTANCE TO NEW OR SUBSTANTIALLY REHABILITATED UNITS.
  SECTION 205(C) OF THE BILL WOULD AMEND SECTION 201(D)(1) OF THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1978 TO ASSURE THAT IN ADDITION TO EXISTING REQUIREMENTS OPERATING ASSISTANCE FOR TROUBLED MULTIFAMILY HOUSING PROJECTS BE MADE AVAILABLE TO A PROJECT ONLY WHERE THE OWNER OF THAT PROJECT HAS AGREED TO MAINTAIN THE LOW- AND MODERATE-INCOME CHARACTER OF THE PROJECT FOR A PERIOD AT LEAST EQUAL TO THE REMAINING TERM OF THE PROJECT MORTGAGE.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



## DISTRIBUTION OF SECTION 9 OPERATING SUBSIDIES

SECTION 206 OF THE BILL WOULD AMEND SECTION 9 OF THE UNITED STATES HOUSING ACT OF 1937 TO PROVIDE THAT, IN ANY YEAR BEGINNING IN FISCAL YEAR 1980, ANY APPROPRIATED PUBLIC HOUSING OPERATING SUBSIDY FUNDS THAT REMAIN AFTER AN ORIGINAL DISTRIBUTION ACCORDING TO THE PERFORMANCE FUNDING SYSTEM ESTABLISHED PURSUANT TO SECTION 9 SHALL BE DISTRIBUTED TO LOW-INCOME HOUSING PROJECTS WHICH INCURRED EXCESSIVE COSTS WHICH WERE BEYOND THEIR CONTROL AND THE FULL EXTENT OF WHICH WAS NOT TAKEN INTO ACCOUNT IN THE ORIGINAL DISTRIBUTION OF FUNDS.

## SECTION 101 RENT SUPPLEMENT

SECTION 207 OF THE BILL WOULD AMEND SECTION 101 OF THE HOUSING AND URBAN DEVELOPMENT ACT OF 1965 TO CONFORM TENANT ELIGIBILITY, RENTAL ASSISTANCE PAYMENTS AND TENANT INCOME DETERMINATIONS IN THE RENT SUPPLEMENT PROGRAM WITH THE REQUIREMENTS OF THE SECTION 8 PROGRAM. HOWEVER, THE CHANGES IN THE METHOD OF CALCULATING TENANT INCOME AND THE AMOUNT OF RENTAL ASSISTANCE PAYMENTS WOULD ONLY OCCUR AFTER AMENDING THE CONTRACTS TO CONFORM THEM TO THE TERMS AND CONDITIONS OF A SECTION 8 CONTRACT. PRIORITY FOR ASSISTANCE WOULD BE GIVEN TO INDIVIDUALS OR FAMILIES WHO, AT THE TIME THEY SEEK ASSISTANCE, ARE OCCUPYING**2376 *60** SUBSTANDARD HOUSING OR ARE INVOLUNTARILY DISPLACED. THE SECRETARY WOULD BE GIVEN THE AUTHORITY TO OFFER TO AMEND EACH EXISTING RENT SUPPLEMENT CONTRACT IN ORDER TO CONFORM THAT CONTRACT WITH TERMS AND CONDITIONS REQUIRED UNDER A SECTION 8 CONTRACT AND THE SECRETARY MAY USE FUNDS APPROPRIATED FOR THE SECTION 8 PROGRAM ON OR AFTER OCTOBER 1, 1979, FOR THE PURPOSE OF CARRYING OUT SUCH AMENDMENTS.

## SECTION 235AMENDMENTS

**54** SECTION 208(A) OF THE BILL WOULD AMEND SECTION 235(A)(1) OF THE NATIONAL HOUSING ACT TO GIVE PRIORITY FOR ASSISTANCE TO LOW-INCOME FAMILIES WHO WILL BECOME CONDOMINIUM OR COOPERATIVE OWNERS AND, IN PARTICULAR, TO THOSE FAMILIES WHO, WITHOUT SUCH ASSISTANCE, WOULD BE LIKELY TO BE DISPLACED FROM RENTAL UNITS BEING CONVERTED TO CONDOMINIUMS OR COOPERATIVES.

SECTION 208(B) OF THE BILL WOULD DELETE THE PROVISION WHICH RESTRICTS THE AVAILABILITY OF SECTION 235 HOMEOWNERSHIP ASSISTANCE FOR AN EXISTING DWELLING UNIT OR CONDOMINIUM PROJECT TO CERTAIN DISPLACED FAMILIES, FAMILIES WITH FIVE OR MORE CHILDREN OR FAMILIES LIVING IN PUBLIC HOUSING.

## DISPLACES TENANTS IN A HUD-OWNED PROJECT

SECTION 209 OF THE BILL WOULD AMEND SECTION 203(D)(2) OF THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1978 TO REQUIRE THAT WHENEVER TENANTS WILL BE DISPLACED FROM A HUD-OWNED FORMERLY SUBSIDIZED MULTIFAMILY HOUSING PROJECT AS A RESULT OF THE DISPOSITION OR REPAIR OF SUCH PROJECT, THE SECRETARY SHALL ASSURE THAT ANY TENANT HAS THE RIGHT TO RETURN TO A REPAIRED UNIT, OCCUPY ANOTHER UNIT, OBTAIN HOUSING ASSISTANCE UNDER THE UNITED STATES HOUSING ACT OF 1937 OR RECEIVE ANY OTHER AVAILABLE RELOCATION ASSISTANCE WHICH THE SECRETARY

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



DETERMINES APPROPRIATE.

TITLE III-- PROGRAM AMENDMENTS AND EXTENSIONS

EXTENSION OF FEDERAL HOUSING ADMINISTRATION MORTGAGE INSURANCE PROGRAMS

   SECTION 301 OF THE BILL WOULD EXTEND FOR ONE YEAR THE AUTHORITY OF THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT TO INSURE MORTGAGES OR LOANS UNDER CERTAIN HUD-FHA MORTGAGES OR LOAN INSURANCE PROGRAMS CONTAINED IN THE NATIONAL HOUSING ACT. UNDER EXISTING LAW, THESE AUTHORITIES WILL EXPIRE ON SEPTEMBER 30, 1979.
   SUBSECTION (A) OF THIS SECTION WOULD EXTEND, THROUGH SEPTEMBER 30, 1980, AUTHORITY FOR TITLE I-- PROPERTY IMPROVEMENT AND MOBILE HOME LOAN INSURANCE.
   SUBSECTION (B) WOULD EXTEND, THROUGH SEPTEMBER 30, 1980, THE SECRETARY'S GENERAL MORTGAGE INSURANCE AUTHORIZATION UNDER SECTION 217. THIS AUTHORIZATION SPECIFIES THE PERIOD OF TIME (THROUGH SEPTEMBER 30, 1979, UNDER EXISTING LAW) DURING WHICH LOANS OR MORTGAGES MAY BE INSURED UNDER VARIOUS HUD-FHA INSURING AUTHORITIES. IT INCLUDES: SECTION 203-- BASIC HOME MORTGAGE INSURANCE; SECTION 207-- RENTAL HOUSING INSURANCE; SECTION 213-- COOPERATIVE HOUSING INSURANCE; SECTION 220-- REHABILITATION AND NEIGHBORHOOD CONSERVATION HOUSING INSURANCE; SECTION 222-- MORTGAGE INSURANCE FOR SERVICEMEN; SECTION 223-- MISCELLANEOUS HOUSING INSURANCE, INCLUDING INSURANCE IN OLDER, DECLINING URBAN AREAS AND FOR EXISTING MULTIFAMILY HOUSING PROJECTS; SECTION *61 *2377 231-- HOUSING FOR THE ELDERLY; SECTION 232-- NURSING HOMES; SECTION 233-- EXPERIMENTAL HOUSING; SECTION 234-- CONDOMINIUMS; SECTION 237-- SPECIAL RISK MORTGAGES; SECTION 240-- HOMEOWNER PURCHASES OF FEE SIMPLE TITLE; SECTION 241-- SUPPLEMENTAL LOANS FOR MULTIFAMILY HOUSING PROJECTS; SECTION 242-- HOSPITALS; AND SECTION 243-- HOMEOWNERSHIP FOR MIDDLE-INCOME FAMILIES.
   *55 SUBSECTION (C) WOULD EXTEND, THROUGH SEPTEMBER 30, 1980, THE AUTHORITY FOR SECTION 221-- HOUSING FOR MODERATE INCOME AND DISPLACED FAMILIES.
   SUBSECTIONS (D) AND (E) WOULD EXTEND, THROUGH SEPTEMBER 30, 1980, RESPECTIVELY, THE AUTHORITY WITH RESPECT TO SECTION 235-- HOMEOWNERSHIP FOR LOWER INCOME FAMILIES AND THE AUTHORITY WITH RESPECT TO SECTION 236-- RENTAL AND COOPERATIVE HOUSING FOR LOWER INCOME FAMILIES.
   SUBSECTION (F)(1) WOULD EXTEND, THROUGH SEPTEMBER 30, 1980, THE INSURING AUTHORITY WITH RESPECT TO SECTION 244-- MORTGAGE INSURANCE ON A CO-INSURANCE BASIS.
   SUBSECTION (F)(2) WOULD PROVIDE FOR A PARALLEL EXTENSION OF THE PERIOD DURING WHICH STATUTORY PERCENTAGE LIMITATIONS APPLY WITH RESPECT TO THE AGGREGATE PRINCIPAL AMOUNT OF MORTGAGES INSURED PURSUANT TO SECTION 244.
   SUBSECTION (G) WOULD EXTEND, THROUGH SEPTEMBER 30, 1980, THE SECRETARY'S AUTHORITY UNDER SECTION 245 TO INSURE GRADUATED PAYMENT MORTGAGES AND LOANS.
   SUBSECTION (H), (I), (J), AND (K) WOULD EXTEND, FOR AN ADDITIONAL YEAR, AUTHORITIES WITH RESPECT TO TITLE VIII-- ARMED FORCES-RELATED HOUSING (SUBSECTIONS (H) AND (I)), TITLE X-- LAND DEVELOPMENT (SUBSECTION (J)), AND TITLE XI-- GROUP PRACTICE FACILITIES (SUBSECTION (K)).

EXTENSION OF FLEXIBLE INTEREST RATE AUTHORITY

   SECTION 302 OF THE BILL WOULD EXTEND, THROUGH SEPTEMBER 30, 1980, THE SECRETARY'S

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



AUTHORITY ADMINISTRATIVELY TO SET INTEREST RATES FOR FHA-INSURED MORTGAGE LOANS TO MEET THE MARKET AT RATES ABOVE THE STATUTORY MAXIMUM. UNDER EXISTING LAW, THIS AUTHORITY TO SET RATES ABOVE THE STATUTORY 6 PERCENT MAXIMUM WILL EXPIRE ON SEPTEMBER 30, 1979.

### EXTENSION OF EMERGENCY HOME PURCHASE ASSISTANCE ACT OF 1974

  SECTION 303 OF THE BILL WOULD EXTEND TO OCTOBER 1, 1980, THE AUTHORITY OF THE GOVERNMENT NATIONAL MORTGAGE ASSOCIATION TO ENTER INTO NEW COMMITMENTS TO PURCHASE MORTGAGES UNDER THE INTERIM MORTGAGE PURCHASE AUTHORITY CONTAINED IN SECTION 313 OF THE NATIONAL HOUSING ACT, AS ADDED BY THE EMERGENCY HOME PURCHASE ASSISTANCE ACT OF 1974.

### RESEARCH AUTHORIZATIONS

  SECTION 304 OF THE BILL WOULD AMEND SECTION 501 OF THE HOUSING AND URBAN DEVELOPMENT ACT OF 1970 TO AUTHORIZE APPROPRIATIONS OF NOT TO EXCEED $51,000,000 FOR FISCAL YEAR 1980.

### FEDERAL HOUSING ADMINISTRATION GENERAL INSURANCE FUND

  SECTION 305 OF THE BILL WOULD AMEND SECTION 519 OF THE NATIONAL HOUSING ACT TO INCREASE BY $93,000,000 ON OCTOBER 1, 1979, THE EXISTING OVERALL LIMITATION ON APPROPRIATIONS AUTHORIZED TO COVER LOSSES OF THE GENERAL INSURANCE FUND.

### *62 *2378 HOUSING FOR THE ELDERLY OR HANDICAPPED

  SECTION 306(A) OF THE BILL WOULD AMEND SECTION 202 OF THE HOUSING ACT OF 1959 TO INCREASE THE LIMIT ON TREASURY BORROWING AUTHORITY FOR THE SECTION 202 PROGRAM SO THAT THE TOTAL AUTHORIZATION IS INCREASED TO $3,835,000,000 ON OCTOBER 1, 1979, $4,785,000 ON OCTOBER 1, 1980, AND TO $5,760,000 ON OCTOBER 1, 1981.
  SECTION 306(B) OF THE BILL WOULD AMEND SECTION 202(A) OF THE HOUSING ACT OF 1959 TO ADD A SUBSECTION (6) TO PROVIDE THAT IN REVIEWING APPLICATIONS FOR LOANS THE SECRETARY MAY CONSIDER THE EXTENT TO WHICH SUCH LOANS, (A) WILL ASSIST IN STABILIZING, CONSERVING, AND REVITALIZING NEIGHBORHOODS AND COMMUNITIES, (B) WILL ASSIST IN PROVIDING HOUSING FOR ELDERLY AND HANDICAPPED FAMILIES IN NEIGHBORHOODS AND COMMUNITIES IN WHICH THEY ARE EXPERIENCING SIGNIFICANT DISPLACEMENT DUE TO PUBLIC OR PRIVATE INVESTMENT, OR (C) WILL ASSIST IN THE SUBSTANTIAL REHABILITATION IN AN ECONOMICAL MANNER, OF STRUCTURES HAVING ARCHITECTURAL, HISTORICAL OR CULTURAL SIGNIFICANCE.
  *56 AN ADDITIONAL NEW SUBSECTION WOULD PROVIDE THAT THE SECRETARY MAY MAKE AVAILABLE APPROPRIATE TECHNICAL AND TRAINING ASSISTANCE TO ASSURE THAT APPLICANTS HAVING LIMITED RESOURCES, PARTICULARLY MINORITY APPLICANTS, ARE ABLE TO PARTICIPATE MORE FULLY IN THE SECTION 202 PROGRAM.
  SECTION 306(C) OF THE BILL WOULD AMEND SECTION 202 OF THE HOUSING ACT OF 1959 TO REQUIRE THE SECRETARY, AT THE TIME OF SETTLEMENT ON PERMANENT FINANCING WITH RESPECT TO A PROJECT ASSISTED UNDER THIS SECTION, TO MAKE APPROPRIATE ADJUSTMENTS

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



IN THE AMOUNT OF ANY ASSISTANCE TO BE PROVIDED UNDER AN ANNUAL CONTRIBUTIONS CONTRACT PURSUANT TO SECTION 8 OF THE UNITED STATES HOUSING ACT TO REFLECT FULLY ANY DIFFERENCES BETWEEN THE INTEREST RATE WHICH WILL ACTUALLY BE CHARGED IN CONNECTION WITH THE PERMANENT FINANCING AND THE INTEREST RATE WHICH WAS EFFECTIVE AT THE TIME OF RESERVATION OF ASSISTANCE FOR THE PROJECT.

### MORTGAGE INSURANCE FOR EXISTING DWELLINGS WITH WARRANTY PLANS

SECTION 307 OF THE BILL WOULD AMEND SECTION 203(B)(2) TO PROVIDE THE SECRETARY AUTHORITY TO INSURE MORTGAGES ON ONE TO FOUR FAMILY DWELLINGS IN AMOUNTS NOT TO EXCEED AN AMOUNT EQUAL TO THE SUM OF 97 PERCENT OF THE FIRST $25,000 OF APPRAISED VALUE OF A PROPERTY, AND 95 PERCENT OF SUCH VALUE IN EXCESS OF $25,000 WHEN THE DWELLING IS COVERED BY A CONSUMER PROTECTION OR WARRANTY PLAN ACCEPTABLE TO THE SECRETARY AND SATISFIES ALL REQUIREMENTS WHICH WOULD HAVE BEEN APPLICABLE IF SUCH DWELLING HAD BEEN APPROVED FOR MORTGAGE INSURANCE PRIOR TO THE BEGINNING OF CONSTRUCTION.

### AUTHORIZATION FOR NEIGHBORHOOD REINVESTMENT CORPORATION

SECTION 308 OF THE BILL AMEND SECTION 608(A) OF THE NEIGHBORHOOD REINVESTMENT CORPORATION ACT TO AUTHORIZE APPROPRIATIONS OF NOT TO EXCEED $9,500,000 FOR FISCAL YEAR 1980.

### STUDY ON MORTGAGE INSURANCE PREMIUMS

SECTION 309 OF THE BILL WOULD DIRECT THE SECRETARY TO CONDUCT A STUDY OF THE RELATIVE RISKS OF LOSS WHICH EXIST WITH RESPECT TO THE VARIOUS CLASSES OF MORTGAGES WHICH MAY BE INSURED UNDER SECTIONS 203(B) AND 213 OF THE NATIONAL HOUSING ACT FOR THE PURPOSE OF MAKING RECOMMENDATIONS ON THE ADVISABILITY OF REDUCING SOME OR ALL OF THE MORTGAGE INSURANCE PREMIUMS REQUIRED FOR SUCH CLASSES OF MORTGAGES. SUCH *63 *2379 RECOMMENDATIONS WOULD BE TRANSMITTED TO THE CONGRESS WITHIN EIGHTEEN MONTHS OF ENACTMENT OF THE BILL.

### EXEMPTION FROM STATE USURY LAWS

SECTION 310 OF THE BILL WOULD ADD A NEW SECTION 529 TO THE NATIONAL HOUSING ACT WHICH WOULD PROVIDE THAT THE PROVISION OF ANY STATE CONSTITUTION OR LAW EXPRESSLY LIMITING THE RATE OR AMOUNT OF INTEREST, DISCOUNT POINTS OR OTHER CHARGES WHICH MAY BE CHARGED OR RECEIVED BY LENDERS SHALL NOT APPLY TO ANY LOAN, MORTGAGE OR ADVANCE WHICH IS INSURED UNDER TITLES I OR II OF THE NATIONAL HOUSING ACT. THE SECTION WOULD ALSO PROVIDE THAT THIS EXEMPTION WOULD NOT APPLY TO SUCH LOANS, MORTGAGES OR ADVANCES IF A STATE WERE TO ENACT SUCH A LIMITATION AFTER THE EFFECTIVE DATE OF THIS SECTION.

### NEIGHBORHOOD SELF-HELP DEVELOPMENT

*57 SECTION 311 OF THE BILL WOULD AMEND SECTION 704(D) OF THE NEIGHBORHOOD SELF-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



HELP DEVELOPMENT ACT OF 1978 TO PROVIDE THAT NO MORE THAN TEN PERCENT OF THE
ASSISTANCE MADE AVAILABLE UNDER THIS PROGRAM MAY BE MADE AVAILABLE WITHOUT A
CERTIFICATION BY THE LOCAL GOVERNMENT THAT SUCH ASSISTANCE IS CONSISTENT WITH
AND SUPPORTIVE OF THE SPECIFIC OBJECTIVES OF THE LOCAL GOVERNMENT, IF THE
ASSISTANCE IS BEING MADE AVAILABLE FOR THE DEMONSTRATION OF INNOVATIVE MEANS OF
ASSISTING IN NEIGHBORHOOD CONSERVATION AND REVITALIZATION.

FHA MORTGAGE LIMITS

   SECTION 312 (A) OF THE BILL WOULD AMEND SECTION 203(B)(2) OF THE NATIONAL HOUSING
ACT SO AS TO INCREASE THE MAXIMUM INSURABLE MORTGAGE TO $65,000 FOR ONE-FAMILY
RESIDENCES, TO $73,500 FOR TWO-FAMILY RESIDENCES, TO $87,500 FOR THREE-FAMILY
RESIDENCES, AND TO $100,000 FOR FOUR-FAMILY RESIDENCES.
   SECTION 312 (B) OF THE BILL WOULD AMEND SECTION 220(D)(3)(A)(I) OF THE NATIONAL
HOUSING ACT SO AS TO INCREASE THE MAXIMUM INSURABLE MORTGAGE UNDER THIS
PROGRAM TO $65,000 FOR ONE-FAMILY RESIDENCES, TO $73,500 FOR TWO-FAMILY RESIDENCES,
TO $87,500 FOR THREE-FAMILY RESIDENCES, TO $100,000 FOR FOUR-FAMILY RESIDENCES, AND UP
TO $8,000 FOR EACH ADDITIONAL FAMILY UNIT IN EXCESS OF FOUR LOCATED ON A PROPERTY.
   SECTION 312(C) WOULD AMEND SECTION 222(B)(2) AND 234(C) OF THE NATIONAL HOUSING ACT
SO AS TO INCREASE THE MAXIMUM INSURABLE MORTGAGE UNDER THESE PROGRAMS TO
$65,000.

HIGH COST AREAS MAXIMUM MORTGAGE AMOUNTS

   SECTION 313 OF THE BILL WOULD AMEND SECTIONS 207(C)(3), 213(B)(2), 220(D)(3)(B)(III),
221(D)(3)(II), 221(D)(4)(II), 231(C)(2), AND 234(E)(3) TO PROVIDE THE SECRETARY AUTHORITY TO
INSURE MORTGAGES UNDER THESE SECTIONS BY UP TO 75 PERCENT ABOVE THE STATUTORY
LIMITATIONS IN GEOGRAPHIC AREAS WHERE SHE FINDS THAT COST LEVELS SO REQUIRE.
UNDER PRESENT LAW, THE SECRETARY MAY INCREASE SUCH AMOUNTS BY 50 PERCENT.

TITLE I LOANS FOR MOBILE HOMES AND LOTS

   SECTION 314 OF THE BILL COULD MAKE SEVERAL CHANGES IN SECTION 2(B) OF THE NATIONAL
HOUSING ACT.
   SECTION 314(A) WOULD INCREASE FROM $16,000 TO $17,300 THE MAXIMUM LOAN WHICH SHE
MAY INSURE UNDER THIS PROGRAM FOR A MOBILE HOME CONSISTING OF A SINGLE MODULE.
THE BILL WOULD ALSO INCREASE THE MAXIMUM*2380 *64 INSURABLE LOAN FOR A MOBILE
HOME COMPOSED OF TWO OR MORE MODULES FROM $24,000 TO $25,920.
   SECTION 314(B) OF THE BILL WOULD INCREASE THE MAXIMUM INSURABLE LOANS FOR
MOBILE HOMES COMBINED WITH LOTS. UNDER PRESENT LAW, SEPARATE MAXIMUMS EXIST FOR
BOTH THE HOME AND LOT COMPONENTS, WITH DIFFERENT MAXIMUMS FOR UNDEVELOPED AND
DEVELOPED LOTS. THE BILL WOULD ELIMINATE THESE SEPARATE CALCULATIONS FOR LOTS
AND HOMES AND INCREASE THE MAXIMUM INSURABLE LOAN ON A SINGLE MODULE HOME OR
AN UNDEVELOPED LOT TO $23,550 ($32,170 IN THE CASE OF A HOME CONSISTING OF TWO OR
MORE MODULES). MAXIMUMS FOR SINGLE MODULE HOMES ON DEVELOPED LOTS WOULD BE
INCREASED TO $16,675 ($35,295 IN THE CASE OF A HOME CONSISTING OF TWO OR MORE
MODULES).
   SUBSECTION (B) WOULD ALSO INCREASE THE MAXIMUM INSURABLE LOANS COVERING LOTS

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



ONLY FROM $5,000 TO $6,250 IN THE CASE OF AN UNDEVELOPED LOT AND FROM $7,500 TO $9,375 IN THE CASE OF A DEVELOPED LOT. THE MAXIMUM MATURITY PERMITTED FOR LOT ONLY LOANS WOULD BE INCREASED FROM 10 YEARS AND THIRTY-TWO DAYS TO 15 YEARS AND THIRTY-TWO DAYS.

### FEDERAL HOME LOAN MORTGAGE CORPORATION ACT AMENDMENTS

**\*58** SECTION 315 OF THE BILL WOULD MAKE THREE AMENDMENTS TO THE FEDERAL HOME LOAN MORTGAGE CORPORATION ACT.

SECTION 315(A) WOULD PROVIDE THAT ANY PERSON, TRUST OR ORGANIZATION EXISTING UNDER THE LAWS OF THE UNITED STATES OR ANY STATE SHALL BE AUTHORIZED TO PURCHASE, HOLD AND INVEST IN MORTGAGES, OBLIGATIONS OR OTHER SECURITIES SOLD BY THE CORPORATION TO THE SAME EXTENT THAT SUCH ENTITY IS AUTHORIZED TO PURCHASE, HOLD AND INVEST IN OBLIGATIONS ISSUED BY OR GUARANTEED BY THE UNITED STATES OR ANY AGENCY OR INSTRUMENTALITY THEREOF.

SECTION 315(B) WOULD AMEND SECTION 305(B) OF THE ACT TO CLARIFY THE AUTHORITY OF VARIOUS FINANCIAL INSTITUTIONS TO SELL MORTGAGES TO THE CORPORATION.

SECTION 315(C) WOULD AMEND SECTION 303 OF THE ACT TO ADD A NEW SUBSECTION (F) WHICH WOULD PROVIDE THAT ALL OBLIGATIONS, PARTICIPATIONS OR OTHER INSTRUMENTS ISSUED BY OR GUARANTEED BY THE CORPORATION SHALL BE LAWFUL INVESTMENTS, AND ACCEPTED AS SECURITY FOR FIDUCIARY TRUST AND PUBLIC FUNDS, THE INVESTMENT OR DEPOSIT OF WHICH SHALL BE UNDER THE AUTHORITY AND CONTROL OF THE UNITED STATES.

### GNMA LIMITS

SECTION 316 OF THE BILL WOULD AMEND SECTION 302(B)(1) OF THE NATIONAL HOUSING ACT TO PROVIDE THAT GNMA MAY PURCHASE MORTGAGES WHICH EXCEED THE EXISTING STATUTORY LIMITATIONS OF THE MORTGAGE IF THE MORTGAGE IS INSURED UNDER SECTIONS 221(D)(3) OR (D)(4) OF THE ACT AND AT LEAST 20 PERCENT OF THE UNITS COVERED BY SUCH MORTGAGE ARE ASSISTED UNDER CONTRACTS AUTHORIZED BY SECTION 8 OF THE UNITED STATES HOUSING ACT OF 1937. THE SECTION WOULD DELETE PROVISIONS WHICH PROVIDE FOR SUCH EXCEPTIONS WHEN THE MORTGAGE IS INSURED UNDER SECTION 236 OR IS A BELOW-MARKET INTEREST RATE MORTGAGE INSURED UNDER SECTION 221(D)(3) AND THE PROPERTY WHICH THE MORTGAGE COVERS HAS THE BENEFIT OF LOCAL TAX STATEMENT.

### HUD MINIMUM PROPERTY STANDARDS

SECTION 317 OF THE BILL WOULD DISAPPROVE FINAL RULE REVISION 6A OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ENTITLED 'INCREASES**\*2381 \*65** IN THERMAL REQUIREMENTS FOR HUD MINIMUM PROPERTY STANDARDS' INSOFAR AS IT APPLIES TO MASONRY CONSTRUCTION.

### MORTGAGE INSURANCE IN OUTLYING AREAS

SECTION 318 OF THE BILL WOULD AMEND SECTION 201(I) OF THE NATIONAL HOUSING ACT SO AS TO (1) DECREASE THE MINIMUM LOT SIZE WITH RESPECT TO A FARM HOME MORTGAGE WHICH MAY BE INSURED FROM FIVE TO TWO-AND-ONE-HALF ACRES AND (2) CHANGE THE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



REQUIREMENT THAT SUCH HOME BE LOCATED ADJACENT TO A PUBLIC HIGHWAY TO AN ALL-WEATHER PUBLIC ROAD.

## TITLE IV-- INTERSTATE LAND SALES

### DEFINITIONS

SECTION 401 OF THE BILL WOULD PROVIDE A NEW DEFINITION OF 'SUBDIVISION ' DELETING THE REFERENCE TO A FIFTY-LOT MINIMUM SIZE AND A SEPARATE DEFINITION OF THE TERM 'COMMON PROMOTIONAL PLAN.' EXISTING LAW COMBINED THESE TWO DEFINITIONS.

### EXEMPTIONS

SECTION 402 WOULD REVISE SECTION 1403 OF THE ACT TO CREATE TWO CATEGORIES OF EXEMPTIONS, AND TO PROVIDE AS FOLLOWS:

SECTION 1403(A) WOULD RESTATE THE EXISTING COMPLETE EXEMPTION FROM THE REGISTRATION, DISCLOSURE AND FRAUD PROVISIONS OF THE ACT FOR CERTAIN TYPES OF SUBDIVISIONS. THESE INCLUDE IMPROVED LAND, SALES OF INDEBTEDNESS SECURED BY MORTGAGES AND SECURITIES ISSUED BY REAL ESTATE INVESTMENT TRUSTS, SALES BY GOVERNMENTS, CEMETERY LOTS, OR SALES TO PERSONS IN THE REAL ESTATE BUSINESS.

**\*59** SECTION 1403(B) WOULD EXEMPT CERTAIN SUBDIVISIONS FROM THE DISCLOSURE AND REGISTRATION, BUT NOT THE FRAUD, PROVISIONS OF THE ACT. THIS SECTION CONTAINS SEVERAL NEW EXEMPTIONS, REVISED EXEMPTIONS, AND DELETES TWO EXISTING EXEMPTIONS.

SECTION 1403(B)(1) WOULD PROVIDE THAT THE MAXIMUM SIZE OF A SUBDIVISION WHICH IS EXEMPT FROM THE DISCLOSURE AND REGISTRATION REQUIREMENTS IS INCREASED FROM 50 TO **100 LOTS**. SUBDIVISIONS OF ANY SIZE, UNLESS EXEMPT UNDER SECTION 1403(A) WOULD BE COVERED BY THE PROHIBITIONS RELATING TO FRAUD.

SECTION 1403(B)(2) WOULD ADD AN EXEMPTION FOR DEVELOPERS WHO SELL 12 OR FEWER LOTS PER YEAR REGARDLESS OF THE NUMBER OF LOTS ULTIMATELY SOLD.

SECTION 1403(B)(3) WOULD ADD AN EXEMPTION FOR SCATTERED SITE SUBDIVISIONS WHERE NO PART OF THE SUBDIVISION HAS MORE THAN 10 LOTS AND AN ON-SITE INSPECTION IS MADE.

SECTION 1403(B)(4) WOULD EXEMPT SUBDIVISIONS WHERE AT LEAST 90 PERCENT OF THE LOTS ARE EACH 40 ACRES OR MORE IN SIZE AND ANY REMAINING LOTS ARE EACH NO LESS THAN 30 ACRES IN SIZE. PRESENT LAW EXEMPTS SUBDIVISION WHERE ALL LOTS ARE 5 OR MORE ACRES IN SIZE.

SECTION 1403(B)(5) WOULD REVISE THE REGULATED JURISDICTION EXEMPTION SO THAT EXEMPT LOTS (1) NEED NOT BE LOCATED ON A PAVED PUBLIC STREET OR HIGHWAY BUT ONLY ON A PAVED STREET OR HIGHWAY, (2) THE STREET WILL BE BUILT TO STANDARDS APPLICABLE TO THOSE MAINTAINED BY THE LOCAL GOVERNMENT AND MUST BE ACCEPTABLE TO THE LOCAL GOVERNMENT AND (3) A HOMEOWNER'S ASSOCIATION, AS WELL AS A LOCAL GOVERNMENT, MAY ACCEPT RESPONSIBILITY FOR MAINTENANCE OF THE STREET OR HIGHWAY. IF A HOMEOWNER'S ASSOCIATION RATHER THAN THE LOCAL GOVERNMENT WILL BE **\*66 \*2382** RESPONSIBLE, A GOOD FAITH WRITTEN ESTIMATE OF THE COST OF SUCH MAINTENANCE OVER THE FIRST TEN YEARS OF OWNERSHIP MUST BE PROVIDED TO THE PURCHASER.

WHERE WARRANTY DEEDS ARE NOT COMMONLY USED IN THE JURISDICTION, A SELLER MAY UTILIZE A DEED OR GRANT THAT WARRANTS AT LEAST THAT THE GRANTOR HAS NOT CONVEYED THE LOT TO ANOTHER PERSON AND THAT THE LOT IS FREE FROM ENCUMBRANCES MADE BY THE SELLER.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



A TITLE INSURANCE BINDER OR A TITLE OPINION, RATHER THAN A TITLE INSURANCE POLICY, WOULD BE ACCEPTABLE.

DIRECT MAIL OR TELEPHONE SOLICITATIONS WHICH OFFER GIFTS, TRIPS, DINNERS AND SIMILAR PROMOTIONAL ITEMS WOULD BE PROHIBITED.

SECTION 1403(B)(6) WOULD ADD AN EXEMPTION FOR THE SALE OR LEASE OF A LOT IF A MOBILE HOME IS TO BE ERECTED ON IT AS A PRIMARY RESIDENCE EVEN IF THE LOT IS SOLD BY ONE PARTY AND THE HOME BY ANOTHER IF THERE IS A CONTRACT REQUIRING A COMPLETED HOME TO BE ERECTED ON A COMPLETED SITE WITHIN TWO YEARS. TO QUALIFY FOR THIS EXEMPTION, ALL FUNDS RECEIVED BY SELLERS WOULD BE PLACED IN ESCROW ACCOUNTS TO BE RELEASED TO THE BUYER ON DEMAND WITHOUT PREJUDICE IF THE COMPLETED LAND AND HOME ARE NOT CONVEYED WITHIN THE TWO-YEAR PERIOD. IN ADDITION, THE HOMESITE MUST CONFORM TO ALL LOCAL CODES AND STANDARDS FOR MOBILE HOME SUBDIVISIONS AND MOST PROVIDE POTABLE WATER, SANITARY SEWAGE DISPOSAL, ELECTRICITY AND ACCESS BY ROADS. COMMON FACILITIES, IF ANY, ARE TO BE COMPLETED OR FULLY FUNDED AND MARKETABLE TITLE TO THE LOT MUST BE PROVIDED.

**\*60** EXISTING EXEMPTIONS CONTAINED IN THE ACT FOR THE SALE OF REAL ESTATE PURSUANT TO A COURT ORDER OR WHEN THERE HAS BEEN AN ON-SITE INSPECTION WOULD BE DELETED.

### REQUIREMENTS RELATING TO THE SALE OR LEASE OF LOTS

SECTION 403 WOULD REVISE SECTION 1404 OF THE ACT TO CREATE TWO CATEGORIES OF PROHIBITED PRACTICES; THOSE RELATED TO LOTS THAT MUST BE REGISTERED AND THOSE EXEMPT FROM REGISTRATION.

SECTION 1404(A)(1) WOULD SPECIFY PROHIBITED PRACTICES RELATED SOLELY TO THE SALE OF LOTS IN SUBDIVISIONS WHICH ARE NOT EXEMPT FROM THIS TITLE AND FOR WHICH REGISTRATION AND DISCLOSURE ARE REQUIRED.

SECTION 1404(A)(1)(A) WOULD RETAIN THE EXISTING REQUIREMENT THAT NONEXEMPT LOTS MAY NOT BE SOLD UNLESS A STATEMENT OF RECORD IS IN EFFECT.

SECTION 1404(A)(1)(B) WOULD RETAIN THE EXISTING REQUIREMENT THAT NONEXEMPT LOTS MAY NOT BE SOLD UNLESS A PROPERTY REPORT IS FURNISHED PRIOR TO SIGNING THE CONTRACT OF SALE.

SECTION 1404(A)(1)(C) WOULD RETAIN THE EXISTING REQUIREMENT THAT NO PART OF THE STATEMENT OF RECORD OR PROPERTY REPORT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT.

SECTION 1404(A)(1)(D) WOULD ADD AS A PROHIBITED PRACTICE THE DISPLAY OR DELIVERY TO PROSPECTIVE PURCHASERS OF ADVERTISING OR PROMOTIONAL MATERIAL WHICH IS INCONSISTENT WITH INFORMATION WHICH MUST BE DISCLOSED IN THE PROPERTY REPORT.

SECTION 1404(A)(2) WOULD RELATE TO ALL SUBDIVISIONS COVERED BY THE ACT, INCLUDING THOSE SPECIFIED IN SECTION 1403(B) AS EXEMPT FROM THE REGISTRATION AND DISCLOSURE REQUIREMENTS SECTION.

SECTION 1404(A)(2)(A) WOULD RETAIN THE EXISTING PROHIBITION AGAINST THE USE OF ANY DEVICE, SCHEME OR ARTIFICE TO DEFRAUD.

**\*67 \*2383** SECTION 1404(A)(2)(B) WOULD PROHIBIT, WITH RESPECT TO ANY INFORMATION PERTINENT TO THE LOT OR SUBDIVISION, THE MAKING OF AN UNTRUE STATEMENT OF A MATERIAL FACT OR ANY OMISSION OF A MATERIAL FACT NECESSARY IN ORDER TO MAKE STATEMENTS MADE NOT MISLEADING IN LIGHT OF THE CIRCUMSTANCES IN WHICH THEY WERE MADE AND WITHIN THE CONTEXT OF THE OVERALL OFFER AND SALE OR LEASE.

SECTION 1404(A)(2)(C) WOULD PROHIBIT ANY TRANSACTION, PRACTICE OR COURSE OF BUSINESS WHICH WOULD OPERATE AS A FRAUD OR DECEIT UPON A PURCHASER.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



SECTION 1404(A)(2)(D) WOULD PROHIBIT THE PRACTICE OF REPRESENTING THAT ROADS, SEWERS, WATER, ELECTRIC SERVICE OR RECREATIONAL AMENITIES WILL BE PROVIDED OR COMPLETED BY THE DEVELOPER WITHOUT STIPULATING IN THE CONTRACT OF SALE THAT SUCH SERVICES WILL BE PROVIDED OR COMPLETED.

SECTION 1404(B) WOULD, IN THE CASE OF NONEXEMPT LOTS, EXTEND THE PERIOD IN WHICH A PURCHASER MAY REVOKE A CONTRACT OF SALE OR LEASE TO 10 DAYS FROM THE DATE OF SIGNING THE CONTRACT. THE SECTION WOULD ALSO PREEMPT ANY FEDERAL OR STATE REVOCATION PERIOD BUT WOULD ALLOW A STATE TO PERMIT A LONGER REVOCATION PERIOD. ANY CONTRACT OR AGREEMENT SHOULD CLEARLY PROVIDE THIS RIGHT.

SECTION 1404(C) WOULD PROVIDE A TWO-YEAR LIMITATION ON THE TIME IN WHICH A PURCHASER WHO HAS NOT RECEIVED A PROPERTY REPORT IN ADVANCE OF SIGNING THE CONTRACT OF SALE OR LEASE MAY REVOKE THIS CONTRACT AND THE CONTRACT MUST PROVIDE THIS RIGHT.

**\*61** SECTION 1404(D) WOULD PROVIDE THAT WITHIN TWO YEARS A PURCHASER MAY REVOKE A CONTRACT FOR THE SALE OF A NONEXEMPT LOT WHICH DOES NOT PROVIDE: (1) A LEGALLY SUFFICIENT AND RECORDABLE DESCRIPTION OF THE LOT, (2) THAT, IN THE EVENT OF A BREACH BY THE PURCHASER, THE SELLER (OR HIS SUCCESSOR) WILL PROVIDE WRITTEN NOTICE OF SUCH BREACH, WITH A 30-DAY OPPORTUNITY TO REMEDY THE BREACH, AND (3) THAT AFTER A PURCHASER HAS PAID 15 PERCENT OF THE PURCHASE PRICE OF THE LOT, A SELLER (OR HIS SUCCESSOR) WILL PROVIDE WRITTEN NOTICE OF SUCH BREACH, WITH A 30-DAY OPPORTUNITY TO REMEDY THE BREACH, AND (3) THAT AFTER A PURCHASER HAS PAID 15 PERCENT OF THE PURCHASE PRICE OF THE LOT, A SELLER (OR HIS SUCCESSOR) MUST REFUND TO THE PURCHASER, ANY AMOUNTS PAID (EXCLUDING INTEREST) OVER THE SELLER'S (OR HIS SUCCESSOR'S) ACTUAL DAMAGES. THIS SUBSECTION WOULD NOT APPLY WHERE THE PURCHASER RECEIVED A WARRANTY OR SIMILAR DEED TO THE LOT.

SECTION 1404(E) WOULD PROVIDE THAT UPON REVOCATION AND TENDER OF AN INSTRUMENT DIVESTING HIMSELF OF HIS INTEREST IN THE LOT, THE PURCHASER IS ENTITLED TO ALL MONEY PAID UNDER THE CONTRACT.

CERTIFICATION OF SUBSTANTIALLY EQUIVALENT STATE LAW

**\*61** SECTION 404 OF THE BILL WOULD REVISE THE EXISTING PROVISIONS OF SECTION 1409 OF THE ACT WITH RESPECT TO COOPERATION WITH STATE AUTHORITIES AND REQUIRE THE SECRETARY TO CERTIFY SUBSTANTIALLY EQUIVALENT STATE LAWS. THE REVISED SECTION 1409 WOULD PROVIDE AS FOLLOWS:

SECTION 1409(A)(1) WOULD PROVIDE THAT A STATE SHALL BE CERTIFIED WHEN THE SECRETARY DETERMINES THAT WHEN TAKEN AS A WHOLE, THE LAWS AND REGULATIONS OF THE STATE APPLICABLE TO NONEXEMPT LOTS IN THAT STATE REQUIRE DISCLOSURE SUBSTANTIALLY EQUIVALENT TO, OR GREATER THAN, THAT OF THIS ACT, AND THE STATE ADMINISTRATION OF THESE LAWS AND REGULATIONS PROVIDES, TO THE MAXIMUM EXTENT PRACTICABLE, THAT SUCH INFORMATION IS ACCURATE.

SECTION 1409(A)(2) WOULD PROVIDE AN ALTERNATIVE MEANS OF CERTIFICATION WHEN THE SECRETARY DETERMINES THAT WHEN, TAKEN AS A WHOLE, THE STATE'S LAWS AND REGULATIONS WITH RESPECT TO MATTERS FOR WHICH INFORMATION IS NOT DISCLOSED PROVIDE SUFFICIENT PROTECTION FOR THE PURCHASERS AND THE **\*68 \*2384** STATE'S ADMINISTRATION OF THESE LAWS AND REGULATIONS PROVIDES TO THE MAXIMUM EXTENT PRACTICABLE, THAT THE INFORMATION THAT IS REQUIRED TO BE DISCLOSED IS ACCURATE AND THAT SUFFICIENT PROTECTION IS PROVIDED TO PURCHASERS AND LESSEES.

SECTION 1409(B) WOULD PROVIDE THAT WHEN A STATE IS CERTIFIED, THE DISCLOSURE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



MATERIALS AND ANY RELATED DOCUMENTATION ACCEPTED BY THE STATE SHALL BE ACCEPTABLE FOR FILING UNDER THIS ACT.

SECTION 1409(C) WOULD PROVIDE FOR PERIODIC REVIEW OF CERTIFIED STATES AND FOR WITHDRAWAL OF CERTIFICATION WHEN APPROPRIATE.

SECTION 1409(D) WOULD PROVIDE THAT THIS PROVISION IS NOT INTENDED TO PREVENT OR LIMIT THE AUTHORITY OF STATES OR LOCAL GOVERNMENTS TO ENFORCE LAWS NOT IN CONFLICT WITH THE ACT AND IT WOULD REQUIRE HUD TO COOPERATE WITH STATE AUTHORITIES CHARGED WITH REGULATING THE SALE OR LEASE OF SUBDIVISIONS SUBJECT TO THIS ACT.

## CIVIL LIABILITIES

**\*62** SECTION 405 OF THE BILL WOULD REVISE EXISTING SECTION 1410 OF THE ACT, TO PROVIDE AS FOLLOWS:

SECTION 1410(A) WOULD RESTATE THE RIGHT OF A PURCHASER OR LESSEE TO BRING A CIVIL ACTION FOR BREACH OF THE PROHIBITIONS DEFINED IN SECTION 1404(A) AND AUTHORIZE SUCH DAMAGES, SPECIFIC PERFORMANCE OR OTHER RELIEF, AS THE COURT DEEMS FAIR, JUST AND EQUITABLE.

SECTION 1410(B) WOULD PROVIDE A RIGHT OF ACTION TO ENFORCE THE REVOCATION PROVISIONS OF SECTION 1404(B) THROUGH (E).

SECTION 1410(C) WOULD ENUMERATE CERTAIN COSTS WHICH MAY BE RECOVERED IN SUCH SUITS.

SECTION 1410(D) WOULD RESTATE THE RIGHT TO CONTRIBUTION WHICH A PARTY LIABLE UNDER THIS SECTION MAY ASSERT AGAINST OTHER PERSONS WHO, IF SUED SEPARATELY, WOULD ALSO HAVE BEEN LIABLE.

## LIMITATION OF ACTIONS

SECTION 406 OF THE BILL WOULD REVISE EXISTING SECTION 1412 OF THE ACT, TO PROVIDE AS FOLLOWS:

SECTION 1412(A) WOULD PROVIDE THAT ACTIONS MAINTAINED UNDER SECTION 1410(A) MUST BE BROUGHT WITHIN THREE YEARS AFTER DISCOVERY OF VIOLATIONS WAS OR SHOULD HAVE BEEN MADE. IT WOULD FURTHER LIMIT SUITS WITH RESPECT TO VIOLATIONS OF SECTION, 1404(A)(1) TO A MAXIMUM OF 3 YEARS AFTER THE LAST PAYMENT HAS BEEN MADE PURSUANT TO THE CONTRACT OF SALE OR 3 YEARS AFTER THE CONVEYANCE OF A WARRANTY OR SIMILAR DEED, WHICHEVER OCCURS EARLIER.

SECTION 1412(B) WOULD LIMIT ACTIONS BROUGHT BECAUSE OF A BREACH OF THE REVOCATION PROVISIONS OF THE ACT TO THREE YEARS AFTER SIGNING THE CONTRACT OF SALE OR LEASE.

## CEASE AND DESIST ORDER

SECTION 407 OF THE BILL WOULD AMEND SECTION 1415 OF THE ACT TO PROVIDE THE SECRETARY OF HUD WITH AUTHORITY TO ISSUE CEASE AND DESIST ORDERS.

SECTION 1415(E) WOULD PROVIDE THAT WHENEVER THE SECRETARY HAS REASONABLE CAUSE TO BELIEVE A DEVELOPER IS ENGAGED IN AN ACT OR PRACTICE WHICH WOULD VIOLATE THE PROVISIONS OF SECTION 1404(A)(2) REGARDING FRAUDULENT ACTIVITY AND CERTAIN REPRESENTATIONS BY THE DEVELOPER AND THAT SUCH ACT OR PRACTICE IS LIKELY TO CAUSE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



HARM TO PURCHASERS OR LESSEES, **69 *2385** THE SECRETARY MAY ORDER A HEARING WITH RESPECT TO ISSUING A CEASE AND DESIST ORDER. A DECISION MUST BE ISSUED WITHIN 10 DAYS OF THE HEARING AND WOULD BE EFFECTIVE UPON SERVICE.

SECTION 1415(F)(1) WOULD PROVIDE THAT WHEN THE SECRETARY HAS REASONABLE CAUSE TO BELIEVE THE VIOLATION IS LIKELY TO CAUSE IMMEDIATE AND SUBSTANTIAL HARM TO PURCHASERS OR LESSEES, A TEMPORARY RESTRAINING ORDER REQUIRING THE DEVELOPER TO CEASE AND DESIST MAY BE ISSUED AND SHALL BECOME EFFECTIVE ON ISSUANCE.

SECTION 1415(F)(2) WOULD PROVIDE A RIGHT FOR A DEVELOPER SERVED BY A TEMPORARY ORDER TO CEASE AND DESIST TO APPEAL IN U.S. DISTRICT COURTS WITHIN 10 DAYS.

SECTION 1415(G)(1) WOULD PROVIDE A CIVIL PENALTY OF $5,000 FOR EACH VIOLATION OF A CEASE AND DESIST ORDER.

SECTION 1415(G)(2) WOULD PROVIDE THAT THE SECRETARY MAY COLLECT PENALTIES IN U.S. DISTRICT COURTS.

SECTION 1415(G)(3) WOULD PROVIDE THAT SUCH PENALTIES SHALL BE PAYABLE TO THE U.S. TREASURY.

CRIMINAL PENALTIES

**63** SECTION 408 OF THE BILL WOULD REVISE SECTION 1418 OF THE ACT TO INCREASE THE CRIMINAL PENALTIES OF THE ACT FROM $5,000 AND NOT MORE THAN FIVE YEARS OF IMPRISONMENT TO $10,000 AND NOT MORE THAN 7 YEARS OF IMPRISONMENT.

REPORT TO CONGRESS

SECTION 409 OF THE BILL WOULD ADD A NEW SECTION 1422 TO THE ACT REQUIRING A BIENNIAL REPORT TO CONGRESS BY THE SECRETARY ON THE ADMINISTRATION OF THE ACT AND ITS IMPACT UPON THE LAND DEVELOPMENT INDUSTRY AND PURCHASERS AND LESSEES OF UNDEVELOPED LAND.

TITLE V-- RURAL HOUSING

AUTHORIZATION AND EXTENSIONS OF AUTHORITIES

SECTION 501(A) WOULD AMEND SECTION 513 OF THE HOUSING ACT OF 1949 AS FOLLOWS:

SECTION 513(A) WOULD BE SUBJECT TO APPROPRIATION ACTS ALL FMHA INSURED AND GUARANTEE LOANS AND WOULD AUTHORIZE AN AGGREGATE PRINCIPAL AMOUNT NOT TO EXCEED $3,906,000 FOR THE FISCAL YEAR ENDING SEPTEMBER 30, 1980, OF WHICH $2,857,000,000 WOULD BE AUTHORIZED FOR LOANS INSURED OR GUARANTEED ON BEHALF OF BORROWERS RECEIVING INTEREST CREDIT AND DEEP HOME OWNERSHIP SUBSIDY ASSISTANCE; AND $38,000,000 OF SUCH AMOUNT WOULD BE AUTHORIZED FOR SECTION 514 DOMESTIC FARM LABOR HOUSING LOANS.

SECTION 513(B) WOULD AUTHORIZE TO BE APPROPRIATED: (1) SUCH SUMS AS MAY BE NECESSARY TO MEET PAYMENTS ON NOTES OR OTHER OBLIGATIONS ISSUED BY THE SECRETARY (A) THE AGGREGATE OF THE CONTRIBUTIONS FOR INTEREST CREDITS PURSUANT TO SECTION 503, AND (B) THE INTEREST DUE ON NOTES OR OTHER OBLIGATIONS ISSUED BY THE SECRETARY; (2) $48,000,000 FOR SECTION 504 REHABILITATION LOANS AND GRANTS FOR FISCAL YEAR 1980; (3) $25,000,000 FOR SECTION 516 DOMESTIC FARM LABOR HOUSING ASSISTANCE FOR FISCAL YEAR 1980; (4) $1,000,000 FOR SECTION 506 TECHNICAL SERVICES AND RESEARCH FOR

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



FISCAL YEAR 1980; (5) $5,000,000 FOR PREPAYMENT ADVANCES UNDER SECTION 501(E) FOR FISCAL YEAR 1980; (6) $5,000,000 FOR SECTION **70 *2386** 509(C) STRUCTURAL DEFECTS PAYMENTS FOR FISCAL YEAR 1980; (7) $1,200,000 FOR SECTION 525(A) TECHNICAL ASSISTANCE, $3,800,000 FOR A NEW SECTION 525(B) COUNSELLING PROGRAM FOR FISCAL YEAR 1980, AND $1,000,000 FOR SECTION 525(C) LOANS; AND (8) SUCH SUMS AS MAY BE REQUIRED TO ADMINISTER SECTIONS 235 AND 236 OF THE NATIONAL HOUSING ACT AND SECTION 8 OF THE UNITED STATES HOUSING ACT OF 1937.

SECTION 501(B) WOULD AMEND CERTAIN EXISTING PROVISIONS TO CONFORM THEM WITH THE NEW AUTHORIZATION LANGUAGE BY (1) REPEALING SECTION 514(D); (2) AMENDING SECTION 509(C) BY STRIKING OUT THE SECOND SENTENCE; AND (3) AMENDING SECTION 517(J) BY STRIKING OUT PARAGRAPHS (5) AND (6).

SECTION 501(C)(1) WOULD AMEND SECTION 521(A)(1)(C) LIMITING DEEP HOMEOWNERSHIP SUBSIDY ASSISTANCE APPROVED IN APPROPRIATION ACTS OF AN AGGREGATE AMOUNT OF $985,000,000 FOR FISCAL YEAR 1979 AND $500,000,000 FOR FISCAL YEAR 1980, AND WOULD LIMIT THE PERIOD DURING WHICH DEEP SUBSIDY ASSISTANCE CONTRACTS COULD BE ENTERED INTO THE PERIOD ENDING SEPTEMBER 30, 1981. SUBSECTION (2) WOULD AMEND SECTION 521(C) TO AUTHORIZE SUCH SUMS AS MAY BE NECESSARY TO REIMBURSE THE RURAL HOUSING INSURANCE FUND FOR HOMEOWNERSHIP ASSISTANCE PAYMENTS. SUBSECTION (3) WOULD AMEND SECTION 521(A)(1) BY STRIKING OUT SUBPARAGRAPH (H) WHICH LIMITED THE PRINCIPAL OBLIGATIONS OF LOANS RECEIVING ASSISTANCE UNDER THE DEEP HOMEOWNERSHIP SUBSIDY PROGRAM.

**64** SECTION 501(D) WOULD AMEND SECTION 523(F) TO AUTHORIZE $1,000,000 FOR SELF HELP TECHNICAL ASSISTANCE GRANTS FOR FISCAL YEAR 1980; AND TO EXTEND THE PROGRAM FOR ONE YEAR.

SECTION 501(E) WOULD AMEND SECTION 515(B)(5) TO EXTEND THE RENTAL ASSISTANCE PROGRAM FOR ONE YEAR.

SECTION 501(F) WOULD AMEND SECTION 517(A)(1) TO EXTEND THE LOW AND MODERATE INCOME INTEREST CREDIT PROGRAM FOR ONE YEAR.

SECTION 521(A) INTEREST RATE PROVISIONS AND DEFINITION OF LOW-INCOME PERSONS

SECTION 502(A) WOULD AMEND SECTION 521(A)(1) TO REQUIRE THAT FMHA INSURED LOANS TO LOW- AND MODERATE-INCOME PERSONS BEAR THE SAME RATE OF INTEREST AS FHA INSURED LOANS PURSUANT TO SECTION 203(B)(5) OF THE NATIONAL HOUSING ACT.

SECTION 502(B) WOULD AMEND SECTION 501(B) TO DEFINE LOW INCOME FOR FMHA PROGRAMS AS PERSONS AND FAMILIES WHOSE INCOMES DO NOT EXCEED 80 PERCENT OF THE MEDIAN INCOME FOR THE AREA AND WOULD PERMIT THE SECRETARY TO MAKE ADJUSTMENTS FOR SMALLER AND LARGER FAMILIES; CONSTRUCTION COSTS, UNUSUALLY HIGH OR LOW FAMILY INCOMES, OR OTHER FACTORS. IT WOULD ALSO DEFINE 'INCOME' AS INCOME FROM ALL SOURCES OF EACH MEMBER OF THE HOUSEHOLD, AS DETERMINED BY THE SECRETARY.

REPAYMENT AND REFINANCING OF LOANS UNDER SECTIONS 514 AND 515

SECTION 503(A) WOULD AMEND SECTION 502(B)(2) TO PROVIDE THAT FOR SECTIONS 514 AND 515 LOANS UNLESS THE SECRETARY OBLIGATES THE BORROWER (AND HIS OR HER SUCCESSORS IN INTEREST) TO UTILIZE THE ASSISTED HOUSING AND RELATED FACILITIES FOR THE SECTION 514 OR 515 PURPOSES FOR THE DURATION OF THE ORIGINAL REPAYMENT SCHEDULE OF THE LOAN OR UNTIL HE DETERMINES THAT THERE IS NO LONGER A NEED FOR SUCH HOUSING AND

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



RELATED FACILITIES OR THAT FEDERAL OR OTHER FINANCIAL ASSISTANCE FOR THE RESIDENTS OF SUCH HOUSING WILL NO LONGER BE PROVIDED:

**\*71 \*2387** (1) WHERE THERE IS AN OFFER TO PREPAY THE PRINCIPAL AND INTEREST OF ANY LOAN PURSUANT TO CONTRACTS ENTERED INTO WITH A BORROWER AFTER THE DATE OF THE ENACTMENT OF THIS SUBSECTION, OR

(2) WHERE THE SECRETARY HAS REASON TO REQUEST REFINANCING OF ANY LOAN PURSUANT TO A CONTRACT ENTERED INTO BEFORE OR AFTER THE DATE OF THE ENACTMENT OF THIS SUBSECTION, THE SECRETARY MAY NOT ACCEPT AN OFFER TO PREPAY OR REQUEST REFINANCING.

## RENTAL ASSISTANCE

SECTION 504(A) WOULD AMEND SECTION 521(A)(2)(A) TO INCREASE FROM 20 TO 40 PERCENT THE PROPORTION OF UNITS IN A SECTION 515 PROJECT THAT MAY RECEIVE RENTAL ASSISTANCE SUBSIDIES WITHOUT A SPECIFIC FINDING BY THE SECRETARY AS TO THE NECESSITY OR FEASIBILITY OF PROVIDING SUCH ADDITIONAL ASSISTANCE.

SECTION 504(B) WOULD AMEND SECTION 521(A)(2)(A) TO MAKE A TECHNICAL CORRECTION TO A PROVISION IN THE HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS OF 1978 WHICH AMENDED SECTION 514.

## TECHNICAL ASSISTANCE AND COUNSELLING

SECTION 505 WOULD AMEND SECTION 525 TO AUTHORIZE A SEPARATE COUNSELLING PROGRAM FOR BORROWERS ASSISTED BY THE NEW DEEP HOMEOWNERS SUBSIDY PROGRAM TO ASSIST THEM IN MANAGING THEIR FINANCES AND MAINTAINING THEIR HOMES, AS WELL AS TO DELINQUENT BORROWERS TO ASSIST THEM IN CURING THEIR DEFAULT. THE PROVISION WOULD ALSO MAKE A TECHNICAL CONFORMING CHANGE BY DELETING THE EXISTING SUBSECTION 525(C).

## REFINANCING

**\*65** SECTION 506 WOULD AMEND THE REFINANCING PROVISIONS IN SECTION 501(A)(4) TO DELETE THE REQUIREMENT THAT ONLY PRIVATELY MADE LOANS THAT ARE FIVE OR MORE YEARS OLD MAY BE REFINANCED. IN ADDITION, THE AMENDMENT WOULD CLARIFY THE EXISTING PROVISIONS THAT REFINANCING MAY BE PERMITTED UNDER TWO CIRCUMSTANCES, FIRST TO PERMIT A FAMILY IN SUBSTANDARD HOUSING TO COMBINE REFINANCING THE LOAN WITH A NEW LOAN TO REPAIR OR REHABILITATE THE DWELLING IN ORDER TO BRING THE DWELLING UP TO A DECENT, SAFE AND SANITARY STANDARD AND SECOND, WHERE REFINANCING WOULD BE NECESSARY TO PREVENT A FAMILY FROM LOSING ITS HOME OR FARM SERVICE BUILDING DUE TO CIRCUMSTANCES BEYOND THE FAMILY'S CONTROL.

## PROPERTY DISPOSITION

SECTION 507 WOULD AMEND SECTION 510(E) TO REQUIRE THAT IN DISPOSING OF PROPERTIES THAT ARE TO BE CONTINUED AS RESIDENTIAL PROPERTIES, THE SECRETARY MUST TAKE STEPS TO ASSURE THAT SUCH PROPERTY WILL BE IN A DECENT, SAFE, AND SANITARY CONDITION BEFORE OR WITHIN A REASONABLE TIME AFTER SALE OR DISPOSITION.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



CONSTRUCTION DEFECTS

SECTION 508 WOULD AMEND SECTION 509(C) TO EXTEND FROM 18 TO 36 MONTHS THE TIME IN WHICH A CLAIM FOR STRUCTURAL DEFECTS PAYMENTS MAY BE REQUESTED BY OWNERS OF PROPERTIES CONSTRUCTED WITHIN 18 MONTHS PRIOR TO THE ENACTMENT OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1977.

SECTION 524 SITE DEVELOPMENT LOANS

SECTION 509(A) WOULD AMEND SECTION 524(A) TO PERMIT PUBLIC AND PRIVATE NONPROFIT ORGANIZATIONS TO BE ELIGIBLE FOR SITE DEVELOPMENT *72 *2388 LOANS REGARDLESS OF WHETHER OR NOT THE HOUSING TO BE BUILT ON THE SITES IS TO BE USED FOR LOW AND MODERATE INCOME PERSONS AND WAS ELIGIBLE FOR FEDERAL, STATE OR LOCAL GOVERNMENTAL ASSISTANCE.

SECTION 509(B) WOULD AMEND SECTION 524(A) TO REQUIRE THE MARKET INTEREST RATE FOR SITE DEVELOPMENT LOANS.

\*    \*    \*    \*

**\*138** ADDITIONAL VIEWS BY REP. VENTO

WHEN CONSIDERED IN TOTAL, AND IN TERMS OF THE BUDGETARY CONSTRAINTS FACING CONGRESS THIS SESSIONS, THE HOUSING AND COMMUNITY DEVELOPMENT ACT AMENDMENTS OF 1979 SHOULD BE VIEWED AS REASONED AND BALANCED LEGISLATION. HOWEVER I FEEL A RESPONSIBILITY TO EXPRESS CONCERNS WITH SPECIFIC PROVISIONS OF THIS LEGISLATION.

F.H.A. MORTGAGE INSURANCE LIMITATIONS

DURING SUBCOMMITTEE CONSIDERATION ON H.R. 3875, I SPONSORED AN AMENDMENT TO RAISE THE F.H.A. MORTGAGE LIMITATION. THIS AMENDMENT SOUGHT TO INCREASE THE LIMITATIONS TO $70,000 FOR A SINGLE FAMILY HOME; TO $80,000, $99,000 AND $120,000 FOR 2, 3 AND 4 FAMILY STRUCTURES RESPECTIVELY; AND PROVIDING A 7.5% ANNUAL INCREASE IN THE PER UNIT MULTIFAMILY MORTGAGE LIMITATIONS SINCE THEY WERE LAST REVISED IN THE 1976 HOUSING AND COMMUNITY DEVELOPMENT AMENDMENTS. THE SUBCOMMITTEE ACCEPTED A SUBSTITUTE OFFERED BY THE CHAIRMAN, MR. ASHLEY.

ONE PRIMARY PURPOSE OF THE MORTGAGE LIMITATIONS IS TO INSURE THAT THE F.H.A. PROGRAMS SERVE MODERATE AND LOW INCOME FAMILIES. THIS IS ACCOMPLISHED BY RESTRICTING THE INSURABLE MORTGAGE TO A LEVEL THAT A MODERATE OR LOW INCOME FAMILY COULD REALISTICALLY BE EXPECTED TO AFFORD. DURING THE LAST DECADE THE F.H.A.'S SHARE OF THE TOTAL MARKET HAS DECREASED DRAMATICALLY. IN PART, THIS IS A RESULT OF THE INCREASINGLY SMALLER SHARE OF THE HOUSING STOCK THAT CAN BE PURCHASED WITHIN THE EXISTING LIMITATIONS. INDEED, IN MANY AREAS OF THE COUNTRY THE MEDIAN PURCHASE PRICE OF A HOME ALREADY EXCEEDS THESE LIMITATIONS. HISTORICALLY MORTGAGE LIMITATIONS WERE SET AT A LEVEL TO REFLECT 120% TO 125% OF THE MEDIAN PURCHASE PRICE OF A NEW HOME. AS HOUSING COSTS CONTINUE TO RISE, IT IS LIKELY THAT THE MORTGAGE INSURANCE LIMITATIONS WILL BE AT OR BELOW THE NATIONAL

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



MEDIAN PURCHASE PRICE OF A NEW HOME BY THE EFFECTIVE DATE OF THIS LEGISLATION.

*66 IT IS INCUMBENT UPON THIS SUBCOMMITTEE TO REEXAMINE THESE LIMITATIONS AND ESTABLISH LIMITS WHICH REALISTICALLY REFLECT THE EFFECT OF RISING HOUSING COSTS. IN THE ABSENCE OF THIS ACTION, A GREATER AMOUNT OF MODERATE AND LOW INCOME FAMILIES WILL NOT BE ABLE TO FIND AFFORDABLE HOME FINANCING WITH THE CAREFUL SAFEGUARDS THAT CHARACTERIZE THE F.H.A. PROGRAM. AS A CONSEQUENCE F.H.A.'S PARTICIPATION IN THE MORTGAGE INSURANCE MARKET WILL CONTINUE TO DECREASE AT THE SAME TIME THAT PUBLIC AND SUPPORTED HOUSING PROGRAMS ARE UNDER STRESS AT THE FEDERAL LEVEL. SIMILARLY THE F.H.A. DOWN PAYMENT REQUIREMENTS SHOULD ALSO BE REFRAMED TO FACILITATE HOME OWNERSHIP AND RECOGNIZE THE THRESHOLD IS BEING INADVERTENTLY RAISED TO LEVELS NOT NEEDED TO INSURE THE CREDIT WORTHINESS AND PROTECTION OF THE F.H.A. INSURANCE PROGRAM.

### *139 *2389 TENANT CONTRIBUTIONS

SECTION 203 OF H.R. 3875 WOULD MODIFY THE EXISTING RENT CONTRIBUTION LIMITATION OF 25% OF INCOME. THIS LEGISLATION ESTABLISHES A SLIDING SCALE CONTRIBUTION SCHEDULE WHICH REQUIRES INCREASED RENTAL CONTRIBUTION BY THOSE FAMILIES OR INDIVIDUALS WHOSE INCOME IS BETWEEN 50% AND 80% OF THE AREA'S MEDIAN INCOME. WHILE UNDERSTANDING THAT THIS SECTION WILL ADVERSELY AFFECT ONLY 7% TO 12% OF SECTION 8 AND PUBLIC HOUSING RESIDENTS, I DISAGREE WITH THIS AS A NEW PUBLIC POLICY, BECAUSE IT REQUIRES INCREASED RENTAL CONTRIBUTIONS FROM THOSE INDIVIDUALS WHO AS A RESULT OF THE INCREASED COST OF OTHER ESSENTIALS ARE LEAST ABLE TO SHOULDER THE BURDEN OF INCREASED RENT.

THE REASON FOR ENACTMENT OF THE INITIAL BROOKE LANGUAGE WAS TO INSURE THAT CERTAIN HOUSING PROGRAMS SERVE THEIR INTENDED PURPOSE BY PROVIDING LOW INCOME PERSONS WITH DECENT HOUSING AT RENTS WHICH THEY CAN AFFORD. IF THERE IS A VALID CRITICISM WHICH CAN BE MADE OF THIS PROVISION, IT IS THAT THE CEILING IS TOO HIGH, NOT THAT IT IS TOO LOW. POOR FAMILIES ALREADY PAY A HIGHER PERCENTAGE OF THEIR INCOME FOR HOUSING, FOOD, TRANSPORTATION, CLOTHES AND OTHER ESSENTIALS THAN MIDDLE OR UPPER INCOME FAMILIES.

INFORMATION COMPILED BY THE BUREAU OF THE CENSUS AND REPORTED IN THE ANNUAL HOUSING SURVEY INDICATED THAT THE MEDIAN PERCENTAGE OF INCOME CONTRIBUTED TOWARDS HOUSING NATIONWIDE IS 24% FOR RENTERS AND 18% FOR HOMEOWNERS WITH A MORTGAGE. EVIDENCE ALSO INDICATES THAT AS INCOME INCREASES, THE PERCENTAGE OF INCOME CONTRIBUTED TOWARDS HOUSING DECREASES. THE TYPICAL WAGE EARNER WITH A $20,000 INCOME WILL PAY ONLY 13% OF INCOME TOWARD RENT AND 16% OF INCOME FOR HOME OWNERSHIP INCLUDING MORTGAGE PAYMENTS.

SOUND PUBLIC POLICY DICTATES THAT DURING TIMES OF INFLATIONARY STRESS WHEN LOW INCOME FAMILIES ARE ALREADY PAYING A DISPROPORTIONATE PERCENTAGE OF INCOME TOWARDS HOUSING, OUR LOW INCOME HOUSING PROGRAMS SHOULD PROVIDE ASSISTANCE TO THOSE INDIVIDUALS AND FAMILIES WHICH ARE MOST ADVERSELY AFFECTED BY INFLATION. I AM VERY CONCERNED THAT SECTION 203 WORKS AT CROSS PURPOSES TO THIS GOAL. DURING COMMITTEE CONSIDERATION, REPRESENTATIVE GARCIA OFFERED AN AMENDMENT TO STRIKE SECTION 203 FROM THE BILL. I SUPPORTED THIS EFFORT IN COMMITTEE AND WILL SUPPORT THIS AMENDMENT IF IT IS OFFERED ON THE FLOOR OF THE HOUSE OF REPRESENTATIVES.

### SECTION 312 REHABILITATION LOAN PROGRAM

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



**\*67** SECTION 101 OF H.R. 3875 PROVIDES AUTHORIZATION FOR THE SECTION 312 REHABILITATION LOAN PROGRAM. THE AUTHORIZED LEVEL REPRESENTS A $20,000,000 INCREASE OVER THE PRESIDENT'S BUDGET REQUEST, BUT ALSO REPRESENTS A MARKED DECREASE FROM THE 1979 APPROPRIATION FOR THIS PROGRAM.

THE SECTION 312 REHABILITATION LOAN PROGRAM HAS PROVEN TO BE ONE OF THE MOST SUCCESSFUL COMMUNITY DEVELOPMENT PROGRAMS ADMINISTERED BY THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT. I AM CONCERNED THAT A REDUCED PROGRAM LEVEL WILL RESULT IN A DECREASED NUMBER OF IMPROVED HOUSING UNITS BROUGHT ONTO THE MARKET. SECTION 312 LEVERAGES SUBSTANTIAL RESOURCES TO THE REHABILITATION OF EXISTING HOUSING STOCK WITHOUT A MASSIVE COMMITMENT OF FEDERAL FUNDS. CONSIDERING THE PRESSURES ON THE HOUSING MARKET: A CONTINUALLY INCREASING DEMAND FOR RENTAL AND OWNER OCCUPIED HOUSING; A REDUCTION IN **\*140 \*2390** THE NUMBER OF HOUSING STARTS; ANNUAL INCREASES IN THE COST OF HOUSING AVERAGING BETWEEN 15% AND 20%; AND A REDUCTION IN THE NUMBER OF FEDERALLY ASSISTED RENTAL UNITS AUTHORIZED FOR CONSTRUCTION DURING 1980; THE SECTION 312 PROGRAM COULD DO MUCH TO PROVIDE A LARGE NUMBER OF SAFE AND DECENT HOUSING UNITS IF IT WERE AUTHORIZED AT A LEVEL GREATER THAN EXISTS IN H.R. 3875. I AM CONCERNED THAT THIS LEVEL OF AUTHORIZATION WILL ONLY EXACERBATE THE INFLATIONARY PRESSURES PRESENT IN THE HOUSING MARKET.

LOCAL OFFICIALS HAVE BROUGHT TO MY ATTENTION THEIR CONCERNS REGARDING MORE RESTRICTIVE GEOGRAPHICAL TARGETING OF THE SECTION 312 PROGRAM. CERTAINLY THESE FUNDS SHOULD BE USED IN AREAS WHERE THERE EXISTS A SUBSTANTIAL NEED FOR IMPROVED HOUSING STOCK. IT SHOULD ALSO BE RECOGNIZED THAT A HOUSING AUTHORITY, AS PART OF A COMPREHENSIVE HOUSING PLAN TO INCREASE ECONOMIC DISPERSAL, MAY HAVE AUTHORIZED THE CONSTRUCTION OF LOW INCOME MULTI-FAMILY UNITS OUTSIDE OF A TARGETED GEOGRAPHICAL AREA. AFTER MANY YEARS OF USE, THESE UNITS MAY NOW BE IN NEED OF REHABILITATION TO PROVIDE ADEQUATE HOUSING. I AM HOPEFUL THAT THE SUBCOMMITTEE WILL EXAMINE THE ADMINISTRATION OF THIS PROGRAM TO INSURE THAT IN OUR ATTEMPT TO PROVIDE MAXIMUM ASSISTANCE TO A GEOGRAPHICAL AREA WITH SUBSTANTIAL NEED, WE DO NOT ELIMINATE THE ELIGIBILITY OF LOW INCOME MULTI-FAMILY UNITS OUTSIDE OF TARGETED AREAS. THESE UNITS CAN PROVIDE RELATIVELY QUICK AND INEXPENSIVE HOUSING TO ALLEVIATE SOME OF THE ACUTE HOUSING SHORTAGE OF OUR COUNTRY.

BRUCE F. VENTO.

### \*141 MINORITY VIEWS ON H.R. 3875

THE MINORITY MEMBERS OF THE COMMITTEE HAVE IN LARGE PART SUPPORTED THE PROVISIONS OF H.R. 3875. THAT DOES NOT MEAN, HOWEVER, THAT WE BELIEVE ALL THE PROVISIONS OF THE BILL ARE ACCEPTABLE. INDEED, RECENT HEADLINES RELATING TO THE INFLATIONARY SPIRAL EXISTING TODAY ARGUE EVEN MORE STRONGLY FOR AMENDMENTS WHICH WERE OFFERED BY THE MINORITY BUT DEFEATED IN THE COMMITTEE. SPECIFICALLY, WE ARE REFERRING TO HEADLINES THAT THE ADMINISTRATION'S 'NEW' PROJECT IS FOR AN 8.5 PERCENT, AND POSSIBLY HIGHER, INFLATION RATE FOR 1979. REGRETTABLY, THE 'POSSIBLY HIGHER' PORTION OF THAT ESTIMATE MAY BE CLOSER TO THE FACT. THE RATHER INDELICATE ADMISSION, BY THE SECRETARY OF THE TREASURY, THAT THE ADMINISTRATION 'SCREWED UP' ON THE ORIGINAL FORECAST DOES LITTLE TO ALLAY FEARS THAT THE NEW PROJECTION MAY PROVE TO BE JUST AS INACCURATE. WITH THIS BACKDROP, AND KEEPING THE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



ADMINISTRATION'S RHETORIC ABOUT REDUCING THE BURDEN OF FEDERAL REGULATIONS IN MIND, WE WOULD LIKE TO DISCUSS THE PROBLEMS WITH H.R. 3875.

### URBAN DEVELOPMENT ACTION GRANTS (UDAG)

**\*68** H.R. 3875 PROVIDES AN INCREASE OF APPROXIMATELY 70 PERCENT IN THE AUTHORIZATION FOR THE UDAG PROGRAM, OVER THE LEVEL IN FISCAL YEAR 1979. IT IS INEXPLICABLE HOW SUCH AN INCREASE CAN BE JUSTIFIED FOR A PROGRAM WHICH WAS CREATED IN 1977, TO PROVIDE 'SUPPLEMENTAL GRANT ASSISTANCE' TO THE BASIC COMMUNITY DEVELOPMENT BLOCK GRANT PROGRAM **\*2391** (CDBG), AND WHICH HAS YET TO RECEIVE EVEN THE MOST CURSORY REVIEW BY THE CONGRESS. INDEED, ONE GETS THE CLEAR IMPRESSION THAT HUD WOULD PREFER TO MAKE UDAG, WITH THE SECRETARY AS DISPENSER OF THE 'GOODIES', THE MAJOR PROGRAM AND TO RELEGATE THE CDBG PROGRAM TO THE ROLE OF SUPPLEMENTAL ASSISTANCE. UNFORTUNATELY, THE LURE OF UDAG GRANTS CAUSES DISTORTIONS IN THE FORESIGHT OF MANY WHO LOOK AT THE PROGRAM'S MERITS OR DEMERITS, AS THE CASE MAY BE.

DURING THE DEBATE IN COMMITTEE, WE CONSTANTLY HEARD THAT UDAG IS A 'SUCCESS '. IF SUCCESS IS DEFINED AS THE MERE AWARDING OF A GRANT, THEN THERE ARE A NUMBER OF CITIES THAT CAN ATTEST TO THE 'SUCCESS' OF THE PROGRAM. IF, HOWEVER, WE REQUIRE A SLIGHTLY MORE RATIONAL DEFINITION, SUCH AS CONTAINED IN THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, WE WOULD DEFINE SUCCESS AS 'THE FAVORABLE OR PROSPEROUS TERMINATION OF ATTEMPTS OR ENDEAVORS.' CLEARLY, ON THIS BASIS, UDAG CANNOT BE CLASSIFIED AS A SUCCESS. IN FACT, HUD TESTIFIED THAT AS OF FEBRUARY 28, 1979 ONLY $2,383,386 OR .4 PERCENT HAD BEEN DRAWN DOWN OUT OF THE $600 MILLION WORTH OF GRANTS APPROVED. THIS IS HARDLY A BASIS FOR CLAIMING SUCCESS, LET ALONE INCREASING THE PROGRAM LEVEL FROM $400 MILLION A YEAR TO $675 MILLION A YEAR. PROPONENTS OF THE INCREASE ARGUE THAT THE PROGRAM IS NEW AND DRAW-DOWNS COME LATE. WE AGREE AND THAT IS WHY IT IS TOO SOON TO PROCLAIM THE PROGRAM IS A 'SUCCESS'. SO LITTLE **\*142** HAS BEEN ACCOMPLISHED AND MORE GRANT ANNOUNCEMENTS HAVE BEEN CANCELED TO DATE, THAN PROJECTS HAVE BEEN COMPLETED.

WHEN UDAG WAS CREATED IN 1977, IT WAS AUTHORIZED AT A LEVEL OF $400 MILLION FOR EACH OF THE FISCAL YEARS, 1978, 1979 AND 1980. AT THE SAME TIME, THE BASIC CDBG PROGRAM WAS AUTHORIZED AT A LEVEL OF $3.50 BILLION FOR FISCAL YEAR 1978, $3.65 BILLION FOR FISCAL YEAR 1979, AND FOR $3.80 BILLION FOR FISCAL YEAR 1980. THE UDAG FIGURES RECOGNIZED THAT THE PROGRAM WAS NEW AND SINCE IT HAD NO PROVEN TRACK RECORD, THERE WOULD NOT BE ANY PROJECTED INCREASE IN FUNDING UNTIL THERE WAS AN OPPORTUNITY TO CONDUCT THE NECESSARY OVERSIGHT. ON THE OTHER HAND, THE CDBG PROGRAM WAS BEING REAUTHORIZED AND A MODEST INCREASE WAS BUILT INTO THE PROGRAM TO MAINTAIN THE 'REAL' LEVEL OF FUNDING OF WHAT WAS AGREED TO BE A GENUINELY SUCCESSFUL PROGRAM. OVER THE LAST TWO YEARS, INFLATION HAS DESTROYED THE PROJECTIONS OF FUNDING NECESSARY TO MAINTAIN THE CDBG PROGRAM'S LEVEL.

AN AMENDMENT WAS OFFERED IN COMMITTEE TO DELETE THE PROVISION OF H.R. 3875 WHICH ADDED THE $275 MILLION TO UDAG. IN VIEW OF THE INFLATIONARY CONDITIONS AND THE LEGITIMATE CALL FOR FISCAL RESPONSIBILITY FROM THE TAXPAYERS, A NUMBER OF MEMBERS SOUGHT TO REDUCE INCREASES IN FEDERAL SPENDING BY HOLDING THIS PROGRAM TO THE LEVEL PREVIOUSLY AUTHORIZED. IT WAS EVIDENT IN COMMITTEE THAT INSUFFICIENT SUPPORT EXISTED FOR SUCH A MOVE, AND THE AMENDMENT WAS DEFEATED. ANOTHER AMENDMENT TO EQUITABLY REDISTRIBUTE THE $275 MILLION BETWEEN THE UDAG AND CDBG PROGRAMS WAS THEN OFFERED. IF THESE ADDITIONAL FUNDS ARE TO BE AUTHORIZED, THE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



LATTER AMENDMENT MAKES GOOD SENSE. IT WOULD TRANSFER $200 MILLION OF THE UDAG INCREASE TO THE CDBG PROGRAM, RESULTING IN A 9.6 PERCENT INCREASE IN CDBG FUNDING OVER THE FISCAL YEAR 1979. THIS AMOUNT WOULD HELP KEEP PACE WITH THE INFLATION THE COUNTRY HAS EXPERIENCED, AND HELP REDUCE THE HARDSHIP WHICH WILL RESULT FROM THE PRO-RATA REDUCTIONS IN FUNDING CURRENTLY FACING CDBG RECIPIENTS. THE AMENDMENT WOULD HAVE LEFT $75 MILLION IN NEW FUNDING **\*2392** FOR UDAG, WHICH WOULD HAVE REPRESENTED AN INCREASE OF 18.75 PERCENT OVER 1979. GIVEN THE EARLIER DISCUSSION, AND A RECENT GAO REPORT ON THE PROGRAM, SUCH A PROPOSED INCREASE FOR UDAG WAS QUITE GENEROUS.

**\*69** WITH RESPECT TO THE GAO'S REVIEW, WE WOULD REFER INTERESTED PARTIES TO THE REPORT ENTITLED, IMPROVEMENTS NEEDED IN SELECTING AND PROCESSING URBAN DEVELOPMENT ACTION GRANTS, DATED MARCH 30, 1979. IN THAT REPORT, GAO STATES:

WE REALIZE THAT THE AUTHORIZING LAW AND REGULATIONS FOR THE UDAG PROGRAM ALLOW WIDE LATITUDE OF JUDGMENT IN APPROVING GRANTS. HOWEVER, WE COULD NOT RELATE THE PURPOSES OF THESE FOUR GRANTS TO THE UDAG PROGRAM OBJECTIVES OR TO THE BROAD DESCRIPTION OF THE PROGRAM'S MAIN PURPOSES AND EXPECTATIONS THAT HUD HAS GIVEN TO THE CONGRESS.

DURING THE DEBATE ON THE AMENDMENT, IT WAS CONTINUOUSLY POINTED OUT THAT UDAG WAS MERITORIOUS BECAUSE IT 'LEVERAGED' PRIVATE FUNDS, AND THAT WAS A BASIC TENET OF THE PROGRAM. HOWEVER, THE FOLLOWING QUOTE FROM THE GAO REPORT RAISES SOME SERIOUS QUESTIONS WHICH CANNOT BE DISMISSED BY SAYING THESE WERE 'EARLY ' OR 'FIRST ROUND' GRANTS, AND THAT SUCH GRANTS WOULD NOT BE APPROVED TODAY.

**\*143** WE HAVE RESERVATIONS ABOUT HUD'S USE OF UDAG FUNDS IN CERTAIN INSTANCES. WE BELIEVE THAT 4 OF THE 18 GRANTS WE REVIEWED WERE QUESTIONABLE IN THAT (1) 2 WERE MADE WITHOUT ANY SUBSTANTIAL COMMITMENT OF PRIVATE RESOURCES, (2) 1 WAS APPARENTLY NOT NEEDED TO STIMULATE PRIVATE INVESTMENT, AND (3) 1 PRIMARILY BENEFITED A PRIVATE FIRM. THERE WAS LITTLE OR NOT DOCUMENTATION BEYOND THE AREA/REGIONAL OFFICE LEVEL-- TO SHOW THE BASIS FOR THE FUNDING DECISIONS MADE AND THE DISPOSITION OF CONFLICTING AREA/REGIONAL COMMENTS ON THE PROPOSED GRANTS.

IN ADDITION, THE HOUSE GOVERNMENT OPERATIONS COMMITTEE HAS HAD THE GAO UNDERTAKE A STUDY TO DETERMINE IF SPECIFIC PROJECTS WOULD HAVE OCCURRED WITHOUT THE UDAG GRANT, AND IF THE HUD FIGURES ON THE EXTENT OF PRIVATE INVESTMENT AND JOBS RESULTING FROM SUCH GRANTS ARE INFLATED. IT IS EXPECTED THAT HEARINGS WILL BE HELD, BY THAT COMMITTEE, BEFORE THE END OF THIS MONTH ON THE GAO'S FINDINGS.

IN THIS REGARD, IT IS IMPORTANT TO REMEMBER THAT UDAG GRANTS WERE PREMISED ON THE FINDING STATED IN THE HOUSE COMMITTEE REPORT THAT: 'LOCALITIES HAVE NO MEANS OF FUNDING SPECIAL OR UNIQUE DEVELOPMENT OPPORTUNITIES'. UDAG WAS NOT TO BE A FUNDING SOURCE FOR A COMMUNITY'S 'WISH LIST.' WE BELIEVE THE FINDINGS TO DATE SHOW LITTLE THAT IS 'SPECIAL' AND EVEN LESS THAT IS 'UNIQUE' IN THE UDAG PROGRAM. WE EXPECT THAT THE NEW GAO REVIEW, WHICH IS NEARING COMPLETION, WILL ADD TO THE ARGUMENTS AGAINST SUCH A MASSIVE INCREASE IN FUNDING FOR THE UDAG PROGRAM.

WE NOTE WITH SOME INTEREST THAT THE BODY OF THE COMMITTEE REPORT AVOIDS DESCRIBING THE UDAG PROGRAM AS 'SUCCESSFUL' AND USES THE TERM 'PROMISING ' INSTEAD. ALSO, TO HIGHLIGHT THE FACT THAT THE COMMITTEE HAS NOT UNDERTAKEN AN INDEPENDENT REVIEW OF THE PROGRAM, THE STATISTICS QUOTED FOR THE PROGRAM'S CONTRIBUTION TO JOBS AND PRIVATE INVESTMENT ARE 'ACCORDING TO HUD'. IT WILL BE INTERESTING TO SEE **\*2393** WHETHER THE GAO AGREES WITH HUD'S FIGURES OR WHETHER THEY CONCLUDE THAT A SIGNIFICANT AMOUNT OF 'PUFF' EXISTS IN THE FIGURES.

**\*70** THE TRUTH OF THE MATTER IS THAT THIS COMMITTEE DOES NOT KNOW VERY MUCH

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



ABOUT THE UDAG PROGRAM'S ACTUAL EXPERIENCE, AND WHAT IS KNOWN, IS NOT VERY ASSURING. A REDUCTION IN THE UDAG FUNDING INCREASE IS CLEARLY APPROPRIATE, AND THE RATIONAL FOR SUCH A REDUCTION IS FOUNDED UPON NOT ONLY FISCAL RESPONSIBILITY, BUT ALSO THE BASIC RESPONSIBILITY WE OWE TO OUR CONSTITUENTS THAT WE BE SURE WE ARE RIGHT BEFORE SPENDING MORE OF THEIR TAX DOLLARS.

HOUSING AMENDMENTS

H.R. 3875 CONTAINS A NUMBER OF CHANGES RELATING TO HOUSING WHICH ARE BENEFICIAL, BUT THERE ARE OTHERS THAT GIVE CAUSE FOR CONCERN. THE ESTABLISHING OF FIRM CEILINGS ON THE EXTENT OF THE ASSISTED HOUSING AUTHORIZATION, WHICH CAN BE USED FOR PUBLIC HOUSING, IS A STEP IN THE RIGHT DIRECTION. THE PUBLIC HOUSING PIPELINE AT HUD HAS A BACKLOG OF RESERVATIONS EXCEEDING 90,000 UNITS. THAT FIGURE IS EXPECTED TO EXCEED 100,000 UNITS BY THE END OF THIS FISCAL YEAR. MANY OF THESE RESERVATIONS WILL NOT BECOME 'STARTS' FOR SEVERAL YEARS AND EVEN THEN, ONLY AT CONSIDERABLY HIGHER COSTS. FOR THIS REASON, WE WERE GLAD TO SEE EVEN THE MODEST INCREASE TO $55,000,000 FOR MODERNIZATION, COMPARED TO THE $37,500,000 REQUESTED BY THE ADMINISTRATION. THIS MONEY, WHICH COMES **144** OUT OF THE FUNDS OTHERWISE AUTHORIZED FOR PUBLIC HOUSING, WILL BE FAR BETTER UTILIZED IN MODERNIZING EXISTING PUBLIC HOUSING UNITS, PARTICULARLY THOSE WHICH ARE SUBSTANDARD OR VACANT, THAN THEY WOULD BE FOR SUBSIDIZING ADDITIONAL UNITS.

ONE PROVISION WHICH RAISES CONCERN IS SECTION 204, TENANT SELECTION CRITERIA. OUR CONCERN IS NOT THAT THE LANGUAGE REQUIRES OWNERS OF ASSISTED HOUSING UNITS (BOTH PUBLIC HOUSING AND SECTION 8) TO GIVE PREFERENCE TO FAMILIES WHICH OCCUPY SUBSTANDARD HOUSING, OR HAVE BEEN INVOLUNTARILY DISPLACED. IT IS, HOWEVER, WITH HOW AN OWNER MAY BE REQUIRED TO GIVE PREFERENCE. DISCUSSIONS IN COMMITTEE MADE IT QUITE CLEAR THAT IT IS TO BE THE OWNER WHO CONTROLS THE PROCESS, NOT HUD. HUD IS NOT AUTHORIZED BY THIS PROVISION TO ESTABLISH A TENANT SELECTION LIST, FROM WHICH AN OWNER WOULD BE REQUIRED TO SELECT. ALSO, THE PROVISION DOES NOT AUTHORIZE HUD TO ESTABLISH ANY FORM OF METROPOLITAN-WIDE TENANT CLEARINGHOUSE SERVICE TO DEVELOP SUCH A LIST. NOR, DO WE BELIEVE ANY OTHER PROVISION OF LAW AUTHORIZES SUCH ACTIONS.

THEN WHY ARE WE CONCERNED? THERE IS REASON TO BELIEVE THAT HUD, UNDER ITS CURRENT ADMINISTRATION, WOULD ATTEMPT TO UTILIZE SECTION 204 AS JUSTIFICATION FOR SUCH ACTIONS, WHICH ARE SIMILAR TO THOSE ALREADY REPORTED AS 'DECISIONS' OF THE SECRETARY. SPECIFICALLY, WE REFER TO A JANUARY 17, 1979 MEMO FROM THE EXECUTIVE ASSISTANT TO THE SECRETARY TO ALL OF THE DEPARTMENT'S ASSISTANT SECRETARIES ENTITLED, NEW POLICY TO ENCOURAGE GREATER MOBILITY IN THE ASSISTED HOUSING PROGRAM. BASED ON PRIOR EXPERIENCE, WE ARE NOT VERY SANGUINE THAT THE LANGUAGE IN THE COMMITTEE REPORT WILL BE SUFFICIENT TO RESTRAIN HUD. REPORT LANGUAGE WAS NOT SUFFICIENT ON THE 'EXPECTED TO RESIDE' ISSUE, WHICH REQUIRED REMEDIAL LEGISLATIVE ACTION LAST YEAR. WE HOPE THIS WILL NOT BE REPEATED WITH 'SHALL GIVE PREFERENCE' NEXT YEAR.

**71 *2394** ANOTHER PROVISION, SECTION 205(A)(2), AUTHORIZES THE PAYMENT OF PUBLIC HOUSING OPERATING SUBSIDIES EVEN AFTER THE EXPIRATION OF THE ANNUAL CONTRIBUTIONS CONTRACT, WHICH WAS USED TO PAY OFF THE DEBT SERVICE FOR CONSTRUCTION OF THE PROJECT. WHILE SUCH A USE OF OPERATING SUBSIDY DOLLARS MAY KEEP UP THE INVENTORY OF HOUSING FOR LOW-INCOME PERSONS, IT HIGHLIGHTS THE FACT THAT RENTALS ARE INSUFFICIENT TO SUPPORT SUCH PROJECTS EVEN AFTER THE BUILDINGS

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



ARE PAID FOR. EQUALLY DISTURBING, IS A HUD REPORT ENTITLED, PAYMENTS IN LIEU OF TAXES: A STATUS REPORT, DATED MARCH 19, 1979, WHICH SHOWS THAT DURING THE 25 YEAR PERIOD, 1953-1978, THERE HAS BEEN A DRAMATIC DECREASE IN THE SHARE OF PUBLIC HOUSING COSTS PAID BY LOCAL GOVERNMENTS AND TENANTS. ACCORDING TO THE ILLUSTRATIVE CASES IN THE REPORT, THE FEDERAL/LOCAL SHARE OF COSTS IN A REPRESENTATIVE PROJECT IN 1953, WAS 50 PERCENT EACH. THAT CHANGED TO A FEDERAL SHARE OF 94 PERCENT AND A LOCAL SHARE OF 6 PERCENT IN 1978. IN THE OTHER EXAMPLE ILLUSTRATING A THREE-WAY SHARING OF COSTS, THE PERCENTAGES OF COSTS PAID BY EACH SECTION WAS AS FOLLOWS: 61 PERCENT TENANT, 26 PERCENT FEDERAL, AND 13 PERCENT LOCAL IN 1953; THAT BECAME 78 PERCENT FEDERAL, 17 PERCENT TENANT AND 5 PERCENT LOCAL BY 1978. THESE FIGURES UNDOUBTEDLY LEAD TO THE CONCLUSION THAT AN IN-DEPTH CONGRESSIONAL REVIEW OF THE FEDERAL ROLE IN SUCH PROJECTS IS IN ORDER BEFORE MORE FEDERAL FUNDS ARE POURED INTO SUCH OPERATING SUBSIDIES.


DAVIS-BACON


NOT ONLY ARE WE CONCERNED ABOUT SOME OF THE PROVISIONS INCLUDED IN H.R. 3875, WE ARE ALSO CONCERNED ABOUT THOSE WHICH WERE EXCLUDED. BY A NARROW 20 TO 18 MARGIN, THE COMMITTEE REJECTED AN AMENDMENT **145** TO EXEMPT LOW-INCOME INDIAN HOUSING AND SECTION 8 REHABILITATION DONE BY NON-PROFIT NEIGHBORHOOD BASED ORGANIZATIONS FROM THE REQUIREMENTS OF DAVIS-BACON. IT IS BOTH IRONIC AND UNJUST THAT AN AMENDMENT, WHICH WOULD ACCOMPLISH THE TWIN GOALS OF PROVIDING BETTER HOUSING FOR INDIAN FAMILIES AND ASSISTING NON-PROFIT GROUPS TO REHABILITATE THEIR NEIGHBORHOODS AT REDUCED COSTS, WAS REJECTED BY A COMMITTEE WHICH PROFESSES TO BE CONCERNED ABOUT THE RISING COSTS OF HOUSING.

A RECENT REPORT ISSUED BY THE SENATE SELECT COMMITTEE ON INDIAN AFFAIRS STRONGLY ARGUED THAT THE REQUIREMENT FOR PAYMENT OF PREVAILING WAGE RATES WAS INAPPROPRIATE FOR HUD-ASSISTED INDIAN HOUSING. THE REPORT STATED THAT PAYMENT OF THESE WAGE RATES ON SUCH HUD-ASSISTED CONSTRUCTION HAD 'BEEN IDENTIFIED BY MANY DIFFERENT INDIAN HOUSING AUTHORITIES AS A MAJOR SOURCE OF INFLATION AND DELAY.' THE COST OF INDIAN HOUSING HAS ESCALATED AND IS NOW APPROACHING AN AVERAGE COST OF ALMOST $70,000 PER UNIT, FOR A VERY SMALL AND MODEST SINGLE-FAMILY HOME. THIS COST ESCALATION HAS RESULTED IN A SIGNIFICANT REDUCTION IN HUD'S ESTIMATE FOR FY 1980 OF THE NUMBER OF INDIAN HOUSING UNITS WHICH WILL BE PRODUCED. ADDITIONALLY, BOTH A GAO REPORT AND A RECENT HUD REPORT ON INDIAN HOUSING SHOW THE DESIRABILITY OF EXEMPTING INDIAN HOUSING FROM THE LABOR STANDARD REQUIREMENTS. IN FACT, THE HUD REPORT STATES, 'RESIDENTIAL BUILDERS ARE UNABLE TO PAY SUCH RATES WITHOUT DISRUPTING THEIR ORGANIZATION AND WAYS OF BUILDING AND CONSEQUENTLY THEY DO NOT PARTICIPATE.

**72 *2395** THIS SAME PROBLEM IS EQUALLY TRUE IN URBAN AREAS WHERE NEIGHBORHOOD-BASED NON-PROFIT ORGANIZATIONS HAVE BEEN FRUSTRATED IN THEIR EFFORTS TO REHABILITATE BUILDINGS BECAUSE OF THE REQUIREMENT THAT PREVAILING WAGE RATES BE PAID ON SUCH PROJECTS. SUCH WAGE RATES CAUSE THE HOUSING COSTS TO BE HIGHER THAN NECESSARY AND ACT TO EXCLUDE LOW-INCOME AND UNEMPLOYED WORKERS FROM CONSTRUCTION EMPLOYMENT.

THE AMENDMENT WOULD HAVE SAVED MONEY ON THE AFFECTED PROJECTS, WHILE ENHANCING THE PROSPECTS OF PROVIDING DECENT SAFE AND SANITARY HOUSING FOR LOW-INCOME FAMILIES AND OPENING EMPLOYMENT OPPORTUNITIES FOR LOW-INCOME AND UNEMPLOYED WORKERS. IT ALSO WOULD INCREASE THE PRODUCTION OF ASSISTED HOUSING

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



UNITS WITHOUT INCREASING THE BUDGET.

LEGISLATIVE REVIEW

FOR THE FIRST TIME, THE COMMITTEE HAS EXERCISED ITS AUTHORITY TO DEFER IMPLEMENTATION OF A SET OF HUD'S REGULATIONS FOR 90 DAYS. THIS ACTION WAS TAKEN WITH RESPECT TO THERMAL STANDARDS APPLYING TO MASONRY CONSTRUCTION. THE AUTHORITY TO DEFER REGULATIONS WAS ENACTED LAST YEAR AS A COMPROMISE WITH THE SENATE, WHICH REFUSED TO GO ALONG WITH THE HOUSE'S ONE-HOUSE VETO PROVISION.

THE DEFERRAL AMENDMENT WAS NECESSITATED BY HUD'S FAILURE TO CONSIDER SUCH IMPORTANT FACTORS AS THE IMPACT SUCH REGULATIONS WOULD HAVE ON CONSTRUCTION COSTS AND THE LACK OF EVIDENCE THAT THE REGULATIONS WOULD ACCOMPLISH SIGNIFICANT ENERGY CONSERVATION. BY A VOTE OF 22 TO 6 THE COMMITTEE VOTED TO DELAY AN UNREASONED REGULATION AND TO ALLOW TIME FOR FURTHER CONSIDERATION OF THE COSTS INVOLVED WITH SUCH CHANGES IN FHA MINIMUM PROPERTY STANDARDS.

WE BELIEVE THE LEGISLATIVE REVIEW PROCESS HAS WORKED WELL. AS A RESULT OF THE PROCESS, SOME REGULATIONS HAVE BEEN CHANGED WITHOUT THE **\*146** NEED FOR TRIGGERING THE DEFERRAL MECHANISM. EVEN IN THIS CASE, THE DEPARTMENT WAS OFFERED THE CHANCE TO VOLUNTARILY DELAY IMPLEMENTATION OF THE REGULATIONS. REGRETTABLY, NO SUCH ARRANGEMENT WAS REACHED AND THE COMMITTEE WAS FORCED TO ACT. IT WAS THOMAS JEFFERSON WHO NOTED: 'THE EXECUTION OF THE LAWS IS MORE IMPORTANT THAN THE MAKING OF THEM.' THE BANKING COMMITTEE AGREED, AND ACTED ON THAT NOTION.

INTERSTATE LAND SALES

IF ANY PORTION OF THIS BILL IS SUSCEPTIBLE TO OVERSTATEMENT AS TO ITS MERITS, IT IS TITLE IV DEALING WITH AMENDMENTS TO THE INTERSTATE LAND SALES FULL DISCLOSURE ACT. THE PROVISIONS RELATING TO THE GRANTING OF CEASE AND DESIST POWERS TO THE SECRETARY OF HUD, COUPLED WITH THE AUTHORITY TO LEVY CIVIL PENALTIES WHICH OUTWEIGH THE MAXIMUM FIND FOR CRIMINAL VIOLATIONS, IS A CLEAR CASE OF LEGISLATIVE OVERKILL. INDEED, IT MAKES ONE WONDER WHETHER THE AUTHORS SUBSCRIBE TO MACHIAVELLI'S DIRECTIVE IN THE PRINCE, THAT: 'IF AN INJURY HAS TO BE DONE TO A MAN, IT SHOULD BE SO SEVERE THAT HIS VENGEANCE NEED NOT BE FEARED. ' WE WOULD HOPE THAT SUCH AN ATTITUDE DOES NOT PREVAIL ON THE FLOOR AND THAT A REASONED DISCUSSION OF WHAT POWERS ARE NEEDED, COMPARED TO WHAT POWERS ARE ACTUALLY BEING GRANTED TO HUD, WILL BE PURSUED.

**\*73** ALL TOO OFTEN THE DISCUSSION OF AMENDMENTS TO THE INTERSTATE LAND SALES PROVISIONS GETS BOGGED DOWN IN REFERENCES TO 'RIP-OFFS' AND 'FAST-BUCK ARTISTS'. OBVIOUSLY, SOME PEOPLE BELIEVE THAT SINCE THERE ARE SOME **\*2396** FLAGRANT ABUSES, THE PROCEDURAL SAFEGUARDS WHICH WE HAVE COME TO KNOW AS 'DUE PROCESS' CAN AND SHOULD BE SUSPENDED. WE CANNOT AGREE. WE DEPLORE THE RIP-OFFS AS MUCH AS ANYONE, BUT WE BELIEVE THAT THE LAWS CAN BE ENFORCED THROUGH THE CURRENT PROCESS WHICH ALLOWS FOR DUE PROCESS AND WHICH BALANCES THE PROTECTION OF THE LAND SALES PURCHASER AND THE PERSON WHO SELLS LAND FOR A LIVING. JUDICIAL REMEDIES SHOULD BE RESERVED FOR THE COURTS. AN ADMINISTRATIVE BODY, WITH A VESTED INTEREST IN THE SUBJECT MATTER, SHOULD NOT BE ALLOWED TO PLAY THE ROLE OF PROSECUTOR, JUDGE AND EXECUTIONER AS IS THE CASE WITH THE CEASE AND DESIST POWERS GRANTED TO HUD IN H.R. 3875. THIS MATTER IS DISCUSSED IN MORE DETAIL BELOW.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



H.R. 3875 WOULD GRANT CEASE AND DESIST POWERS TO HUD IN SPITE OF THE FACT THE SAME REMEDIES ARE AVAILABLE TO THE DEPARTMENT UNDER EXISTING LAW. THE DIFFERENCE, IS THAT UNDER EXISTING LAW THESE POWERS, WHICH ARE INHERENTLY JUDICIAL IN NATURE, ARE RESERVED TO THE COURT.

IT IS THIS UNNECESSARY DEPARTURE FROM ESTABLISHED PROCEDURES WHICH GUARANTEE BASIC DUE PROCESS, THAT CONCERNS US THE MOST. IF THERE WERE NOT FEDERAL AND STATE LAWS AVAILABLE TO PROTECT CONSUMERS, A CASE COULD BE MADE FOR GRANTING THE DEPARTMENT SOME REMEDIAL ADMINISTRATIVE POWERS. THE EXACT OPPOSITE, HOWEVER, IS TRUE. THE LAND SALES INDUSTRY IS HEAVILY REGULATED. THEY ARE SUBJECT TO THE JURISDICTION OF THE SECURITIES AND EXCHANGE COMMISSION, THE FEDERAL TRADE COMMISSION AND THE VARIOUS STATES AS WELL AS THE OFFICE OF INTERSTATE LAND SALES. IN FACT, THE FTC JUST RECENTLY ANNOUNCED THE SETTLEMENT OF THE LARGEST LAND SALES FRAUD CASE IN HISTORY. CONSUMERS NEED PROTECTION, BUT THEY ALREADY HAVE SUCH PROTECTION, IF THE EXISTING LAWS ARE ENFORCED.

THE DEVELOPERS, MANY OF WHOM ARE SMALL BUSINESSMEN, ON THE OTHER HAND, NEED PROTECTION FROM HARASSMENT BY THE FEDERAL GOVERNMENT. THE PROCEDURES CONTAINED IN THE BILL NOT ONLY ARE UNNECESSARY, **147** BUT THEY ARE STACKED AGAINST THE DEVELOPER. AT LEAST, UNDER EXISTING LAW, THE DEPARTMENT MUST PROVE ITS CASE BEFORE AN IMPARTIAL THIRD PARTY. UNDER THE BILL, THE BURDEN OF PROOF SHIFTS TO THE DEVELOPER. THE DEPARTMENT CALLS FOR AN INVESTIGATION, SERVES A COMPLAINT ON THE DEVELOPER, AND SETS A DATE FOR A HEARING. AT THE HEARING, THE DEVELOPER MUST SHOW CAUSE WHY AN ORDER SHOULD NOT BE ENTERED BY THE SECRETARY REQUIRING THE DEVELOPER TO CEASE AND DESIST. THE PERSON THE DEVELOPER HAS TO CONVINCE IS A FUNCTIONARY OF THE DEPARTMENT WHOSE DECISIONS ARE REVIEWABLE AND REVERSIBLE BY THE SECRETARY. IN EFFECT, THE DEPARTMENT PLAYS THE ROLE OF PROSECUTOR AND JUDGE, WHICH IS A VIOLATION OF THE PRINCIPLE OF DUE PROCESS.

THE ONLY RIGHT TO APPEAL SUCH A CEASE AND DESIST ORDER IS TO THE U.S. COURT OF APPEALS. IT IS NOT, HOWEVER, A DE NOVO REVIEW. IN FACT, THE FINDINGS OF THE SECRETARY AS TO THE FACTS, IF MERELY SUPPORTED BY SUBSTANTIAL EVIDENCE, ARE CONCLUSIVE. IN CERTAIN CIRCUMSTANCES, THE ACCUSED WOULD NOT EVEN HAVE AN OPPORTUNITY TO PRESENT HIS SIDE OF THE ARGUMENT. THIS WOULD OCCUR WHEN THE SECRETARY BELIEVES THERE IS REASONABLE CAUSE TO BELIEVE THAT IMMEDIATE AND SUBSTANTIAL HARM MAY RESULT. IN SUCH A CASE, THE SECRETARY CAN ISSUE A TEMPORARY RESTRAINING ORDER THAT IS EFFECTIVE IMMEDIATELY. THIS TEMPORARY ORDER CAN BE APPEALED TO A U.S. DISTRICT COURT BUT THE ACCUSED MUST BEAR THE BURDEN OF PROVING THAT THE ORDER WAS ARBITRARY, CAPRICIOUS, OR AN ABUSE OF DISCRETION-- A DIFFICULT, IF NOT IMPOSSIBLE BURDEN.

**74 *2397** SHOULD A DEVELOPER VIOLATE EITHER THE TEMPORARY ORDER OR THE CEASE AND DESIST ORDER, HE CAN BE FINED UP TO $5,000 FOR EACH VIOLATION AND EACH DAY IS CONSIDERED A NEW VIOLATION. THE MAXIMUM FINE UNDER THE CRIMINAL PROVISION IS $10,000 FOR ANY NUMBER OF VIOLATIONS. SURELY, ANY CIVIL PENALTY AS ONEROUS AS THIS IS DESIGNED TO PUNISH AND SHOULD BE ACCORDED THE PROCEDURAL SAFEGUARDS OF A CRIMINAL PENALTY. THE DECISION AS TO WHETHER AN ORDER HAS BEEN VIOLATED AND THE AMOUNT OF THE FINE IS MADE BY THE DEPARTMENT, WHICH HAS NOT EXPANDED ITS ROLE FROM PROSECUTOR AND JUDGE, TO INCLUDE EXECUTIONER.

ANOTHER CRITICAL PROBLEM INVOLVES THE ELIMINATION OF ANY THRESHOLD FOR THE FEDERAL FRAUD PROVISIONS. UNDER THE CURRENT LAW, A SUBDIVISION OF LESS THAN 50 LOTS IS NOT COVERED BY EITHER THE DISCLOSURE OR FRAUD PROVISIONS. WHILE H.R. 3875 INCREASES THE 50 **LOT** EXEMPTION TO **100 LOTS**, FOR DISCLOSURE PURPOSES, IT ALSO

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



REMOVES THE THRESHOLD REQUIREMENTS AS RELATED TO FRAUD. HAVING RELIED ON THE ARGUMENT THAT ADMINISTRATIVE SANCTIONS ARE NECESSARY BECAUSE THE FEDERAL COURT SYSTEM IS ALREADY OVERBURDENED, THE COMMITTEE, IN AN INCOMPREHENSIBLE EXHIBITION OF LOGIC, PROMPTLY TURNED AROUND AND REJECTED AN AMENDMENT TO REESTABLISH THE 50 LOT THRESHOLD FOR FEDERAL FRAUD THAT PRESENTLY EXISTS. ONLY THE SELF-IMPOSED RESTRAINT OF THE DEPARTMENT OF JUSTICE WILL SAVE THE FEDERAL COURTS FROM BEING INUNDATED WITH LAW SUITS UNDER THIS PROVISION.

WE FIND THE COMMITTEE'S ACTIONS INEXPLICABLE IN LIGHT OF THE TESTIMONY FROM HUD THAT IT WOULD NOT WANT TO SEE A ONE-LOT THRESHOLD BECAUSE THE OFFICE OF INTERSTATE LAND SALES DOES NOT HAVE SUFFICIENT STAFF TO ENFORCE IT. IN ADDITION, INFORMATION FROM THE DEPARTMENT OF JUSTICE INDICATED THAT IT WOULD NOT WANT TO SEE THE THRESHOLD REDUCED SINCE THE WORKLOAD REQUIREMENTS, COMPARED TO THE POSSIBLE BENEFITS TO BE DERIVED FROM SUCH ACTION, WOULD NOT BE AN EFFICIENT USE OF THEIR STAFF.

**\*148** EVEN IF THESE TWO DEPARTMENTS HAD NOT INDICATED THEIR OPPOSITION TO THE LOWER THRESHOLD, WE WOULD QUESTION THE VALIDITY OF SUCH A MOVE. THE ORIGINAL 50 LOT EXEMPTION RECOGNIZED THAT SUCH SMALL SUBDIVISIONS WERE PRIMARILY 'INTRA STATE' IN NATURE, DESPITE THE FACT THAT THEY USED THE MAIL AND TELEPHONE, AND THERE WAS NO NEED FOR FEDERAL INTERVENTION. THIS IS STILL A SOUND PRESUMPTION. AN AMENDMENT TO REESTABLISH A 50 LOT THRESHOLD FAILED ON A TIE VOTE IN THE COMMITTEE. WE HOPE IT CAN SUCCESSFULLY BE ADDED TO THE BILL ON THE FLOOR.

IT IS UNFORTUNATE THAT THIS UNREALISTIC THRESHOLD AND THESE PUNITIVE ADMINISTRATIVE REMEDIES HAVE BEEN INCLUDED IN THE INTERSTATE LAND SALES REVISIONS. IT APPEARS THE H.R. 3875 HAS LOST SIGHT OF THE FACT THAT THE EXISTING LAND SALES LAW IS A 'DISCLOSURE' STATUTE AND NOT A REGULATORY AUTHORIZATION. OTHER PARTS OF TITLE IV, WHICH SUBSTANTIALLY REVAMP THE INTERSTATE LAND SALES FULL DISCLOSURE ACT, ARE AN IMPROVEMENT OVER EXISTING LAW. THE INCREASED EXEMPTIONS AND THE PROVISION PROVIDING FOR CERTIFICATION OF STATE LAWS ARE TO BE PARTICULARLY COMMENDED.

CONCLUSION

**\*75** EXCEPT FOR SOME OF THE INTERSTATE LAND SALES PROVISIONS, H.R. 3875 IS NOT A REVOLUTIONARY BILL AND BASICALLY CONTINUES ALONG THE PATH OF EXISTING PROGRAMS. AS SUCH, IT IS A MODERATE BILL. HOWEVER, IT DOES NEED SEVERAL CHANGES AS OUTLINED IN THESE VIEWS. AMENDMENTS WILL BE OFFERED**\*2398** ON THE FLOOR TO CORRECT WHAT WE BELIEVE TO BE UNJUSTIFIED SPENDING PROPOSALS AND OVERLY RESTRICTIVE, BURDENSOME AND UNFAIR FEDERAL REGULATORY POWERS. AFTER ALL, UNLESS WE CAN CONTROL INFLATION THE FUNDS AUTHORIZED BY H.R. 3875 WILL HAVE LITTLE VALUE WHEN THEY GET TO THE INTENDED BENEFICIARIES.

J. WILLIAM STANTON,
HENRY J. HYDE,
JIM LEACH,
EDWIN R. BETHUNE, JR.,
CARROLL A. CAMPBELL, JR.,
JON HINSON,
CHALMERS P. WYLIE,
GEORGE HANSEN,
RICHARD KELLY,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



THOMAS B. EVANS, JR.,
NORMAN D. SHUMWAY,
DONALD RITTER.

## **149** ADDITIONAL VIEWS OF HON. STEWART B. MCKINNEY

AS A STAUNCH SUPPORTER OF BETTER HOUSING FOR THE AMERICAN PEOPLE, MY POSITION ON H.R. 3875, THE HOUSING AND COMMUNITY DEVELOPMENT AUTHORIZATION, SHOULD BE CLEAR TO ALL: I SUPPORT THE PASSAGE OF THIS PROPOSAL AND URGE MY COLLEAGUES TO ENDORSE IT. HOWEVER, I FEEL THAT I SHOULD MAKE PUBLIC A FEW OF MY CRITICISMS OF HOW THE FUNDS FOR OUR HOUSING PROGRAMS ARE BEING USED. MANY OF THESE POINTS WERE MADE DURING THE DAYS OF HEARINGS THAT WERE HELD ON THIS LEGISLATION AND OTHERS WERE BROUGHT OUT DURING OUR MARK-UP SESSIONS. IF I APPEAR TO BE REPEATING MYSELF, IT IS DONE WITH THE HOPE THAT I CAN WEAR DOWN MY OPPOSITION BEFORE IT BEATS ME DOWN.

ONE OF THE PREDOMINANT THEMES DURING THE CONSIDERATION OF THIS AUTHORIZATION PROPOSAL HAS BEEN THE DESIRE TO DEMONSTRATE FISCAL RESPONSIBILITY. BUT THAT SHOULD NOT BE DONE AT THE EXPENSE OF WHAT IS HAPPENING WITHIN OUR CITIES. AT A TIME WHEN THE ADMINISTRATION HAS EFFECTIVELY ABANDONED THE MAJOR ELEMENTS OF ITS URBAN POLICY, I THINK IT IS IMPERATIVE THAT THIS COMMITTEE DEVOTE MORE OF ITS ATTENTION TO THE PRESSING PROBLEMS OF OUR CITIES. TWO YEARS AGO PART OF THE NAME OF THIS COMMITTEE WAS CHANGED FROM HOUSING TO URBAN AFFAIRS TO REFLECT THE BROADER CONCERN OF CONGRESS. IN MY CONVERSATIONS WITH SECRETARY HARRIS AND HER PREDECESSORS I HAVE CONSISTENTLY EMPHASIZED THE MAJOR ROLE THAT BETTER HOUSING MUST PLAY IN REVITALIZING OUR URBAN CENTERS. IF THE FARMLANDS OF MIDDLE AMERICA CONSTITUTE THE BACKBONE OF THIS GREAT NATION, THEN THE CITIES ARE ITS HEART. IN EITHER CASE-- RURAL OR URBAN-- WE MUST DO WHAT WE CAN TO PRESERVE THE SPECIAL NATURE OF EACH. DECENT HOUSING SEEMS TO ME TO THE MOST OBVIOUS AND BASIC STARTING POINT.

ALTHOUGH IT APPEARS THAT THE CREATION OF A NATIONAL DOMESTIC DEVELOPMENT BANK HAS BEEN PUT ASIDE BY THE ADMINISTRATION, ANOTHER KEY ELEMENT OF THE URBAN PROGRAM, THE URBAN DEVELOPMENT ACTION GRANT, HAS BEEN RETAINED IN THIS BILL. DURING OUR MARK-UP AMENDMENTS WERE OFFERED WHICH WOULD HAVE REDUCED THE PROPOSED FUNDING **2399** LEVEL FOR UDAG, RATHER THAN RECOGNIZE THE OBVIOUS MERITS OF THIS ATTEMPT TO COORDINATE AND ENCOURAGE ECONOMIC AND HOUSING DEVELOPMENT IN NEIGHBORHOODS AND COMMUNITIES. THE BASIS FOR THIS CUTBACK WAS THAT GAO CRITICIZED FOUR AWARDS OF EIGHTEEN THAT WERE REVIEWED. (A TOTAL OF 154 GRANTS WERE AWARDED UNDER THE PROGRAM IN 1978.)

**76** I, PERSONALLY, HAVE HIGH HOPES FOR THE UDAG PROGRAM. IF IT HAS MADE MISTAKES, THEY WOULD NOT BE THE FIRST IN THE HISTORY OF FEDERAL PROGRAMS, ESPECIALLY AFTER THE CONGRESSIONAL COMMITTEES GET FINISHED INTERFERING WITH THEM EVERY TWO YEARS. NONE OF US CAN CONGRATULATE OURSELVES ON THE GREAT JOB WE ARE DOING FOR THE AMERICAN CITIES. IT IS OBVIOUS THAT IF WE ARE GOING TO GET ANYTHING DONE, WE ARE GOING TO HAVE TO LEVERAGE AS MANY DOLLARS AS WE CAN OUT OF THE PRIVATE SECTOR. TO DO THIS RIGHT NOW, UDAG IS THE ONLY GAME I SEE IN TOWN.

**150** ANOTHER POINT OF CONCERN TO ME IS THE CONSTANT UPWARD PRESSURE ON INTEREST RATES WHICH TRANSLATES INTO 'POINTS' AT THE TIME OF A HOME SALE. THESE 'POINTS' PAID BY THE SELLER ARE THE DIFFERENCE BETWEEN CURRENT MARKET MORTGAGE RATES AND THE INTEREST RATE THAT MAY BE CHARGED ON AN FHA-INSURED MORTGAGE. OBVIOUSLY THE

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



SELLER OF THE HOUSE INFLATES THE PRICE BY AN EQUAL AMOUNT TO MAINTAIN HIS NET RETURN ON THE TRANSACTION. THE RESULT IS AN ADDITIONAL INFLATIONARY BOOST IN THE COST OF HOUSING. I AM PLEASED THAT THE SECRETARY OF HUD RAISED THE FHA LIMIT ON INTEREST RATES DURING OUR CONSIDERATION OF THIS BILL AND I HOPE THAT IT WILL BE HUD'S PRACTICE TO TRACK MARKET RATES CLOSELY, ESPECIALLY DURING SUCH UNUSUAL TIMES AS THESE. ASSISTANT SECRETARY SIMONS RESPONDED TO MY QUESTION ON THIS TOPIC THAT DISCOUNT POINTS HAVE ALWAYS BEEN CHARGED ON FHA MORTGAGES FROM 2 POINTS ON UP. I HAVE NO PROBLEM WITH EITHER THE CONCEPT OR 2 POINTS BUT WHEN IT APPROACHES 6 POINTS AS IT HAS RECENTLY, THAT IS TOO GREAT A BURDEN TO PUT ON THE HOME PURCHASER WHEN THAT AMOUNT IS COMPOUNDED OVER THE LIFE OF THE MORTGAGE. THE COST OF HOUSING IS AN ESSENTIAL ELEMENT IN THE INFLATION SPIRAL. UNTIL WE CAN CONTROL SOME OF THESE INCREMENTAL FACTORS WE CANNOT CONTROL THE COST AND, IN MY OPINION, THESE POINTS ARE AN ARTIFICIAL INCREMENT.

ANOTHER MORTGAGE-RELATED AREA THAT WAS DISCUSSED DURING THE MARK-UP WAS THE USE OF GRADUATED PAYMENT MORTGAGES. LAST YEAR I ARGUED FOR EXPANDED USE OF ALTERNATIVE MORTGAGE INSTRUMENTS SO THAT WE COULD DEVELOP ENOUGH INFORMATION ON WHICH TO JUDGE THEIR EFFECTIVENESS. THE AMENDMENTS OFFERED BY MY COLLEAGUES, LES AUCOIN AND JOHN LAFALCE, WERE VERY ATTRACTIVE TO ME BUT I DECIDED THAT WE SHOULD GIVE ADDITIONAL TIME TO THE BASIC PROGRAM BEFORE AMENDING IT. I STILL FEEL IT IS NECESSARY FOR US TO DEVELOP INNOVATIVE MEANS OF PERMITTING LOW AND MIDDLE INCOME FAMILIES TO OBTAIN HOUSING. HOWEVER, I DO NOT THINK THAT WE, THE FEDERAL GOVERNMENT, CAN AFFORD TO MAKE THIS PROGRAM MORE ATTRACTIVE WITHOUT ADEQUATE INFORMATION ABOUT THE POTENTIAL RISK OF DEFAULTS.

THIS RAISED ANOTHER DILEMMA FOR ME. I HAVE SUPPORTED SECTION 8 FUNDING IN THE PAST AND HAVE DONE SO AGAIN THIS YEAR. HOWEVER, I AM CONCERNED ABOUT WHERE WE ARE HEADED WITH THIS PROGRAM. THERE IS AN OBVIOUS NEED FOR PUBLIC HOUSING FOR LOW INCOME AND ELDERLY AMERICANS. EVEN THOUGH WE ARE COMMITTING BILLIONS OF DOLLARS TO THIS EFFORT-- AND THE FUTURE LIABILITIES ARE A VERY REAL CONCERN-- WE ARE NOT DELIVERING EFFECTIVELY FOR THE COST. THERE ARE PROJECTS IN MY CITIES OF BRIDGEPORT, STAMFORD AND NORWALK THAT ARE INNOVATIVE AND OF WHICH I AND THE **\*2400** LOCAL PEOPLE ARE QUITE PROUD. BUT WE HAVE HAD TO FIGHT FOR YEARS TO OVERCOME THE STUMBLING BLOCKS OF BUREAUCRATIC RED TAPE, THE INDIFFERENCE OF LOCAL BUSINESSMEN AND THE POOR REPUTATION ASSOCIATED WITH PUBLICLY-FUNDED HOUSING. THERE IS NO ALTERNATIVE; WE MUST MAKE THIS HOUSING AVAILABLE FOR THESE PEOPLE. BUT PERHAPS WE SHOULD ASK OURSELVES SOME HARD QUESTIONS ABOUT HOW TO IMPROVE THE EFFECTIVENESS OF OUR COMMITMENT.

**\*77** ONE SOLUTION TO URBAN HOUSING PROBLEMS WHICH SEEMS MOST OBVIOUS TO ME IS THE REHABILITATION OF EXISTING UNITS. THERE ARE SO MANY EXAMPLES OF SUCCESSFUL REHAB WORK PERFORMED AT MORE REASONABLE PRICES THAN PROVIDING NEW CONSTRUCTION THAT CONGRESS MUST ULTIMATELY COME TO THE REALIZATION THAT IT WORKS. THIS IS NOT JUST ANOTHER URBAN ISSUE. IT IS AN ECONOMIC REALITY WHICH THIS COMMITTEE, HUD AND CONGRESS SHOULD **\*151** ACCEPT. IT MAY NOT BE AS POPULAR WITH INDUSTRY PEOPLE AS NEW CONSTRUCTION, BUT THIS IS ONE TIME WHEN THE PUBLIC INTEREST DESERVES PRIORITY.

THERE ARE A NUMBER OF OTHER POINTS THAT NEED FURTHER ATTENTION SUCH AS HOW TO TREAT POCKETS OF POVERTY, COMPARABLE SERVICES WITHIN COMMUNITIES AND THE MORE EFFECTIVE TARGETING OF HUD'S RESOURCES IN GENERAL. I HOPE OUR COMMITTEE WILL HAVE THE OPPORTUNITY TO CONSIDER SOME OF THESE POINTS IN THE COMING MONTHS. I REALIZE THAT WE HAVE AN EXCELLENT GROUP OF PEOPLE AT HUD. POSSIBLY THIS COMMITTEE COULD

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



HELP IMPROVE THE DEPARTMENT'S EFFICIENCY BY A REVIEW AND REVISION OF SOME OF THE BURDENSOME REGULATIONS THAT HAVE PILED UP OVER THE YEARS. OUR ATTEMPTS TO DEVICE FORMULAE SATISFACTORY TO ALL PARTIES HAVE RESULTED IN PROGRAMS OF LITTLE IMPACT. OUR GOALS SHOULD REMAIN THE SAME, BUT THERE IS DEFINITELY ROOM TO IMPROVE THE EFFECTIVENESS OF OUR DELIVERY SYSTEMS.

STEWART B. MCKINNEY, M.C.

**\*152** SUPPLEMENTAL VIEWS OF CONGRESSMAN S. WILLIAM GREEN ON H.R. 3875

THE BILL REPORTED OUT OF THE COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS DOES NOT MAKE SUBSTANTIAL CHANGES TO EXISTING HOUSING STATUTES, NOR DOES IT INITIATE NEW PROGRAMS. CONCERN ABOUT INFLATION PLAYED A MAJOR ROLE IN DETERMINING THE SHAPE OF THIS LEGISLATION, AND THIS IS REFLECTED IN THE MAJOR REDUCTIONS IN OUR ASSISTED HOUSING PROGRAMS. I AM CONCERNED THAT THE CONGRESS'S DESIRE TO TRIM SPENDING SHOULD BE REFLECTED MOST STRONGLY IN EFFORTS TO AID OUR POOREST CITIZENS.

ANOTHER CONCERN OF MINE IS THAT THE URBAN DEVELOPMENT ACTION GRANT (UDAG) PROGRAM NEEDS TO IMPROVE ITS ABILITY TO ASSIST OUR LARGER URBAN AREAS. AN ANALYSIS I MADE LATE LAST YEAR OF UDAG AWARDS SHOWED THAT MOST OF OUR LARGER CITIES WERE DOING POORLY UNDER THIS PROGRAM. HOWEVER, I OPPOSED EFFORTS DURING MARK-UP OF H.R. 3875 TO TRANSFER $275 MILLION FROM UDAG TO THE COMMUNITY DEVELOPMENT BLOCK GRANT BUDGET. I OPPOSED THIS MEASURE ONLY AFTER TALKING TO NEW YORK CITY MAYOR ED KOCH AND ASSISTANT SECRETARY OF HUD FOR COMMUNITY PLANNING AND DEVELOPMENT ROBERT C. EMBRY, WHO BOTH FELT THAT UDAG'S ASSISTANCE TO LARGE CITIES WILL IMPROVE THIS YEAR. I SHALL BE WATCHING DEVELOPMENTS IN THIS AREA CLOSELY, SINCE UDAG WILL CLEARLY BE FOUND WANTING IF IT CANNOT SERVE OUR LARGEST CITIES.

S. WILLIAM GREENE.

**\*153 \*2401** DISSENTING VIEWS OF RON PAUL H.R. 3875

THE MINORITY VIEWS DO AN ADMIRABLE JOB OF STATING THE SERIOUS PROBLEMS IN H.R. 3875. I WOULD LIKE TO INCORPORATE THEIR OBJECTIONS TO THIS BILL INTO MY OWN BILL.

BECAUSE THE LIST OF PROBLEMS IS SO WELL DONE, I AM DISAPPOINTED AND BAFFLED THAT NEARLY ALL OF THE SIGNATORIES OF THE MINORITY VIEWS VOTED FOR THE BILL. IT IS DIFFICULT TO FIND THEIR REASONS FOR SUPPORTING THE BILL IN THEIR VIEWS; HOWEVER, I DO FIND AN IMPRESSIVE LIST OF PROBLEMS WITH THE BILL. THOSE PROBLEMS, IN BRIEF, ARE:

**\*78** 1. A 70 PERCENT INCREASE IN THE URBAN DEVELOPMENT ACTION GRANTS PROGRAM, WHICH IS SO NEW THAT CONGRESS HAS NOT REVIEWED ITS ACTIVITIES.

2. FINDINGS BY THE GENERAL ACCOUNTING OFFICE THAT GAO 'COULD NOT RELATE THE PURPOSES OF THESE FOUR GRANTS (OUT OF 18 REVIEWED) TO THE UDAG PROGRAM OBJECTIVES OR TO THE BROAD DESCRIPTION OF THE PROGRAM'S MAIN PURPOSES AND EXPECTATIONS THAT HUD HAS GIVEN TO THE CONGRESS.'

3. FAILURE TO INCORPORATE A VERY LIMITED AMENDMENT THAT WOULD EXEMPT REHABILITATIVE PROJECTS ON LOW INCOME INDIAN HOUSING DONE BY NON-PROFIT NEIGHBORHOOD BASED ORGANIZATIONS FROM THE REQUIREMENTS OF THE DAVIS-BACON ACT.

4. GRANTING OF CEASE AND DESIST POWERS TO HUD, AN ADMINISTRATIVE AGENCY, THAT WOULD ELIMINATE DUE PROCESS OF LAW AND REVERSE THE JUDICIAL PROCESS BY ASSUMING

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



THAT THE ACCUSED IS GUILTY UNTIL HE CAN PROVE HIMSELF INNOCENT.

    THIS LAST PROBLEM, SO IT SEEMS TO ME, WOULD BE REASON ENOUGH TO OPPOSE THE BILL. YET IT IS UNDERSTANDABLY DIFFICULT FOR CONGRESS TO OPPOSE ANY ACTION ON CONSTITUTIONAL GROUNDS, FOR ONCE THE CONSTITUTION IS INVOKED, IT MUST BE USED AS THE STANDARD TO MEASURE ALL ACTIONS. ONE CANNOT INVOKE IT SELECTIVELY. WERE IT TO BE INVOKED IN THIS CASE, IT MIGHT BECOME OBVIOUS THAT CONGRESS HAS NO CONSTITUTIONAL AUTHORITY TO ENACT HOUSING LEGISLATION AT ALL IF TOO MUCH ATTENTION IS CALLED TO THE CONSTITUTION.

    THERE ARE, OF COURSE, OTHER PROBLEMS WITH THIS BILL. FIRST, BILLIONS OF DOLLARS OF NEW AUTHORIZATIONS ARE INVOLVED. THE LIMITATIONS ON GUARANTEED LOANS AND MORTGAGES ARE WIDENED, INCREASING THE CONTINGENT LIABILITY OF THE FEDERAL GOVERNMENT AND ENCOURAGING OUR ALREADY DEBT-BURDENED SOCIETY TO GO DEEPER INTO DEBT. THE INTERSTATE LAND SALES FULL DISCLOSURE ACT IS AMENDED TO INCREASE THE 'PROTECTION' AFFORDED THE BUYER IN WHAT APPEARS TO BE A CASE OF REGULATORY OVERKILL.

    THESE PROBLEMS, TOGETHER WITH THOSE LISTED IN THE MINORITY VIEWS, CONSTITUTE A GOOD CASE FOR THE DEFEAT OF H.R. 3875 WHEN IT COMES TO THE HOUSE FLOOR.

    I FERVENTLY HOPE THAT THE HOUSE WILL SO VOTE.

    RON PAUL.

                                    (Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE     DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS,  ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****.              2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD     SEARCH     USING     THE     PUBLIC     LAW     NUMBER,     e.g.,     TO(99-495))

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.