

61 FR 13596-01, 1996 WL 134613 (F.R.)                                                    Page 1

RULES and REGULATIONS

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Office of the Assistant Secretary for Housing—Federal Housing Commissioner; Interstate Land Sales Registration Program; Streamlining Final Rule

24 CFR Parts 1700, 1710, and 1715

[Docket No. FR-3987-F-01]

RIN 2502-AG63

Wednesday, March 27, 1996

**\*13596** AGENCY: Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

ACTION: Final rule.

SUMMARY: This final rule amends HUD's regulations for the Interstate Land Sales Registration Program. In an effort to comply with the President's regulatory reform initiatives, this rule will streamline the Interstate Land Sales Registration Program regulations by eliminating provisions that are repetitive of statutes or are otherwise unnecessary. This final rule will make the Interstate Land Sales Registration Program regulations clearer and more concise. Guidelines applicable to the program are available from the Department, as provided in an uncodified attachment to this rule.

EFFECTIVE DATE: April 26, 1996.

FOR FURTHER INFORMATION CONTACT: David R. Williamson, Director, Office of Consumer and Regulatory Affairs, Department of Housing and Urban Development, 451 7th Street SW., Room 5241, Washington, DC 20410-8000); telephone number: (202) 708-4560 (this is not a toll-free number). For hearing- and speech-impaired persons, this number may be accessed via TDD by calling the Federal Information Relay Service at 1-800-877-8339.

SUPPLEMENTARY INFORMATION:

On March 4, 1995, President Clinton issued a memorandum to all Federal departments and agencies regarding regulatory reinvention. In response to this memorandum, the Department of Housing and Urban Development conducted a page-by-page review of its regulations to determine which can be eliminated, consolidated, or otherwise improved. HUD has determined that the regulations for the Interstate Land Sales Registration Program can be improved and streamlined by eliminating unnecessary provisions.

Several provisions in the regulations repeat statutory language from the **Interstate Land Sales Full Disclosure Act**, 15 U.S.C. 1701 et seq. It is unnecessary to maintain statutory requirements in the Code of Federal Regulations (CFR), because those requirements are otherwise fully accessible and binding. Furthermore, if regulations contain statutory language, HUD must amend the regulations whenever Congress amends the statute. Therefore, this final rule will remove repetitious statutory

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

language and replace it with a citation to the specific statutory section for easy reference.

Many provisions of part 1720 in the regulations are based on requirements that apply to more than one program, and therefore HUD repeated these provisions in different subparts. This repetition is unnecessary, and updating these scattered provisions is cumbersome and often creates confusion. Therefore, some of part 1720 has been removed, and a consolidated rule of investigation procedures that are in a new part 3800 has been made applicable to the Interstate Land Sales Registration program by cross-reference (see 61 FR 10440, March 13, 1996). In addition, the Department is developing a separate rule to consolidate certain procedures into a uniform rule on hearings. When that separate rule is final, the Department expects to revise §1710.45 to include certain provisions of subpart D of part 1720 that will not be removed by the consolidated hearing procedures rule.

This final rule also removes from codification part 1700, §1710.501, § 1710.502, and Appendix A to 1710 (which are maintained in an uncodified appendix accompanying this final rule). The information contained in the material to be removed is informational and will be available through separately issued guidance, which is available from the Department (see uncodified attachment to this rule) and may be updated from time to time and published in the Federal Register.

Copies of this rule and related notices are available electronically from HUD or other sources. You can access this material through the World Wide Web at http://www.hud.gov or telenet to hudclips.aspensys.com. You also may subscribe separately to HUDClips (a source of all of HUD's directives) by calling 301/251-5757 or e-mailing to hudclips(A)aspensys.com.

Justification for Final Rulemaking

HUD generally publishes a rule for public comment before issuing a rule for effect, in accordance with its own regulations on rulemaking in 24 CFR part 10. However, part 10 provides for exceptions to the general rule if the agency finds good cause to omit advance notice and public participation. The good cause requirement is satisfied when prior public procedure is "impracticable, unnecessary, or contrary to the public interest" (24 CFR 10.1). HUD finds that good cause exists to publish this rule for effect without first soliciting public comment. This rule primarily removes unnecessary regulatory provisions. Although the rule also contain some clarification of policy, it does not make substantive changes in the program regulations. Therefore, prior public comment is unnecessary.

Other Matters

*Regulatory Flexibility Act*

The Secretary, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed and approved this final rule, and in so doing certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule merely streamlines regulations by removing unnecessary provisions. The rule will have no adverse or disproportionate economic impact on small businesses.

*Environmental Impact*

This rulemaking does not have an environmental impact. This rulemaking simply amends an existing regulation by consolidating and streamlining provisions and does not alter the environmental effect of the regulations being amended. A Finding of No Significant Impact with respect to the environment was made in accordance with HUD regulations in 24 CFR part 50 that implement section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) at the time of development of regulations implementing the Interstate Land Sales Registration Program. That finding remains applicable to this rule, and is available for public inspection between 7:30 a.m. and 5:30 p.m. weekdays in the Office of the Rules Docket Clerk, Office of General Counsel, Room 10276, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Executive Order 12612, Federalism*

The General Counsel, as the Designated Official under section 6(a) of Executive Order 12612, Federalism, has determined that this rule will not have substantial direct effects on States or their political subdivisions, or the relationship between the Federal government and the States, or on the distribution of power and responsibilities among the various levels of government. No programmatic or policy changes will result from this rule that would affect the relationship **13597** between the Federal Government and State and local governments.

*Executive Order 12606, The Family*

The General Counsel, as the Designated Official under Executive Order 12606, The Family, has determined that this rule will not have the potential for significant impact on family formation, maintenance, or general well-being, and thus is not subject to review under the Order. No significant change in existing HUD policies or programs will result from promulgation of this rule.

List of Subjects

*24 CFR Part 1700*

Consumer protection, Freedom of information, Land sales, Reporting and recordkeeping requirements.

*24 CFR Part 1710*

Administrative practice and procedure, Consumer protection, Freedom of information, Land sales, Reporting and recordkeeping requirements.

*24 CFR Part 1715*

Advertising, Consumer protection, Fraud, Land sales.

Accordingly, under the authority of 42 U.S.C. 3535(d), parts 1700, 1710, and 1715 of title 24 of the Code of Federal Regulations are amended as follows:

PART 1700—[REMOVED]1. Part 1700 is removed.

PART 1710—INTERSTATE LAND SALES REGISTRATION PROGRAM1a. The authority citation for part 1710 is revised to read as follows:

Authority: 15 U.S.C. 1718; 42 U.S.C. 3535(d).

24 CFR § 1710.1

2. Section 1710.1 is revised to read as follows:

24 CFR § 1710.1

§1710.1 Definitions.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(a) Statutory terms. All terms are used in accordance with their statutory meaning in 15 U.S.C. 1702 or with part 5 of this title, unless otherwise defined in paragraph (b) of this section or elsewhere in this part.

(b) Other terms. As used in this part:

Act means the **Interstate Land Sales Full Disclosure Act**, 15 U.S.C. 1701.

Advisory opinion means the formal written opinion of the Secretary as to jurisdiction in a particular case or the applicability of an exemption under §§ 1710.5 through 1710.15, based on facts submitted to the Secretary.

Available for use means that in addition to being constructed, the subject facility is fully operative and supplied with any materials and staff necessary for its intended purpose.

Beneficial property restrictions means restrictions that are enforceable by the lot owners and are designed to control the use of the lot and to preserve or enhance the environment and the aesthetic and economic value of the subdivision.

Date of filing means the date a Statement of Record, amendment, or consolidation, accompanied by the applicable fee, is received by the Secretary.

Good faith estimate means an estimate based on documentary evidence. In the case of cost estimates, the documentation may be obtained from the suppliers of the services. In the case of estimates of completion dates, the documentation may be actual contracts let, engineering schedules, or other evidence of commitments to complete the amenities.

Lot means any portion, piece, division, unit, or undivided interest in land located in any State or foreign country, if the interest includes the right to the exclusive use of a specific portion of the land.

OILSR means the Interstate Land Sales Registration program.

Owner means the person or entity who holds the fee title to the land and has the power to convey that title to others.

Parent corporation means that entity which ultimately controls the subsidiary, even though the control may arise through any series or chain of other subsidiaries or entities.

Principal means any person or entity holding at least a 10 percent financial or ownership interest in the developer or owner, directly or through any series or chain of subsidiaries or other entities.

Rules means all rules adopted pursuant to the Act, including the general requirements published in this part.

Sale means any obligation or arrangement for consideration to purchase or lease a lot directly or indirectly. The terms "sale" or "seller" include in their meanings the terms "lease" and "lessor".

Senior Executive Officer means the individual of highest rank responsible for the day-to-day operations of the developer and who has the authority to bind or commit the developing entity to contractual obligations.

Site means a group of contiguous lots, whether such lots are actually divided or proposed to be divided. Lots are considered to be contiguous even though contiguity may be interrupted by a road, park, small body of water, recreational facility, or any similar object.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Start of construction means breaking ground for building a facility, followed by diligent action to complete the facility.

24 CFR § 1710.2

§1710.2 [Removed]

24 CFR § 1710.2

3. Section 1710.2 is removed.

24 CFR § 1710.5

4. Section 1710.5 is revised to read as follows:

24 CFR § 1710.5

§1710.5 Statutory exemptions from the provisions of this chapter.

A listing of the statutory exemptions is contained in 15 U.S.C. 1703. In accordance with 15 U.S.C. 1703(a)(2), if the sale involves a condominium or multi-unit construction, a presale clause conditioning the sale of a unit on a certain percentage of sales of other units is permissible if it is legally binding on the parties and is for a period not to exceed 180 days. However, the 180-day provision cannot extend the 2-year period for performance. The permissible 180 days is calculated from the date the first purchaser signs a sales contract in the project or, if a phased project, from the date the first purchaser signs the first sales contract in each phase.

24 CFR § 1710.501

24 CFR § 1710.502

§§1710.501, 1710.502, and Appendix A to part 1710 [Removed]

24 CFR § 1710.501

24 CFR § 1710.502

5. Sections 1710.501 and 1710.502 and Appendix A to Part 1710 are removed.

PART 1715—PURCHASERS' REVOCATION RIGHTS, SALES PRACTICES, AND STANDARDS6. The authority citation for part 1715 is revised to read as follows:

Authority: 15 U.S.C. 1718; 42 U.S.C. 3535(d).

24 CFR § 1715.1

7. Section 1715.1 is revised to read as follows:

24 CFR § 1715.1

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

§1715.1 General.

The purpose of this subpart A is to elaborate on the revocation rights in 15 U.S.C. 1703, by enumerating certain conditions under which purchasers may exercise revocation rights. Generally, whenever revocation rights are available, they apply to promissory notes, as well as traditional agreements.

24 CFR § 1715.2

8. Section 1715.2 is revised to read as follows:

24 CFR § 1715.2

§1715.2 Revocation regardless of registration.

24 CFR § 1710.14

All purchasers have the option to revoke a contract or lease with regard to a lot not exempt under §§1710.5 through 1710.11 and 1710.14 until midnight of the seventh day after the day that the purchaser signs a contract or lease. If a purchaser is entitled to a *13598 longer revocation period under State law, that period is deemed the Federal revocation period rather than the 7 days, and all contracts and agreements (including promissory notes) shall so state.

24 CFR § 1715.3

§1715.3 [Removed]

24 CFR § 1715.3

9. Section 1715.3 is removed.

24 CFR § 1715.4

10. Section 1715.4 is revised to read as follows:

24 CFR § 1715.4

§1715.4 Contract requirements and revocation.

(a) In accordance with 15 U.S.C. 1703(d)(3), the refund to the purchaser is calculated by subtracting from the amount described in 15 U.S.C. 1703(d)(3)(B), the greater of:

(1) Fifteen percent of the purchase or lease price of the lot (excluding interest owed) at the time of the default or breach of contract or agreement; or

(2) The amount of damages incurred by the seller or lessor due to the default or breach of contract.

(b) For the purposes of this section:

Damages incurred by the seller or lessor means actual damages resulting from the default or breach, as determined by the law

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

61 FR 13596-01, 1996 WL 134613 (F.R.)                                                      Page 7

of the jurisdiction governing the contract. However, no damages may be specified in the contract or agreement, except a liquidated damages clause not exceeding 15 percent of the purchase price of the lot, excluding any interest owed.

Purchase price means the cash sales price of the lot shown on the contract.

(c) The contractual requirements of 15 U.S.C. 1703(d) do not apply to the sale of a lot for which, within 180 days after the signing of the sales contract, the purchaser receives a warranty deed or, where warranty deeds are not commonly used, its equivalent under State law.

24 CFR § 1715.5

11. Section 1715.5 is revised to read as follows:

24 CFR § 1715.5

§1715.5 Reimbursement.

If a purchaser exercises rights under 15 U.S.C. 1703(b), (c) or (d), but cannot reconvey the lot in substantially similar condition, the developer may subtract from the amount paid by the purchaser, and otherwise due to the purchaser under 15 U.S.C. 1703, any diminished value in the lot caused by the acts of the purchaser.

24 CFR § 1715.15

12. Section 1715.15 is revised to read as follows:

24 CFR § 1715.15

§1715.15 Unlawful sales practices—statutory provisions.

The statutory prohibitions against fraudulent or misleading sales practices are set forth at 15 U.S.C. 1703(a). With respect to the prohibitions against representing that certain facilities will be provided or completed unless there is a contractual obligation to do so by the developer:

(a) The contractual covenant to provide or complete the services or amenities may be conditioned only upon grounds that are legally sufficient to establish impossibility of performance in the jurisdiction where the services or amenities are being provided or completed;

(b) Contingencies such as acts of God, strikes, or material shortages are recognized as permissible to defer completion of services or amenities; and

(c) In creating these contractual obligations developers have the option of incorporating by reference the Property Report in effect at the time of the sale or lease. If a developer chooses to incorporate the Property Report by reference, the effective date of the Property Report being incorporated by reference must be specified in the contract of sale or lease.

24 CFR § 1715.27

13. Section 1715.27 is revised to read as follows:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

24 CFR § 1715.27

§1715.27 Fair housing.

Title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3601, et seq., and its implementing regulations and guidelines apply to land sales transactions to the extent warranted by the facts of the transaction.

Dated: March 13, 1996.

Nicolas P. Retsinas,

Assistant Secretary for Housing-Federal Housing Commissioner.

(Note: The following guidelines will not be codified in the Code of Federal Regulations.)

Guidelines to the Interstate Land Sales Registration Program

A copy of these guidelines applicable to the Interstate Land Sales Registration Program may be obtained by writing to: Interstate Land Sales Registration Program, HUD, 451 7th Street SW., Washington, DC 20410-8000 or by electronic access on the World Wide Web, at: http://www.hud.gov

These guidelines were previously published as appendix A to Part 1710; Part 1700, Introduction; Part 1700.501, Certification criteria; and Part 1700.502, Application for certification of State land sales program, in title 24 of the Code of Federal Regulations (CFR) (1995 edition).

Part IV(b), Improved Lots (which pertains to Appendix A to Part 1710) is revised to reflect recent court actions on this matter, as discussed below.

Section 1702(a)(2) of Title 15 of the United States Code exempts (1) the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building; or (2) the sale or lease of land under a contract obligating the seller or lessor to erect such a building on the lot within a period of 2 years.

Although there is virtually no legislative history regarding this exemption at the time Congress passed the **Interstate Land Sales Full Disclosure Act**, institutional memory within the Department is to the effect that this exemption was added by an amendment offered late in the course of passage. The reason for the amendment was to exclude traditional homebuilders from the Act's requirements since they did not comprise the class of persons Congress sought to regulate. Nor were traditional home buyers, whose purchases tend to be reasoned and deliberative, the class of consumers for whom the Act's protections were intended.

HUD's first set of Guidelines, denoted "Condominium And Other Construction Contracts," was published on February 28, 1974, in response to inquiries as to the applicability of the Act and this exemption to condominiums. The Department published expanded Guidelines on October 8, 1975, April 23, 1979, and August 6, 1984. The 1984 Guidelines (which had appeared as an appendix to 24 CFR part 1710) remained applicable until the effective date of these Guidelines on April 26, 1996.

HUD consistently has taken the position that for a lot sale to be eligible for the exemption under section 1702(a)(2), the seller's obligation to construct must be real and not illusory, and must be obligatory except for the conditions described in these guidelines.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

On July 11, 1995, the United States Court of Appeals for the Eighth Circuit issued an opinion that from HUD's perspective effectively nullified the seller's obligation to construct. In fact, it effectively nullified the exemption.

In Attebury v. Maumelle Company, 60 F.3d 415 (8th Cir. 1995), a case in which HUD appeared as amicus curiae as to the exemption issue only, the developer, Maumelle, used a sales contract that initially recited its obligation to build within two years after the lot sale. The contract then went on to recite a number of conditions, the effect of which was to shift the obligation to build onto the buyer.

HUD argued these guidelines and several cases that have recognized an unconditional requirement on the seller to build. In part, the case law adhered to the rule of construction that exemptions from a remedial statute should be narrowly construed. The court, which observed that the plaintiffs had not relied on the HUD Guidelines in the district court, dismissed the government's arguments primarily based on the language in this section that says: "* * * the contract must specifically obligate the seller to complete the building within two years" (emphasis added), by distinguishing the Guidelines' literal requirement that the obligation to build be "specific" from the argument in this case that the requirement be "unconditional."

At the time of the decision the language in question read:

If a seller (or developer) is relying on this exemption and the residential, commercial, condominium or industrial building is not complete, the contract must specifically obligate the seller to complete the building within two years. If the contractual obligation **13599** is not present, the sale is not exempt. The two-year period begins on the date the purchaser signs the sales contract. The use of a contract that obligates the buyer to build within two years would not exempt the sale.

As amended, the above paragraph will read:

If a seller (developer) is relying on this exemption and the residential, commercial, condominium or industrial building is not complete, the contract must obligate the seller to complete the building within two years. If the contractual obligation is not present, the sale is not exempt. The two-year period normally begins on the date the purchaser signs the sales contract. A contract that conditions construction upon acts of a buyer will not exempt the sale. The essence of this exemption is that it applies to the sale of a house (if not built at the time of sale, then to be built within two years after the sale).

HUD's interpretation of what constitutes an obligation to construct a building relies on general principles of contract law. Provisions for purchaser financing and remedies clauses are matters to be decided by the parties to the contract under the laws of the jurisdiction in which the construction project is located. However, such clauses may not alter the obligation of the seller to build.

(Another reason the court appears to have ruled in favor of Maumelle is that the plaintiffs based much of their case on allegations of fraudulent conduct, conduct which the court found wanting of proof.)

The court also refused to accept the argument that by recognizing the Maumelle contract as eligible for the exemption it essentially abolished the reasons for the exemption. The purpose of the exemption was to eliminate homebuilders from the ambit of the **Interstate Land Sales Full Disclosure Act**. The rationale was that a person who buys a house is much more attentive to the transaction than one who is buying a lot. Moreover, the methods and practices of selling the two products usually differs with a "heavier sell" being employed for lot sales.

Obviously, a buyer in a non-exempt transaction will shoulder any responsibility for building a house. If the conditions in the Maumelle contract create a similar result, which is the effect of the ruling, there would be no reason for the exemption. (The fact that fewer than 200 houses had been built on approximately 2,000 lots sold over a multi-year period was not a factor that the court considered; the district court had found this fact not probative, a finding that the Department found puzzling, given the purpose of this exemption.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

For the above reasons HUD is amending the third, fourth and fifth paragraphs of this section to make it clear that the seller's obligation to build must be unconditional, except for the conditions HUD recognizes as acceptable for exemption eligibility. HUD also is amending the eighth and ninth paragraphs to update the discussion of case law.

HUD is bound by the Maumelle decision within the jurisdiction of the Eighth Circuit but not in other federal judicial circuits. Moreover, since the Guidelines that the court considered when making its decision are being changed to clarify the Department's position that the obligation to build must be that of the developer, subject only to the conditions recognized by HUD, HUD will not recognize the Maumelle decision as controlling within the Eighth Circuit as to lots offered after the publication of these amendments to the Interstate Land Sales Guidelines.

Therefore, the Interstate Land Sales Guidelines are revised as follows:

Guidelines to the Interstate Land Sales Registration Program

Public Information

In general. The identifiable records of the Office of Interstate Land Sales Registration are subject to the provisions of 5 U.S.C. 552, as implemented by 24 CFR part 15—Public Information, subtitle A.

Availability of information and records. Information concerning land sales registrations and copies of statements of record may be obtained from the following address: Interstate Land Sales Registration Program, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410-8000.

In addition, statements of record may be reviewed at such address on any business day from 9 a.m. to 4:15 p.m.

Nonapplicability of exemptions authorized by 5 U.S.C. 552. With the exception of information exempt from disclosure under 5 U.S.C. 552(b)(7) and 24 CFR 15.21(a)(7), all information contained in or filed with any statement of record shall be made available to the public as provided by 15 U.S.C. 1704(d).

Duplication fee—property report. Notwithstanding the provisions of 24 CFR 15.14, Schedule of Fees, copies of a Property Report on file with the Office of Interstate Land Sales Registration will be provided upon request for a fixed fee of $2.50 per copy regardless of the number of pages duplicated. Payment may be made in cash or by check or money order payable to the Department of Housing and Urban Development. Personal checks are acceptable.

Duplication and certification fee-required documents to the several States that accept Federal filings. Notwithstanding the provisions of 24 CFR 15.14, Schedule of Fees, copies of documents on file with the Office of Interstate Land Sales Registration that are provided for certification to the several states that accept Federal filings will be provided upon request for a fixed fee of $12.00 per filing regardless of the number of pages duplicated.

Methods of payment. The fees set forth above may be paid by cash, by personal check, or by company check; or by U.S. money orders; or by certified check payable to the Treasurer of the United States or to the Department of Housing and Urban Development. Postage stamps will not be accepted. All other fees must be paid as set forth in 24 CFR 15.14(g).

Supplemental Information on Part 1710, Subpart C—Certification of Substantially Equivalent State Law

Certification Criteria

(a) Certification of States requiring full disclosure. The Secretary shall certify a state when—

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) It is determined that the laws and regulations of the state applicable to the sale or lease of lots not otherwise exempt under section 1403 of the Act require the seller of lots to disclose information which is substantially equivalent to or greater than the information required to be disclosed in the Federal Statement of Record; and

(2) The state's administration of such laws and regulations shall provide that the information disclosed is current and accurate. The means for administering the disclosure requirements must include considerations of ample staffing, budgetary provisions for policing functions and that the requisite legal authority be vested in the state agency or agencies responsible for enforcing the laws and regulations of the State land program.

(b) Certification of States providing sufficient protection. The Secretary shall certify a state when—

(1) It can be demonstrated that the laws and regulations of the state applicable to the sale or lease of lots not otherwise exempt under section 1403 provide the purchasers and lessees with protection commensurate with that which is provided by the Federal disclosure requirements. That is, a State must develop substantive measures plus disclosure which provides a level of protection that is, at a minimum, comparable to the protection provided by the Federal disclosure standard; and

(2) The administration of the laws and regulations provide that all information disclosed is accurate and current. The means for administering the requirements of sufficient protection must include considerations of ample staffing, budgetary provisions for policing functions and that the requisite legal authority be vested in the state agency or agencies responsible for enforcing the laws and regulations of the State land program.

(c) Applicability to Federal exemptions. To be certified a state need not provide protections with regard to the sale or lease of lots that would qualify for a Federal exemption. The state may choose at its discretion to provide protections on the sale of lots exempt under the Act. However, for certification a state's laws should, in general, apply to the same lots as would be required to be registered under the Act.

(d) Equivalency with Federal disclosure. In order to be determined as substantially equivalent under paragraph (a) or (b) of this section, a state must provide protection either through disclosure, substantive development standards or some combination thereof in the topics delineated in paragraph (e) of this section. In addition, a state must satisfy requirements of paragraphs (f), (g), (h), (i), (j) and (k) of this section.

(e) Areas of required protection. In order to be certified, a state must require specific protections for consumers with regard to *13600 paragraphs (e) (1) through (10) of this section. Protection in these areas can be secured through disclosure, substantive development standards or some combination thereof. Establishing protection provisions in these areas is to be considered essential to the granting of certification to a state. Paragraphs (e) (11) through (15) of this section are considered to be complementary protection provisions which would give additional strength to a state's land program if combined with the required provisions for protection. If the protection which is required by the items listed below is provided through substantive standards rather than solely disclosure, it is expected that the state will buttress those substantive standards with requirements of performance that are enforceable against developers. The state will designate who shall be responsible for enforcing the commitments made by developers and the method of enforcement to be used.

(1) Subdivision and developer information. The name of the subdivision, the name and address of the developer or owner, the nature of the offering and the number of lots in the subdivision must be given to the purchaser.

(2) Method of sale or lease. Information with regard to the: developer's method of sale, type of contract used, type and time frame for delivery of the deed, recordation of contract and deed, whether there is a security arrangement and its description, any escrow arrangement for monies received, title insurance, prepayments, defaults, developer's resale and lot exchange program, time sharing and membership sales must be given to the purchaser.

(3) Condition of title. Information about all liens, encumbrances or mortgages affecting purchasers in the subdivision, the lots

covered and the impact on purchasers and lessees in a subdivision should a developer default, and mortgage release provisions must be given to the purchaser.

(4) Condition and use of property. Information regarding land reservations, unusual or restrictive easements, mineral reservations, land use restrictions, special zoning permits, environmental impact studies which may have been conducted and their results, topographical characteristics, including any subsurface conditions and potentially hazardous natural conditions must be given to purchasers.

(5) Financial and legal information. Information about the net income and worth of the developer, condition of financial operations at present and in the preceding fiscal year, bankruptcy litigation or other litigation to which the developer is a party or action taken against the developer by a governmental agency which may have a material adverse impact upon its financial condition or its ability to transfer title to a purchaser or to complete promised facilities must be given to purchasers.

(6) Roads. Information about access and subdivision roads, type of surface (present and final), completion dates, percentage of completion, buyer's cost and assessment, who is responsible for completion and maintenance and financial assurance of completion must be given to purchasers.

(7) Water. Information as to how water is to be supplied, supplier, completion dates, percentage of completion, any financial assurance of completion, buyer's cost and assessment including hook-up and water hauling costs, who is responsible for completion, quality and quantity, source, capacity of the water system, any intention to transfer the water system and the cost to lot owners or property owners association and any permits or approvals required must be given to purchasers.

(8) Sewerage facilities. Information as to the method used, supplier, completion dates, percentage of completion, any financial assurance of completion, buyer's cost and assessment including hook-up and sewage pumping and hauling, capacity of central system, who is responsible for completion, approvals and permits required, transfer of system to lot owners or property owners association must be given to purchasers.

(9) Utilities (gas, electric, phone). Information as to the availability, supplier, purchaser's or lessee's cost, completion date, percentage of completion must be given to purchasers.

(10) Recreational facilities. A list of the facilities and information about estimated date available for use, percentage of completion, any financial assurance or completion, buyer's or lessee's cost and assessment, who is responsible for completion, maintenance, disclosures on facilities which will be leased and/or transferred to the lot owners or property owners' association and who may use the facilities must be given to purchasers.

(11) Lots being sold or leased. Information about the legal descriptions of the offering by lot, block and unit number may be given to purchasers.

(12) Location, size surrounding communities. Information which describes the county seat, surrounding communities of significant size and services offered, population of the area, road systems and the potential size of the subdivision may be given to purchasers.

(13) Taxes and assessments. Information about payments to property owners' associations, the property owners' association's functions and responsibilities, management of the association, extent of developer control and the purpose of any special improvement district may be given to purchasers.

(14) Community facilities. Information about the availability of schools, medical and dental services, postal services, fire and police protection, shopping facilities and public transportation may be given to purchasers.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(15) Platting. Information which reports whether the subdivision's plats have been approved by regulatory authorities, whether the plats have been recorded and whether the survey and staking of each lot has been done and the cost that may be passed on to purchasers may be given to purchasers.

(f) The disclosure law of the State must be consistent with, but not necessarily identical to, the requirements of 15 U.S.C. 1703(a)(2)(D). This provision makes it unlawful for a developer to represent in any manner that it will provide or complete roads, sewers, water, gas or electric service or recreational amenities without stipulating in the contract of sale or lease that such services or amenities will be provided. Developers registered with the Secretary through a certified state are subject to this requirement. Consequently, the State may itself impose this substantive requirement upon developers. In any event, the disclosure documents approved by any certified state must meet the federal standard with respect to subdivision improvements. Developers are not allowed to represent that they will provide or complete roads, water, sewer, gas or electric facilities or recreational facilities unless the contract or agreement for sale obligates the developer to complete the facilities.

(g) In order to be determined substantially equivalent to the federal disclosure requirement, the state law and regulations must require that prospective purchasers and lessees receive, prior to or at the time of the signing any contract or agreement for purchase or lease, the applicable disclosure document containing complete and accurate information on the subdivision and the developer. In addition, state law or regulation must require developers to file amendments if any change occurs in any representation of material fact required to be stated in the disclosure materials filed with the state. The state law or regulation regarding amendments should entail requirements equivalent to those stated in 24 CFR 1710.23.

(h) For a state to be certified, it must be demonstrated that the state has or will have adequate full-time professional and clerical staff in its regulatory agency or agencies responsible for regulating the sale or lease of lots within its jurisdiction; that there is a budget approved for that staff which will permit them to fulfill the administrative and enforcement responsibilities; and that the staff have adequate legal authority to take official action in cases falling within the purview of state law and regulation.

(i)(1) If a certified state modifies or amends any law, regulation or administrative procedure with regard to subdivision development standards, it shall so notify HUD by registered or certified mail within 30 days after the modification or amendment has been enacted or promulgated. The state must submit to HUD new copies of its laws, regulations, rulings, administrative provisions and legal opinions, as amended, mandating the disclosure of information or establishment of development standards regarding land sales.

(2) Should any changes occur as set forth above and result in a measurable alteration of the protection provided to consumers by the state, the Secretary may, upon examination of those changes, re-evaluate the certification status of the state's land program.

(j) Once a state is certified and the state's disclosure document has become the Federal Property Report, the Secretary may require, as a condition of certification, a cover page, similar to the one presently used for federal filings, to be attached to the certified state filings. The form and substance of the federal cover page is explained in 24 CFR 1710.105. If a certified state filing does not have a cover page, the Secretary may require that, as a condition of certification, the state include **13601** information regarding the federal revocation period within the body of the state disclosure document.

(k) The Secretary shall require all certified states to submit to the Secretary a copy of any notice of suspension which the state has issued to a developer at the time the notice is sent to the developer.

Application for Certification of State Land Sales Program

(a) In order to be certified, a state must submit an application to the Office of Interstate Land Sales Registration, Department of Housing and Urban Development, 451 7th Street, SW., Washington, DC 20410. The application should be titled "Application for Certification of State Land Sales Program."The application should use the section format and contain the information

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

set out below:

Application for Certification of State Land Sales Program Submitted by: (Name, Address and Telephone Number of State Agency and Person To Contact.)

Section 1. Legal Authorities. This section should contain copies of all laws and regulations (including rulings and legal opinions having the effect of law) establishing and interpreting disclosure requirements or substantive development standards with regard to land sales and leases including all administrative provisions and all provisions establishing exemptions from the rule. Only those legal authorities which deal with land sales and leases subject to the federal disclosure requirements need be submitted.

Section 2. Sample Copies of Material to be Submitted by Developers to the State. This section should contain sample copies of all materials required to be filed with the agency responsible for regulating the sale of lots in subdivisions and sample copies of all material required to be provided to purchasers and lessees and prospective purchasers and lessees.

Section 3. Methods of Administration and Enforcement. This section should contain a detailed statement on the methods and scope of the state's administration and enforcement procedures to include:

(a) The name and address of the agency responsible for regulating the sale or lease of lots in subdivisions.

(b) The staffing capacity of the responsible State Regulatory Agency. There should be included:

(1) An organizational chart which describes not only the internal structure of the regulatory agency (agencies) but also the relationship of that agency to other decision-making centers;

(2) a description of the functions and duties of the full-time staff;

(3) the eligibility criteria, i.e., training, education and experience, for principal members of the staff; and

(4) the formula used in calculating the necessary number of staff members to fulfill administrative, investigative and enforcement responsibilities. The state should submit for the Secretary's review the actual number of complaints received, enforcement actions taken, and investigations initiated for the past three years.

(C) A description of the anticipated additional staff, if any, and their duties and qualifications.

(D) The method and scope of investigation and enforcement to be used. The state should demonstrate the procedures to be followed from the time a complaint is received until the completion of action on that complaint and the kinds of sanctions which may be involved.

(E) Included should be an accounting of the number of new filings received per year for the past three years, the number of amendments received per year, and the total number of active filings.

Section 4. Assertion of Equivalency. This section should contain a detailed statement supporting the state's claim that its land program provides purchasers and lessees through disclosure, substantive development standards or combination thereof, protection substantially equivalent to the protection provided for them by Federal law.

(b) Upon receiving an application for certification, the Secretary will publish a Notice of Application in the Federal Register. The purpose of this public notice is to give other certified states and other interested parties an opportunity to review and comment on applications and to enhance consistency among states which are certified. Person(s) interested in receiving ap-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

plication materials for review and comment purposes may request them from the Secretary. Comments should be submitted no later than 30 days after the Notice of Application has been published.

Supplemental Information to Part 1710: Guidelines for Exemptions Available Under the **Interstate Land Sales Full Disclosure Act**

*Table of Contents*

Part I Introduction

Part II Definitions

(a) Anti-Fraud Provisions

(b) Common Promotional Plan

(c) Delivery of Deed

(d) Lot

(e) Sale

(f) Site

(g) Subdivision

Part III Exclusions from the Act

(a) Reservation

(b) Undivided Interest

Part IV Statutory Exemptions from the Title Requiring No Determination by HUD

(a) Twenty-Five Lots

(b) Improved Lots

(c) Evidences of Indebtedness

(d) Securities

(e) Government Sales

(f) Cemetery Lots

(g) Sales to Builders

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(h) Industrial or Commercial Developments

Part V Statutory Exemptions From Registration Requiring No HUD Determination

(a) **One Hundred Lot Exemption**

(b) Twelve Lot Exemption

(c) Scattered Site Exemption

(d) Twenty Acre Lots Exemption

(e) Single-Family Residence Exemption

(f) Mobile Home Exemption

(g) Intrastate Exemption

(h) Metropolitan Statistical Area (MSA) Exemption

Part VI Regulatory Exemptions From Registration Requiring No HUD Determination

(a) General

(b) Eligibility Requirements

(1) Inexpensive Lots

(2) Five Year Lease

(3) Lot Sales to Developers

(4) Adjoining Lot

(5) Lot Sales to a Government

(6) Sales of Leased Lots

Part VII Regulatory Exemption. HUD Determination Required

Part VIII Advisory Opinion

(a) General

(b) Requirements

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Part IX No Action Letter

*Part I—Introduction*

The Interstate Land Sales Registration Division (also known as OILSR) is offering these Guidelines to clarify agency policies and positions with regard to the exemption provisions of the **Interstate Land Sales Full Disclosure Act** (the Act), Pub. L. 90-448 (15 U.S.C. 1701 through 1720), and its implementing regulations, 24 CFR parts 1710 through 1730. The regulations comply with the Paperwork Reduction Act of 1980, as evidenced by Office of Management and Budget approval number 2502-0243. These Guidelines are intended to assist a developer in determining whether or not a real estate offering is exempt from any or all of the requirements of the Act. They supersede any Guidelines previously issued by this Office.

This is an interpretive rule, not a substantive regulation. Not every conceivable factor of the exemption process is covered in these Guidelines and variations may occur in unique situations. Examples are given, but the examples do not in any way exhaust the myriad possibilities occurring in land development and land sales activity, nor do they set absolute standards.

To understand the exemptions, the jurisdictional scope of the Act must be understood. Any use of the mails, including intrastate use, or advertising in media which have interstate circulation is sufficient to establish jurisdiction. Generally, if a real estate offering falls under the jurisdiction established by the Act, a developer of a subdivision containing 100 or more lots must register the subdivision. Registration includes filing a Statement of Record and supporting documentation with HUD and providing to prospective purchasers an effective Property Report containing important facts about the subdivision and the developer.

Effective June 21, 1980, the provisions of the Act that prohibit misrepresentations or practices that would result in defrauding purchasers generally apply to sales or lease programs of 25 or more lots offered pursuant to a common promotional plan where any means or instruments of transportation or communication in interstate commerce, or the mails, are used.

Real estate offerings that meet the eligibility requirements or an exemption are exempt from all or some of the Act's requirements unless the method of operation **\*13602** has been adopted for the purpose of evading the requirements of the law. The exemptions are available for subdivisions with particular characteristics, for certain individual lot sales transactions or for real estate meeting specific criteria. In addition, the Act gives the Secretary authority to exempt subdivisions or lots in a subdivision if, because of the small amount involved or the limited character of the offering, enforcement of the Act (i.e., full registration and disclosure) is not necessary in the public interest and for the protection of purchasers.

If the offering is subject to the Act and does not qualify for an exemption, it must be registered. The requirement of registration does not imply that the real estate value is questioned or the integrity of a business is suspect. The law simply provides that prospective purchasers have the right to adequate disclosure of facts about a subdivision so that an informed decision about the potential purchase can be made.

As exceptions to the registration and full disclosure requirements of the Act, the exemption provisions are strictly construed. The exemption requirements do not prescribe a method of operation or dictate how a subdivision should be developed.

A developer is not required to submit any documentation or obtain a determination from HUD to operate under any exemption except the one provided under 24 CFR 1710.16 (part VI of these Guidelines). However, if there is any question whatsoever concerning whether or not a real estate offering qualifies for any of the exemptions, developers are encouraged to seek legal counsel or obtain an Advisory Opinion from the Department before making any sales or leases. Experience has shown that developers are sometimes misinformed as to the applicability of the Act to their offering and that such misunderstanding can result in violative sales and the disruption of business. The instructions and format for obtaining an Advisory Opinion are contained in §1710.17 of the regulations and in part VIII of these Guidelines.

*Part II—Definitions*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The following definitions are included here because of the importance each has to the explanation and understanding of HUD's interpretations of the exemption requirements. Furthermore, with the exception of "lot", "sale", "common promotional plan", and "subdivision", these definitions are not set forth elsewhere. The definitions of "lot" and "sale" are repeated here because of their extraordinary importance to the exemptions.

(a) Anti-Fraud Provisions means the provisions of the Act that prohibit the use of any sales practices, advertising or promotional materials that: would be misleading to purchasers; contain any misrepresentation of material facts or untrue statements; or would operate as a fraud or deceit upon a purchaser. Also prohibited are representations that roads, sewer, water, gas or electric services or recreational amenities will be provided or completed by the developer without so stipulating in the contract. The relevant provisions are set forth in 15 U.S.C. 1703(a)(2). The regulations that implement the anti-fraud provisions are set forth in 24 CFR part 1715, subpart B.

(b) Common Promotional Plan means any plan undertaken by a single developer or a group of developers acting together to offer lots for sale or lease. A common promotional plan is presumed to exist if land is offered by a developer or a group of developers acting in concert and the land is contiguous or is known, designated, or advertised as a common development or by a common name. The number of lots covered by each individual offering has no bearing on whether or not there is a common promotional plan.

Other characteristics that are evaluated in determining whether or not a common promotional plan exists include, but are not limited to: a 10% or greater common ownership; same or similar name or identity; common sales agents; common sales facilities; common advertising; and common inventory. The presence of one or more of the characteristics does not necessarily denote a common promotional plan. Conversely, the absence of a characteristic does not demonstrate that there is no common promotional plan.

Two essential elements of a common promotional plan are a thread of common ownership or developers acting in concert. However, common ownership alone would not constitute a common promotional plan. HUD considers the involvement of all principals holding a 10 percent or greater interest in the subdivision to determine whether there is a thread of common ownership. If there is common ownership or if the developers are acting in concert, and there is common advertising, sales agents or sales office, a common promotional plan is presumed to exist. Experience has led to the conclusion that sales agents generally will direct a prospective purchaser to any or all properties in inventory to make a sale.

The phrase "common promotional plan" is most often misunderstood by those who believe that "promotion" implies an enthusiastic sales campaign. Any method used to attract potential purchasers is, in fact, the "promotional plan". For example, direct mail campaigns and free dinners may be the promotional plan of one developer while another developer's promotion may be limited to classified advertisements in a local newspaper.

Brokers selling lots as an agent for any person who is required to register are required to comply with the requirements of the Act for those sales. Brokers selling lots for different individuals who do not own enough lots to come within the jurisdiction established by the Act generally would not be considered to be offering lots pursuant to a common promotional plan as long as they are merely receiving the usual real estate commission for such sales. If the broker has an ownership interest in the lots or is receiving a greater than normal real estate commission, the broker may be offering lots pursuant to common promotional plan and may be required to comply with the requirements of the Act.

(c) Delivery of Deed means the physical transfer of a recordable deed, executed by the seller to the purchaser, to the purchaser's agent or to the appropriate governmental recording office. If the transfer (i.e., delivery) is to an agent or to a recording office, there must not be any conditions imposed upon the purchaser or any further action to be taken by either the purchaser or the seller. If delivery is to the place of recordation, it must be accompanied by the proper recordation fees.

(d) Lot means any portion, piece, division, unit or undivided interest in land if such interest includes the right to the exclusive

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

use of a specific portion of the land or unit. This applies to the sale of a condominium or cooperative unit or a campsite as well as a traditional lot.

If the purchaser of an undivided interest or a membership has exclusive repeated use or possession of a specific designated lot even for a portion of the year, a lot, as defined by the regulations, exists. For purposes of definition, if the purchaser has been assigned a specific lot on a recurring basis for a defined period of time and could eject another person during the time he has the right to use that lot, then the purchaser has an exclusive use.

(e) Sale means any obligation or agreement for consideration to purchase or lease a lot directly or indirectly. The time of sale is measured from when a purchaser signs a contract, even if the contract contains contingencies beyond the control of the seller. For example, if a developer uses a contract which states that the sale is contingent upon obtaining an exemption from HUD, a sale, for the purposes of this definition, occurred when the purchaser signed the contract. The terms "sale" and "seller" include the terms "lease" and "lessor" for the purposes of the regulations and these Guidelines.

(f) Site means a group of contiguous lots whether such lots are actually divided or proposed to be divided. Lots are considered to be contiguous even though contiguity may be interrupted by a road, park, small body of water, recreational facility or any similar object.

(g) Subdivision means any land that is located in any state or in a foreign country and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan. Any number of lots, whether divided by the previous owner, divided by the current owner, or merely proposed to be divided may constitute a subdivision. "Proposed to be divided" includes the developer's intention to subdivide land, as well as the developer's intention to add additional land or units.

Part III—Exclusions From the Act

The following items are excluded from the coverage of the Act:

(a) Reservation. A reservation is a non-binding agreement used to gauge market feasibility for a developer through which a potential purchaser expresses an interest to buy or lease a lot or unit at some time in the future. A deposit may be accepted from the interested person provided that the money is placed in escrow with an independent institution having trust powers and is refundable in full at any time at the option *13603 of the potential purchaser. To be excluded from the Act, in no case may a reservation become a binding obligation to purchase a lot; the potential purchaser must take some subsequent affirmative action, typically the signing of a sales contract, to create a binding obligation. An option agreement is an arrangement for consideration in which a potential purchaser could forfeit money; therefore, an option agreement is not a reservation. In no event may a document purporting to be a Property Report or other evidence of compliance with the Act be delivered to an interested party when entering a reservation agreement for a lot or proposed condominium unit which is neither effectively registered nor exempt.

(b) Undivided interests. The sale of undivided interests that do not carry with them the right of exclusive use of a specific lot does not establish jurisdiction. For example, a camping subdivision sold as 400 undivided interests to tenants in common, where purchasers have a co-extensive, non-exclusive right to the use and enjoyment of all campsites on a space available basis and no purchaser has an expressed or implied exclusive right to repeatedly use or occupy any specific campsite, would not be covered by the Act.

Part IV—Statutory Exemptions Requiring No Determination by HUD

The discussions that immediately follow pertain to 15 U.S.C. 1702(a)(1) through (8). The exemptions are set forth in the regulations at 24 CFR 1710.5 (a) through (h). These provisions exempt sales from both the anti-fraud and the registration provisions of the Act.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(a) Twenty-five Lots. (15 U.S.C. 1702(a)(10) and 24 CFR 1710.5(a)).

This section exempts the sale or lease of lots in a subdivision (i.e., lots offered pursuant to the same common promotional plan) that contains fewer than 25 lots. If a subdivision contains 25 or more lots, but fewer than 25 of those lots are offered for sale under a common promotional plan, those sales would be exempt. Thus, in a subdivision of 28 lots in which 4 lots are not offered for sale because, for example, they are permanently dedicated to the public for a park, the sale of the remaining 24 lots is exempt.

If fewer than 25 lots are acquired in a larger subdivision, the offer of these lots may be subject to the Act if the acquiring party is in any way acting in concert with the previous or current developer of the balance of the subdivision. Correspondingly, if fewer than 25 lots are acquired in a larger subdivision, the offer of the lots may be exempt if there is neither an identity of interest between the acquiring party and the previous or current developer nor any form of concerted action that constitutes a common promotional plan.

Since the fewer than 25 lots exemption is based upon the number of lots as opposed to the number of sales, resales of a lot will not be counted toward the fewer than 25 lots limit.

(b) Improved Lots, 15 U.S.C. 1702(a)(2).

Section 1702(a)(2) of Title 15 of the United States Code exempts (1) the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building; or (2) the sale or lease of land under a contract obligating the seller or lessor to erect such a building on the lot within a period of two years.

For a building or unit to be considered complete, it must be physically habitable and usable for the purpose for which it was purchased. A residential structure, for example, must be ready for occupancy and have all necessary and customary utilities extended to it before it can be considered complete. Manufactured home lots with pads but no structure, even if improved with utilities and roads, will not qualify for this exemption. Recreational vehicles are not considered buildings.

If a seller (developer) is relying on this exemption and the residential, commercial, condominium or industrial building is not complete, the contract must obligate the seller to complete the building within two years. If the contractual obligation is not present, the sale is not exempt. The two-year period normally begins on the date the purchaser signs the sales contract. A contract that conditions construction upon acts of a buyer will not exempt the sale. The essence of this exemption is that it applies to the sale of a house (if not built at the time of sale, then to be built within two years after the sale).

HUD's interpretation of what constitutes an obligation to construct a building relies on general principles of contract law. Provisions for purchaser financing and remedies clauses are matters to be decided by the parties to the contract under the laws of the jurisdiction in which the construction project is located. However, such clauses may not alter the obligation of the seller to build. For example, if the type and terms of financing are subject to negotiation between buyer and seller, but the buyer is unable to obtain financing as a condition of the obligation to build, then the sale fails for exemption purposes. The inability of the buyer to obtain construction financing will not relieve the seller from the obligation to build, thereby leaving the buyer with a lot free of a construction obligation. Since the nature of the transaction is the sale of a house (or other structure), there should be no reason for separate construction financing in the normal course of business.

The contract must not allow nonperformance by the seller at the seller's discretion. Contracts that permit the seller to breach virtually at will are viewed as unenforceable because the construction obligation is not an obligation in reality. Thus, for example, a clause that provides for a refund of the buyer's deposit if the seller is unable to close for reasons normally within the seller's control is not acceptable for use under this exemption. Similarly, contracts that directly or indirectly waive the buyer's right to specific performance are treated as lacking a realistic obligation to construct. HUD's position is not that a right to specific performance of construction must be expressed in the contract, but that any such right that purchasers have must not

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

be negated. For example, a contract that provides for a refund or a damage action as the buyer's sole remedy would not be acceptable.

Contract provisions which allow for nonperformance or for delays of construction completion beyond the two-year period are acceptable if such provisions are legally recognized as defenses to contract actions in the jurisdiction where the building is being erected. For example, provisions to allow time extensions for events or occurrences such as acts of God, casualty losses or material shortages are generally permissible. Also permissible, in the case of multi-unit construction, is a clause conditioning the completion of construction or closing of title on a certain percentage of sales of other units. The presale period cannot exceed 180 days from the date the first purchaser signs a contract in the project or, in a phased project, from the date the first purchaser signs a sales contract in a phase. Such a clause may not extend the overall two-year obligation to construct.

Although the factual circumstances upon which nonperformance or a delay in performance is based may vary from transaction to transaction, as a general rule delay or nonperformance must be based on grounds cognizable in contract law such as impossibility or frustration and on events which are beyond the seller's reasonable control.

Because of the variations in applicable contract law among the states and the many different provisions that are used by sellers in construction contracts, HUD may condition its advisory opinions regarding this exemption on representations by local counsel as to the current status of state law on the relevant issues. For example, the Florida Supreme Court has ruled that there must be an unconditional commitment to complete construction within two years and that the remedies available to the purchaser must not be limited. Samara Development Corp. v. Marlow, 556 So.2d 1097 (Fla. 1990). See also Schatz v. Jockey Club Phase III, Ltd., 604 F. Supp. 537 (S.D. Fla. 1985). Developers, especially those in Florida, should be aware of these decisions, as well as decisions in other jurisdictions, e.g., Markowitz v. Northeast Land Co., 906 F.2d 100 (3d Cir. 1990).

For a different view, readers should refer to Attebury v. Maumelle Company, 60 F.3d 415 (8th Cir. 1995), in which the court upheld a contractual provision to build as sufficient to qualify for the exemption despite the fact that the contract then shifted that responsibility to the buyer. This revision of the Guidelines dealing with the "Improved lot" exemption is in reaction to the Maumelle decision. At the time of this writing another case of interest was pending in the United States District Court for the Eastern District of Michigan. Whether it ultimately will result in a decision on the Land Sales issues is unknown, as it is the understanding of the Department that settlement negotiations are ongoing. The court is considering those issues on remand from the Court of Appeals for the Sixth Circuit. See Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 43 F.3d 1054 (6th Cir. 1995).

Since questions about this exemption most often arise in connection with condominiums, developers and others should be aware of the decision in the case **13604** of Winter v. Hollingsworth Properties Inc., 777 F.2d 1444 (11th Cir. 1985), in which the court held that the **Interstate Land Sales Full Disclosure Act** applied to the sale or lease of condominium units. This ruling is in consonance with the Department's longstanding position on the condominium issue. The weight of authority of other cases, both Federal and State, supports the Department's position. Therefore, it continues to be the Department's policy that the mere use of the condominium form of ownership does not determine jurisdiction of the Act and that developers should look to the specific requirements of the statutory and regulatory exemptions as amplified in these Guidelines to determine the applicability of the Act.

(c) Evidence of Indebtedness. (15 U.S.C. 1702(a)(3) and 24 CFR 1710.5(c)).

This section exempts the sale or lease of evidences of indebtedness (typically a note) secured by a mortgage or deed of trust on real estate. The sale of such notes, which is common in the industry, is exempt; however, the underlying sale of the land is not exempt under this provision.

(d) Securities. (15 U.S.C. 1702(a)(4) and 24 CFR 1710.5(d)).

This section exempts the sale of securities issued by a real estate investment trust.

(e) Government Sales. ([15 U.S.C. 1702(a)(5)](#) and [24 CFR 1710.5(e)](#)).

This section exempts the sale or lease of real estate by any government or government agency. This exemption extends to the sale or lease of land by a city, state, or foreign government as well as the sale of land by the U.S. Government. However, it does not exempt sales or leases of lots by Federal or state chartered and regulated institutions such as banks or savings and loan associations, nor does the fact that the development is assisted, insured or guaranteed under a Federal or state program exempt the lot sales. Municipal Utility Districts and Special Improvement Districts may or may not be considered a qualified government agency under this exemption depending on the legal basis and operation of the District.

(f) Cemetery Lots. ([15 U.S.C. 1702(a)(6)](#) and [24 CFR 1710.5(f)](#)).

This section exempts the sale or lease of cemetery lots.

(g) Sales to Builders. ([15 U.S.C. 1702(a)(7)](#) and [24 CFR 1710.5(g)](#)).

This section exempts the sale or lease of lots to any person who acquires the lots for the purpose of engaging in the business of constructing residential, commercial, or industrial buildings or for the purpose of resale or lease of the lots to persons engaged in such a business. The term business is viewed as an activity of some continuity, regularity, and permanency, or means of livelihood.

The sale or lease of lots to an individual who purchases the lots to have his or her own home built is not exempt under this provision. The sale to a non-broker who is buying a lot for investment with indefinite plans for resale also is not exempt.

(h) Industrial or Commercial Developments. ([15 U.S.C. 1702(a)(8)](#) and [24 CFR 1710.10(h)](#)).

This section exempts the sale or lease of real estate which is zoned for industrial or commercial development. If there is no zoning ordinance, the exemption is available only if the real estate is restricted to industrial or commercial development by a declaration of covenants, conditions, and restrictions which have been recorded in the official records of the city or county in which the real estate is located. In addition, the following five conditions must exist in order to establish eligibility for this exemption:

(1) Local authorities have approved access from the real estate to a public street or highway. The approved access to a public street or highway must run to the legal boundary of the subdivision, but need not run to each and every lot;

(2) The purchaser or lessee of the real estate is a duly organized corporation, partnership, trust or business entity engaged in commercial or industrial business. To be considered "duly organized", a purchaser or lessee must have set up an administrative structure to conduct business, such as: checking accounts; licenses and permits, if required; evidence of intent; and a set of accounting records. The phrase "engaged in business" implies an activity of some continuity, regularity and permanency, or means of livelihood. A new entity or individual starting a business must be authorized to conduct such business in the jurisdiction in which the subdivision is located;

(3) The purchaser or lessee of the real estate is represented in the transaction of sale or lease by a representative of its own selection. The term "representative" is not limited to attorneys and does not exclude sole proprietors from representing themselves. Any person can serve as the representative of the purchaser or lessee so long as sufficient evidence can be produced to prove authority to act in that capacity;

(4) The purchaser or lessee of the real estate affirms in writing to the seller that: it is either purchasing or leasing the real estate substantially for its own use or it has a binding commitment to sell, lease or sublease the real estate to an entity which

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

meets the requirements of (2) above; it is engaged in commercial or industrial businesses; and it is not affiliated with the seller or agent. These affirmations should be retained by the developer in accordance with the statute of limitations of the local jurisdiction or for a period of three years, whichever is longer. If the affirmation is included in the contract, a space must be provided for the purchaser to initial immediately following the affirmation clause; and

(5) A title insurance policy or a title opinion is issued in connection with the transaction showing that title to the real estate purchased or leased is vested in the seller or lessor, subject only to such exceptions as are approved in writing by the purchaser or lessee, preferably in a separate document, prior to the recordation of the instrument of conveyance or execution of the lease. The recordation of a lease is not required. Any purchaser or lessee may waive, in writing in a separate document, the requirement that a title insurance policy or title opinion be issued in connection with the transaction.

*Part V—Statutory Exemptions From Registration Requiring No HUD Determination*

The discussions that immediately follow pertain to 15 U.S.C. 1701(b)(1) through (8) and 24 CFR 1710.6 through 1710.13.

The developer must comply with the Act's anti-fraud provisions (15 U.S.C. 1703(a)(2)) for sales of lots in the subdivision that are exempt under these provisions. Developers should be particular aware of the requirements of 15 U.S.C. 1703(a)(2)(D).

(a) **One Hundred Lot Exemption**. (15 U.S.C. 1702(b)(1) and 24 CFR 1710.6).

This section exempts the sale of lots in a subdivision if: the subdivision contained fewer than 100 lots on April 28, 1969; has, since that date, contained fewer than 100 lots; and will continue to contain fewer than 100 lots. The 100 lot count for purposes of this exemption excludes lots that are exempt from jurisdiction under 24 CFR 1710.5 (b) through (h). It should be noted that the "25 lot" exemption under §1710.5(a) cannot be used in connection with the "**100 lot**" **exemption**.

For example, a developer of a subdivision containing a total of 129 lots since April 28, 1969, qualifies for this exemption if at least 30 lots are sold in transactions that are exempt because the lots had completed homes erected on them. The 30 exempt transactions may fall within any one exemption or a combination of exemptions noted in §1710.5 (b) through (h) and may be either past or future sales. In the above example, the developer also could qualify if twelve lots had been sold with residential structures already erected on them, nine lots had been sold to building contractors and at least nine lots were reserved for either the construction of homes by the developer or for sales to building contractors. The reserved lots need not be specifically identified.

Developers of subdivisions containing more than 99 lots who wish to operate under this exemption must assure themselves that all lots in excess of 99 have been and will be sold in transactions exempt under 24 CFR 1710.5 (b) through (h). The sale of more than 99 lots in transactions not exempt under §1710.5 (b) through (h) would nullify this exemption for prior and future sales and might result in prior sales being voidable at the purchaser's option.

Since the " **100 lot**" **exemption** applies to the number of the lots as opposed to the number of sales, resales of a lot will not be counted toward the 100 lot limit. However, any sale or resale of a lot must comply with the anti-fraud provisions.

If fewer than 100 lots are acquired in a larger subdivision, the offer of these lots will not be exempt if the acquiring party is, in any way, acting in concert with the previous or current developer of the balance of the subdivision so as to create a common promotional plan for 100 or more lots unless sales of the other lots are exempt under §1710.5. However, if fewer than 100 lots are acquired in a larger subdivision, the offer of the lots may be exempt if there is neither an identity of interest between the acquiring party and the previous or current developer nor a form of concerted action constituting a common promotional plan.

**\*13605** (b) Twelve Lot Exemption. (15 U.S.C. 1702(b)(2) and 24 CFR 1710. 7).

This section exempts the sale of lots from the registration requirements of the Act if, beginning with the first sale after June 20, 1980, no more than twelve lots in the subdivision are sold in the subsequent 12-month period. Thereafter, the sale of the first twelve lots each period is exempt from the registration requirements if no more than twelve lots were sold in each previous 12-month period that began with the anniversary date of the first sale after June 20, 1980. For example, if a developer's first lot sale after June 20, 1980 occurred on August 5, 1980 and no more than eleven additional lots in the subdivision were sold through August 4, 1981, the sales would be exempt.

During the second year of operation under this exemption (beginning on August 5, 1981 in the example) at least the first twelve lot sales would be exempt. However, if lot sales exceed twelve in the second or any subsequent year, the exemption would terminate on the sale of the thirteenth lot. Once eligibility has been terminated, the exemption is no longer available and cannot be recaptured by the same developer for the same subdivision even if there are fewer than twelve lots sold in subsequent years.

A developer may apply to the Secretary to establish a different twelve-month period for use in determining eligibility for the exemption, and the Secretary may allow the change if it is for good cause and consistent with the purpose of this section. An example would be to change the year to coincide with the developer's fiscal or tax year.

In determining eligibility for this exemption, all lots sold or leased in the subdivision after June 20, 1980 are counted, whether or not the lot is registered or the transaction is otherwise exempt, such as the sale of a home and lot package. This exemption extends to twelve lots, not twelve sales. Each lot would be counted in the sale or lease of multiple lots.

Since the "twelve lot" exemption applies to the number of lots as opposed to the number of sales, resales of a lot will not be counted toward the twelve lot limit. The sale and resale of a lot must qualify for the exemption and comply with the anti-fraud provisions. However, lot sales exempt under §1710.5 (b) through (h), while counted toward the total of twelve, are not required to comply with the anti-fraud provisions.

(c) Scattered Site Exemption. (15 U.S.C. 1702(b)(3) and 24 CFR 1710.8).

This section exempts from the Act's registration requirements the sale of lots in a subdivision consisting of noncontiguous parts if: (1) each noncontiguous part of the subdivision contains twenty or fewer lots; and (2) each purchaser or purchaser's spouse makes a personal, on-the-lot inspection of the lot purchased before signing a contract.

This exemption is intended to relieve the developers of small, scattered offerings of the requirement to register their subdivisions. The exemption may also apply to real estate brokers who have an ownership interest in more than one site, each containing 20 or fewer lots.

If a developer intends to rely on this exemption, it is important that the developer understand the definition of subdivision, how a common promotional plan is determined and what constitutes a site. These terms are defined in part II of these Guidelines.

Lots that are contiguous when they are originally platted or developed are considered to remain contiguous. For purposes of this exemption, interruptions such as roads, parks, small bodies of water or recreational facilities do not serve to break the contiguity of parts of a subdivision.

(d) Twenty Acre Lots Exemption. (15 U.S.C. 1702(b)(4) and 24 CFR 1710.9).

This section exempts the sale of lots in a subdivision from the registration requirements of the Act if, since April 28, 1969, each lot in the subdivision has contained at least twenty acres. In determining eligibility for the exemption, easements for

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ingress and egress or public utilities are considered part of the total acreage of the lot if the purchaser retains ownership of the property affected by the easement.

This exemption applies to the entire subdivision and requires that each lot in the subdivision be twenty acres or larger in order for the subdivision to qualify. If a single lot offered in the subdivision is less than twenty acres in size, no lot in the subdivision qualifies for the exemption. If a developer has two sites which comprise the subdivision and only one of the sites contains lots that are all greater than twenty acres in size, the offering of these lots would not be exempt under this provision. All lots offered pursuant to a common promotional plan must be considered.

A subdivision which is platted of record and contains a single lot that is less than twenty acres cannot qualify for the exemption even if the lots are offered in multiples that aggregate twenty acres or more. Further, if the platted lots are all twenty acres or more in size, but a lot is divided and a portion that is less than twenty acres is offered for sale, the exemption would not be available to the subdivision.

(e) Single-Family Residence Exemption. (15 U.S.C. 1702(b)(5) and 24 CFR 1710.10).

(1) General. This section provides an exemption for the sale of lots that are limited to single-family residential use. Developers are advised to carefully review the eligibility requirements listed below before proceeding with sales. Note especially that some of the eligibility requirements pertain to the entire subdivision while others apply to individual lots.

(2) Subdivision Requirements. All lots offered under the same common promotional plan must comply with the two eligibility requirements listed below in order for any lot to be eligible for this exemption.

(i) The subdivision must meet all local codes and standards. If local codes expressly permit incremental development, then only the portions of the subdivision being offered at any given time are required to meet the codes and standards to satisfy this requirement. Otherwise, the entire subdivision must comply with the local standards.

(ii) In the promotion of the subdivision, there cannot be offers, by direct mail or telephone solicitation, of gifts, trips, or dinners or the use of similar promotional techniques to induce prospective purchasers to visit the subdivision or to purchase a lot. There is no prohibition against using the mails, telephone or other advertising media to promote or advertise the offering or to respond to inquiries from potential purchasers. The only prohibition is that these media cannot contain offers of gifts, trips, dinners or other inducement.

In order to qualify for this exemption, the subdivision must have complied with the requirements pertaining to advertising and promotional methods since June 13, 1980, the date the exemption became effective.

(3) Lot Requirements. Having met the edibility requirements for a subdivision, each lot offered under the exemption also must comply with the eight requirements listed below. Lots within a subdivision that do not comply with these additional requirements must either be registered or sold in compliance with another exemption, even though the two subdivision requirements have been met.

(i) The lot must be located within a municipality or county where a unit of local government or the State specifies minimum standards for the development of subdivision lots taking place within its boundaries. Each lot must comply with these standards. The following is a list of the areas which must be regulated:

(A) Lot dimensions.

(B) Plat approval and recordation.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(C) Roads and access.

(D) Drainage.

(E) Flooding.

(F) Water supply.

(G) Sewage disposal.

(ii) Each lot sold under the exemption must be either zoned for single-family residence or, in the absence of a zoning ordinance, limited exclusively by enforceable covenants or restrictions to single-family residences or, in the absence of a zoning ordinance, limited exclusively by enforceable covenants or restrictions to single-family residences. Manufactured homes, townhouses, and residences for one to four family use are considered single-family residences for purposes of this exemption. Recreational vehicles are not considered to be residential buildings. Manufactured homes must be affixed to the real estate to be eligible, e.g., connected to water, sewer and electrical sources and on blocks with skirts.

The phrase "* * * in the absence of a zoning ordinance" is interpreted in its literal sense. The existence of a zoning ordinance other than single-family residence zoning is considered to be disqualifying even if there are covenants or restrictions limited construction to single-family residences. Situations such as the foregoing would, however, be a candidate for a "substantial compliance" exemption (24 CFR 1710.16) if all other eligibility requirements of the exemption are satisfied substantially. "Substantial compliance" is discussed in part VII of these Guidelines.

**\*13606** (iii) The lot must be situated on a paved street or highway which has been built to standards prescribed by a unit of local government in which the subdivision is located and be acceptable to that local unit. If the street or highway is not complete, the developer must post a bond or other surety acceptable to the municipality or county in the full amount of the cost of completing the street or highway to assure its completion to local standards. For the purposes of this exemption, paved means concrete or pavement with a bituminous wearing surface that is impervious to water, protects the base and is durable under the traffic load and maintenance contemplated.

(iv) The unit of local government or a homeowners' association must have accepted or be obligated to accept the responsibility for maintaining the street or highway upon which the lot is situated. The obligation of the local government entity to accept this responsibility may be evidenced by an ordinance which binds the government to maintain the streets or by a written statement signed by the appropriate government official. Maintenance independently provided by a developer is not acceptable under this exemption.

In any case in which a homeowners' association has accepted or is obligated to accept maintenance responsibility, the developer must, prior to a purchaser signing a contract or agreement to purchase, provide the purchaser with a good faith written estimate of the cost of maintenance over the first ten years of ownership. A good faith estimate means a current estimate based on documentary evidence, usually obtainable from the suppliers of the necessary services.

(v) At the time of closing, potable water, sanitary sewage disposal, and electricity must be extended to the lot or the unit of local government must be obligated to install the facilities within 180 days following closing.

The obligation may be in the form of a local statute or written agreement signed by the appropriate government authority. A local code or statute that obligates the subdivider or developer to complete installation of water and sewage disposal systems within a certain time does not satisfy this requirement of the exemption.

For subdivisions that will not have a central water system, there must be assurances that an adequate potable water supply is

available year-round to service the subdivision. Assurances of an adequate, drinkable water supply can be obtained from a hydrologist or the local health department.

For subdivisions that will not have a central sewage disposal system, there also must be assurances that each lot is approved for the installation of a septic tank. If the individual lot is not approved for the installation of a septic tank at time of sale, the developer may provide in the contract that approval will be obtained prior to closing provided that any purchaser deposits and/or payments are placed in an escrow account with an institution having trust powers in the jurisdiction where the subdivision is located. All such monies must be refunded to the purchaser if the approval is not obtained prior to closing. Closing must occur within 180 days. The approval for the installation of a septic tank must come from the appropriate government authority, usually the local health department, local governmental engineer or county sanitarian. Developers selling lots prior to obtaining approval for installation of a septic tank on the individual lot are proceeding at their own risk. The sale will not qualify for the exemption if the approval is not obtained and the closing does not occur within 180 days.

(vi) The contract of sale must require delivery of a warranty deed to the purchaser within 180 days after the signing of the sales contract. The deed must be free from monetary liens and encumbrances at the time of delivery. If a warranty deed is not commonly used in the jurisdiction where the lot is located, a deed or grant that warrants that the seller has not conveyed the lot to another person may be delivered in lieu of a warranty deed. The deed or grant used must also warrant that the lot is free from encumbrances made by the seller or any other person claiming by, through or under the seller.

(vii) At the time of closing, a current title insurance binder, policy or title opinion reflecting the condition of title must be issued or presented to the purchaser showing that, subject only to exceptions which are approved in writing by the purchaser at the time of closing, marketable title to the lot is vested in the seller. In order to satisfy this requirement, a developer may want to obtain the purchaser's written approval of exceptions to title prior to closing, although the actual title binder, policy or opinion must be current at the time of closing and show that title is vested in the seller. If closing occurs and the purchaser has not approved the exceptions to title in writing, the sale would not be exempt under this provision. The party that bears the cost of the title binder, policy or opinion is not relevant to eligibility for the exemption. Unless otherwise defined by state law, the time of closing is the date that legal title to the property is transferred from seller to buyer.

(viii) The purchaser or purchaser's spouse must make a personal, on-the-lot inspection of the lot purchased prior to signing a contract or agreement to purchase.

(f) Mobile home exemption. (15 U.S.C. 1702(b)(6) and 24 CFR 1710.11)

For purposes of this exemption, a mobile home is a unit receiving a label in conformance with HUD Regulations implementing the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C. 5401, et seq.).

This section exempts the sale of a mobile home lot from the registration requirements of the Act when all eligibility requirements listed below are met:

(1) The lot is sold as a homesite by one party and a mobile home is sold by another party, and the individual contracts of sale:

(i) Obligate the sellers to perform, contingent upon the other seller carrying out its obligations, so that a completed mobile home will be placed on a completed homesite within two years after the date the purchaser signs the contract to purchase the lot (see part IV(b) of these guidelines for HUD's position on two year completion requirements);

(ii) Provide that all funds received by the sellers are to be deposited in escrow accounts independent of the sellers until the transactions are completed;

(iii) Provide that funds received by the sellers will be released to the buyer upon demand if either of the sellers do not perform; and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(iv) Contain no provisions that restrict the purchaser's right to specific performance under state law.

(2) The homesite is developed in conformance with all local codes and standards, if any, for mobile home subdivisions.

(3) At the time of closing:

(i) Potable water and sanitary sewage disposal are available to the homesite and electricity has been extended to the lot line:

(ii) The homesite is accessible by roads;

(iii) The purchaser receives marketable title to the lot; and

(iv) Other common facilities represented in any manner by the developer or agent to be provided are completed or, in the alternative, there are letters of credit, cash escrows or surety bonds in a form acceptable to the local government in an amount equal to 100 percent of the estimated cost of completion. Corporate bonds are not acceptable for purposes of the exemption.

(g) Intrastate Exemption. (15 U.S.C. 1702(b)(7) and 24 CFR 1710.12).

This section exempts the sale or lease of real estate in a sales operation that is intrastate in nature. The lot must be free and clear of all liens, encumbrances and adverse claims. The following six eligibility requirements must be met before a lot qualifies for this exemption:

(1) The sale of lots in the subdivision after December 20, 1979, must have been and must continue to be restricted solely to residents of the state in which the subdivision is located, unless the sale is exempt under 24 CFR 1710.5, 1710.11 or 1710.13. Sales of lots exempt under §1710.5, §1710.11 or § 1710.13 may be to out-of-state purchasers without affecting the eligibility of the overall subdivision for the intrastate exemption. Any other sales to out-of-state purchasers, even if the lots were registered or otherwise exempt under any other section, would make the entire subdivision ineligible for the intrastate exemption.

Residency is determined by state law. For purposes of this exemption, a developer may rely on a statement signed by the purchaser or lessee as to the state of residence. Obviously, the prospective purchaser must be an actual resident of the state at the time of signing the sales contract as opposed to a person visiting the state or planning to move into the state. However, service personnel **13607** may, at their option, claim the state in which they are stationed.

(2) The purchaser or purchaser's spouse must make a personal on-the-lot inspection of the lot to be purchased before signing a contract. Evidence of this inspection should be retained by the developer.

(3) Each contract must:

(i) Specify the developer's and purchaser's responsibilities for providing and maintaining roads, water and sewer facilities and any existing or promised amenities. If the developer is not responsible for providing or completing a particular service or amenity, the contract should make it clear that it is up to the buyer to make the necessary arrangements for the desired services. If a third party is involved, the contract must specify whether the buyer or seller is responsible for making the required arrangements;

(ii) Contain a good faith estimate of the year in which the roads, water and sewer facilities and promised amenities will be completed.

This estimate is required for any facility the developer promises or indicates will be completed. Estimates should be based on

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

documentary evidence, such as contracts, engineering schedules or other evidence of commitments to complete the facilities and amenities; and

(iii) Contain a non-waivable provision giving the purchaser the right to revoke the contract until at least midnight of the seventh calendar day following the date the purchaser signed the contract. This revocation right cannot be restricted to a specific method of notification such as requiring notification to be in writing. If the purchaser is entitled to a longer revocation period by operation of state law, that period automatically becomes the Federal revocation period and the contract must reflect the longer period. If the purchaser revokes the contract during this "cooling-off period," he or she is entitled to a full refund of all money paid.

(4) The lot being sold must be free and clear of all liens, encumbrances and adverse claims. To remain exempt, the real estate must remain free and clear of all liens, encumbrances and adverse claims, with the exception of those placed on the property by the purchaser. Thus, real estate that is sold under a installment contract prior to conveyance by deed cannot be burdened by a lien and still qualify for the exemption. If a lien is placed on the property, the exemption is automatically terminated at the time the lien is perfected.

The fact that a title company will insure against a lien, encumbrance or adverse claim has no bearing in determining whether or not the sale qualifies for the exemption. Except as noted below, the existence of a lien, encumbrance or adverse claim disqualifies the affected lot or lots for this exemption. The only exceptions to this requirement are listed below:

(i) Mortgages or deeds of trust containing release provisions for the individual lot purchased if:

(A) The contract of sale obligates the developer to deliver a free and clear warranty deed or its equivalent under local law within 180 days (constructive delivery is acceptable); and

(B) The purchaser's payments are deposited in an escrow account independent of the developer until a deed is delivered. The escrow account must be with an institution which has trust powers or in an established bank, title insurance, abstract or escrow company that is doing business in the jurisdiction in which the property is located. The purchaser's earnest money payment or any other payment by the purchaser cannot be used to obtain a release from the mortgage and may not be released from escrow until the deed is delivered.

(ii) Liens that are subordinate to the leasehold interest and do not affect the lessee's right to use or enjoy the lot.

(iii) Property reservations that are for the purpose of bringing public services to the land being developed, such as easements for water and sewer lines.

Other acceptable property reservations are easements for roads and electric lines to serve the subdivision as well as certain drainage easements. The reservation of subsurface oil, gas or mineral rights is acceptable unless the reservation expressly or impliedly includes the right of ingress and egress upon the property. Examples of the types of reservations and easements that are unacceptable and disqualify the burdened property for the exemption include easements for high power transmission lines, telephone long lines, pipelines and bridle trails.

(iv) Taxes or assessments which constitute liens before they are due and payable if imposed by a state or other public body having authority to assess and tax property or by a property owners' association.

(v) Beneficial property restrictions that are mutually enforceable by all lot owners in the subdivision.

Developers who wish to maintain control of a subdivision indefinitely through a Property Owners' Association, Architectural Control Committee, and/or restrictive covenants will find the requirements of this exemption unsuitable.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

In recognition of the fact that developer control is unavoidable until lots are sold, for the purpose of this exemption, a developer must provide an opportunity for the transfer of control to all lot owners at or before the time when the developer no longer owns a majority of total lots in, or planned for, the subdivision. Relinquishment of developer control must require affirmative action, usually in the form of an election based upon one vote per lot.

The developer may continue to participate in the control of the subdivision to the extent that lots remain unsold. For example, a developer who still owns thirty percent of the lot inventory has a thirty percent voting block on issues regarding the subdivision.

It is acceptable for the developer to appoint, during the initial stages of development, a governing body (panel, commission, etc.) whose members subsequently are elected and re-elected by all the lot owners to administer subdivision control.

To be enforceable, restrictions must be part of a general plan of development. Restrictions, whether separately recorded or incorporated into individual deeds, must be applied uniformly to every applicable lot or group of lots. To be considered beneficial and enforceable, any restriction or covenant that imposes an assessment on lot owners must apply to the developer on the same basis as other lot owners.

(vi) Reservations contained in United States land patents and similar Federal grants or reservations are excepted from the term "liens" but must be disclosed in the Intrastate Exemption Statement.

Many of the land patents by which land west of the Mississippi River was originally conveyed contain reservations to the United States for minerals and water rights-of-way for canals and ditches. These reservations as well as any other Federal grants or reservations must be disclosed but are not disqualifying factors.

(5) Before the sale the developer must disclose in a written statement (see sample below) to the purchaser all liens, reservations, taxes, assessments and restrictions applicable to the lot purchased. The developer must obtain a written receipt from the purchaser acknowledging that the statement required by this subparagraph was delivered.

Neither the statement nor the written receipt have to be submitted to HUD, but copies of the purchaser receipts should be available for review upon demand by the Secretary or his or her designee. It is suggested that the developer retain the purchaser receipts for at least three years.

(6) The written statement (see sample below) also must include good faith cost estimates for providing electric, water, sewer, gas and telephone service to the lot. Estimates must include all costs associated with obtaining the services. For example, if private wells are the water source, the estimate should include the cost of the well, pump, casing, etc. Likewise, if butane or propane gas is used, the statement must include the cost of installing a tank and the per gallon cost of the gas.

The estimates for services applicable to unsold lots must be updated every two years or more frequently if the developer has reasons to believe that at least a $100 increase or decrease for a particular item has occurred. The dates on which the estimates were made must be included in the statement.

Effective state property reports or disclosure statements containing all the information required in the Intrastate Exemption Statement may be used in lieu of a separate statement. State property reports which do not contain all the information required in the Intrastate Exemption Statement may be used only of they are supplemented with the missing information.

Sample Intrastate Exemption Statement

*Intrastate Exemption Statement*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Name of Developer

Address

Name of Subdivision

Location

***13608** *Liens*

(Provide a clear and concise listing of all liens on the property. As used in this statement, liens are security interests such as mortgages or deeds of trust, tax liens, mechanics liens or judgments. Liens which are acceptable for purposes of the exemption are those which contain release provisions for the individual lot purchased but only if the contract of sale obligates the developer to deliver a deed within 180 days and the purchaser's payments are held in an independent escrow account until a deed is delivered and, in the case of leases, liens which are subordinate to the lease hold interest and do not affect the lessee's right to enjoy or use the lot.) A chart similar to the following may be used:

| Type of lien | Amount of lien | Lots subject to lien. |
| --- | --- | --- |
|  |  |  |

*Reservations*

(Disclose all easements and reservations affecting the lots that are offered for sale. The preceding narrative contains examples of easements and reservations which are acceptable.)

*Taxes*

(Provide sufficient information to enable a purchaser to estimate the annual taxes due on the lot purchased.)

*Assessments*

(Disclose all assessments, fees and dues that have been imposed or may be imposed. The list of assessments, fees and dues must show the rates and amounts and explain who has the authority for imposing the listed assessments, fees and dues.)

*Restrictions*

(Recite verbatim all restrictions that apply to the lots being offered. In the alternative, the developer may attach a complete copy of all restrictions affecting the lots. If the restrictions do not apply to all the lots in the offering, the developer should specify which lots are affected by the restrictions. In addition, the developer should explain who has the authority to enforce the restrictions and indicate whether or not the restrictions are recorded.)

*Utility Cost Estimates*

(Disclose a good faith estimate of the cost to the purchaser of providing water, electric, telephone, sewage disposal and gas service to each lot offered under the exemption. The estimate must include all costs associated with obtaining the services.) A

chart similar to the following may be used.

| Lot No. | Water | Electric | Telephone | Sewage disposal | Gas |
|---------|-------|----------|-----------|-----------------|-----|
|         |       |          |           |                 |     |

Under each heading list the estimated cost to the purchaser and the date the estimate was made.

I affirm that to the best of my knowledge the above information is accurate and complete.

 (Signature of Developer or Authorized Agent)

 (Date)

 (Title)

*Purchaser's Acknowledgement*

(The developer must obtain a written receipt from the purchaser acknowledging that the purchaser received a written statement(s) of all liens, reservations, taxes, assessments and restrictions applicable to the lot and good faith estimates of the cost of providing electric, water, sewer, gas and telephone service to the lot.)

The receipt may be in the following form:

*Sample Receipt*

I acknowledge that I have received an Intrastate Exemption Statement listing all liens, reservations, taxes, assessments, restrictions and estimates of utility costs applicable to (identify the subdivision and its location) from (name of developer). I have made a personal on-the-lot inspection of (identify the lot), which is the lot I am interested in buying or leasing.

 (Signature of Purchaser)

 (Date)

(h) Metropolitan Statistical Area (MSA) Exemption. (15 U.S.C. 1702(b)(8) and 24 CFR 1710.13).

This section exempts the sale or lease of lots in a subdivision located in a Metropolitan Statistical Area (MSA). The eligibility criteria for the MSA Exemption are the same as that of the Intrastate Exemption with the following exceptions:

(1) The subdivision must have contained fewer than 300 lots on and since April 28, 1969, and continue at or below that quantity in the future;

(2) The lot(s) must be located in a MSA as defined and designated by the U.S. Office of Management and Budget;

(3) The principal residence of each purchaser must be within the same MSA;

(4) Adverse claims that are disqualifying for the Intrastate Exemption are acceptable for the MSA Exemption. The only re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

quirement in this regard is for the adverse claim to be disclosed in the MSA Exemption Statement. The party making the claim, the basis of the claim and the property affected by the claim must be identified; and

(5) Although the MSA exemption is self-determining, a written affirmation must be submitted by developers relying on this exemption. The due date is January 31 of each year. Failure to submit the affirmations will disqualify the subdivision for this exemption. The written affirmation must be in the following format: Affirmation

Developer's Name

Developer's Address

Purchaser's Name(s)

Purchaser's Address(es) (including county)

 Name of Subdivision

Legal Description of Lot(s) Purchased

24 CFR § 1710.13

I hereby affirm that all of the requirements of the MSA exemption as set forth in 15 U.S.C. 1702(b)(8) and 24 CFR 1710.13 have been met in the sale or lease of the lot(s).

I also affirm that I submit to the jurisdiction of the **Interstate Land Sales Full Disclosure Act** with regard to the sale or lease cited above.

 (Date)

 (Signature of Developer or Authorized Agent)

(Title)

The sample Intrastate Exemption Statement shown above may be used as a guide in preparing the MSA Exemption Statement. Simply substitute references to the MSA Exemption in lieu of references to the Intrastate Exemption and add a provision for disclosure of "Adverse Claims" after the discussion of "Restrictions" and before the caption "Utility Cost Estimates".

*Part VI—Regulatory Exemptions From Registration Requiring No HUD Determination—(24 CFR 1710.14)*

(a) General.

The Secretary has established several regulatory exemptions from the registration and full disclosure requirements of the Act (i.e., filing a Statement of Record and furnishing a Property Report). These exemptions are self-determining and do not require a submission to HUD.

To qualify, a developer must satisfy the eligibility criteria at all times. Exempt status ends when a developer fails to immediately comply with the eligibility criteria. Furthermore, if there are reasonable grounds to believe that the use of any of these regulatory exemptions is not in the public interest in a particular case, the Secretary may deny the use of the exemption by an

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

otherwise eligible subdivision, site or lot. The developers will be given notice and an opportunity for hearing before a final determination is made. Proceedings under this provision follow the requirements set forth in the regulations (24 CFR 1720.105, et seq.) and are patterned after the notice and **13609 time requirements of a proceeding pursuant to 24 CFR 1710.45(b)(1).

If a sale meets any one of the following requirements, it qualifies for exemption from the registration requirements of the Act. However, qualifying sales must comply with the anti-fraud provisions.

(b) Eligibility Requirements.

(1) Inexpensive Lots (24 CFR 1710.14(a)(1))

The sale or lease of a lot for less than $100, including closing costs, is exempt if the purchaser or lessee is not required to purchase or lease more than one lot. This exemption is available on a lot-by-lot basis. The entire subdivision need not qualify.

(2) Leases for Limited Duration (24 CFR 1710.14(a)(2))

The lease of a lot for a term of five years or less is exempt if the terms of the lease do not obligate the lessee to renew. This exemption is available on a lot-by-lot basis. The entire subdivision need not qualify.

The use of an arrangement that is called a lease but is tantamount to the sale or long-term lease of a lot would not qualify for this exemption; i.e., a lease with a large initial payment or substantial payments over five years and token payments thereafter.

A five-year lease with an option to purchase or renew would be suspect under this exemption and might or might not qualify depending on the overall transaction. In these cases, a request for an Advisory Opinion is strongly recommended.

(3) Lots Sold to Developers (24 CFR 1710.14(a)(3))

The sale or lease of lots to a person who is engaged in a bona fide land sales business is exempt. For a transaction to qualify for this exemption, the purchaser must be a person who plans to subsequently sell or lease the lot(s) in the normal course of business. The term business refers to an activity of some continuity, regularity and permanency, or means of livelihood. The sale or lease of lots to an individual who is buying the property for investment, to be sold at some unforeseeable time in the future, would not be exempt under this provision. This exemption is available on a lot-by-lot basis, although most transactions would include more than one lot. The entire subdivision need not qualify.

(4) Adjoining Lot (24 CFR 1710.14(a)(4))

The sale or lease of a lot to a purchaser who owns a contiguous lot that has a residential, commercial, or industrial building on it is exempt. This exemption permits a developer to sell or lease unimproved lots to persons wishing to enlarge the property on which their home or business is located. This exemption is available on a lot-by-lot basis.

(5) Lot Sales to a Government (24 CFR 1710.14(a)(5))

The sale or lease of real estate to a government or government agency is exempt. This exemption is available on a lot-by-lot basis. The entire subdivision need not qualify.

(6) Sales of Leased Lots (24 CFR 1710.14(a)(6))

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The sale of a lot or lots on which the purchaser has maintained his or her primary residence for at least one year is exempt. Typically, these sales will occur in a mobile home subdivision. This exemption is available on a lot-by-lot basis. The entire subdivision need not qualify.

(c) Termination.

If HUD has reasonable grounds to believe that exemption from registration in a particular case is not in the public interest, HUD may terminate the exemption as to a subdivision or as to particular lots in a subdivision. Termination could be ordered only after the developer is notified of HUD's intention to terminate and is afforded a hearing opportunity. The reasons for termination will vary from case to case but could include unlawful sales practices by the developer or its agents, insolvency or adverse information about the lots or the subdivision that should be disclosed to purchasers.

*Part VII—Regulatory Exemption HUD Determination Required—(24 CFR 1710.16)*

An Exemption Order is available for a subdivision or certain lots in a subdivision that technically do not comply with the eligibility requirements of one of the other available exemptions. However, to qualify for an Exemption Order, the offering must substantially comply with the eligibility requirements.

In evaluating the circumstances of an Exemption Order request, HUD examines the basic intent and legislative history of the exemption that the developer claims to substantially meet. If the offering is not consistent with the basic intent, an Exemption Order will not be issued even though some of the technical requirements of that exemption are met.

Offerings that involve circumstances that are equal to or better than the technical requirements, or that are consistent with the basic intent of the exemption, will be judged to be in substantial compliance and an Exemption Order will be issued. It should be noted that an Exemption Order applies only to sales after the date of the Order and has no retroactive effect. This is the only exemption that requires submission of a request and a determination by HUD before it is effective. Developers wishing to request an Exemption Order must submit the information listed below:

(a) A detailed statement describing how the proposed sales of lots meet, or substantially meet, each of the eligibility requirements of the exemption that the developer claims to substantially meet.

(b) A copy of the contract to be used. The contract must:

(1) Specify the developer's and purchaser's responsibilities for providing and maintaining roads, water and sewer facilities and any existing or promised amenities. If the developer is not responsible for providing or completing a particular service, the contract should make it clear that it is up to the buyer to make the necessary arrangements for desired services; and

(2) Contain a good faith estimate of the year in which the roads, water and sewer facilities and promised amenities will be completed. This estimate is required for any facility the developer promises or indicates will be completed. Estimates should be based on documentary evidence, such as contracts, engineering schedules or other evidence of commitments to complete facilities and amenities; and

(3) Contain a non-waivable provision giving the purchaser the opportunity to revoke the contract until at least midnight of the seventh calendar day following the date the purchaser signed the contract. If the purchaser is entitled to a longer revocation period by operation of state law, that period becomes the Federal revocation period and the contract must reflect the requirements of the longer period; and

(4) Contain a provision that obligates the developer to deliver to the purchaser within 180 days of the date the purchaser signed the sales contract, a warranty deed, or its equivalent under local law, which at the time of delivery is free from any

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

61 FR 13596-01, 1996 WL 134613 (F.R.)                                                                        Page 36

monetary liens or encumbrances.

(c) A plat of the entire subdivision with the lots subject to the exemption delineated.

(d) A description of how the lots have been and will be promoted and to which population centers the promotion has been and will be directed.

(e) Documentation to establish that each purchaser or purchaser's spouse will make an on-the-lot inspection of the lot to be purchased before the contract is signed.

(f) A filing fee in the amount set forth in §1710.35(c) in the form of a certified check, cashier's check or postal money order made payable to the U.S. Treasury.

If, after an Exemption Order has been issued, HUD has reasonable grounds to believe that the exempt status of the subdivision or individual lots is not in the public interest, the Exemption Order may be terminated. Such an action would be preceded by a notice giving the developer an opportunity to request a hearing on the allegations leading to termination. For example, proceedings may be initiated because of the apparent omissions or misrepresentations in the information upon which the Exemption Order was based, the unethical conduct of the developer or the developer's agent or the presence of adverse conditions at or about the real estate which should be brought to the attention of purchasers by way of a disclosure document.

Some examples of substantial compliance are listed below. These are examples only and presume that all other applicable eligibility requirements of the exemption are either fully met or substantially met. It should be remembered that substantial compliance can occur with virtually any of the twenty-two available exemptions.

(1) One of the eligibility requirements for the Single-Family Residence Exemption is that the lots be zoned as single-family residential or, in the absence of a zoning ordinance, restricted to single-family residence development by enforceable covenants or restrictions. As stated before, the phrase "* * * in the absence of a zoning ordinance * * *" is interpreted in its most literal sense. Therefore, the existence of any zoning ordinance other than single-family **13610** residence zoning is a disqualifying factor for the exemption.

However, substantial compliance would be considered if a different zoning ordinance existed and the enforceable covenants or restrictions limited development to single-family residences.

(2) Another eligibility requirement for the Single-Family Residence Exemption states that, at the time of closing, potable water, sanitary sewage disposal and electricity must be extended to each lot or the unit of local government must be obligated to install these facilities within 180 days following closing.

Substantial compliance with this provision would be considered in those cases where one or more of these utilities is not available but the developer has a contract with a publicly regulated utility to install the facilities within 180-days following closing or upon demand of the purchaser.

Furthermore, substantial compliance would be considered if the utility trunk lines are "reasonably close" to the lots instead of at each lot line.

(3) An eligibility requirement for the Intrastate Exemption is that the lot sold must be free and clear of all liens, encumbrances and adverse claims. Mineral reservations have been deemed to be acceptable so long as the reservation does not include the right of ingress or egress upon the property. If the right of ingress or egress exists, substantial compliance will be considered if there are written, recorded provisions from the owner(s) of the mineral rights for compensating the lot owner for loss of the use or enjoyment of the property when such rights are exercised.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Part VIII—Advisory Opinion—Secretary's Opinion May Be Requested—(24 CFR 1710.17)*

(a) General

When it is not clear that an offering is either exempt under the self-determined statutory or regulatory provisions or whether jurisdiction exists, an Advisory Opinion may be requested to clarify the situation. The filing requirements are found in 24 CFR 1710.17 of the regulations and are described in (b) and (c) below.

The material to be submitted with all requests for Advisory Opinions is described under (b) below. In most cases, depending on the provision under which an exemption is claimed, additional documentation is needed before an opinion can be given. Review (c) below to determine what additional documentation is customarily needed before submitting a request.

HUD's Advisory Opinions are based upon and limited to the representations made by the developer. Therefore, if a favorable Advisory Opinion is issued based upon incomplete, improper or incorrect representations, the Opinion has no binding effect.

(b) Basic Requirements For Submission

(1) A filing fee in the amount required by §1710.35(c) in form a certified check, cashier's check or postal money order made payable to the U.S. Treasury.

(2) A comprehensive description of the conditions and operations of the offering. Specify the provision(s) of the Act or regulations under which sales are believed to be exempt or why there is no jurisdiction.

(c) Additional Requirements For Submission

Depending on the provision under which an exemption is claimed, a developer may be required to submit additional information. Beginning with the exemption under 24 CFR 1710.5(a) of the regulations and ending with 24 CFR 1710.14, the additional information that should be submitted with a request for an Advisory Opinion is listed below. In some cases, information or documentation other than that specified may be requested after a submission has been reviewed by HUD.

(1) To obtain an Advisory Opinion pertaining to 24 CFR 1710.5(a), the "25 lot" exemption, submit a plat of the subdivision. Submit a listing of any other properties in which the developer has an interest and the geographic relationship of those properties to the subdivision for which the exemption is claimed. If other properties are divided or proposed to be divided, indicate the total number of lots planned. Indicate those properties which will be offered by the same sales personnel or through the same sales office as the subdivision for which the exemption is claimed. Describe how the lots are marketed, i.e., who sells the lots, how the lots are advertised, whether prospective purchasers are referred between subdivisions, etc.

(2) To obtain an Advisory Opinion pertaining to 24 CFR 1710.5(b), the "improved lot" exemption, submit a copy of the contract of sale or lease and an opinion of local counsel with respect to whether the contract meets the exemption's requirements under the law in the jurisdiction in which the subdivision is located.

(3) To obtain an Advisory Opinion pertaining to 24 CFR 1710.5(c), the "evidences of indebtedness" exemption, describe the security arrangement and submit a copy of the evidence of indebtedness.

(4) To obtain an Advisory Opinion pertaining to 24 CFR 1710.5(d), the "securities" exemption, no additional documentation is customarily required to be submitted with the request.

(5) To obtain an Advisory Opinion pertaining to 24 CFR 1710.5(e), the "government sales" exemptions, specify the govern-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment agency selling the property and submit the enabling legislation.

(6) To obtain an Advisory Opinion pertaining to 24 CFR 1710.5(f), the "cemetery lots" exemption, no additional documentation is customarily required to be submitted with the request.

(7) To obtain an Advisory Opinion pertaining to 24 CFR 1710.5(g), the "sales to builders" exemption, submit specific information showing that the purchaser or lessee is engaged in the business of building or is acquiring the real estate for resale or lease to a builder.

(8) To obtain an Advisory Opinion pertaining to 24 CFR 1710.5(h), the "industrial or commercial development" exemption submit a plat and supporting documentation, including a copy of the instrument containing the purchaser or lessee affirmation and evidence of the zoning or, in the absence of zoning, restrictive covenants.

(9) To obtain an Advisory Opinion pertaining to 24 CFR 1710.6, the " **100 lot**" **exemption**, submit a plat of the subdivision. In addition, submit a listing of any other properties in which the developer has an interest and the geographic relationship of those properties to the subdivision for which the exemption is claimed. If other properties are divided or proposed to be divided, indicate the total number of lots planned. Indicate those properties that will be offered by the same sales personnel or through the same sales office as the subdivision for which the exemption is claimed. Describe how the lots are marketed, i.e., who sells the lots, how the lots are advertised, whether prospective purchasers are referred between subdivisions, etc.

(10) To obtain an Advisory Opinion pertaining to 24 CFR 1710.7, the "12 lot" exemption, submit a list of all lots sold under the same common promotional plan since June 20, 1980. (Review Part II(b) of these Guidelines for an explanation of common promotional plan.) Indicate the date of each sale. State whether the developer has been involved in the sale of any other real estate since June 20, 1980 and indicate how it is intended that future sales will be restricted.

(11) To obtain an Advisory Opinion pertaining to 24 CFR 1710.8, the "scattered sites" exemption, submit a plat of the site and list the name and geographic location of all other properties in which the developer has an interest. State the extent of the developer's interest.

(12) To obtain an Advisory Opinion pertaining to 24 CFR 1710.9, the "20 acre lots subdivision" exemption, submit a plat of the subdivision with the acreage of each lot clearly delineated. In addition, substantiate that all lots offered under the same common promotional plan are greater than 20 acres in size and have been that size since April 29, 1969. Describe all properties in which the developer has an interest and the geographic relationship of such properties to the subdivision for which the exemption is claimed. Indicate those properties which will be offered by the same sales personnel or through the same sales office as the subdivision for which the exemption is claimed. Describe how the properties are marketed, i.e., who sells the lots, how the lots are advertised, whether purchasers are referred between subdivisions, etc.

(13) To obtain an Advisory Opinion pertaining to 24 CFR 1710.10, the "single-family residence" exemption, address each of the subdivision requirements and the eight lot requirements as set forth in Part V(e) of these Guidelines. For example, the developer should specifically state how the condition of title will be demonstrated, that the purchaser's approval of exceptions to title will be obtained prior to closing and that the purchasers will make a personal on-the-lot inspection prior to signing the contract. The submission should describe how the standards are being enforced by the local authorities. The submission must also describe the marketing and promotion of the subdivision.

The submission should be accompanied by documentation including a copy of the contract of sale and a copy of the state or **\*13611** local minimum standards. The documents submitted must include minimum standards for each of the eight areas listed in the regulations. The documentation should clearly show that the standards are being enforced and are not merely discretionary. If the developer states that the local authorities will take over responsibility for the roads, submit documentation evidencing that intent. If the developer represents that water is the purchaser's responsibility, submit a copy of the appropriate report assuring that an adequate year-around water supply is available. If septic tanks are to be used, submit a copy of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

61 FR 13596-01, 1996 WL 134613 (F.R.)

the approval for their installation and a statement of how approval will be obtained for each lot.

The above listing is not comprehensive. It is designed to give the developer an idea of the type of statements and documentation which will be requested before an opinion will be issued.

(14) To obtain an Advisory Opinion pertaining to 24 CFR 1710.11, the "manufactured home" exemption, identify who is selling the lot and who is selling the manufactured home. Submit a copy of the contracts to be used.

(15) To obtain an Advisory Opinion pertaining to 24 CFR 1710.12, the "intrastate" exemption, submit a copy of the contract of sale, the Intrastate Exemption Statement, the restrictive covenants, a statement of the status of mineral right ownership and the enabling document(s) of the Property Owners' Association or condominium association including the by-laws, if any. If sales have been made since December 20, 1979, submit a list of such sales with the purchaser's name, address at the time of sale, date of sale and lot number(s).

(16) To obtain an Advisory Opinion pertaining to 24 CFR 1710.13, the "MSA" exemption, submit a copy of the contract of sale, plat, and MSA Exemption Statement. If sales have been made, submit a list of such sales with the purchaser's name, address at the time of sale, date of sale and lot number(s).

(17) To obtain an Advisory Opinion pertaining to 24 CFR 1710.14(a)(1), the "inexpensive lots" exemption, submit a copy of the proposed promotional materials and the documents to be used in the sale.

(18) To obtain an Advisory Opinion pertaining to 24 CFR 1710.14(a)(2), the "limited term leases" exemption, submit a copy of the lease and other documentation relevant to the lease transaction.

(19) To obtain an Advisory Opinion pertaining to 24 CFR 1710.14(a)(3), which exempts sales of lots to developers, submit information to substantiate the claim that the purchaser is in the land sales business.

(20) To obtain an Advisory Opinion pertaining to 24 CFR 1710.14(a)(4), the "adjoining lot" exemption, submit a map showing the lot on which the purchaser owns a residential, commercial or industrial building and the lot to be purchased.

(21) To obtain an Advisory Opinion pertaining to 24 CFR 1710.14(a)(5), the "sales to government" exemption, name the Government entity and submit a copy of the legal document by which the entity was created or a document evidencing the governmental decision to purchase.

(22) To obtain an Advisory Opinion pertaining to 24 CFR 1710.14(a)(6), the "sales of leased lots" exemption, state the circumstances which the purchaser has lived on or will have lived on the lot for one year or more and submit a copy of the lease or other agreement entitling the purchaser to occupy the lot. State whether the purchaser is using the lot as his or her primary residence.

*Part IX—No-Action Letter—(24 CFR 1710.18)*

The availability of expanded regulatory exemptions has resulted in the exemption of most transactions which may previously have warranted the issuance of a No-Action Letter. Nevertheless, there may be instances when one or more sales or leases fall within the purview of the Act but do not qualify for an exemption, although the circumstances of the sales or leases may be such that no affirmative action is needed to protect the public interest and prospective purchasers.

In such instances, a No-Action Letter may be requested. The request should include a thorough explanation of the proposed transaction(s) and the facts and supporting documentation necessary to demonstrate that no affirmative action is needed in the particular situation. If a request for a No-Action Letter is based upon a belief that the offering is ineligible for an exemption

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

61 FR 13596-01, 1996 WL 134613 (F.R.)                                                      Page 40

due to a minor technicality, demonstrate how other provisions of the particular exemption are met. The issuance of a No-Action Letter will not affect any right or remedy that the purchaser may have under the Act, including the right to rescind a contract for a period of two years. A No-Action Letter simply signifies that HUD will not take any affirmative action to require registration. However, the issuance of a No-Action Letter does not preclude any future agency action which may become necessary because of new information or a change in the circumstances.

HUD's No-Action Letters are based upon and limited to representations made by the developer. Therefore, if a favorable No-Action Letter is issued based upon incomplete, improper or incorrect representations, the Letter has no binding effect.

In no event will a No-Action Letter be issued if the sale or lease has already occurred.

There is no prescribed format for requesting a No-Action Letter. Therefore, describe the circumstances as fully as possible following a general rule that too much information is better than too little. Upon review of the information submitted, additional clarification may be required to permit a final determination.

[FR Doc. 96-7280 Filed 3-26-96; 8:45 am]

BILLING CODE 4210-27-P

61 FR 13596-01, 1996 WL 134613 (F.R.)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.